Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
(214) 855-7500

COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03010-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. and NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendants. | § | |

## ADVISORS' TRIAL BRIEF

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COME NOW NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors,

L.P. (together, the "Advisors"), the defendants in the above styled and numbered Adversary

Proceeding, and file this their *Trial Brief*, respectfully stating as follows:

## I.    **SUMMARY**

1.    The Advisors' administrative claim is simple. Even though the Payroll Reimbursement Agreements required the Advisors to reimburse Highland for Highland's actual costs incurred for various employees, Highland in fact billed the Advisors for 20 employees who were not actually employees, and on account of whom Highland did not incur any actual costs. Highland, contractually obligated to manage the Advisors' contracts and accounts, then used its powers to pay itself for these non-existing employees out of the Advisors' funds, totaling almost $7.7 million in postpetition overpayments – all the while shirking its contractual obligations to ensure that such very overpayments did not occur. These are incontestable facts. Even Highland's own controller calculated the overpayments at $6.6 million on an annualized basis, in December 2020. When at the outset of the Bankruptcy Case, the Advisors had sought to change these amounts on a go-forward basis, Highland stood behind the automatic stay, informing the Advisors that the stay prevented the Advisors from modifying the reimbursement rates. Highland breached the Payroll Reimbursement Agreements and the Advisors are entitled to an administrative claim for the resulting damages.

2.    Highland also breached the Shared Services Agreements with the Advisors. First, it failed to provide legal and compliance services, despite the Advisors paying for the same. This led to $425,000 in cover damages. Second, Highland's own internal record demonstrates that Highland was not providing $1.3 million in legal services under the Shared Services Agreements, again despite actually billing the Advisors for the same and paying itself from the Advisors' funds. Third, Highland failed to properly adjust the reimbursement rates under the Payroll Reimbursement Agreements, a service which the Advisors contracted for and paid for under the Shared Services Agreements.

3. For similar reasons, Highland cannot recover on its breach of contract claims against the Advisors. Highland committed the first material breaches under each of the agreements. In particular, Highland refused to negotiate the reimbursement rates under the Payroll Reimbursement Agreements, as required by those agreements. And, Highland has failed to calculate how much should have been payable under all of the agreements in light of the greatly reduced headcount and services being provided. To the extent that the Advisors owe Highland any amounts under the Payroll Reimbursement Agreements and Shared Services Agreements, those amounts must be calculated in light of Highland's actual costs and should be offset against the Advisors' administrative claims.

## II. THE FACTS

### A. THE AGREEMENTS

4. The Advisors are registered investment advisors. They serve as the investment manager, either directly or indirectly, to a number of investment vehicles, including certain retail funds, regulated pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940. The Advisors provide investment advisory services to their Clients pursuant to written investment advisory agreements.

5. In order for the Advisors to provide the required services to their clients and to comply with various legal compliance requirements, the Advisors need the services of a number of employees. Some of these services and employees are highly specialized, while others are not. Thus, in order for the Advisors to be able to provide these services, they contracted with Highland for various so-called "front office," "middle office," and "back office" services. This was effectuated through four (4) written agreements at issue in this Adversary Proceeding.

6. On May 1, 2018, but effective as of January 1, 2018, HCMFA entered into that certain *Payroll Reimbursement Agreement* with Highland, while on the same date NexPoint (also

to be effective as of January 1, 2018) entered into its own, virtually identical *Payroll Reimbursement Agreement* with Highland (together, the "Payroll Reimbursement Agreements").

7. Under the Payroll Reimbursement Agreements, Highland made various of its employees "dual employees" with the Advisors, and the Advisors agreed to reimburse Highland for a percentage of each employee's costs (consisting generally of a percentage of compensation, including bonuses, paid by Highland to the employee). The details of the agreements are discussed below but, generally, each provides that these reimbursement amounts will be a monthly payment by each Advisor: $416,000 per month from HCMFA and $252,000 from NexPoint. Each of the Payroll Reimbursement Agreements has a schedule of employees attached to it, together with an allocated percentage of that employee's compensation per Advisor. For example, for Highland's provision of employee Cameron Baynard, HCMFA agreed to pay 29% of that employee's compensation, while NexPoint agreed to pay 9%. These percentages were prepared by Highland employees using a reasonable methodology to determine approximately how much of each employee's time was devoted to providing services to each of the Advisors.

8. Separately, on February 8, 2013, HCMFA entered into that certain *Second Amended and Restated Shared Services Agreement* with Highland, and, on January 1, 2018, NexPoint entered into that certain *Amended and Restated Shared Services Agreement* with Highland (together, the "Shared Services Agreements"). Unlike the Payroll Reimbursement Agreements, where Highland made its employees directly available to the Advisors, under the Shared Services Agreements Highland agreed to provide various services, using its employees, to the Advisors. Some of the services provided by Highland under the Shared Services Agreements included regulatory compliance, legal, facilities (office space, IT, etc.), book keeping, accounts payable, expense reimbursement, vendor management, and human resources.

9. Under its Shared Services Agreement, HCMFA agreed to pay Highland for the actual costs, at 100%, of the shared services provided by Highland, and an additional margin of 5%. Under its Shared Services Agreement, NexPoint was to pay a flat fee of $168,000 to Highland per month.

10. The Payroll Reimbursement Agreements and the Shared Services Agreements are executory contracts under the Bankruptcy Code. At no time did Highland move to assume or reject any of these agreements. Rather, Highland terminated the Shared Services Agreements effective as of February 28, 2021.

**B. HIGHLAND PAYING ITSELF FROM THE ADVISORS' FUNDS**

11. It is also important to note that it was Highland employees who, pursuant to the shared services they were providing, controlled the processing and payment of the Advisors' bills, including under the Payroll Reimbursement Agreements and the Shared Services Agreements themselves. These employees had access to the Advisors' bank accounts and caused the Advisors to pay each month under the Payroll Reimbursement Agreements from the Advisors' funds, without the involvement of any Advisor employee.

**C. OVERBILLING OF THE ADVISORS UNDER THE AGREEMENTS**

12. As noted, each of the Payroll Reimbursement Agreements contained a schedule of employees, a percentage of whose compensation each Advisor was responsible to reimburse Highland for. However, many of these employees were no longer employed by Highland as of the petition date and thereafter. This is simply because the employees resigned or were terminated, especially postpetition when Highland reduced its workforce. Thus, while each of the Payroll Reimbursement Agreements contains twenty-five (25) employees, twenty (20) of these employees were no longer employees at various points in time postpetition. Yet Highland continued to bill the Advisors for these 20 employees—in effect, the Advisors were paying the compensation of 20

employees who simply were no longer employees of Highland and who were not providing services to the Advisors. The Advisors were "reimbursing" Highland for costs and expenses that Highland simply no longer had. That is the core of the Advisors' overpayment claim under the Payroll Reimbursement Agreements.

13. In the end, and during the postpetition period, Highland billed HCMFA, and paid itself from HCMFA's funds, $4,928,103 for reimbursements for employees who simply were not there. Likewise, postpetition Highland billed NexPoint, and paid itself from NexPoint's funds, $2,721,839 for employees who were no longer there. Thus, the Advisors together overpaid Highland $7,649,942 during the postpetition period in reimbursements when Highland itself had no actual costs for these employees since they were no longer employees. Put another way, Highland was contractually obligated to monitor the Advisors' contracts and to advise the Advisors of undesirable or money-losing contracts; Highland breached that obligation when it chose not to so advise the Advisors where Highland itself was the counterparty; and Highland profited from the same in excess of $7 million.

14. The situation with the Shared Services Agreements is slightly difference in that the issue does not involve the payment for non-existing employees, but rather the payment for services that Highland was contracted to provide, paid itself from the Advisors' funds for providing, yet failed to provide to the Advisors. These services largely involved legal and compliance services, after Mr. Seery, the new CRO and CEO of Highland, instructed Highland's employees that they could not work on any matter that could be adverse to the interests of Highland (although there were other services which Highland failed to provide for different reasons). Here, the issue is simply a failure by Highland to provide what it contracted to provide and what the Advisors actually paid it to provide.

15.     This caused damages to the Advisors.  The Advisors were forced to employ two people full time, one to provide legal services and the other compliance services, resulting in the Advisors being forced to pay $425,000 in cover.  Separately, as will be discussed below, the Debtor's own internal records demonstrate that the Debtor was making a profit of $1 million on an annualized basis under the Shared Services Agreements, even though no such profit was provided for, except for a 5% margin.  Thus, the Advisors overpaid Highland on the Shared Services Agreements as well.

D.     **ADVISORS' ATTEMPTS TO MODIFY REIMBURSEMENT RATES**

16.     The Payroll Reimbursement Agreements provide that the monthly reimbursement amounts may be modified periodically based on the actual costs of the dual employees (such as which employees were even being used) and based on allocated percentages (if an employee was spending less time or more time working for an Advisor).  In late 2018, and consistent with its general practices to do an annual true-up and reconciliation for its contracts, Highland and the Advisors performed a true-up for amounts reimbursed under the Payroll Reimbursement Agreements for the year 2018 (and, to the extent that the agreements provide for a monthly true-up period, which provision is not exclusive, the parties modified such monthly review by doing it annually due to the burdens of performing the true-up every month).  As a result of this true-up, HCMFA paid Highland an *additional* $1,200,000, while NexPoint paid Highland an *additional* $1,300,000.

17.     In late 2019, and after Highland filed bankruptcy, Highland again began the process of a true-up under the Payroll Reimbursement Agreement.  At the same time, the Committee requested detailed information regarding the Payroll Reimbursement Agreements and the Shared Services Agreements.  Thus, Frank Waterhouse, at the time an officer of both Highland and each of the Advisors, reviewed the Payroll Reimbursement Agreements and noted that the Advisors

were overpaying by substantial amounts for reimbursements due to employees who were no longer there.

18.    Mr. Waterhouse did exactly as he should have done, both pursuant to prior practice, pursuant to the terms of the Payroll Reimbursement Agreements, and pursuant to the Shared Services Agreements under which, as noted above, Highland was to provide services to the Advisors to make sure that they were paying correct amounts under their contracts and accounts payable.  Next, and after he determined that there were sizable overpayments, he again did what he should have done: he discussed the overpayments with Fred Caruso, then the CRO of Highland, and with Highland's general counsel, and he requested that the reimbursement amounts be changed based on the lack of so many employees.

19.    In response, Mr. Caruso told Mr. Waterhouse that the automatic stay prevented a modification of the reimbursement amounts in the Payroll Reimbursement Agreements, a position that Highland's legal counsel confirmed.  Mr. Caruso informed Mr. Waterhouse that the matter would have to be addressed later, and that it would be addressed.  Mr. Waterhouse relied on these representations.  Nor was that the only time that the Advisors sought to modify the reimbursement amounts, as Mr. Dustin Norris, an officer of the Advisors, repeatedly discussed the matter with Highland's controller starting in late Summer or early Fall, 2020.  Each time the response from Highland was that the automatic stay applied but that the overpayments would be addressed as part of a then-contemplated global resolution between Highland, Mr. Dondero, and his related entities.

**E.    HIGHLAND'S ADMISSIONS OF OVERPAYMENTS**

20.    Beginning with Mr. Waterhouse's first discussion of the overpayments with Mr. Caruso, and continuing throughout 2020 with Mr. Norris and Mr. Klos, Highland repeatedly admitted that the Advisors were overpaying under the Payroll Reimbursement Agreements and,

later, were also paying for services under the Shared Services Agreement that Highland was no longer providing.

21. Most significantly, however, in December, 2020, Mr. Klos undertook an internal analysis at Highland, at the request of Mr. Waterhouse, to determine the profitability of the Payroll Reimbursement Agreements and Shared Services Agreements to Highland. As a professional accountant, and with full knowledge of the facts (and the one who originally populated the employee allocation percentages and lists of employees attached to the agreements), Mr. Klos calculated that the Advisors were overpaying under the Payroll Reimbursement Agreements by $6.6 million per year, and that Highland was making a $1 million annual gain on the Shared Services Agreements, despite those agreements' provision for only a 5% markup.

22. Indeed, Mr. Klos even wrote an e-mail in which he stated that, "given the changes in headcount . . . along with not paying insider bonus compensation, has increased the profitability of the contracts from HCMLP's perspective." Exactly. Except that the Payroll Reimbursement Agreements and Shared Services Agreements were not supposed to provide for a "profit" to Highland, and instead only a reimbursement (with the one exception for a 5% margin).

23. It is when these facts—the magnitude of the overpayments—came to light that the Advisors stopped paying on the Payroll Reimbursement Agreements and the Shared Services Agreements. The Advisors did not refuse to pay *all* amounts, but rather the inflated overpayment amounts, unless and until Highland did as the contracts require, which was to negotiate in good faith what the appropriate reimbursement and actual cost amounts should be. Highland never did that.

### III. <u>DISCUSSION</u>

#### A. <u>HIGHLAND'S BREACHES OF THE AGREEMENTS</u>

24.     The evidence will be incontestable that, postpetition, Highland was charging the Advisors, and the Advisors were paying Highland, for 20 employees who were not employees of Highland; *i.e.* the Advisors were reimbursing Highland for costs that Highland was not actually incurring.  The evidence will demonstrate that the amount of these overpayments is $7,649,942 postpetition.  Even Highland's own internal analysis, from December, 2020, demonstrated that the Advisors were overpaying by $6.6 million per year.  The question is whether this constituted a breach by Highland of the Payroll Reimbursement Agreements.

25.     The elements of a breach of contract are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach."  *Schlumberg Ltd. v. Ruherford*, 472 S.W. 881, 892 (Tex. App. – Houston [1st Dist.] 2015).  The Court's primary role in interpreting a contract is "to determine the parties' intent as reflected in the [contract's] terms."  *Chrysler Ins. Co. v. Greenspoint Dodge of Houston Inc.*, 297 S.W.3d 248, 252 (Tex. 2009).  "Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law."  *Id*.  "If the contract is capable of being given a definite legal meaning, parole evidence is generally not admissible to create an ambiguity."  *Kendziorski v. Saunders*, 191 S.W.3d 395, 405 (Tex. App. – Austin 2006).

26.     The fundamental question is what the Payroll Reimbursement Agreements required the Advisors to pay to Highland.  Highland now takes the position that the Payroll Reimbursement Agreements were not reimbursement agreements at all, but rather agreements that provided for a set amount of money to be paid by the Advisors to Highland irrespective of the provisions of the agreements.  Any such evidence will be inadmissible parole evidence, as the Payroll

Reimbursement Agreements are not ambiguous. They provide for the Advisors to reimburse Highland for the actual costs of the dual employees, which monthly amount is estimated in the agreements, but subject to modification by either party based on the actual costs incurred.

27.     Both of the Payroll Reimbursement Agreements contain the same operative provisions. The most important provisions are those governing reimbursement: "During the Term, HCMLP will seek reimbursement from HCMFA for the cost of certain employees who are dual employees . . . and who provide advice to registered companies advised by HCMFA under the direction and supervision of HCMFA." *See* Recital A. In fact, each Payroll Reimbursement Agreement references a "reimbursement" obligation at least ten (10) times.

28.     Section 2.01 of the Payroll Reimbursement Agreements provides as follows:

Employee Reimbursement. During the Term, HCMFA shall reimburse HCMLP for the Actual Cost to HCMLP of certain employees who (i) are dual employees of HCMLP and HCMFA and (ii) provide advice to any investment company . . . pursuant to an investment advisory agreement between HCMFA and such investment company.

29.     The Payroll Reimbursement Agreements define "Actual Cost" as follows:

Actual Cost means, with respect to any period hereunder, the actual costs and expenses caused by, incurred or otherwise arising from or relating to each Dual Employee, in each case during such period. Absent any changes to employee reimbursement, as set forth in Section 2.02, such costs and expenses are equal to $416,000 per month [and for NexPoint, $252,000 per month].

30.     Section 2.02 of the Payroll Reimbursement Agreements provides as follows:

Changes to Employee Reimbursement. During the Term, the Parties may agree to modify the terms and conditions of HCMFA's reimbursement in order to reflect new procedures or processes, including modifying the Allocation Percentage (defined below) applicable to such Dual Employee to reflect the then current fair market value of such Dual Employee's employment. The Parties will negotiate in good faith the terms of such modification.

31.     Section 4.02 of the Payroll Reimbursement Agreement provides as follows:

Determination and Payment of Cost. HCMFA shall promptly make payment of the Actual Cost within ten (10) days of the end of each calendar month. Should either

Party determine that a change to employee reimbursement is appropriate, as set forth in Section 2.02, the Party requesting such modification shall notify the other Party on or before the last business day of the calendar month.

32.     The Payroll Reimbursement Agreements are therefore straightforward.    The Advisors are to reimburse Highland for Actual Cost.   Unless Actual Cost is changed pursuant to section 2.02, Actual Cost is a predetermined monthly amount.   And, importantly, section 2.02 does not state *when* a change must be made, and it does not limit the change to a prospective, as opposed to a retrospective, amount; only that the modification be "during the term" and that the parties "will negotiate in good faith the terms of such modification."   This is exactly what the parties did at the end of 2018 when they retroactively did a "true-up" of Actual Cost for 2018 and the Advisors paid an additional $2.5 million to Highland.   And, while section 4.02 suggests that a prospective change must be requested before the end of any given month, nothing in that section makes that requirement exclusive, limits a retrospective modification, or controls section 2.02, which provides that the modification may be at any time during the term.

33.     Highland argues that the preset monthly amounts are controlling and that the Advisors failed to follow section 2.02 to change those monthly amounts, in effect waiving their abilities to change those amounts retroactively.   On that last point, however, the evidence will demonstrate the following.

(i)     First, in 2018, the parties agreed that a monthly true-up would be too burdensome and cumbersome and that, instead, Highland would perform an annual true-up at the end of each year, consistent with its custom and practice of truing-up and reconciling its contracts on an annual basis.   The parties did so on December 14, 2018 and agreed that the Advisors actually owed Highland *more* than the monthly amounts.   In fact, HCMFA paid Highland an additional $1.2 million and NexPoint paid Highland an additional $1.3 million, because the parties agreed, as part of the true-up, that the preset monthly amounts in the agreements did not provide accurate "reimbursement."

(ii)    Postpetition in late 2019, Frank Waterhouse, as officer of each of the Advisors and of Highland, again looking at an annual true-up and in response to inquiries made by the Committee, informed both Fred Caruso, Highland's CRO at the time, and

Highland's legal counsel, that the monthly amounts needed to be changed because the Advisors were by then overpaying Highland since many employees the subject of the agreements were no longer actually employed. Mr. Caruso and legal counsel, who were not officers or employees of the Advisors, informed Mr. Waterhouse that the automatic stay prevented the Advisors from changing the amounts or terminating the agreements, but that Highland would get to it and do a true-up later on in the case. Thus, the Advisors triggered section 2.02 of the Agreements but Highland did not, as required by that section, "negotiate in good faith the terms of such modification," instead submitting that the automatic stay prevented any modification. Mr. Waterhouse relied on this representation, especially as it was confirmed by Highland's legal counsel who, at the same time, was also the Advisors' legal counsel pursuant to the Shared Services Agreements. In other words, the Advisors tried, but were rebuked by Highland.

(iii)     The Advisors again sought to trigger section 2.02 in September and October, 2020. Dustin Norris, an officer of the Advisors, discussed the issue on multiple occasions with David Klos, the controller for Highland. Mr. Klos repeatedly acknowledged the fact of overpayments but informed Mr. Norris that Highland could not do anything about it at that time. In fact, Mr. Klos then prepared an internal calculation for Highland, in December, 2020, showing that Highland was making an annualized $6.6 million profit on the Payroll Reimbursement Agreements. Again, the Advisors tried, but were rebuked by Highland, which again did not "negotiate in good faith the terms of such modification," precisely because the agreements had become so profitable to Highland (even as Highland was otherwise informing the Court that the agreements were not profitable at all).

(iv)     Section 4.02 provides that, "[s]hould either Party determine that a change to employee reimbursement is appropriate . . ." Highland should have determined that such a change was appropriate. Under the Shared Services Agreements, Highland was providing services to the Advisors which included legal and payment services such that Highland was responsible to, on behalf of the Advisors, review bills before paying them and review contracts and bills to see whether they were appropriate, whether there were credits or savings to be had, and whether there were defenses to payment. The Advisors were paying Highland precisely to review the Payroll Reimbursement Agreements on a real-time basis to determine whether the Advisors were paying proper reimbursement amounts. Despite knowledge since late 2019 that the Advisors were overpaying, Highland did nothing, either honestly believing that the automatic stay applied or hiding behind the stay in light of the new profitability under the agreements.

34.     Accordingly, there was no waiver. On the contrary, the Advisors repeatedly tried to exercise their rights under section 2.02 to change the reimbursement amounts. And, it is Highland that breached the Payroll Reimbursement Agreements first, by charging for employees

who were not there, and second, by categorically failing or refusing to negotiate a modification to the monthly amounts in good faith.

35.     Importantly, as pointed out above, the Advisors were each paying Highland under the Shared Services Agreements to review and assist with accounts payable, accounting, legal, expense reimbursement, vendor management, and other services pursuant to which Highland should have been the one to raise the overpayment issue, the same as it would have done, and did, when reviewing third party invoices and bills.  This would have included checking to see whether correct amounts were being charged the Advisors prior to paying the Advisors' invoices with the Advisors' fuds.  It utterly failed to do this.  In this respect, Texas law is clear that on may not take advantage of another's delay in the performance of a contractual obligation when his own negligence has caused the delay.  *See, e.g., Collier v. Robinson*, 129 S.W. 389 (Tex. Civ. App. 1910) ("plaintiffs were excused from payment of the purchase price of the property within sixty days from the date of the contract, in the event only of a finding by the jury that they were prevented from so doing by the negligence of the defendants").  As explained by one court:

> It is settled law that one may not take advantage of, nor recover damages for, delays for which he is himself responsible, and that the time for performance is excused and a corresponding extension of time given where the delay is occasioned by the act or default of the party claiming the damages.

*Szanto v. Pagel,* 47 S.W.2d 632, 635 (Tex. Civ. App. – Austin 1932).

36.     Thus, not only is Highland's failure to take timely and appropriate action to correct the overpayments itself a breach of the Shared Services Agreements, but it also means that Highland cannot take advantage of any delay by the Advisors in enforcing their rights when that delay was occasioned by Highland's own negligence and breach of contract.

37.     The situation with the Shared Services Agreements is more straightforward: the Advisors contracted with Highland to provide various services, and they paid Highland for those

services, and Highland failed to provide those services. This gives rise to direct damages, which means the "restoration of the benefit of a plaintiff's bargain." *Signature Indus. Servs. LLC v. Int'l Paper Co.*, 2022 Tex. LEXIS 44 at *8 (Tex. 2022). Such damages include "cover" damages, meaning the costs incurred by the Advisors to replace the services that Highland failed to provide. *See Little Darling Corp. v. Ald, Inc.*, 566 S.W.2d 347, 349 (Tex. Civ. App. 1978) (where defendant failed to provide services required under contract, finding that plaintiff is entitled to additional sums paid to procure replacement services).

38.     Since Highland was not permitted a profit under the Shared Services Agreement and the amounts payable by the Advisors were the reimbursement for actual costs (except to the extent of a 5% margin), yet Highland itself calculated a $1 million annual profit, the damages for its breach of contract are $1,300,000, given the 13 months of payments by the Advisors under the Shared Services Agreements. The cover damages are $425,000, representing the cost to the Advisors of having to hire two employees to cover for the services that Highland was not providing (but for which the Advisors were nevertheless paying Highland in full).

**B.     ALLOWANCE OF CONTRACT DAMAGES AS ADMINISTRATIVE CLAIMS**

39.     Administrative expenses generally include "the actual, necessary costs and expenses of preserving the estate …." 11 U.S.C. § 503(b)(1)(a). However, the list of administrative expense claims set forth in section 503(b) is not exclusive or exhaustive. *In re Imperial Bev. Group, LLC*, 457 B.R. 490, 500 (Bankr. N.D. Tex. 2011) (citing various cases for the proposition that "the administrative expenses listed in the subsections of § 503(b)—preceded by 'including'—are not exclusive"); 11 U.S.C. § 102(3) ("In this title … 'includes' and 'including' are not limiting …."). Here, there is no question that Highland's breaches of the agreements were committed postpetition, and that the Advisors provided millions of dollars in value to Highland stemming from their overpayments. That is an administrative claim. *See, e.g., In re Nat'l Steel Corp.*, 316 B.R. 287,

300 (Bankr. N.D. Ill. 2004) ("[c]laims under § 503(b)(1)(A) are to be measured by the benefit received by the estate").

40.     Each of the Payroll Reimbursement Agreements and Shared Services Agreements were unexpired executory contracts, which Highland never assumed or rejected.  Postpetition, pre-rejection performance under an executory contract gives rise to an administrative expense claim. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services"); *In re MCS/Tex. Direct, Inc.*, 02-40229-DML-11, 2004 Bankr. LEXIS 379, *11-12 (Bankr. N.D. Tex. March 30, 2004) ("Even if the contract is rejected, the contract party is entitled to payment for postpetition value received by a debtor.").

41.     Similarly, a postpetition, pre-rejection breach of contract gives rise to an administrative expense claim.  *See In re United Trucking Serv.*, 851 F.2d 159, 162 (6th Cir. 1988) ("the damages under the breached lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were property accorded priority under § 503"); *Shapiro v. Meridian Auto. Sys. (Del.) (In re Lorro, Inc.)*, 391 B.R. 760, 766 (Bankr. E.D. Mich. 2008) ("the term 'administrative expense' has been construed to include claims based on tort, trademark infringement, patent infringement, and breach of contract") (citing, *inter alia*, *Reading Co. v. Brown*, 391 U.S. 471 (1968)).  And, as the Supreme Court confirmed in 1968, the "actual and necessary costs" or preserving the estate include, with respect to an operating debtor-in-possession, damages that the debtor causes from its operation of its business.  *See Reading Co. v. Brown*, 391 U.S. 471 (1968).

42.     It is incontestable that Highland received millions of dollars from the Advisors in exchange for which the Advisors provided no return consideration.  "In order to establish the

priority of an administrative claim, the claimant must demonstrate that the debt (1) arose out of a transaction with the debtor-in-possession and (2) benefitted the operation of the debtor's business." *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984). The measure of the administrative claim is "the benefit received by the estate rather than the costs incurred by a claimant." In *In re Nat'l Steel Corp.*, 316 B.R. 287 (N.D.Ill. 2004). Here, the benefit to the estate, of pure profit and free money where the only "work" Highland performed was to transfer the Advisors' money into its own pockets, totals in the millions of dollars.

43. In *Steel Corp.*, a creditor filed an administrative claim based on the debtor overcharging the creditor for steel. There, the bankruptcy court denied the creditor's administrative claim because, even though the debtor charged the creditor in excess of the agreed-upon contract, the creditor nevertheless received below-market steel, and the debtor did not fail to deliver the steel nor delivered defective steel or steel not made to specifications. *Id.* Notably, the contract price only *informed* the Court's decision, but did not control. Here, Highland did not deliver but benefitted greatly. Thus, while the contracts are informative and should guide the Court's ruling, it cannot be the end of the inquiry. Highland's contractual argument taken to its conclusion means that Highland would be contractually entitled to millions of dollars even if Highland provided the Advisors with *zero employees and zero services* – an absurd result that cannot stand in equity. In the end, Highland received free money well in excess of Highland's costs, every dollar of which benefitted its estate. That entitles the Advisors to an administrative claim to the extent services were not provided.

C.    **THE ADVISORS DID NOT WAIVE THEIR RIGHTS OR THEIR CLAIMS**

44.    As explained above, the Advisors did not waive their rights to change the amounts payable under the agreements.  On the contrary, they attempted to change those amounts shortly after bankruptcy and repeatedly thereafter, only to be informed by Highland that the automatic stay prevented any modification to the present amounts.

45.    Waiver is an affirmative defense on which Highland bears the burden of proof.  *See Zarate v. Rodriguez*, 542 S.W.3d 26, 40 (Tex. App. – Houston [14th Dist.] 2017).  "[W]aiver is the intentional relinquishment of a right actually or constructively known, or intentional conduct inconsistent with claiming that right.  The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right."  *Perry Homes v. Cull*, 258 S.W.3d 580, 602-03 (Tex. 2008) (internal citation omitted). There could have been no actual intent by the Advisors to waive their rights, and no intentional conduct inconsistent with those rights, when their officers attempted repeatedly postpetition to change the reimbursement amounts in the Payroll Reimbursement Agreements.

46.    Moreover, the Payroll Reimbursement Agreements expressly contain a no-waiver provision: "[n]o failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right."  Agreements at § 6.12.  This provision is fully enforceable under Texas law.  *See, e.g., Shields Ltd. P'ship v. Bradberry,* 526 S.W.3d 471, 481-82 (Tex. 2017) ("[g]iven Texas's strong public policy favoring freedom of contract, there can be no doubt that, as a general proposition, nonwaiver provisions are binding and enforceable").

47.    The evidence will therefore demonstrate that, despite repeated attempts by the Advisors to exercise their rights under section 2.02 of the Payroll Reimbursement Agreements,

Highland did not "negotiate in good faith the terms of such modification." This constituted a breach by Highland of section 2.02 of the agreements, in addition to its overall breach of the agreements by charging reimbursement amounts that it knew were well in excess of the actual costs it was incurring for its employees. That point should not be lost on the Court. Highland, despite having professional management and being a fiduciary in its bankruptcy case, charged the Advisors millions of dollars postpetition for employees who simply were not there, knowing that it was making a large profit on those agreements, and doing nothing about it and refusing to do anything about it once repeated efforts were made by the Advisors.

**D.      VOLUNTARY PAYMENT DOCTRINE DOES NOT APPLY**

48.      Highland argues that the voluntary payment doctrine prevents the Advisors from recovering their overpayments. Under the voluntary payment rule, "money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability." *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009). Here, the rule does not apply factually for at least two immediate reasons. First, the Advisors did not "voluntarily" make the overpayments; Highland employees, who were not Advisor employees, made the payments from the Advisors' funds pursuant to the shared services agreement. Second, the Advisors did not have knowledge of all of the facts because, even though they knew that certain employees were no longer there, they did not know that Highland was still billing them, and paying itself, for those employees. Again, it was all Highland employees doing the billing and the payments.

49.      Moreover, the voluntary payment rule does not apply to breach of contract claims. Historically, the voluntary payment rule was "a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a

defendant may respond with the voluntary-payment rule as a defense." See *BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2004). But "[a]lthough the voluntary-payment rule has been applied, at times, in both private and public contexts, other legal and statutory remedies have evolved over time to supplant the rule's application in many of these contexts." *Id*. at 770. "Thus, although the voluntary-payment rule may have been widely used by parties and some Texas courts at one time, its scope has diminished as the rule's equitable policy concerns have been addressed through statutory or other legal remedies." *Id*. at 771. "Like other equitable claims and defenses, an adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable." *Id*. at 770. While not completely abrogated, the rule today has only "limited application in Texas jurisprudence." *Id*. at 771 .

50.     Here, the issue is a statutory one, with respect to the Bankruptcy Code's provisions governing the allowance of an administrative claim. The statute should govern. And, courts have expressly held that the voluntary payment rule does not apply to breach of contract claims. *Lopez v. Bailon*, No. 07-14-00442-CV, 2016 Tex. App. LEXIS 8458, *10 (Tex. App.—Amarillo Aug. 4, 2016) ("The voluntary payment defense does not apply to a simple breach of contract action."); *see BMG Direct Mktg.*, 178 S.W.3d at 775 ("It is true that, to the extent the subject matter of Peake's claim is covered by the parties' contract, the rule would not apply."). The Advisors have not submitted merely a common-law unjust enrichment claim. They have asserted a claim under the Bankruptcy Code and written contracts. Under these circumstances, the voluntary payment rule does not apply.

## E.     THE COURT SHOULD DENY HIGHLAND'S CLAIMS

51.     As explained above, Highland breached each of the agreements in question. "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Bartush-*

*Schnitzius Foods Co. v. Cimco Refrigeration Inc..* 518 S.W.3d 432, 436 (Tex. 2017). Texas law identifies five (5) nonexclusive factors that govern the materiality question: "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004).

52.     Certainly with respect to the Payroll Reimbursement Agreements, Highland's breaches were material: billing the Advisors for 20 out of 25 employees who were no longer there, refusing to negotiate in good faith, and damages of almost $7.7 million. And, Highland will not suffer a forfeiture: it had no right to the overpayments. Likewise, Highland's behavior does not comport with any standard of good faith and fair dealing. Highland, itself seeking relief from this Court, and with fiduciary duties to its estate, knew full well that it was overbilling the Advisors, refused to do anything about it despite requests and the language of the agreements, refused to negotiate in good faith, and simply pocketed the overpayments as profit.

53.     Accordingly, the Court should deny Highland's claims for unpaid amounts under the agreements. However, if the Court concludes otherwise, Highland has utterly failed to calculate its damages except on its flawed theory that the Payroll Reimbursement Agreements provide for monthly payments, period, irrespective of actual costs and the agreements' requirements for reimbursement. The Advisors clearly initiated the process of modifying the monthly reimbursement rates well prior to when they stopped payments, and the agreements

clearly require Highland to "negotiate in good faith the terms of such modification." Highland utterly failed or refused to engage in *any* negotiation, much less a good faith one.

54.     Insofar as the Advisors invoked section 2.02 of the Payroll Reimbursement Agreements, and section 4.01 of the HCMFA Shared Services Agreement (as well as any similar provision in the NexPoint Shared Services Agreement), and Highland failed to comply with its obligations, the agreements' basic requirement of a reimbursement of "the actual costs and expenses" relating to each dual employee controls. Highland has the burden to calculate these amounts, and it has failed to do so, instead relying on its theory that only the preset monthly amounts matter—a theory the Court cannot adopt without reading section 2.02 out of the agreements. Accordingly, the Court should reject Highland's damages model as a matter of law and deny any relief on Highland's claims or, alternatively, calculate those claims based on actual costs under the Payroll Reimbursement Agreements and the Shared Services Agreements.

RESPECTFULLY SUBMITTED this 6th day of April, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
        Davor Rukavina, Esq.
        State Bar No. 24030781
        Thomas D. Berghman, Esq.
        State Bar No. 24082683
        Julian P. Vasek, Esq.
        State Bar No. 24070790
        500 N. Akard Street, Suite 3800
        Dallas, Texas 75202-2790
        Telephone: (214) 855-7500
        Facsimile: (214) 978-4375
        Email: drukavina@munsch.com
        Email: tberghman@munsch.com
        Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this the 6th day of April, 2022, true and correct copies of this document were electronically served on all parties entitled to notice thereof, including on Highland through its attorneys of record.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.