PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03010-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendants. | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

## TABLE OF CONTENTS

**Page**

I.      SUMMARY OF PROPOSED FINDINGS AND CONCLUSIONS ................................. 1

II.     PROPOSED FINDINGS OF FACT ................................................................................ 3

    A.      The Advisors ........................................................................................................ 3

    B.      The Agreements at Issue ...................................................................................... 4

        1.      The HCMFA Shared Services Agreement ..................................... 4

        2.      The NexPoint Shared Services Agreement ................................... 6

        3.      Highland Gives Written Notice of Termination of the
            Shared Services Agreements and Then Agrees to Extend
            the Termination Date ...................................................................... 7

            i.      The Termination Notices ................................................... 7

            ii.     Highland Agrees to Extend the Termination Date ............ 7

        4.      The Payroll Reimbursement Agreements ...................................... 8

            iii.    Events Leading Up to the Creation of the NexPoint
                  PRA .................................................................................... 8

            iv.     Highland's Revenue Stream Faces Unexpected
                  Pressure and Highland Is Advised that the Sub-
                  Advisory Agreement Is Not a Viable Structure for
                  Providing Highland with Urgently Needed Cash ........... 12

            v.      Pursuant to Section 2.02, the Parties Amend the
                  PRAs in December 2018 ................................................... 17

            vi.     Before Any Dispute Arose, Mr. Klos Confirmed the
                  Parties' Intent that the PRAs Were "Flat Fee for
                  Services" Arrangements ................................................... 18

    C.      Highland's Claim for Unpaid Fees ..................................................................... 20

    D.      The Shared Services Agreements ....................................................................... 21

        1.      Highland Performed All of Its Obligations under the
            Agreements ................................................................................... 21

        2.      The Advisors Knowingly and Intentionally Made All
            Payments Due under the Agreements from January 1, 2018
            through November 30, 2020 ......................................................... 33

        3.      The Advisors Knew (i)What Services Were Being
            Provided, and (ii)When Every Person (Including Every
            Dual Employee) Was Hired and Terminated by Highland,
            During the Relevant Period ......................................................... 35

    E.      The Advisors' Damages and Overpayment Theory is Fatally Flawed ............... 38

III.  PROPOSED CONCLUSIONS OF LAW ........................................................................ 39

    A.  Jurisdiction and Venue............................................................................................. 39

    B.  The Parties' Claims.................................................................................................. 39

        1.  Highland's Claims ........................................................................................ 39

        2.  The Advisors Claims.................................................................................... 40

    C.  Choice of Law.......................................................................................................... 40

    D.  The Advisors' Claims for Overpayment under the PRAs ........................................ 40

        1.  The Payroll Reimbursements are Unambiguous as a Matter
            of Law .......................................................................................................... 42

            i.  Legal Standard ................................................................................. 42

            ii.  The PRAs Unambiguously Required the Advisors
                 to Pay Highland Fixed Monthly Fees Absent
                 Changes Made Under Section 2.02................................................... 44

            iii.  Even if the PRAs Are Ambiguous, the Parole
                 Evidence and the Parties' Course of Dealing
                 Supports Highland's Interpretation.................................................. 48

        2.  The Advisors' Claim for Overpayment Under the PRAs
            Fails............................................................................................................. 50

        3.  The Advisors Waived any Claim for Overpayments Under
            the PRAs ....................................................................................................... 52

            i.  Legal Standard ................................................................................. 52

            ii.  The Advisors' Conduct Constitutes Waiver ................... 53

        4.  The Advisors' Claim of Overpayment Under the PRAs is
            Barred by the Voluntary Payment Rule ....................................... 56

    E.  The Advisors Claims for Breach of the Shared Services Agreements ................ 58

        1.  The Advisors' Fail to Prove Highland Breached the SSAs ......... 59

            i.  Legal Standard ................................................................................. 59

            ii.  The Advisors Fail to Establish Highland's
                 Nonperformance under the SSAs..................................................... 59

            i.  The Advisors Fail to Establish Damages ........................ 61

        2.  The Advisors' Claim for Overpayment under the SSAs
            Fails............................................................................................................. 62

        3.  The Advisors Waived Any Claims Relating to the
            Payments Made Under the Shared Services Agreements............ 63

    F.  Highland's Claim for Breach of the SSAs ........................................................ 63

## HIGHLAND'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Highland Capital Management, L.P. ("Plaintiff" or "Highland") submits the following *Proposed Findings of Fact and Conclusions of Law* in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case") and the above-captioned adversary proceeding (the "Adversary Proceeding") pursuant to Local Bankruptcy Rule 7016-1 and the *Agreed Amended Scheduling Order* [Adv. Pro. Docket No. 60].[2]

### I.     SUMMARY OF PROPOSED FINDINGS AND CONCLUSIONS[3]

1.      This Adversary Proceeding involves competing claims arising under certain Shared Services Agreements and Payroll Reimbursement Agreements entered into between and among the Parties.

2.      The Advisors assert claims against Highland for (a) "overpayment" under the PRAs, (b) "overpayment" under the SSAs, and (c) breach of contract under the SSAs.  In support of their claims for "overpayment" under the PRAs, the Advisors contend that they were wrongfully charged their allocable share of the "Actual Cost" of certain Dual Employees who were no longer employed at Highland.  The Advisors do not claim that Highland failed to provide advisory services under the PRAs; rather, they contend that they were overcharged for these services since such services were not provided by specified Dual Employees.  In their claim for overpayment and breach of the SSAs, the Advisors maintain that (i) Highland did not perform services under the SSAs, and (ii) as a result, the Advisors were overcharged for such services that were allegedly not being provided.

---

[2] "Adv. Pro. Docket No. __" refers to the docket entries maintained in the Adversary Proceeding.

[3] Capitalized terms not defined in this Summary have the meanings ascribed to them below.

3.      In its defense, Highland contends that the PRAs clearly and unambiguously establish that the Advisors agreed to pay – and properly did pay -- a flat monthly fee for investment advisory services rendered, regardless of which employees actually performed those services, unless the parties agreed otherwise.

4.      Highland also argues that even if the PRAs are deemed ambiguous, parol evidence, the surrounding circumstances, and the parties' uninterrupted course of dealing proves that the parties intended that the Advisors would pay a flat monthly fee for investment advisory services, unless modified in writing pursuant to the PRAs. Highland further maintains that, even if the Advisors could prove that they "overpaid" under the PRAs, the Advisors claims have been (i) waived and (ii) are barred by the voluntary payment rule.

5.      Highland asserts claims against the Advisors for breach of contract arising from the Advisors' failure to pay amounts due and owing under the SSAs and PRAs as well as for other reimbursable costs that Highland incurred on their behalf.

6.      The Parties' claims under the Agreements were tried before the court on April 12 and April 13, 2022. The Court heard testimony from [**number**] of witnesses, including [**names**], and admitted [**number**] exhibits into evidence.

7.      For the reasons set forth below, the Court finds that the Advisors have failed to meet their burden of proving (i) that they made any "overpayments" under the PRAs; (ii) that Highland breached the SSAs; or (iii) that the Advisors "overpaid" under the SSAs. The Court also finds that even if the Advisors had met their burden of proving that they "overpaid" under the PRAs, the Advisors claims for are (i) waived, and (ii) barred by the voluntary payment rule. The Advisors' claims for "overpayments" under the SSA are likewise waived.

8.     The Court further finds that Highland has met its burden of proving (a) its breach of contract claim against the Advisors, and (b) that it is entitled to recover its costs and expenses, including attorneys' fees, in prosecuting and defending the claims asserted in this Adversary Proceeding.

9.      In reaching these conclusions, the Court has considered all of the admissible evidence, including documentary evidence, and has carefully considered weighed the credibility of the witnesses.

10.     For the reasons set forth herein, it is hereby **ORDERED** that the Advisors failed to prove their breach of contract and overpayment claims under the SSA and PRAs, and therefore, the Advisors cannot recover on their claims.

11.     It is further **ORDERED** that Highland met its burden of proving the Advisors breached the SSAs by failing to pay amounts due and owing, and the Advisors are liable to Highland for all amounts due and owing thereunder as well as all costs and expenses, including attorneys' fees, in prosecuting and defending the claims asserted in this Adversary Proceeding.

## II.     PROPOSED FINDINGS OF FACT

### A.     The Advisors

12.     Pyxis Capital, L.P. ("Pyxis") was formed in or around 2009.  In or around 2012, Pyxis changed its name to Highland Capital Management Fund Advisors, L.P. ("HCMFA").  At all relevant times, James Dondero ("Mr. Dondero") has controlled HCMFA.  [Adv. Pro. Docket No. 25].

13.     NexPoint Advisors, L.P. ("NexPoint" and together with HCMFA, the "Advisors") was formed in or around 2012.  At all relevant times, Mr. Dondero has controlled NexPoint.  *Id.*

14.     The Advisors are registered investment advisors under the Investment Advisers Act of 1940.  They serve as the investment manager for certain investment vehicles (collectively, the

"Clients"), including certain retail funds (the retail funds for which HCMFA and NexPoint serve as the investment advisor are collectively referred to as the "Retail Funds"), regulated pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940 (the "ICA").

15.    The Advisors provide investment advisory services to their Clients pursuant to written investment advisory agreements (the "Investment Advisory Agreements").

16.    The Advisors' Investment Advisory Agreements are (a) the principal source of the Advisors' revenue, and (b) are the reason for the Advisors' existence.

**B.    The Agreements at Issue**

**1.    The HCMFA Shared Services Agreement**

17.    On February 9, 2012, Highland and Pyxis (HCMFA's predecessor) entered into that certain *Shared Services Agreement*, effective as of December 15, 2011.  **Exhibit 54**.

18.    On September 12, 2012, Highland and Pyxis entered into that certain *Amended and Restated Shared Services Agreement*, effective as of December 15, 2011.  **Exhibit 55**.

19.    Highland and HCMFA entered into that certain *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013 (the "HCMFA SSA"), which noted that HCMFA was "formerly known as" Pyxis.  **Exhibit 2**.

20.    Pursuant to the HCMFA SSA, HCMFA agreed to pay Highland for certain costs incurred or arising from certain shared services requested by HCFMA and provided by Highland, including, in pertinent part: (i) finance and accounting, (ii) human resources, (iii) marketing, (iv) legal, (v) corporate, (vi) information technology, and (vii) operations (the "HCMFA Shared Services").  *See id*. (HCMFA SSA) Article II, Section 2.01.

21. Pursuant to the HCMFA SSA, HCMFA was required to pay Highland its allocable share of the Actual Cost of Shared Services and Shared Assets based on an Allocation Percentage, as those terms are defined in the HCFMA SSA. *See id.* (HCMFA SSA) Section 4.01.

22. To determine the amounts owed, (a) Highland was to prepare Quarterly Reports setting forth the cost allocations and detailing amounts paid during the applicable quarter; (b) the parties were to agree on the allocations set forth in the Quarterly Reports and prepare invoices (the "HCMFA SSA Invoices"); and (c) the invoiced amounts were to be paid within 10 days. *See id.* (HCMFA SSA) Sections 5.01, 5.02, and 5.03.

23. At all relevant times, David Klos ("Mr. Klos") served as Highland's Controller and Chief Accounting Officer and reported directly to Frank Waterhouse ("Mr. Waterhouse"), Highland's Chief Financial Officer, who simultaneously served as the Treasurer for each of the Advisors.[4]

24. Mr. Klos had primary responsibility for overseeing the preparation of the HCMFA SSA Invoices and will testify (a) about the process of preparing and paying the HCMFA SSA Invoices, and (b) that the process of preparing and paying the HCMFA SSA Invoices was substantively the same from 2012 until the HCMFA SSA was terminated in January 2021.

25. In other words, Mr. Klos will testify that the process of preparing and paying the HCMFA SSA Invoices in 2020 (after the Independent Board took control of Highland) was the same as the process that was in place during the prior eight (8) years (when Mr. Dondero controlled Highland and each of the Advisors).

---

[4] Mr. Klos is a certified public accountant and was promoted to Chief Financial Officer of Highland shortly after Highland's plan of reorganization was confirmed and Mr. Waterhouse resigned to accept a position with Skyview.

2.      **The NexPoint Shared Services Agreement**

26.     On June 5, 2013, Highland and NexPoint entered into that certain *Shared Services Agreement*, effective as of January 1, 2013 (the "Original NexPoint SSA"). **Exhibit 29**.

27.     The Original NexPoint SSA was modelled on the HCMFA SSA and included a formula for determining NexPoint's share of the allocable cost of shared services and assets, which did not rely on an actual analysis of cost, but rather a percentage of managed fund assets. *See id.* (Original NexPoint SSA) Sections 4.01, 5.01, 5.02, and 5.03.

28.     For reasons described in more detail below, Highland and NexPoint amended the Original NexPoint SSA in early 2018. Specifically, Highland and NexPoint, entered into that certain *Amended and Restated Shared Services Agreement*, effective as of January 1, 2018 (the "NexPoint SSA," and together with the HCMFA SSA, the "Shared Services Agreements"). **Exhibit 3**.

29.     Among the most significant changes to the parties' relationship were that (a) the "asset based" formula (which was calculated using asset values of a fund advised by NexPoint) for determining the value of Highland's services was replaced with a monthly, "flat fee" arrangement, and (b) Highland was provided with exculpation and indemnification rights.

30.     Consequently, rather than paying for services based on an agreed-upon formula, NexPoint agreed to pay Highland a flat monthly fee of $168,000, payable in advance on the first business day of each month, in exchange for shared services. *See id.* (NexPoint SSA) Article III, Section 3.01.

31.     In addition, Highland was granted broad indemnity and exculpation rights. *See id.* (NexPoint SSA), Sections 6.02 and 6.03. Under Section 6.03 of the NexPoint SSA, Highland is entitled to recover its costs and expenses, including attorney's fees, incurred in connection with the defense or settlement of indemnifiable claims. *See id.* at Section 6.03.

32.     Mr. Waterhouse signed the NexPoint SSA on behalf of ***both*** Highland (in his capacity as Treasurer of Strand Advisors, Inc., Highland's General Partner) and NexPoint (in his capacity as NexPoint's Treasurer).

**3.     Highland Gives Written Notice of Termination of the Shared Services Agreements and Then Agrees to Extend the Termination Date**

**i.     The Termination Notices**

33.     On November 30, 2020, Highland exercised its right under the HCMFA SSA by providing written notice to HCMFA (the "HCMFA Termination Notice") that it intended to terminate the HCMFA SSA as of January 31, 2021 (the "HCMFA Termination Date"). **Exhibit 153**.

34.     On November 30, 2020, Highland exercised its right under the NexPoint SSA by providing written notice to NexPoint (the "NexPoint Termination Notice", and together with the HCMFA Termination Notice, the "Termination Notices") that it intended to terminate the NexPoint SSA as of January 31, 2021 (the "NexPoint Termination Date", and together with the HCMFA Termination Date, the "Termination Date"). **Exhibit 154**.

**ii.     Highland Agrees to Extend the Termination Date**

35.     Prior to providing the Termination Notices, starting in the summer of 2020, Highland began negotiating a transition plan for the orderly transition of services to the Advisors or their designee. By the end of January 2021, the parties had not reached an agreement on a transition plan.

36.     In an act that avoided catastrophic consequences for the Retails Funds and their investors that would have resulted from an abrupt termination of the Shared Services Agreements, Highland offered to extend the termination date by two weeks—provided that the Advisors paid for services in advance.

37.     Thus, on January 29, 2021, the parties executed an agreement extending the Termination Date to February 14, 2021 in exchange for the Advisors' payment for services to be rendered by Highland during that two-week period.

38.     In February 2021, the parties extended the Termination Date one final time.[5]

**4.     The Payroll Reimbursement Agreements**

39.     In addition to the Shared Services Agreements, Highland and each of the Advisors were parties to certain "Payroll Reimbursement Agreements" (the "PRAs" and together with the Shared Services Agreements, the "Agreements") that are the subject of their competing claims.

40.     The PRAs were not adopted in a vacuum.  While Highland contends, and the evidence shows, that the terms of the PRAs are clear and unambiguous, the background facts and contemporaneous, written communications exchanged before any dispute arose end any manufactured debate over whether the parties intended that the Advisors would each pay Highland a flat monthly fee in exchange for investment advisory (or "front office") services unless and until the parties agreed in writing to amend the flat fee.

**iii.     Events Leading Up to the Creation of the NexPoint PRA**

41.     Throughout the latter half of the 2010s, Highland's operating performance steadily declined.  By the end of 2017, Highland was operating at a loss, which was expected to accelerate into 2018.  **Exhibit 86** at 2.

---

[5] When Highland commenced this Adversary Proceeding, it sought, among other things, a mandatory injunction requiring the Advisors to adopt a viable transition plan.  Highland was expected to downsize following confirmation of its plan of reorganization, and it needed finality.  *See generally Plaintiff Highland Capital Management L.P.'s Verified Original Complaint for Damages and for Declaratory and Injunctive Relief*, Adv. Pro. No. 21-03010-sgj, Docket No. 1.  The evidence adduced at the hearing on Highland's motion for injunctive relief established that the only issue preventing a consensual transition of shared personnel and services was the Advisors' insistence that Mr. Dondero be given access to Highland's offices, notwithstanding the imposition of temporary and preliminary injunctive relief against him.

42.     To help address this problem, and to reduce NexPoint's taxable income, Mr. Dondero directed Highland's team to prospectively increase NexPoint's annual payments to Highland for services to be rendered to exactly $6 million, and that's precisely what Highland's team did.

43.     To achieve that result, the Highland team created a new Agreement—a "Sub-Advisory Agreement"—pursuant to which NexPoint would compensate Highland for the "front office" investment advice that Highland provided, while also amending the NexPoint SSA to provide for a fixed fee, rather than a fee calculated by a formula.

44.     Mr. Waterhouse will testify that Highland had provided the same "front office" investment advice to the Advisors prior to 2018 without payment or compensation of any kind.

45.     In December 2017, however, in order to implement Mr. Dondero's directive that the value of the services that Highland provided to NexPoint be fixed at $6 million per year, the Highland team created the following framework by which NexPoint would compensate Highland for services rendered:

- The NexPoint SSA was changed from a variable "cost based" contract to a "fixed fee" contract whereby NexPoint would pay Highland a **flat monthly fee of $168,000** (**Exhibit 3** (NexPoint SSA) § 3.01);

- NexPoint would pay Highland a **flat monthly fee of $252,000** pursuant to a newly crafted Sub-Advisory Agreement (**Exhibit 5** (NexPoint Sub-Advisory Agreement) § 2(a)); and

- An affiliate of NexPoint, NexPoint Real Estate Advisors ("NREA"), would pay Highland a **flat monthly fee of $80,000** pursuant to a separate Shared Services Agreement (the "NREA SSA", and together with the NexPoint SSA and the NexPoint Sub-Advisory Agreement, the "NexPoint Agreements").

*See* **Exhibit 130** (January 4, 2018 e-mail from D. Klos allocating the $6 million among the three contemplated NexPoint Agreements); **Exhibit 86** at 36 (forecast that assumed that "NexPoint and subs [would pay Highland] $6 million/year subadvisory + shared services").[6]

46. The flat fees contemplated under the NexPoint Agreements equaled $500,000 per month, or $6 million, as Mr. Dondero instructed.

47. On or about January 11, 2018, Highland and NexPoint entered into that certain *Sub-Advisory Agreement*, effective as of January 1, 2018 (the "Sub-Advisory Agreement"). **Exhibit 5** (Sub-Advisory Agreement). *See also* **Exhibit 130** (January 11, 2018 e-mail from Sean Fox attaching executed copies of, among other things, the NexPoint Agreements).

48. Pursuant to the Sub-Advisory Agreement, Highland, as "Sub-Advisor," was to provide certain front-office services to the Advisors to enable the Advisors to fulfill their obligations to their Clients under the Investment Management Agreements.

49. Mr. Waterhouse signed the Sub-Advisory Agreement on behalf of ***both*** Highland (in his capacity as Treasurer of Strand Advisors, Inc., Highland's general partner) and NexPoint (in his capacity as NexPoint's Treasurer).

50. All of this and more was contemporaneously explained to Mr. Dondero and his partner, Mark Okada ("Mr. Okada"). Each year, Mr. Waterhouse and Mr. Klos prepared a written analysis of Highland's past and projected financial performance (each, an "Annual Review") that

---

[6] To remove any doubt about the parties' intentions, the Annual Review that was presented to Mr. Dondero and Mark Okada on or about January 26, 2018, contained a three-year projection of NexPoint's profits and losses that **projected that NexPoint would pay Highland exactly $6 million per year in 2018, 2019, and 2020** (Exhibit 86 at 46) (projecting annual payments of $3,024,000 for sub-advisory fees (*i.e.*, $252,000 per month), and annual payments of $2,976,000 for shared services (*i.e.*, $168,000 per month for NexPoint's shared services and $80,000 per month for NREA's (as defined *supra*) shared services), which together yield $6 million in annual fees).

they presented to Mr. Dondero and Mr. Okada. *See, e.g.*, **Exhibit 86** (2017/2018 Annual Review), **Exhibit 142** (2018/2019 Annual Review), and **Exhibit 143** (2019/2020 Annual Review).[7]

51.     On or about January 26, 2018, Mr. Waterhouse and Mr. Klos presented the Annual Review for 2017/18 to Mr. Dondero and Mr. Okada. The 2017/2018 Annual Review included the following statements and information:

- Highland was projected to incur operating losses of $12 million in 2018 (**Exhibit 86** at 2);

- Highland's projected operating losses in 2018 were to be mitigated by the $6 million in fees that Mr. Dondero directed NexPoint to pay Highland for services to be rendered (*id.* at 36);

- The fixed, $6 million-aggregate, annual payments were projected to be made by NexPoint in 2018, 2019, and 2020 (*id.* at 46); and

- Extensive information about new hires, terminations, and compensation and benefits paid across the Highland platform (*id.* at 29-33, 48).

52.     Notably, and as discussed in more detail below, the 2017/2018 Annual Review (a) assumed that the NexPoint Sub-Advisory Agreement would be retroactive to January 1, 2018; (b) did not contemplate that HCMFA would enter into a Sub-Advisory Agreement with Highland or that HCMFA would otherwise suddenly begin paying Highland for investment advisory services; and (c) assumed that Highland would continue to receive substantial revenue under sub-advisory and shared services agreements with an affiliate, Acis Capital Management, L.P. ("Acis").

---

[7] Mr. Waterhouse will testify that Brian Collins, then Highland's head of Human Resources, also participated in the Annual Reviews for the limited purpose of presenting information relating to hires, terminations, compensation, and benefits for everyone employed in the Highland complex. Mr. Collins is on the Advisor's witness and exhibit list, and Highland believes that if he is actually called to testify, Mr. Collins will be forced to acknowledge that (i) he kept Mr. Dondero informed of all personnel matters, including hires and terminations, (ii) Mr. Dondero determined the salary, bonus, and compensation amounts for all employees across the Highland complex, (iii) each month the Human Resources Department e-mailed detailed information to numerous people, including the Advisors' officers, about hires and terminations across the Highland complex (*see* **Exhibits 88-127**); and (iv) NexPoint made substantial post-petition payments to Highland's "insiders" without disclosure to the Court or the Independent Board and at times NexPoint now contends it "overpaid" Highland for services rendered.

####    iv.    Highland's Revenue Stream Faces Unexpected Pressure and Highland Is Advised that the Sub-Advisory Agreement Is Not a Viable Structure for Providing Highland with Urgently Needed Cash

53.    Almost immediately after Mr. Waterhouse and Mr. Klos presented the 2017/2018 Annual Review to Mr. Dondero and Mr. Okada, Highland faced a new and substantial threat to its operating revenue stream.

54.    In particular, on January 30, 2018, Joshua Terry commenced an involuntary bankruptcy case against Acis in the United States Bankruptcy Court for the Northern District of Texas, Case No. 18-30264-sgj11 (the "Acis Bankruptcy").

55.    At the time, Acis was an affiliate of Highland that managed certain collateralized loan obligations ("CLOs").  To perform its duties, Acis had entered into sub-advisory and shared services agreements with Highland (the "Acis Agreements").

56.    The Acis Agreements were a vital source of Highland's revenue.  Highland was projected to receive almost $10 million in revenue in 2018 alone from the deals subject to the Acis Agreements—Highland's second-highest source of revenue representing nearly 12% of its total projected operating income.  **Exhibit 86** (Annual Review) at 35 ("Highland 2.0 CLOs" refers to the CLOs managed by Acis).

57.    Mr. Terry's decision to commence the Acis Bankruptcy was an unexpected threat to Highland's operating performance.[8]

58.    On top of that, Highland continued to urgently need cash.  **Exhibit 128**.  On March 7, 2018, in response to these developments, Highland decided to create a Sub-Advisory Agreement for HCMFA, initially for a flat monthly fee of $450,000, retroactive to January 1, 2018.  A week

---

[8] The threat presented from the potential loss of Acis's revenue was not limited to 2018, because Highland expected to "reset" the Acis CLOs to extend the reinvestment period and maturity by more than two years.  **Exhibit 86** (Annual Review) at 34 ("Acis CLOs 3-6 reset and extend investment period and maturity by 2.25 years").  Consequently, the Acis Bankruptcy threatened Highland with the loss of over $20 million in expected revenue over the next 27 months.

later, a draft Sub-Advisory Agreement modeled on the NexPoint Sub-Advisory Agreement was prepared for HCMFA. *See* **Exhibit 87** (e-mails between March 7 and March 15, 2018).

59. The creation of the Sub-Advisory Agreement for HCMFA is notable because (a) the Annual Review presented to Mr. Dondero and Mr. Okada just six weeks earlier did not contemplate that HCMFA would be party to a Sub-Advisory Agreement or otherwise compensate Highland for investment advisory services it was providing, and (b) it corroborates Highland's contention that the parties intended to create a "fee for service" advisory relationship.

60. Within days, however, Highland learned that the Sub-Advisory Agreement structure could not be utilized to implement Mr. Dondero's directive that NexPoint and HCMFA pay Highland fees for "front office" services rendered.

61. Specifically, Highland learned (a) from its outside counsel that (i) the Retail Board needed to approve the Sub-Advisory Agreements during an in-person meeting, and that (ii) the Sub-Advisory Agreements could not be made retroactive to January 1, 2018, and (b) that the next in-person meeting of the Retail Board would not be until June. **Exhibit 87** (*see* March 15, 2018 e-mails from Lauren Thedford, an attorney employed by Highland but who also served as an officer (Secretary) of the Advisors).

62. Based on this advice, Highland concluded that it could not utilize the contemplated Sub-Advisory Agreement structure because (a) Highland would not be able to earn any revenue for sub-advisory services until June, the earliest date the Retail Board could approve of the Sub-Advisory Agreements during an in-person meeting, and (b) it could not be retroactive to January 1, 2018, meaning that Highland would be unable to receive six months of needed revenue. So another method was needed to overcome these obstacles—and the Payroll Reimbursement Agreements were born.

63.     The next month, Highland prepared a draft Payroll Reimbursement Agreement that did not need Retail Board-approval and could be made retroactive to the beginning of the year. Mr. Klos immediately expressed his concerns about tying the payments to any assessment of "actual costs," writing to Ms. Thedford that:

> Does it have to be framed as reimbursement of actual costs? **We'd much rather it be characterized as just an agreed upon amount between the two entities**. It's not a small task and involves subjective assumptions to allocate individual employees, so as it's written, **it would be creating a ton of work that isn't creating any value to the overall complex**.

**Exhibit 129** (emphases added).[9]

64.     In response, Ms. Thedford stated that she was "open" to changing the "definition of Actual Costs" but observed that there "needs to be some method of determining the amounts" and that it was "important" to treat the agreement as one for "reimbursement." In response, Mr. Klos stated:

> Could we say that Actual Cost is being determined **at the outset of the agreement, have a schedule as of Jan. 1, 2018 and say that Actual Cost shall be as set out in that schedule and shall be paid in monthly installments for the term of the agreement . . . that way the exercise is only performed once**.
>
> Beyond that year, termination provision kicks-in, so if there's a belief that Actual Costs have changed materially, either party could terminate and/or renegotiate for an amended agreement.

**Exhibit 129** (Klos e-mail to Thedford sent on April 17, 2018 at 10:56 a.m.) (emphasis added).

---

[9] Mr. Klos's reference to the "overall complex" was consistent with Highland's internal view that Highland and its affiliates were an integrated unit, not arm's-length business partners. Indeed, in the Annual Review, Mr. Waterhouse and Mr. Klos presented Highland's results to Mr. Dondero and Mr. Okada on a consolidated basis (including HCMLP, HCMFA, NexPoint and Acis, among other affiliates), entirely stripping out (or "eliminating") the fees from the shared services and presenting employment information on a unified basis. *See* **Exhibit 86** (Annual Review) at 6 (consolidated balance sheet), 11 (consolidated profit and loss statement for 2015 through 2017, excluding fees under the Shared Services Agreements among the consolidating entities), 13 (analysis of operating income and margins on a consolidated basis), 14 (analysis of net income and net income margin on a consolidated basis), 15 (historical, consolidated revenue), 19 (legal matters), and 29-33 (monthly headcount, hires, terminations, compensation, and other human resource matters across the Highland platform).

65.     Ms. Thedford believed that Mr. Klos' suggested approach was "workable" and asked Mr. Klos if he had a "methodology **for the outset determination**."  Mr. Klos subsequently created a list of employees and allocations with "fully loaded compensation."  **Exhibit 129** (emphasis added).

66.     Mr. Klos will testify that the list and allocations were created to "back into" the same monthly fees that were contemplated under the now to-be-replaced Sub-Advisory Agreements.  Mr. Klos will further testify that while the estimates were made in good faith, they were based on his personal subjective assessments, were not based on any empirical research, and were only created as a "proxy" to provide cover for the flat monthly payments.[10]

67.     With these issues resolved and the parties' intent clear, on or around May 1, 2018, Highland and NexPoint entered into that certain *Payroll Reimbursement Agreement*, effective as of January 1, 2018 (the "NexPoint PRA"), and Highland and HCMFA entered into that certain *Payroll Reimbursement Agreement*, effective as of January 1, 2018 (the "HCMFA PRA").  **Exhibit 6** (NexPoint PRA); **Exhibit 8** (HCMFA PRA).

68.     Except for the (a) names of the parties, (b) the amount of monthly fees to be paid thereunder, and (c) the list of Dual Employees and their respective Allocations set forth in Exhibit A, the NexPoint PRA and the HCMFA PRA were identical.

69.     Consistent with the understanding reached between Mr. Klos and Ms. Thedford, a then-officer of the Advisors, and despite the Advisors' current protests to the contrary, the PRAs clearly and unambiguously required the Advisors to pay a flat monthly fee for investment advisory services unless and until the parties agreed otherwise.

---

[10] Mr. Klos and Mr. Waterhouse will confirm that Highland never maintained (and no one was ever asked or expected to maintain) any time records or other documents that could be utilized or relied upon to create the allocations.  Mr. Klos did not confer with any of the Dual Employees to determine if his allocations were accurate, nor was he ever asked or instructed to do so.

70.     Specifically, pursuant to Section 2.01 of the PRAs, each of the Advisors was required to pay Highland the "Actual Cost to HCMLP" allocated to each Advisor for certain Dual Employees (as defined in the PRAs).   **Exhibit 6** (NexPoint PRA) §§ 2.01, 3.01; **Exhibit 8** (HCMFA PRA) §§ 2.01, 3.01.

71.     "Actual Cost" was defined in the PRAs as follows:

> [W]ith respect to any period hereunder, the actual costs and expenses caused by, incurred, or otherwise arising from or relating to each Dual Employee, in each case during such period. ***Absent any changes to employee reimbursement, as set forth in Section 2.02, such costs and expenses are equal to [$X] per month***.

**Exhibit 6** (NexPoint PRA) Article I (fixing the costs and expenses at $252,000 per month); **Exhibit 8** (HCMFA PRA) Article I (fixing the costs and expenses at $416,000 per month) (emphasis added).

72.     Pursuant to Section 2.02, the parties could agree to modify the Actual Cost if they believed a change to employee reimbursement was appropriate.  **Exhibit 6** (NexPoint PRA) § 2.02; **Exhibit 8** (HCMFA PRA) § 2.02.  *See also* **Exhibit 6** (NexPoint PRA) § 4.02 ("Should either Party determine that a change to employee reimbursement is appropriate, as set forth in Section 2.02, the Party requesting the modification shall notify the other Party on or before the last business day of the calendar month"); **Exhibit 8** (HCMFA PRA) § 4.02 (same).[11]

73.     The undisputed evidence establishes that (a) neither Mr. Klos nor anyone else ever updated the Exhibits attached to the PRAs; (b) neither Mr. Klos nor anyone else was ever instructed to update the Exhibits attached to the PRAs; (c) at all relevant times, the Advisors and Highland had access to the same information concerning the amounts paid under the PRAs, the amounts projected to be paid under the PRAs, the termination of Dual Employees, the compensation of

---

[11] The Advisors contend that Section 4.02 imposed an affirmative obligation on Highland to update Exhibit A and unilaterally adjust the monthly payments, but no such obligation exists, nor—notwithstanding any revisionist history or uninformed statement to the contrary—did the Advisors ever expect Highland to do so.

Dual Employees, and the investment advisory services provided by Highland to each of the Advisors; and (d) as discussed below, the parties knew of and relied on Section 2.02 in December 2018 to amend the PSAs while Mr. Dondero was fully in control of the Highland complex.

### v. Pursuant to Section 2.02, the Parties Amend the PRAs in December 2018

74. Despite the substantial support provided by the PRAs, Highland continued bleeding cash while the Advisors were generating cash, so by December 2018, Highland turned to the PRAs as a source of further funding.

75. Again, pursuant to Section 2.02 of the PRAs, the parties could "agree to modify" the amounts to be paid under those Agreements. Relying on that provision, Mr. Dondero instructed the Highland team to cause the Advisors make an additional, one-time $2.5 million payment to Highland, allocated between them, under the PRAs.

76. Based on Mr. Dondero's instruction, on December 14, 2018, (a) Highland and NexPoint entered into that certain *Amendment Number One to Payroll Reimbursement Agreement* (the "NexPoint PRA Amendment"), pursuant to which NexPoint paid $1,300,000 to Highland, and (b) Highland and HCMFA entered into that certain *Amendment Number One to Payroll Reimbursement Agreement* (the "HCMFA PRA Amendment" and together with the NexPoint PRA Amendment, the "PRA Amendments"), pursuant to which HCMFA paid $1,200,000 to Highland. **Exhibit 7** (NexPoint PRA Amendment); **Exhibit 9** (HCMFA PRA Amendment).[12]

77. Mr. Klos will testify that Mr. Dondero fixed the amounts set forth in the PRA Amendments and that the payments were not supported by any analysis of Highland's "actual costs." He will further testify that given his knowledge of the profitability of each of Highland

---

[12] Mr. Waterhouse signed each of the PRA Amendments on behalf of the General Partners of Highland and each of the Advisors but will testify that he has no recollection as to how the amounts set forth in the PRA Amendments were determined.

and the Advisors, the rationale for an adjustment to increase the amounts was not unreasonable at the time, since Highland was operating negatively, whereas the Advisors were operating positively, all whilst operating in the same business with substantive overlap from the same employees supporting each of Highland and the Advisors.  There will be no evidence that anyone performed (or was asked to perform) any analysis of Highland's "actual costs" of providing sub-advisory services to the Advisors before Mr. Waterhouse executed the PRA Amendments (or at any time thereafter).[13]

### vi.    Before Any Dispute Arose, Mr. Klos Confirmed the Parties' Intent that the PRAs Were "Flat Fee for Services" Arrangements

78.    In January 2020, at around the time when Mr. Dondero ceded control of Highland, but more than six months before any dispute arose concerning amounts paid or to be paid under the Agreements, Mr. Klos reiterated to Mr. Waterhouse and Ms. Thedford that the PRAs were intended to be fixed-fee agreements for sub-advisory or "front office" services rendered, rather than a "reimbursement" program based on periodic assessments of annual costs.

79.    At that time, in response to inquiries from the Retail Board, Ms. Thedford sought information concerning expense reimbursements and allocations under the PRAs.  After Mr. Klos informed Ms. Thedford that such information "doesn't exist in terms of current percentages," Ms. Thedford asked whether such information was contained in Exhibit A to the PRAs.  In response, Mr. Klos reminded Ms. Thedford that the allocations in Exhibit A were:

**a point in time estimate as of 2018.  Half the people are gone now and if you were to reallocate them now, all the percentages would be different**.  On top of

---

[13] The evidence corroborates Highland's contention that the PRA Amendments (like the PRAs themselves) were not based on "actual costs," because the Advisors were paying millions of additional dollars at a time when they knew that more than one-third of the Dual Employees had already been terminated.  **Exhibit 14** (responses to Interrogatories 3 and 4 in which the Advisors admit having contemporaneous knowledge that 9 of the 26 Dual Employees (or, more than one-third) were terminated before December 1, 2018).  If the parties intended that the Advisors would pay for "actual costs" (as opposed to services), the Advisors would never have agreed to pay millions of additional dollars in December 2018; instead, they would have made the same arguments of "overpayments" that they advance here.

that, we don't have anything comprehensive that is comparable for back office people so the only thing we can really provide is a stale percentage on a small subset of the overall population.

Would be much more logical to do the yes/no and then as **a blanket statement say that HCMFA/NPA pay $x/$y annually to HCMLP for these employees' services**.

**Exhibit 151** (emphases added).

80.     Ms. Thedford responded by simply writing "Got it, thanks." *Id*.

81.     Later in January 2020, Mr. Waterhouse asked Mr. Klos for information concerning the "monthly amount for each agreement."  In response, Mr. Klos again confirmed that "flat fee" arrangement under the Agreements (except for the HCMFA SSA), and provided information showing NexPoint continued to pay Highland $6 million per year for services rendered:

Monthly amounts below

HCMFA
$416k **flat** for investment support
$290k-300k for shared services

NPA
$252k **flat** for investment support
$248k **flat** for shared services ($168k from NPA directly; $80k from NREA, but assume you're looking for a consolidated number)

**Exhibit 146** (emphases added).

82.     Thus, in January 2020 (the month the Independent Board took control of Highland), the Advisors' Treasurer was reminded in writing of the flat monthly fees that the Advisors were paying under the Agreements.  The evidence will show that these exact amounts were charged to, and paid by, the Advisors for the two-year period before January 2020 and continued uninterrupted until Mr. Dondero directed Mr. Waterhouse to cease making all payments to Highland in late 2020.

C.      **Highland's Claim for Unpaid Fees**

83.      From October 16, 2019 (the "<u>Petition Date</u>") until November 30, 2020 (the "<u>Relevant Period</u>"), the Advisors paid Highland amounts due and owing under the Agreements each month, just as they had for years.

84.      By the end of November 2020, (i) the Independent Board had demanded Mr. Dondero's resignation; (ii) Mr. Dondero had begun interfering with Highland's business and engaging in other improper conduct that ultimately led to the imposition of injunctive relief; and (iii) Highland had delivered the Termination Notices.

85.      In the face of this acrimony, Mr. Dondero instructed Mr. Waterhouse to stop making any payments to Highland.  As a result of Mr. Dondero's instruction, the Advisors failed to pay amounts due and owing under the Agreements for the month of December 2020 and January 2021 (and in the case of the HCMFA SSA, the month of November 2020).  Specifically, (a) for the months of November and December 2020, and January 2021, HCMFA failed to pay Highland $1,726,277 for services rendered, (b) for the months of December 2020 and January 2021, NexPoint failed to pay Highland $1,000,000[14] for services rendered, and (c) the Advisors failed to pay Highland for other reimbursable out-of-pocket costs not otherwise captured through the monthly invoices and represented primarily by the Advisors' allocable portion of accounting software, IT development, and investment research products and tools (*e.g.*, Bloomberg machines).[15]

86.      There will be no dispute that the Advisors failed to (i) pay Highland any amounts due and owing under the Agreements or (ii) otherwise compensate Highland for investment

---

[14] This amount includes non-payment by NexPoint's wholly owned subsidiary, NREA, for two months of shared services at $80,000 per month, or $160,000 total.

[15] HCMFA's portion of such amounts was $2,054,546.19; NexPoint's portion of such amounts was $100,834.96.

advisory and shared services rendered in December 2020 and January 2021 (and as to HCMFA, shared services in November 2020).

**D.** **The Shared Services Agreements**

87. The evidence shows that the Shared Services Agreements enabled the Advisors to obtain middle- and back-office services from Highland that were required so that the Advisors could fulfill their obligations to their Clients pursuant to the Investment Advisory Agreements.

88. The evidence also shows that the Advisors fully performed their obligations under the Investment Advisory Agreements and—as specifically described below—that the Advisors repeatedly represented to the Retail Board that Highland's performance under the shared-services arrangements was not adversely impacted by Highland's bankruptcy and that service was never interrupted.

**1.** **Highland Performed All of Its Obligations under the Agreements**

89. The evidence—including, but not limited to, the Advisors' contemporaneous and repeated representations to the Retail Board—proves that Highland fully performed its obligations under the Agreements.

90. As required by the ICA, the Retail Board conducts an annual review whereby it determines whether to extend its Investment Advisory Agreements with the Advisors. This is referred to as the "15(c) review" process.

91. As part of this 15(c)-review process, and at other times during Highland's bankruptcy, the Advisors provided the Retail Board with information concerning the status of the shared services relationship, Highland's provision of services thereunder, and contingency planning in case the Advisors' shared services relationship with Highland was terminated.

92. The Advisors provided this information to the Retail Board either in writing or orally during meetings of the Retail Board (the "Retail Board Meetings"). Minutes from the Retail

Board Meetings were created in the ordinary course (the "Board Minutes"). A representative of the Retail Board will testify that the Board Minutes were adopted only after, among other things, the Advisors had an opportunity to review and edit their content to assure their accuracy.

93.     The Board Minutes recite, among other things, that one or more of the Advisors' officers (*i.e.*, Mr. Waterhouse, Mr. Norris, Ms. Thedford, or Mr. Post) or attorneys (*i.e.*, Dennis C. Sauter, the Advisors' in-house counsel, or K&L Gates, the Advisors' outside counsel) was present and participated in every applicable Retail Board Meeting. *See generally* **Exhibits 57-73**.

94.     A representative of the Retail Board will testify that the Retail Board (a) assumed that the Advisors made the statements and representations reflected in the Board Minutes on an informed basis after conducting due diligence, and (b) the Retail Board relied on the statements and representations made by or on behalf of the Advisors in the Retail Board Meetings.

95.     The contemporaneous Board Minutes from 2020 constitute substantial, irrefutable evidence of Highland's uninterrupted performance of its obligations under the Agreements.

96.     In January 2020, Mr. Dondero avoided the appointment of a trustee by ceding control of Highland to the Independent Board. With Mr. Dondero's loss of control of Highland, the Retail Board naturally sought information about whether this change would impact Highland's staffing. Thus, the Board Minutes from the Retail Board Meeting held on January 22, 2020 (shortly after the Court approved the Corporate Governance settlement) included the following entries:

> Ms. Thedford noted that **the Meeting Materials included a headcount report that lists each employee associated with HCMLP and the Advisers and identifies whether the employee is dually employed by both HCMLP and an Adviser** or pursuant to a separate arrangement, such as Mr. Norris' employment with the Funds' distributor, NexPoint Securities, Inc. . . .
>
> Mr. Norris discussed the shared services arrangements that each Adviser is a party to with HCMLP pursuant to which the Adviser may utilize employees from HCMLP for the provision of various services such as human resources, accounting,

valuation, information technology services, compliance and legal. Mr. Norris noted, however, that many of these "third party" services are readily available on the open market.

**Exhibit 57** at 2, 3.

97.     In response to the Retail Board's request, the Advisors included in the "Meeting Materials" a list of every person employed in the Highland complex, including (a) name, (b) title, (c) department, (d) employing entity (*e.g.*, HCMLP, HCMFA, NexPoint), (e) whether the person was a "dual employee," (f) office location, and (g) whether the person was an "investment professional" or was providing "back office" services." **Exhibit 75**.

98.     In mid-June, Jason Post ("Mr. Post"), the Advisors' Chief Compliance Officer, assured the Retail Board that the Advisors were "monitor[ing]" the "level and quality" of Highland's shared services and that he was unaware of any disruptions:

> Mr. Post described the team members providing compliance and legal support services to the Funds and the Advisers. . . . Mr. Post stated he believed the Compliance department was adequately staffed.
>
> Mr. Post also discussed the quality and continuity of services provided to the Funds by HCMLP pursuant to shared services agreements with the Advisers in the context of the HCMLP bankruptcy. A discussion ensued during which Mr. Post responded to questions from the Board. *He noted the regular updates provided to the Board and also discussed how the level and quality of services are being monitored and confirmed that he is not aware of any disruptions in the service levels provided to the Funds*.

**Exhibit 58** at 20 (emphasis added).

99.     In August, Dustin Norris ("Mr. Norris"), an Executive Vice President of each Advisor, represented to the Retail Board that "there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter," although James P. Seery, Jr. ("Mr. Seery"), Highland's Chief Executive Officer, advised the Retail Board that certain conflicts might arise given the differing investment strategies being adopted by Highland, on the one hand, and the Advisors, on the other:

Mr. Norris next provided an overview of the 15(c) review materials and process and discussed the expected timeline with respect to Board consideration of approval of the renewals. ***He noted that there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter***.

Mr. Seery then pointed out to the Board a potential conflict of interest that had arisen with respect to an investment held by both HCMLP-advised funds and certain of the Funds. Mr. Seery explained that the HCMLP-advised funds were likely to seek to sell their interests in the investment. This divergence of investment objectives of HCMLP and the Funds, and the overlapping portfolio and administrative personnel of HCMLP and HCMFA and the NexPoint Advisors working on the matter, created a potential conflict between the two groups.

**Exhibit 59** at 6, 11 (emphasis added).

100.    In advance of a Retail Board Meeting to be held in September, the Advisors sent a memorandum to the Retail Board in which they stated, among other things, that the "Advisors and HCMLP believe the current shared services being provided are generally consistent with the level of service that historically been received," and further addressed potential conflict issues. **Exhibit 18** at ACL 080581 (response to question 3).

101.    During the two-day Retail Board meeting held on September 17-18, 2020, the Retail Board was advised that Highland continued to perform all of the shared services and was provided with additional information concerning potential conflicts:

In response to questions from the Board, Mr. Ellington noted that he had been advised that Mr. Dondero had a high degree of confidence that, even if an overall settlement could not be achieved, there would be a mechanism in place for the services currently provided by HCMLP such that any impact to the Funds would be minimal. In the short-term, Mr. Seery expected that the shared services agreement (the "Shared Services Agreement") between HCMLP (on the one hand) and HCMFA/NexPoint Advisers (on the other) to remain in place. In the event that the Shared Services Agreement were terminated, Mr. Seery believes that the employees and services at HCMLP that are currently supporting the Funds would be transferred either directly to HCMFA/NexPoint Advisors or to a third-party that would continue to service the Funds. A discussion then ensued, including as regards the process for addressing any conflicts of interest. . . .

Mr. Surgent joined the Meeting. During the discussion, he responded to the 15(c) follow-up questions submitted by the Board relating to HCMLP matters. ***He provided the Board with a status update on the HCMLP bankruptcy and***

*discussed the impact of the HCMLP bankruptcy on the shared services arrangements with the Funds, noting he does not expect that the level and quality of services would change in the immediate term*.  Regarding the bankruptcy, Mr. Surgent reiterated Mr. Seery's stated goal to achieve a consensual, omnibus resolution by the end of the year.  To the extent this was not achievable, Mr. Surgent noted that an alternative plan had been filed by HCMLP. . . . *He indicated that at this time it was business as usual with respect to the services provided to the Funds* and that the Board would be notified immediately of any developments.  A robust discussion then ensued, which included an explanation of how conflicts of interests are addressed when certain HCMLP employees are conflicted out of working on particular matters, as was the case in the recent OmniMax International, Inc. (f/k/a Euramax) ("OmniMax") matter.  Mr. Surgent and Mr. Norris explained that there were sufficient and appropriate personnel at HCMFA/NexPoint Advisors who are not also dual employees at HCMLP to cover all relevant functions on such matters, including legal, compliance, accounting, administration and portfolio management.  *Mr. Surgent also provided an update on the current matters where this was being utilized, including with respect to OmniMax, and noted that there were a limited number of such potential conflicts.  Mr. Norris confirmed that he was comfortable with the level and quality of services being provided and has not seen any issues with the conflicts process*.  He also noted that in view of this being an employee of NexPoint and not being an employee of HCMLP, he was not conflicted out of working on any such matter and was able to oversee the process.  In response to a request of the Board, Mr. Norris undertook to provide the Board with a list of non-HCMLP employees available to address any conflicts that may arise.

**Exhibit 60** at 7, 12-13 (emphases added).

102.    On October 9, 2020, Mr. Norris sent an e-mail to the Retail Board and other officers and agents of the Advisors (including outside counsel) to provide an interim update in which he advised the Retail Board that NexPoint was working on contingency plans to "ensure that there is no disruption in services":

We are working on full responses to your with [sic] 15(c) follow-up questions attached, however we want to keep you updated as it pertains to the continued developments with shared services and your first question on the attached.  As it stands today, NexPoint's senior management's plan as a backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by 12/31/2020.  *This will help ensure that there is no disruption in services to the Funds.  Once we have further details of this we will advise.  In the interim the plan is to continue with existing shared services*.

**Exhibit 81** (emphasis added).

103.    A few days later, on October 13, 2020, Mr. Norris informed the Retail Board during a regularly scheduled meeting that, with respect to shared services, "all operations continued in the normal course there [sic] had been no material impact on the day-to-day operations of the Funds" and that contingency plans were "in place to continue to provide the same level and quality of services to the Funds":

> Mr. Ellington then explained three various potential scenarios contemplated during the ongoing negotiations, including a full or partial buyout of certain creditor claims by Mr. Dondero or no agreement, which could potentially lead to liquidation of HCMLP and termination of all HCMLP employees. . . .

> Mr. Sauter also discussed the status of the shared services agreements.  In response to another question, ***Mr. Norris discussed the morale employees [sic] and noted that all operations continued in the normal course there [sic] had been no material impact on the day-to-day operations of the Funds***.  He indicated that there would not likely be any material developments with respect to the status of HCMLP until the end of the year at the earliest.  The Board requested that the Advisers continue working toward developing definitive plan to ***ensure that the resources, both of personnel and equipment, are in place to continue to provide the same level and quality of services to the Funds*** and to continue to report back to the Board on the status.

**Exhibit 61** at 2, 3 (emphases added).

104.    On October 23, 2020, the Advisors provided written responses to certain questions posed by the Retail Board, including whether the Advisors had "contingency plans with respect to the services provided under the Shared Services Agreement in the event that the outcome of the HCMLP bankruptcy proceedings were to impact the current servicing structure."  As to that question, the Advisors provided the following response:

> **Response**: As a result of the Highland Capital Management, L.P. ("<u>HCMLP</u>") bankruptcy, NexPoint's senior management's plan as a backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by December 31, 2020.  ***This will help ensure that there is no disruption in services to the Funds***. . . .

**Exhibit 22** at 1 (emphasis added).[16]

105. The Retail Board also asked whether there were "any material outstanding amounts currently payable or due in the future (e.g., notes) to HLCMLP [sic] by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds." *Id*. at 2. As to that question, the Advisors informed the Retail Board of the amounts due under various promissory notes and noted that "*[a]ll amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter*." *Id*.

106. On October 28, 2020, the Retail Board was again told that (i) Highland was expected to continue to provide shared services without interruption, (ii) the parties continued to work on a "seamless transition," (iii) according to Mr. Collins, there had been no "significant departures" of employees, and that (iv) the "quality and level" of services had not been negatively impacted by Highland's bankruptcy:

> Mr. Ellington provided an update on the HCMLP bankruptcy, focusing on the contingency plan for fund service providers if HCMLP is unable to perform its current functions. . . . He also noted that based upon on-going discussions with HCMLP, as well as in view of these alternative contingency plans, *the Advisers do not expect any interruption to the services to the Funds that are currently being provided by HCMLP pursuant to the Shared Services Agreement*.

> Mr. Ellington and Mr. Waterhouse next discussed the potential moving of employees from HCMLP to a newly formed company ("NewCo"). *Such a transfer of employees to NewCo would take place at the termination of the Shared Services Agreements and would permit a seamless transition of personnel and services for the Funds*. . . . Mr. Collins noted that, although employees of HCMLP were not yet able to be released subject to confirmation of the plan of bankruptcy, *he was confident in the firm's ability to retain talent throughout this process based on discussions with the employees. He noted that every employee team leader had been spoken to and also noted that there have been no significant departures to date*. He also noted that in order to assist with any potential conflict of interests, Jason Post, the Funds' CCO, became an employee of NexPoint on October 14, 2020. He noted that Mr. Post, while formerly an HCMLP employee, had only been

---

[16] Notably, Mr. Post, the Advisors' then-Chief Compliance Officer, drafted this response in conjunction with Mr. Norris, Ms. Thedford, and Mr. Collins. **Exhibit 21**.

performing work for the Funds. Mr. Post then referred the Board to the Board Materials, which included a list of current co-investments and cross-held positions held by the funds and a list of non-HCMLP employees who would be available to assist the Board in the event of any conflict of interest between HCMLP, on one hand, and the Advisers of the Funds, on the other. . . .

*The Advisers represented that the quality and level of services provided to the Funds by the Advisers and pursuant to the shared services arrangements had not been negatively impacted to date and that adequate plans were in place prevent any diminution of services as a result of any potential issues relating to the HCMLP bankruptcy that might arise*. . . .

*The Board noted that the level and quality of services to the Funds by the Advisers and its affiliates had not been materially impacted by the HCMLP bankruptcy and took into account the Advisers' representations that the level and quality of the services provided by the Advisers and their affiliates, as well as of those services currently being provided by HCMLP pursuant to the Shared Services Agreement, would continue to be provided to the Funds at the same or higher level and quality*.

**Exhibit 62** at 2, 3, 7 (emphases added).

107.    A week later, Mr. Norris again reassured the Retail Board that Highland continued to provide shared services on an uninterrupted basis and that no issues of "conflict" arose:

*Mr. Norris then noted that there has not been any disruption to the services provided to the Funds by HCMLP pursuant to the Shared Services Agreement and that he expects that such services will continue to be provided in normal course*. In addition, Mr. Norris noted that there have been no issues with an HCMLP employee being conflicted out since the last update.

**Exhibit 63** at 3 (emphasis added).

108.    By December 1, 2020, (a) the Court had approved Highland's latest *Disclosure Statement* [Docket No. 1476]; (b) Highland had sent the Termination Notices (**Exhibit 153** and **Exhibit 154**); and (c) the Advisors had allegedly discovered the "overpayments under the Agreements." (**Exhibit 13** ¶ 16). Yet, the Advisors continued to reassure the Retail Board that everything was proceeding normally and that the parties were working to achieve an orderly, seamless transition.

109. Indeed, on December 1, 2020, Mr. Post confirmed that Highland sent the Termination Notices and informed the Retail Board that the Advisors planned to revise the "disclosure documents for the Funds" to state, among other things, that:

> *On November 13, 2020, HCMLP filed an amended plan of reorganization and* disclosure statement (the "Amended Plan") which was subsequently accepted by the Creditors and approved by the Court. On November 30, 2020, HCMLP provided notice of termination of the Shared Services Agreement to HCMFA/NPA, effective January 31, 2021. However, based upon on-going discussions with HCMLP, **HCMFA/NPA expects to be able to continue to receive these services through a transfer of personnel, equipment and facilities from HCMLP** either to HCMFA/NPA or to a third-party service provider.

**Exhibit 16** at (December 1, 2020 e-mail from Mr. Post) (emphasis added).

110. On December 7, 2020, the Advisors provided written responses posed by Blank Rome, outside counsel to the Retail Board. In response to a question about who "is responsible for putting together the plan to continue to provide/transition shared services for the retail complex," the Advisors stated:

> The senior management team of the Advisors is responsible for the transition of services, and this group is made up of Jim Dondero, D.C. Sauter, Jason Post, and Dustin Norris. *This group is working with HCMLP management to ensure an orderly transition*.

**Exhibit 10** at 1 (emphasis added).

111. The Retail Board also asked for a "matrix of current services provided and services that will be transferred." In response, the Advisors stated:

> Please see Appendix A below, which includes the list of services provided under the shares services agreement with HCMLP. These services fall into two broader categories: 1) Employees performing services and 2) Systems, infrastructure, software and supplies/equipment. As we understand it, the bankruptcy plan of reorganization approved by the bankruptcy court (the "Approved Plan") anticipates the termination of all HCMLP employees by 1/31/21. *The Advisors anticipate extending employment offers to the vast majority of HCMLP's employees such that the employees would be rehired immediately upon termination of their employment with HCMLP. This will cover all of the services under category 1 above*.

*Id*. at 2 (emphasis added).

112. During a Retail Board meeting held on December 10-11, 2020, (a) Mr. Norris reviewed the "current services provided under the shared services agreement with HCMLP and discussed the current plans for ensuring the continuation of those services after a plan of reorganization is approved"; and (b) Mr. Sauter "noted that there has been no material attrition to date with respect to employees":

> Mr. Norris provided responses to the Board's follow up questions that had been submitted on their behalf prior to the Meeting. Among these items, ***Mr. Norris reviewed a matrix of current services provided under the shared services agreement with HCMLP and discussed the current plans for ensuring the continuation of those services after a plan of reorganization is approved***. Mr. Norris noted that these shared services fell into two broader categories: (1) employees performing services and (2) systems, infrastructure, software and supplies/equipment. With respect to the first category, Mr. Norris discussed plans by the Advisers to extend employment offers to the vast majority of HCMLP's employees such that the employees would be rehired immediately upon termination of their employment with HCMLP. In the alternative, these employees could join a newly formed entity (New Co) and continue to provide services to the Funds through NewCo. ***With respect to the second category, Mr. Sauter noted that the Advisers and HCMLP were in agreement that these would be assigned with a payment from the Advisers*** and that there were working groups set up that were pursuing an orderly transition of all of these items, which included orderly assignment and assumption of the relevant agreements needed to continue with all current services. ***He noted that there has been no material attrition to date with respect to employees***. . . . Mr. Norris also discussed the Advisers' proposed alternative plan and confirmed that ***regardless of whether the Advisers and HCMLP came to an agreement on shared services, such services would be continued to be provided to the Funds without interruption***.

**Exhibit 64** at 7, 8 (emphases added).

113. By January 2021, Highland had obtained temporary injunctive relief against Mr. Dondero, but the Advisors assured the Retail Board that it had no impact on the Advisors' ability to obtain access to information and resources concerning the Retail Funds:

> Mr. Norris confirmed that ***the Advisers did not feel limited by the temporary restraining orders relating to the HCMLP bankruptcy with respect to access to Fund information***. Mr. Norris then updated the board on a number of employee moves from HCMLP to NexPoint. In response to a question, Messrs. Post and

Norris confirmed that there was sufficient legal and compliance coverage for the Funds.

Mr. Norris then provided an update on the negotiations with HCMLP on the transition of shared services. He noted that both sides had agreed in principal on the transition of services and cost sharing but that it was not yet memorialized in a contract and a number of details still needed to be resolved. *He confirmed that the Advisers continued to receive full access to information and resources with respect to the Funds*.

**Exhibit 66** at 2, 3 (emphases added).

114. On January 29, 2021, Jackie Graham, NREA's Director of Investor Relations and Capital Markets, sent an e-mail to Mr. Dondero, Mr. Sauter, and others in advance of a Board call in which she attached an outline of certain issues concerning shared services provided by Highland and stated, among other things, that:

Because the [relevant Funds] are externally managed by external advisors (NexPoint Real Estate Advisors, L.P. and its affiliates (the "Advisors")), the [relevant Funds] rely on the Advisors to provide certain services to them. *The Advisors utilize Highland Capital Management, L.P. ("HCM") to provide a certain subset of these services under a shared services agreement between HCM and the Advisors*. . . .

Employees of the Advisors are working with HCM to provide a transition of shared services from HCM to the Advisors or third party providers. . . . Specifically, the Advisors and affiliate advisors would pay a one-time fee of $400,000 and ongoing monthly costs of $270,000. Additionally, *HCM may require the Advisors and affiliate advisors to pay previously unpaid fees allegedly owed to HCM totaling $5.5m*. . . .

Winston is reviewing potential legal remedies *in the event HCM breaches the shared services* but denying us access to our data held by HCM or otherwise attempts to cause harm to our shareholders . . .

**Exhibit 84** at FUNDS 0000043-44 (emphases added).

115. As the transition of the shared services from Highland to Skyview was nearing completion, the Advisors continued to reassure the Retail Board that all was well. On February 26, 2021, Mr. Norris provided an update on the transition:

Mr. Norris provided an update on the shared services arrangements and employee transitions. ***He indicated that there would be no impact as a result of certain employees not transitioning to the Advisers*** and discussed the team in place and their qualifications. He noted that the current shared services arrangements with HCMLP would cease at the end of February and that the Advisers wish to move forward with new Shared Services Agreements between each Adviser and NewCo. He then stated that these Agreements were in the process of being drafted and finalized and will be reviewed with the Board at its next meeting. ***He indicated that there had been no major issues in connection with the transition and that the personnel from the Advisers had met with HCMLP with respect to data files and are comfortable that HCMLP will be providing the necessary information***. In response to a question from the Board, he indicated that there was not an immediate need for such data and confirmed that the Advisers had the data and information files they needed with respect to Fund operations and services.

**Exhibit 73** at 9-10 (emphases added).

116.    Based on all the information and representations made by the Advisors, the

NexPoint Diversified Real Estate Trust (one of the Advisors' Clients) filed its annual report with

the SEC in early ***2022*** (about a year after Highland commenced this Adversary Proceeding and the

Advisors filed their administrative claim) in which it disclosed, among other things, the following:

> The Fund has retained NexPoint Advisors, L.P. (the "Investment Adviser") to manage the assets of the Fund pursuant to an investment advisory agreement between the Investment Adviser and the Fund (the "Agreement"). . . . ***The Board of Trustees noted that the level and quality of services to the Fund by the Investment Adviser and its affiliates had not been materially impacted by the HCMLP bankruptcy*** and took into account the Investment Adviser's representations that the level and quality of the services provided by the Investment Adviser and their affiliates, as well as of those services provided by Skyview to the Investment Adviser under the Skyview Services Agreement, would continue to be provided to the Fund at the same or higher level and quality.

**Exhibit 77** at 41, 43.[17]

---

[17] The Highland Income Fund, advised by HCMFA, also filed its annual report in early 2022 that contained the same disclosure.

2.      **The Advisors Knowingly and Intentionally Made All Payments Due under the Agreements from January 1, 2018 through November 30, 2020**

117.    From January 1, 2018 (the effective date of all of the Agreements, except the HCMFA SSA) though November 30, 2020, the Advisors knowingly and intentionally made all monthly payments due and owing under the Agreements in exchange for Highland's front-office and middle- and back-office services.[18]

118.    The evidence establishing that the Advisors had contemporaneous knowledge of the payments made under the Agreements includes the following:

- The Agreements signed by the Advisors' Treasurer specified the fixed monthly amounts to be paid;[19]

- The monthly payments made by NexPoint were consistent with Mr. Dondero's determination that the total annual payment for Highland's services was to be fixed at $6 million;[20]

- Mr. Dondero was given written projections for 2018, 2019, and 2020 that are consistent with all amounts subsequently paid during those years (except December 2020);[21]

- The parties originally sought to enter into "flat fee" arrangements under the Sub-Advisory Agreements and only entered into the PRAs because outside counsel advised that the Sub-Advisory Agreements could not be retroactive and could not be adopted unless approved by the Retail Board during an in-person meeting;[22]

- Highland sought and obtained Mr. Waterhouse's approval before making payments under the Agreements;[23]

---

[18] The lone exception was the monthly amount from HCMFA for shared services rendered in November 2020, because such amounts were not determined until after Mr. Dondero's direction to stop making payments.

[19] **Exhibit 3** §3.01; **Exhibit 6** (definition of "Actual Costs"); and **Exhibit 8** (definition of "Actual Costs").

[20] *See* **Exhibit 86** at 36 (forecast assumed that "NexPoint and subs [would pay Highland] $6 million/year subadvisory + shared services").

[21] **Exhibit 86** at 46 (projecting annual payments of $3,024,000 for sub-advisory fees (*i.e.*, $252,000 per month) and annual payments of $2,976,000 for shared services (*i.e.*, $168,000 per month for shared services for NexPoint and $80,000 per month for shared services for NexPoint's affiliate, NREA), which together yield $6 million in annual fees)

[22] **Exhibit 129**.

[23] *See, e.g.*, **Exhibit 147** and **Exhibit 152**. Mr. Klos and Mr. Waterhouse will confirm that Highland obtained Mr. Waterhouse's approval before making payments under the Agreements.

- The Advisors' contemporaneous books and records recorded all payments to Highland under the Agreements;[24]

- Mr. Klos reminded Mr. Waterhouse in January 2020 of the "flat" monthly fees being charged;[25]

- In April 2020, Mr. Dondero was provided with written forecasts showing that NexPoint was projected to pay Highland exactly $500,000 per month (or, again, $6 million per year on an annualized basis) through December 2020;[26]

- In August 2020, HCMFA provided its unaudited income statement to the Retail Board that showed, among other things, all amounts paid under the Agreements for the twelve months ending June 30, 2020;[27]

- The Advisors represented to the Retail Board in October 2020 that "[a]ll amounts owed by each of NPA and HCMFA pursuant to the shared services arrangement have been paid,"[28] a representation that could not have been made in good faith if made on an uniformed basis; and

- Each of the payments that the Advisors made under the Agreements between January and November 2020 (when the Independent Board controlled of Highland) were exactly the same (or utilized the exact same methodology under the HCMFA SSA) as the payments that the Advisors made under the Agreements between January 1, 2018 and December 31, 2019 (when Mr. Dondero solely controlled Highland and the Advisors).

119.     There will be no evidence showing that the Advisors were unaware of the amounts being charged and paid under the Agreements between the Petition Date and November 30, 2020, when the Advisors knowingly and intentionally ceased making payments to Highland.

---

[24] Mr. Waterhouse will testify to this fact and it will be uncontested.

[25] **Exhibit 146**.

[26] **Exhibit 150**.

[27] **Exhibit 17** at ACL 080290.

[28] **Exhibit 22** at ACL 080593 (response to Question 2).

**3.** **The Advisors Knew (i) What Services Were Being Provided, and (ii) When Every Person (Including Every Dual Employee) Was Hired and Terminated by Highland, During the Relevant Period**

120. There is overwhelming, irrefutable evidence that the Advisors had contemporaneous knowledge of every person who was hired or terminated by Highland from before January 1, 2018 through at least December 30, 2020, including the following:

- In their written responses to interrogatories, the Advisors admitted that they had contemporaneous knowledge of the termination of every Dual Employee (the "<u>Advisors' Admissions</u>");[29]

- Every month from at least October 2017 through January 2021, Highland's Human Resources department (under the direction of Mr. Collins) prepared a "Monthly Headcount Report" (the "<u>Monthly Headcount Reports</u>") listing every employee in the Highland complex and highlighting new hires and terminations and distributed such reports to numerous people, including the Advisors' officers (*i.e.*, Mr. Waterhouse, Ms. Thedford, and Mr. Norris);[30]

- Multiple witnesses will testify that Mr. Dondero was informed (if not approved) of every hiring and termination from before January 1, 2018 through at least January 9, 2020;

- Mr. Dondero was provided with extensive information concerning hires, terminations, and employee compensation and benefits during the Annual Reviews;[31]

- In early 2020, the Advisors provided detailed information to the Retail Board concerning all of Highland's employees;[32]

- On August 13, 2020, the Advisors informed the Retail Board, among other things, of recent changes to the Advisors' portfolio management team (*i.e.*, the team that provided investment advisory or "front office" services) and concluded that "there have been no changes that may reasonably be viewed to bear on an Advisers' performance of services for a Fund or otherwise to have an effect on a Fund;"[33]

---

[29] **Exhibit 14** (responses to Interrogatories 3 and 4).

[30] **Exhibits 88-127**.

[31] **Exhibit 86** (2017/2018 Annual Review) at 29-33; **Exhibit 142** (2018/2019 Annual Review) at 6-10.

[32] **Exhibit 57**; **Exhibit 75**.

[33] **Exhibit 17** at 3-5 (responses to Questions 4 and 5).

- On October 28, 2020, Mr. Collins informed the Retail Board that he was confident the Advisors could retain Highland's employees based on his discussions with those individuals and that there were "no significant departures to date;"[34] and

- In December 2020, Mr. Sauter represented to the Retail Board that there was "no material attrition to date with respect to employees."[35]

121.   Based on this information, there is no credible basis for the Advisors' contention that the Advisors only intended to pay for the "Actual Cost" of the Dual Employees listed on Exhibit A to each of the PRAs.

122.   Based on the Advisors' Admissions and the Monthly Staffing Reports alone, the Advisors knew the following facts at the following times:

- As of May 1, 2018, when the Advisors entered into the PRAs, **4 of the 29** Dual Employees on Exhibit A had already been terminated;

- As of December 14, 2018, when the Advisors entered into the PRA Amendments pursuant to which they agreed to pay Highland an incremental $2.5 million in the aggregate, **9 of the 29** Dual Employees on Exhibit A had already been terminated; and

- As of October 16, 2019, the date Mr. Dondero caused Highland to commence the Bankruptcy Case, **14 of the 29** employees on Exhibit A had already been terminated.

123.   Prior to the Petition Date, and indeed prior to the delivery of the Termination Notices,[36] the departure of the Dual Employees was apparently of no concern to the Advisors.

124.   There is no dispute that (i) Mr. Dondero controlled Highland and the Advisors from at least January 1, 2018 through the Petition Date and (ii) ***nearly half*** of the Dual Employees were terminated during that time.  Over this same period, a number of employees were either hired or

---

[34] **Exhibit 62**.

[35] **Exhibit 64**.

[36] At least three additional Dual Employees were terminated between the Petition Date and the date Highland sent the Termination Notices (*see* **Exhibit 14** (response to interrogatory 3)), yet the Advisors never exercised their rights under Section 2.02 of the PRAs or otherwise said or suggested that the fixed monthly amounts that had been charged every month since January 2018 should be modified.

transitioned roles in order to maintain the level of services provided to the Advisors. Despite having contemporaneous knowledge of these facts, there will be no evidence that the Advisors ever attempted to modify the amounts to be paid pursuant to Section 2.02 of the PRAs (except for the December 2018 amendments to *increase* such amounts) or objected to the amounts being charged.[37] Indeed, the evidence is exactly the opposite: for twenty-two (22) consecutive months, each of the Advisors paid the "flat fee" expressly set forth in the definition of "Actual Costs" in the PRAs.

125. Nor can the Advisors credibly contend that they were "unaware" of what shared services were being provided by Highland. The undisputed evidence shows, among other things, that:

- Until late December 2020, Mr. Dondero was physically present in Highland's offices and regularly communicated with Highland's employees;

- Mr. Dondero and each of the Advisors' officers interacted with Highland's employees each business day during the post-petition period;

- The Advisors knew that they needed to obtain the shared services so they could fulfill their obligations under the Investment Advisory Agreements;

- Accordingly, and as the Advisors expressly represented to the Retail Board, *the Advisors "monitored" the "level and quality" of shared services that Highland was providing*;[38]

- The Advisors repeatedly and without exception represented to the Retail Board that Highland continued to provide quality shared services without interruption, notwithstanding the bankruptcy filing;[39]

- Between October 16 and December 31, 2020, the Advisors and their outside counsel, K&L Gates, wrote five (5) separate letters to Highland but—with one

---

[37] Notably, the Advisors never filed a pre-petition claim based on the theory they are now pressing in support of their administrative claim.

[38] **Exhibit 58**.

[39] *See, e.g.*, **Exhibit 58** at 20; **Exhibit 59** at 6; **Exhibit 18** at ACL 080581; **Exhibit 60** at 7, 12-13; **Exhibit 81**; **Exhibit 61** at 2, 3; **Exhibit 22** at 1; **Exhibit 62** at 2-3, 7; **Exhibit 63** at 3; **Exhibit 16**; **Exhibit 10** at 1; **Exhibit 64** at 7, 8; **Exhibit 66** at 2,3; and **Exhibit 73** at 9-10.

spurious exception—never complained about the shared services being provided by Highland, let alone asserted that Highland was in breach of their obligations under the Shared Services Agreements.[40]

126.     In short, the evidence will conclusively establish that, between January 10, 2020 and February 2021, Highland provided the same services to the Advisors under the Agreements, for the same set prices, as Highland provided and charged between January 1, 2018 and January 9, 2020, when Mr. Dondero was in control of Highland and the Advisors.

E.     **The Advisors' Damages and Overpayment Theory is Fatally Flawed**

127.     The Advisors have not and cannot meet their burden of proving damages for at least the following reasons:

- The Advisors' damage theory is based on an analysis (a) originally created for an unrelated purpose, (b) revised under suspicious circumstances; and (c) based on assumptions that are incompatible with the Advisors' intended contention;

- The analysis in question was originally prepared by Mr. Klos in November 2019 (**Exhibit 144**), and was updated a month later for use in discussions with Highland's Official Committee of Unsecured Creditors (**Exhibit 145**);

- Mr. Waterhouse has admitted that he asked Mr. Klos to update his analysis in December 2020, and that he made the request because he believed the revised analysis could be useful in "negotiations;"

- As constructed, the analysis is not a reliable basis for determining the Advisors' allocable share of the "Actual Costs" of the Dual Employees nor is it a reliable indicator of Highland's alleged profitability under the Agreements; and

- The evidence establishes that Mr. Dondero incorporated the flawed analysis into the "plan" he proposed on the eve of confirmation as a way to drive a bargain.

---

[40] *See* **Exhibit 148** (October 16, 2020 letter from the Advisors); **Exhibit 155** (November 24, 2020 letter from the Advisors); **Exhibit 156** (December 22, 2020 letter from K&L Gates); **Exhibit 157** (December 23, 2020 letter from K&L Gates); and **Exhibit 158** (December 31 2020, letter from K&L Gates). The only issue raised in these letters that even arguably concerns "shared services" is the Advisors' complaint that Highland would not "allows its employees to work on certain matters that jointly affect HCMLP and the Advisors." **Exhibit 148**. This is a reference to "conflicts of interest," a topic that was transparently and extensively discussed with the Retail Board. *See, e.g.*, **Exhibits 18, 59, 60, 62, and 63**. Mr. Seery will testify that the actual areas of "conflict" were quite limited and that, in any event, the Agreements did not require (and could never be reasonably read to require) Highland to cause its employees to act against Highland's own interests or contrary to applicable law.

128. For the reasons set forth below, the Advisors have failed to meet their burden of proving "overpayment" or that Highland breached the HCMFA SSA. Even if they had met their burden, however, the Advisors have failed to meet their burden of proving damages by a preponderance of evidence.

### III.   PROPOSED CONCLUSIONS OF LAW

#### A.   Jurisdiction and Venue

129. This Court has jurisdiction over this Adversary Proceeding, and this Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

130. This Adversary Proceeding is commenced pursuant to Bankruptcy Rules 7001 and 7065, Bankruptcy Code sections 105(a) and 362, 28 U.S.C. §§ 2201 and 2202.

131. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

#### B.   The Parties' Claims

132. This action involves competing claims for alleged breaches of the Agreements. The Parties' claims are summarized as follows:

##### 1.   Highland's Claims

133. Highland asserts breach of contract claims against (a) HCMFA for failing to pay for services rendered by Highland under (i) the HCMFA SSA during the months of November 2020, December 2020, and January 2021, and (ii) the HCMFA PRA during the months of December 2020, and January 2021, and against (b) NexPoint for failing to pay for services rendered by Highland under (i) the NexPoint SSA during the months of December 2020 and January 2021, and (ii) the NexPoint PRA during the months of December 2020 and January 2021 and (c) both Advisors for also failing to reimburse Highland for expenses under the Shared Services Agreements.

134.    In accordance with the clear and unambiguous provisions of section 6.03 the NexPoint SSA, Highland also seeks to recover its costs and expenses, including attorneys' fees, incurred in the pursuit and defense of the claims asserted in this Adversary Proceeding.[41]

### 2.    The Advisors Claims

135.    The Advisors bring claims against Highland for (a) restitution for overpayments made under the PRAs, (b) breach of contract under the SSAs for Highland's failure to perform services thereunder, (c) restitution for overpayments made under the SSAs.

136.    The Court will address each claim in turn.

## C.    Choice of Law

137.    Texas law applies to the claims at issue.  *See* **Exhibit 2** (HCMFA SSA), Section 9.05 (providing that "the Agreement shall be governed by, and construed in accordance with, the laws of the state of Texas"); **Exhibit 3** (NexPoint SSA), Section 8.02 (same); **Exhibit 6** (NexPoint PRA), Section 6.05 (same); **Exhibit 8** (HCMFA PRA), Section 6.05 (same).

## D.    The Advisors' Claims for Overpayment under the PRAs

138.    The Advisors seek restitution for alleged overpayments they made under the PRAs from the Petition Date until November 30, 2020 (the date the Advisors ceased making any payments under the PRAs).

139.    As set forth in the Joint Pretrial Order filed in this Adversary Proceeding, the Advisors contend that each of the Advisors is to reimburse Highland for its actual costs of the Dual Employees listed on Exhibit A to the PRAs, but that as of the Petition Date, certain of the Dual

---

[41] The parties agree that the "quantification of any attorney's fees awarded in this Adversary Proceeding, subject to defenses, will be handled through post-trial motion practice under Rule 54(d)(2) and no Party need present evidence on any attorney fee claim at the trial of this Adversary Proceeding." *Joint Pretrial Order*, Section VII.  For the reasons set forth below, the Court finds that the Advisors are liable for the reimbursement of Highland's costs and fees (including attorneys' fees), but defers for another day any determination as to the quantum of costs and fees to be paid.

Employees were no longer employed at Highland. Therefore, the Advisors argue, during this period, that they were paying Highland for Dual Employees who were no longer employed by Highland, and that such payments constituted overpayments under the PRAs. The Advisors maintain that their monthly payments under the PRAs resulted in overpayments by the Advisors to Highland totaling $7,649,942, broken down as $4,928,103 in postpetition overpayments by HCMFA and $2,721,839 in postpetition overpayments by NexPoint. The Advisors' overpayment claim is premised on the contention that the Advisors were only required to pay for "actual costs and expenses" relating to each "Dual Employee," notwithstanding the clear, fixed monthly amount required to be paid by the Advisors by the PRAs.

140.     Alternatively, the Advisors argue that if Section 2.02 of the PRAs controls, the Advisors sought to modify the clear, fixed monthly amounts under Section 2.02, but that Highland failed to negotiate the same in good faith as required by such section.

141.     In defense, Highland argues that the PRAs clearly and unambiguously require that the Advisors pay a flat monthly fee for investment advisory services rendered, regardless of which employees actually performed those services, unless the parties agreed otherwise in writing pursuant to Section 2.02.

142.     Highland also argues that even if the PRAs are deemed ambiguous, parole evidence and the parties' uninterrupted course of dealing proves that the parties intended for the Advisors pay a flat monthly fee for investment advisory services, unless modified pursuant to Section 2.02.

143.     Alternatively, Highland further maintains that, even if the Advisors could prove that they "overpaid," under the PRAs, the Advisors claims have been (a) waived and (b) are barred by the voluntary payment rule.

144. Since the Parties disagree as to the meaning of "Actual Cost," the Court first addresses the question of whether the PRAs are unambiguous regarding the Advisors' payment obligations thereunder. The Court next turns to the merits of Advisors' overpayment claims and Highland's defenses.

1. **The Payroll Reimbursements are Unambiguous as a Matter of Law**

    i. **Legal Standard**

145. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered into." *BCC Merchant Solutions, Inc. v. Jet Pay, LLC*, 129 F.Supp.3d 440, 466 (N.D.Tex. 2015) (internal quotations omitted); *see also Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982) ("[W]hen a question relating to the construction of a contract or its ambiguity is presented, the court is to take the wording of the contract in the light of the surrounding circumstances, in order to ascertain the meaning that would be attached to the wording by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration"). "If, in the light of the surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing." *Watkins*, 689 F.2d at 538 (internal quotations omitted); *see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996) ("In determining the parties' agreement, we are to examine all parts of the contract and the circumstances surrounding the formulation of the contract.").

146. "In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "In identifying such intent, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none

will be rendered meaningless." *Id*. "We begin this analysis with the contract's express language." *Id.*

147. A contract is unambiguous and will be enforced as written where it is "susceptible to only one reasonable construction." *BCC Merchant*, 129 F.Supp.3d at 477. "[A] cardinal rule of contract interpretation under Texas law is that the entire writing must be examined" and "no single provision taken alone [may] be given controlling effect." *Id.* (citing Texas law) (internal quotations omitted). Texas courts consider the entire writing "to harmonize and effectuate all provisions such that none are rendered meaningless." *Id.* "An ambiguity is not created simply because the parties advance conflicting interpretations of the contract … Rather, an ambiguity exists only where such conflicting interpretations are 'reasonable.'" *Id.* at 477-78 (internal quotations and citations omitted); *see also AXA Art Americas Corp. v. Public Storage*, 208 F.Supp.3d 820, 828 (S.D.Tex. 2016) ("Ambiguity arises only when the applicable of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of … two meanings is the proper one") (internal quotations omitted); *Instone Travel Tech Marine & Offshore v. Int'l Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (A "contract is not ambiguous because it suffers from mere 'uncertainty or lack of clarity,'" noting "[t]he failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists."); *Columbia Gas*, 940 S.W.2d at 589 ("For an ambiguity to exist, both interpretations must be *reasonable*.") (emphasis in original).

148. "Where the language is clear and definite, the contract is not ambiguous, and a court must apply the plain language as a matter of law." *Main Street Bank v. Unisen*, No. H-06-3776, 2008 WL 11483415, at *4 (S.D.Tex. Feb. 15. 2008). "Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true

meaning of the instrument." *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450–51 (Tex.2008)

(per curiam) (internal quotation omitted); *see also Italian Cowboy*, 341 S.W.3d at 333 (same).

### ii.  The PRAs Unambiguously Required the Advisors to Pay Highland Fixed Monthly Fees Absent Changes Made Under Section 2.02

149.    There is no ambiguity regarding the Advisors' payment obligations under the

PRAs, and specifically whether the Advisors were obligated to pay fixed monthly fees to Highland.

150.    As mandated, the Court begins by examining the express terms of the contracts.

Under the plain terms of the PRAs, each of the Advisors were to pay Highland the "Actual Cost"

for investment advisory services provided by Dual Employees (as defined in the PRAs).  *See*

Exhibit 6 (NexPoint PRA) §§ 2.01, 3.01, Exhibit 8 (HCMFA PRA) §§ 2.01, 3.01.

151.    Each of the PRAs contains an identical "ARTICLE I DEFINITIONS" provisions

,save for the fixed dollar amount of "Actual Cost,"  which Article sets forth the definitions of terms

used in the respective PRAs.  **Exhibit 6** (NexPoint PRA) Article I, **Exhibit 7** (HCFMA PRA)

Article I, Exhibit 7.  Each of the PRAs also contains an identical "Section 6.15 General Rules of

Construction" which provides:   [f]or all purposes of this Agreement and the Exhibits and

Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the

meanings ascribed to them in Article I and include the plural as well as the singular."  **Exhibit 6**

(NexPoint PRA) Section 6.15, **Exhibit 7** (HCFMA PRA) Section 6.15.  As a result, the definitions

in Article I of each of the PRAs are binding on the parties thereto and cannot be amended absent

a writing executed by each of the parties to the agreements.  **Exhibit 6** (NexPoint PRA) Section

6.02, **Exhibit 7** (HCMFMA PRA) Section 6.02.

152.    The binding definitions of "Actual Cost" and "Dual Employees" in Article I of each

of the PRAs is clear, unambiguous, and determinative.  The definition of "Actual Cost" is:

> [W]ith respect to any period hereunder, the actual costs and expenses caused by,
> incurred, or otherwise arising from or relating to each Dual Employee, in each case

during such period. **Absent any changes to employee reimbursement, as set forth in Section 2.02, such costs and expenses are equal to [$X] per month**.

**Exhibit 6** (NexPoint PRA) Article I, **Exhibit 8** (HCMFA PRA) Article I (emphasis added).

153.     The PRAs fix a set amount for Actual Cost which is binding unless amended in writing. the plain meaning of these provisions proves, as a matter of law, that the parties agreed (a) on the value to be paid for the investment advisory services each month, and (b) that the value to be paid for those services each month would remain in effect "[a]bsent any changes to employee reimbursement, as set forth in Section 2.02."

154.     The Advisors' interpretation of the PRAs is unreasonable precisely because it renders the second sentence of the definition of "Actual Costs"—that is, the fixed amount—superfluous, an obvious violation of basic rules of contract interpretation.  Stated another way, if—as the Advisors now contend—the parties intended that the Advisors' payment obligations would fluctuate based on the identity, compensation, and time allocation each Dual Employee, they would never have included the second sentence fixing the amount in the definition of "Actual Costs."

155.     The Advisors' interpretation is also unreasonable because it would either (a) leave the Advisors with a gap in investment advisory services every time a Dual Employee was terminated or (b) would require Highland to provide the investment advisory services of departed Dual Employees without compensation.  This re-writing of the contract makes no sense.

156.     The Court finds and determines as a matter of law that, unless modified in writing pursuant to Section 2.02, the "Actual Cost" for the investment advisory services that Highland provided to NexPoint under the NexPoint PRA was fixed at $252,000 per month (*see* **Exhibit 6** (NexPoint PRA), Article I), and the "Actual Cost" for the investment advisory services that

Highland provided to HCMFA under the NexPoint PRA was fixed at $416,000 per month. *See* **Exhibit 8** (HCMFA PRA) Article I.

157. The Parties' rights to modify the "Actual Cost" under the PRAs are also unambiguous. Pursuant to the express terms of Section 2.02, either party could request a modification to the "Actual Cost" if they believed a change was appropriate. **Exhibit 6** (NexPoint PRA) § 2.02; **Exhibit 8** (HCMFA PRA) § 2.02. *See also* **Exhibit 6** (NexPoint PRA) § 4.02 ("Should either Party determine that a change to employee reimbursement is appropriate, as set forth in Section 2.02, the Party requesting the modification shall notify the other Party on or before the last business day of the calendar month"), **Exhibit 8** (HCMFA PRA) § 4.02 (same). Any such modification had to be evidence by a writing signed by all parties to the agreement. Exhibit 6 (NexPoint PRA) Section 6.02, Exhibit 7 (HCMFMA PRA) Section 6.02.

158. The inclusion of Sections 2.02, 4.02, and 6.02 is further evidence that the Advisors' current interpretation is unreasonable. Again, if, as the Advisors now contend, the parties intended that the Advisors' payment obligations would be determined by a formula based on the identity, compensation, and time allocation of each Dual Employee, the PRAs would say that. But they don't. Indeed, the right to request modifications to "Actual Costs" under Sections 2.02 and 4.02 would be completely unnecessary if the parties intended that "Actual Costs" would fluctuate based on objectively ascertainable and undisputable facts such as the continued employment of each Dual Employee.[42]

---

[42] There is more evidence that the Advisors' interpretation is unreasonable. The Advisors admit knowing that four (4) of the 29 Dual Employees listed on Exhibits A were terminated between January 1, 2018 (the effective date of the PRAs) and May 1, 2018 (the date the PRAs were signed). *See* **Exhibit 14** (response to interrogatories 3 and 4). If the parties intended that the Advisors would retroactively pay only for the "Actual Cost" of the Dual Employees beginning on January 1, 2018, then the monthly charge referred to in the definition of "Actual Cost" would have had one price for January 2018 (the *only* month in which *all* of the Dual Employees were employed by Highland), and that price would have been reduced for February (when Jake Tomlin and Michael Phillips were terminated); it would have been further reduced for March (when Sanjay Gulati was terminated); and it would have been further reduced for April (when Phillip Ryder was terminated). Instead, ***the Advisors entered into the PRAs knowing that***

159.    The Advisors' suggestion that Sections 2.02 and 4.02 imposed an affirmative obligation on Highland to update the list of Dual Employees and their respective Allocation Percentages, or to unilaterally adjust the "Actual Costs," is similarly untenable  Under the Advisors' re-interpretation of the PRA, Highland would have been obligated to invoke Section 4.02 (which is itself dependent on Section 2.02) on the Advisors' behalf and to adjust the Advisors' monthly payments as Dual Employees were terminated or changes were made in their compensation or Allocation Percentages.  But again, that is simply not what the PRAs say.

160.    Indeed, (a) the name "HCMLP" does not even appear in either Section 2.02 or 4.02; (b) modifications to the fee structure under Section 2.02 could not be imposed unilaterally but instead required an "agree[ment]" of the parties; and (c) modifications to the fee structure under Section 2.02 are permissive, not mandatory.  *See e.g.*, **Exhibit 6** (NexPoint PRA) Section 2.02 (the "Parties ***may*** agree" to change the fees to be paid) (emphasis added).

161.    Based on the foregoing, the Court concludes as a matter of law that the Advisors' interpretation of the PRA is not a "reasonable interpretation" that could create ambiguity.  *See AXA*, 208 F.Supp.3d at 828 (finding contract unambiguous as a matter of law where provision "unambiguously" sets forth plaintiff's right and "creates no affirmative duty" on defendant, noting plaintiff's "interpretation is not reasonable in light of the [] agreement as a whole); *BCC*, 129 F.Supp.3d at 478 (finding no ambiguity in agreement based on its "plain" and "unequivocal" language, noting that party's "proffered interpretation" "does not reasonably account for the surrounding language" of agreement, would render such language "meaningless," and is "not reasonable under Texas law"); *Instone*, 334 F.3d at 431 ("when properly confined to the four corners of the document … [defendant's] interpretation" is not "reasonable" because it

---

*the monthly charge referred to in the definition of "Actual Cost" included the cost of four (4) Dual Employees on Exhibit A who were already terminated*.

"unambiguously holds [defendant] responsible" thereunder); *David J. Sacks, ,* 266 S.W.3d at 450–51 (finding "plain language" of engagement letter unambiguously provided that defendant agreed to pay plaintiff hourly fees, and rejecting defendants' contention that "fee agreement must specifically state that hourly fees will accrue without limit," explaining that "the lack of such explicit language is irrelevant if the agreement can be reasonably interpreted only one way.") *Italian Cowboy*, 341 S.W.3d at 333 ("We conclude that the only reasonable interpretation of the contract language at issue here is that the parties to this lease intended nothing more than the provisions of a standard merger clause, and did not intend to include a disclaimer of reliance on representations.  Therefore, we need not consider any extraneous evidence of the parties' intent to ascertain the true meaning of the instrument."); *Columbia Gas*, 940 S.W.2d at 591-92 (finding party' interpretation of contract unreasonable where it has effect of "eliminating the viability of" and "frustrate the intend [sic??] of" another provision of the contract, and where party's "interpretation ignores the contract language.").

162.    Thus, the express terms of the PRAs unambiguously provide, as a matter of law, that NexPoint and HCMFA were obligated to pay Highland a fixed monthly "Actual Cost" in the amount of $252,000 and $416,000, respectively, absent any changes pursuant to Section 2.02 of the PRAs.

###    iii.    Even if the PRAs Are Ambiguous, the Parole Evidence and the Parties' Course of Dealing Supports Highland's Interpretation

163.    Even if the PRAs were found to be ambiguous on the issue of how the monthly advisory fees were to be determined, the parole evidence and the parties' course of dealing conclusively establishes that Highland's interpretation is the only reasonable interpretation of the agreements which accurately reflects the parties' intent.

164.    The Court incorporates by reference by reference all of the Findings of Fact set forth in Section B(4) above but highlights certain particularly pertinent facts here:

- The PRAs were preceded by the Sub-Advisory Agreement (an indisputably fixed-cost contract for investment advisory services) and were *only* created after the parties learned that the Sub-Advisory Agreement could not be retroactive or adopted except upon approval during an in-person meeting of the Retail Board;

- The Communications between Mr. Klos and Ms. Thedford in April 2018 (**Exhibit 129**) prove that the parties never intended to update Exhibit A and that the advisory fees would be fixed after being initially set, subject only to termination or an agreement to amend (*i.e.*, Section 2.02);

- Mr. Klos created Exhibits A in good faith but for the purpose of "backing into" the fee structure set forth in the Sub-Advisory Agreement and the annual amounts determined by Mr. Dondero;

- Exhibits A were never updated and there is no evidence anyone was charged with the responsibility for doing so;

- The Advisors, with full knowledge of all relevant facts, paid the fixed monthly fees required by the definition of "Actual Cost" during every month between January 1, 2018 and November 30, 2020, without protest or objection;

- The Parties entered into the PRA Amendments in December 2018 when Mr. Dondero was solely in control of Highland and the Advisors, and the additional fixed amount of $2,500,000 paid by the Advisors bore no relationship to costs incurred by Highland or the schedule of "Dual Employees" (indeed, more than one-third of the Dual Employees were terminated as of December 2018) and

- Highland's interpretation of the PRAs was ratified in the January 2020 communications exchanged between Mr. Klos and the Advisors' officers before any dispute existed.

165.    The surrounding circumstances (including parole evidence and the parties' uninterrupted course of dealings) establish that even if the PRAs were found to be ambiguous, Highland's interpretation makes sense, is intellectually and factually consistent, and is reasonable while the Advisors' interpretation is not. *See Columbia Gas.*, 940 S.W.2d at 591 (finding party's "circuitous" interpretation of contract especially unreasonable in light of "circumstances

surrounding formulation of contract," including what parties knew when contract was signed, and that parties incorporated certain provisions at the time the contract was formulated, noting "this interpretation properly considers the circumstances surrounding the formulation of the contract…").

166. Based on the undisputed circumstances surrounding the creation, drafting, execution and administration of the PRAs, the Advisors were required to pay a flat monthly fee in the amounts of $252,000 and $416,000 for NexPoint and HCMFA, respectively, for investment advisory services unless the Parties agreed in writing otherwise. *See Epps v. NCNB Tex. Nat'l Bank*, 838 F. Supp. 296, 304 (N.D. Tex. 1993), *aff'd sub nom. Epps v. NCNB Tex.*, 7 F.3d 44 (5th Cir. 1993) ("[A]pplying the undisputed facts to the unambiguous terms of the contract," the contract is not ambiguous); *Watkins*, 689 F.2d at 540 ("[T]he express language of the agreement-in the light of this circumstance (known to both parties who confected the agreement) and of others surrounding the agreement-in our opinion is susceptible with regard to the issue before us of only one reasonable (and thus unambiguous) meaning," finding that "even if we were to construe the agreement to be ambiguous (so as to allow parole evidence to show not only the surrounding circumstances but also the intent of the parties)" the parol evidence does not prove contrary interpretation).

## 2. The Advisors' Claim for Overpayment Under the PRAs Fails

167. The Advisors' claim of overpayments on the PRAs is premised on the theory of unjust enrichment or restitution. "Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, such as unjust enrichment." *DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 49 (Tex. App. 2008). There are, however, exceptions to this general rule, such as when a claim for unjust

enrichment is premised on overpayments made under a valid contract. *See id.*; *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 470 (Tex. 1998) (same).

168.     The Advisors' claim for overpayments under the theory of unjust enrichment or restitution fails for the reasons discussed above.  The claim is premised on the faulty notion that the Advisors were paying for specific Dual Employees under the PRAs, and not the services rendered by Highland in exchange for a fixed monthly fee, *i.e.*, the "Actual Cost" defined in the PRAs.

169.     As discussed *supra*, the payments made by the Advisors under the PRAs were required under the clear and unambiguous terms of valid contracts.  Moreover, the Advisors have not alleged, let alone proven, that Highland failed to provide investment advisory services under the PRAs.  The Advisors also adduced no evidence proving that Highland failed to negotiate in good faith under Section 2.02.[43]  Accordingly, the Advisors' claims for "overpayment" under the PRAs fail.  *See DeClaire*, 260 S.W.3d at 49 (finding that party's claim for overpayments under contract failed where "the parties entered into a valid, written contract and nothing suggests that overpayments were made on the contract" and where such contract contained express language setting forth payments at issue); *Sw. Elec. Power*, 966 S.W.2d at 470 (party failed to prove claim for unjust enrichment for overcharges on contract, where defendant charged the rates expressly set forth in the contract, and plaintiff paid the rates established in accordance with such contract,

---

[43] The Court finds that Highland did not violate its obligation to negotiate in "good faith" because the evidence shows that the Advisors' contentions were manufactured for the purpose of creating negotiating leverage, not because of any legitimate dispute.  Even if that were not the case, Highland did not violate any obligation given that the Advisors were on notice of Highland's monetization plan and its intention to cease providing services when the Advisors first began questioning the amounts charged under the PRAs.  Finally, even if Highland breached its obligations, such breach would be of extremely limited utility to the Advisors since any "modification" to the fee structure could only be prospective, not retroactive. *See, e.g.*, **Exhibit 6** (NexPoint PRA) Section 4.02 (requests for modifications had to be made "on or before the last business day of the calendar month," a provision that would be rendered meaningless if the fees paid during the contractual term could be re-visited at any time).

finding that "if the contract rates were paid under the [] agreements, there could be no recovery of 'overcharges' under a theory of unjust enrichment.")

170.    There is no evidence showing that the Advisors made "overpayments" under the PRAs.  Accordingly, the Advisors cannot recover for their claim of "overpayments."

### 3.    <u>The Advisors Waived any Claim for Overpayments Under the PRAs</u>

171.    The Court finds that, even if the Advisors could prove that they overpaid under the PRAs, any such claim for "overpayment" has been waived.

### i.    <u>Legal Standard</u>

172.    "Under Texas case law, waiver is the intentional relinquishment of a known right or the intentional conduct inconsistent with claiming that right." *Sedona Contracting, Inc. v. Ford, Powell & Carson, Inc.*, 995 S.W.2d 192, 195 (Tex. App. 1999).  The elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right (which can be inferred from the conduct). *See id.*; *see also Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 778 (Tex. 2008); *Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 643 (Tex. 1996) ("The affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right.").  "Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver." *Tenneco*, 925 S.W.2d at 643.  While waiver is largely a matter of intent, that intent should be implied where a party has relied on its counterparty's conduct to its detriment. *Enserch Corp. v. Rebich*, 925 S.W.2d 75, 82 (Tex. App. 1996) *("'[W]aiver by implication* should not be inferred contrary to the intention of the party whose rights would be injuriously affected thereby, *unless the opposite party has been misled to his or her prejudice'")* (emphasis in original) (internal quotations omitted).

173.    While waiver is ordinarily a question of fact, when the surrounding facts and circumstances are undisputed, the question becomes one of law. *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.,* 1 S.W.3d 108, 111 (Tex. 1999); *Tenneco*, 925 S.W.2d at 643.

## ii.    The Advisors' Conduct Constitutes Waiver

174.    The Advisors' conduct satisfies each of the foregoing elements, and waiver has, therefore, been established as a matter of law.

175.    The first factor is easily met.  For purposes of this analysis only, the Court assumes (contrary to the conclusions of law set forth above) that the Advisors were *only* required to pay for their respective, allocated share of the "Actual Cost" of Dual Employees.  In addition, as discussed above, the Parties could agree to modify the fixed fee definition of Actual Cost pursuant to Section 2.02 if they believed a change to the reimbursement was appropriate.  **Exhibit 6** (NexPoint PRA) § 2.02, **Exhibit 8** (HCMFA PRA) § 2.02.  Section 4.02 provided the mechanism through which the Party could invoke Section 2.02.  It provided that *"*[s]hould either Party determine that a change to employee reimbursement is appropriate, as set forth in Section 2.02, the Party requesting the modification shall notify the other Party on or before the last business day of the calendar month"), **Exhibit 8** (HCMFA PRA) § 4.02.

176.    Based on the foregoing assumptions and facts, the Advisors had the rights to (a) pay *only* for their allocable share of the "Actual Cost" for the Dual Employees listed on the Exhibits A, and (b) to seek to modify the amounts charged if they believed a change was appropriate.

177.    The second factor—knowledge of these existing rights—is also satisfied. According to the Advisors, their right to pay *only* for their allocable share of the "Actual Cost" for the Dual Employees listed on the Exhibits A is embedded in the PRAs, as is their right to seek

modification. The PRAs were signed by Mr. Waterhouse in his capacity as an officer of the Advisors (and Highland), and the Advisors rely on the PRAs for their claims. Consequently, there is no dispute that the Advisors knew of their "rights" (as they now contend they understood them).

178. The third factor—intent to relinquish, and "the key element of waiver"—is also met. *See Sedona*, 995 S.W.2d at 196. "In order to establish waiver, the act must be clear and decisive." *Id.* The evidence establishes that the Advisors actions constituted a continuous, clear, and decisive intention to relinquish their rights.

179. ***First***, if the Advisors actually believed that they had the right to ***only*** pay for their allocable share of the "Actual Cost" of the Dual Employees, then they knowingly and intentionally relinquished that right the moment Mr. Waterhouse signed the PRAs. The monthly fees set forth in the PRAs included the allocable share of the "Actual Cost" of four (4) Dual Employees who were terminated between January 1, 2018 (the effective date of the PRAs) and May 1, 2018 (when the PRAs were signed). In other words, under the Advisors' theory, they were grossly "overpaying" under the PRAs from the outset.

180. ***Second***, in December 2018, the Advisors agreed to collectively pay an additional $2,500,000 pursuant to Section 2.02 of the PRAs. The Advisors' decision to enter into the PRA Amendment is another act of waiver because (a) they knew at the time that nine (9) of the Dual Employees listed on Exhibits A had already been terminated and (b) the amounts charged under the PRA Amendments had no relationship to "Actual Costs" (nor would that make sense since the Advisors were paying millions of additional dollars while knowing that more than one- third of the Dual Employees on Exhibit A had already been terminated).

181. ***Third,*** from January 1, 2018 through November 30, 2020, the Advisors knowingly and intentionally paid the flat fee amounts set forth in the PRAs (a) with contemporaneous

knowledge of the departure of certain of the Dual Employees on Exhibits A and (b) without objection or any attempt to exercise their rights under Section 2.02.

182.    The overwhelming evidence demonstrates that *for nearly three years*, with complete, contemporaneous knowledge of the departure of a substantial number of Dual Employees, the Advisors knowingly and intentionally (a) paid the amounts set forth in the PRAs rather than their supposed allocable share of the "Actual Cost" of the Dual Employees list on Exhibits A, and (b) failed to exercise their known rights to modify the PRAs.  This is the definition of "waiver."  *See Sedona*, 995 S.W.2d at 196 (party's conduct constituted waiver where he understood terms of the documents he submitted); *Tenneco*, 925 S.W.2d at 643 (waiver was established as a matter of law where "defendants have shown that until this lawsuit, [party] accepted" situation without invoking provision of agreement at issue); *United States Bank, N.A. v. Kobernick*, 454 Fed. Appx. 307, 315 (5th Cir. Dec. 16, 2011) (finding "each element of waiver is present" where party had right under agreement, party knew it had that right, and its intentional conduct was inconsistent with such right).   Accordingly, the Advisors have waived any claims relating to overpayments under the PRAs.

183.    The Advisors cannot avoid the consequences of their inaction by relying on so-called "non-waiver" provisions.[44]  Texas law provides that ostensible "non- waiver provisions" can themselves be waived by the parties.  *See, e.g., Kobernick*, 454 Fed. Appx. at 315 (5th Cir. Dec. 16, 2011) (bank's actions were inconsistent with preserving contractual right to declare a certain default and thus, the bank had waived said right, notwithstanding non-waiver clause (citing

---

[44] For example, the PRAs provide in Section 6.02 that: "No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof ...."

*Straus v. Kirby Court Corp.*, 909 S.W.2d 105, 108 (Tex. App. 1995) and other cases); *Shields LP v. Bradberry*, 526 S.W.3d 471, 482-83 (Tex. 2017) ("To the extent there has been any doubt up to this time, we affirm that a party's rights under a nonwaiver provision may indeed be waived expressly or impliedly," noting "a nonwaiver provision absolutely barring waiver in the most general of terms might be wholly ineffective"); *see also* 8 Corbin on Contracts § 40.13 ("a provision that an express condition of a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting estoppel, is wholly ineffective").

**4.** **The Advisors' Claim of Overpayment Under the PRAs is Barred by the Voluntary Payment Rule**

184. The Advisors are barred from asserting a claim of "overpayment" under the PRAs under the voluntary payment rule.

185. Under the voluntary payment rule, "[m]oney voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability." *BMG Direct Mktg., Inc. v. Peake,* 178 S.W.3d 763, 768 (Tex.2005) (internal quotations omitted). "The voluntary payment rule precludes a party from 'pay[ing] out his money, leading the other party to act as though the matter were closed, and then be in the position to change his mind and invoke the aid of the courts to get it back.'" *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009). "Money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered merely because the party at the time of the payment was ignorant of or mistook the law as to [their] liability." *XTO Energy Inc. v. Goodwin*, 584 S.W.3d 481, 497 (Tex. App. 2017). "The rule is a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a defendant may respond with the voluntary-

payment rule as a defense." *Id.* (citing *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005)). "Because public policy favors protecting the finality of payments when a person is aware of all the facts upon which the liability to make payments depends, and there is no fraud, deception, duress, or coercion involved, Texas courts have, at times, applied the voluntary-payment rule between private parties." *Id.; see also BMG*, 178 S.W.3d at 770 ("[T]he rule against recovery of voluntary payments "precludes the courts being occupied in undoing the arrangements of parties which they have voluntarily made, and into which they have not been drawn by fraud or accident, or by any excusable ignorance of their legal rights and liabilities.") (internal quotations omitted).

186.    Here, as discussed *supra*, the Advisors knowingly and intentionally paid Highland the Actual Costs (as actually defined in the PRAs) every month from January 1, 2018 until November 30, 2020.  The Advisors never objected to making such payments.  Nor is there any evidence that they made such payments under duress, or otherwise through any deceptive or fraudulent conduct on the part of Highland.[45]  Thus, even if the Advisors could show there were any overpayments under the PRAs, the voluntary payment rule would, as a matter of law, preclude the Advisors from recovering on any amounts paid.  *See BMG*, 178 S.W.3d at 771-72 (applying the voluntary payment rule to prevent the recovery of a "late fee" paid by a customer who later claimed it was unlawful); *XTO Energy*, 584 S.W.3d at 499 (finding voluntary payment was a defense as a matter of law to plaintiff's claim of unjust enrichment arising from overpayments on royalties where plaintiff voluntarily paid those royalties to defendant, had all the documents and information before it to assess and evaluate the merits of those payments and calculate payments

---

[45] Indeed, the evidence shows that the payments were (a) consistent with the 3-year budget presented to Mr. Dondero and Mr. Okada in January 2018; (b) were consistent with the 2020 forecast presented to Mr. Dondero in April 2020, and (c) all approved in advance by Mr. Waterhouse. *See, e.g.*, **Exhibit 86**, **Exhibit 50**, **Exhibit 152**.

prior to making challenged payments, and where there was no evidence that any accounting errors or incorrect determinations were precipitated through defendant's fraudulent or deceptive conduct); *Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868 (Tex. 2005) (finding voluntary payment rule barred plaintiff's recovery of fees paid where defendant introduced evidence that plaintiffs "paid the fees without filing any type of grievance protest" and plaintiffs did not establish duress as a matter of law); *Samson Exploration, LLC v. T.S. Reed Properties, Inc.*, 521 S.W.3d 766, 779-80 (Tex. 2017) (finding voluntary payment rule applied to preclude lessee from seeking to recover alleged overpayments of royalty payments to lessors and other stakeholders where payments were voluntary and lessee made the payments with "full knowledge of the fact" that there was error in zoning designation, and where lessee "never exercised its authority to amend the designation … even though the designation that it filed expressly provided that [lessee] reserved the right to do so in order to correct any error," further noting that payments were not paid under duress or over any objection to doing so); *Texas Nat. Bank of Baytown v. Harris County*, 765 S.W.2d 823, 825-26 (Tex. App. 1988) (voluntary payment rule barred recovery on taxes paid, even though it was illegal, where  paid where such payments were made voluntarily absent duress).   Accordingly, the voluntary payment rule precludes the Advisors' recovery on any alleged overpayments under the PRAs.

E.     **The Advisors Claims for Breach of the Shared Services Agreements**

187.     The Advisors vaguely claim that Highland breached the SSAs by failing to perform certain services to the Advisors, including legal and compliance services, thereunder.   The Advisors contend that on or around July 2020, Highland instructed its employees to cease providing certain services to the Advisors which Highland believed were adverse to the interests of Highland.   The Advisors maintain that this forced the Advisors to retain two new employees to cover for such services, resulting in $425,000 in damages.   The Advisors also contend they were

forced to pay Highland $1 million for legal services that Highland was no longer providing, resulting in $1.3 million in payments postpetition for services that Highland failed to provide. The Advisors seek damages for overpayments and breaches of the SSAs totaling $1,725,000. [46]

### 1. The Advisors' Fail to Prove Highland Breached the SSAs

#### i. Legal Standard

188.    Under Texas law, a party claiming breach of contract has the burden to prove the following elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach." *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018) (internal citations omitted); *see also Calce v. Dorado Expl., Inc.*, 309 S.W.3d 719, 733 (Tex. App. 2010) ("A party claiming breach of contract has the burden to prove the elements of that cause of action."); *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App. 2014) (noting the plaintiff "had the burden of proof on its breach of contract claim.").

189.    The Advisors have not met their burden to establish that Highland breached the Agreements. Specifically, the Advisors fail to prove the elements of (1) breach and (2) damages.

#### ii. The Advisors Fail to Establish Highland's Nonperformance under the SSAs

190.    The Advisors fail to adduce any evidence showing that Highland failed to perform its obligations under the Shared Services Agreements. By contrast, the undisputed and overwhelming evidence demonstrates that, at all relevant times, Highland performed its obligations under the Shared Services Agreements. As discussed *supra*, the Advisors repeatedly

---

[46] It should be noted that Highland charged HCMFA a flat fee of only $10,500 per month for comprehensive legal services. *See, e.g.*, **Exhibit 159**. Thus, assuming for the sake of argument that the Advisors believed that they had to hire new a new in-house lawyer in the fall of 2020 and came out of pocket for the small, if even existent, matters that Highland's legal team could no longer assist with, such annualized costs was substantially greater than what HCMFA paid for comprehensive legal services under the HCMFA SSA.

represented to the Retail Board that Highland was fully performing its obligations under the Shared Services Agreements.

191.    In August 2020, the Advisors represented to the Retail Board that Highland was performing its obligations under the Shared Services Agreements. *See, e.g.*, **Exhibit 59** (in August 2020, Mr. Norris represented to the Retail Board that "there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter"); **Exhibit 18** (the Advisors represented to the Retail Board that "the Advisors and HCMLP believe the current shared services being provided are generally consistent with the level of services that historically have been received").

192.    The Advisors continued to repeat these representations to the Retail Board into September and October 2020. *See, e.g.*, **Exhibit 60** (the Advisors represented to the Retail Board during a two-day Retail Board meeting on September 16-17, 2020 that they do "not expect that the level and quality of services would change in the immediate term," and Mr. Norris noted that he was "comfortable with the level and quality of services being provided and has not seen any issues with the conflicts process."); **Exhibit 81** (The Advisors represented to the Retail Board on October 9, 2020 that they were formulating "contingency plans" to "ensure that there is no disruption in services," noting that "NexPoint's senior management's plan as a backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by 12/31/2020. This will help ensure that there is no disruption in services to the Funds … In the interim the plan is to continue with existing shared services."); **Exhibit 61** (Mr. Norris represented to the Retail Board on October 13, 2020 that with respect to shared services, "all operations continued in the normal course there [sic] had been no material impact on the day-to-day operations of the Funds," and that contingency plans were "in place to continue to provide the same level and quality of services to the Funds."); **Exhibit 22** (reassuring the Retail Board on

October 23, 2020 through written responses to Retail Board questions that NexPoint's backup/contingency plan "is to extend employment offers to the vast majority of HCMLP's employees by December 31, 2020. This will help ensure that there is no disruption in services to the Funds…"); **Exhibit 62** (the Advisors reiterated to the Retail Board on October 28, 2020 that the parties continued to work on a "seamless transition" of services and that the "quality and level" of services had not been negatively impacted by Highland's bankruptcy); **Exhibit 63** (the Advisors reassured the Retail Board a week later that there "has not been any disruption to the services provided to the Funds by HCMLP pursuant to the Shared Services Agreement"). The Advisors' representations to the Retail Board that Highland was performing its obligations under the SSAs continued into December 2020 and January 2021. *See* **Exhibit 16**, **Exhibit 10**, **Exhibit 64**, **Exhibit 66**.[47]

193.    There is otherwise no evidence showing that Highland failed in any way to fulfill its obligations under the SSAs. Accordingly, the Advisors have not met their burden of proving that Highland did not perform under the SSAs.

### iii.    The Advisors Fail to Establish Damages

194.    The Advisors also cannot prove the element of damages.

195.    The Advisors maintain that as a result of Highland's alleged nonperformance under the SSAs, the Advisors were forced to retain two new employees to cover for such services, resulting in $425,000 in damages. The Advisors also contend they were forced to pay Highland

---

[47] The only services that Highland admittedly did not perform were those in which conflicts of interest existed. This did not constitute a breach of the SSAs, and in fact, such services were not permitted under the SSAs. *See* Exhibit 3 (NexPoint SSA) section 5.01(b). Highland was not obligated to perform services that were adverse to Highland or violated Applicable Law, including services related to conflicts that would cause its employees to act against Highland's own interests.

$1 million for legal services that Highland was no longer providing, resulting in $1.3 million in payments postpetition for services that Highland failed to provide.

196.    Again, there is no evidence in the record showing that the Advisors did not receive services under the SSAs from Highland.  The Advisors have not provided any admissible evidence of reasonably ascertainable monetary damages incurred as a result of any alleged breach of the SSAs.  "Compensatory damages may only be recovered in a claim for breach of contract when the loss is a 'natural, probable, and foreseeable consequence of the defendant's conduct." *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 737 F. Supp. 2d 648, 656 (S.D. Tex. 2010) (applying Texas law) (internal quotations omitted); *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App. 2014) ("The absence of this causal connection between the alleged breach and the alleged damages will preclude recovery.") (internal quotations omitted).  "A party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural." *Healix*, 737 F. Supp. 2d at 656–57.

197.    The Advisors fail to show that any losses incurred from retaining two new employees to cover for certain legal services were caused by Highland's failure to perform under the SSAs.   Accordingly, the Advisors fail to prove the element of damages.

### 2.    The Advisors' Claim for Overpayment under the SSAs Fails

198.    The Advisors bring a claim for overpayments under the SSAs, and specifically maintain they overpaid Highland $1 million for legal services that Highland was no longer providing.   As discussed *supra*, Highland provide all required services to the Advisors under the SSAs.  The Advisors, therefore, cannot recover on their claim of overpayment under the SSAs.

**3.      The Advisors Waived Any Claims Relating to the Payments Made Under the Shared Services Agreements**

199.    Even if the Advisors could prove their claim of overpayment under the SSAs, the Advisors waived any such claim.   The Advisors knowingly and intentionally made all monthly payments every month under the SSAs until November 30, 2020.   The Advisors never objected to making such payments, sought judicial relief, or otherwise put Highland on notice that the Advisors did not believe such payments under the SSAs were proper.   The Advisors were aware of such payments under the SSAs each month, which is demonstrated by the fact that, at all relevant times, (i) Mr. Waterhouse, the Advisors' Treasurer, authorized all such payments prior to making them, (ii) such payments were recorded in the Advisors' books and records, and (iii) the Advisors represented to the Retail Board that such payments had been made.

**F.      Highland's Claim for Breach of the SSAs**

200.    Highland has established all elements of its breach of contract against (a) HCMFA for failing to pay for services rendered by Highland under (i) the HCMFA SSA during the months of November 2020, December 2020, and January 2021, and (ii) the HCMFA PRA during the months of December 2020, and January 2021, and against (b) NexPoint for failing to pay for services rendered by Highland under (i) the NexPoint SSA during the months of December 2020 and January 2021, and (ii) the NexPoint PRA during the months of December 2020 and January 2021, as well as additional expenses.

201.    It is undisputed that the Agreements are valid contracts.   The overwhelming evidence in the record demonstrates that Highland performed under the Agreements, and that the Advisors failed to pay for such services.   Finally, Highland has also proven by a preponderance of the evidence that it was damaged as a result of the Advisors' failure to pay for services rendered. Specifically, (a) for the months of November and December 2020, and January 2021, HCMFA

failed to pay Highland $1,726,277 for services rendered, (b) for the months of December 2020 and January 2021, NexPoint failed to pay Highland $1,000,000[48] for services rendered, and (c) the Advisors also failed to reimburse Highland for expenses under the Shared Services Agreements.

202.    Highland is also entitled to recover its costs and expenses, including its attorneys' fees, prosecuting the foregoing claims and defense against the Advisors' claims.

### END OF FINDINGS AND CONCLUSIONS ###

---

[48] Includes non-payment by NexPoint's wholly-owned subsidiary, NREA, for two months of shared services at $80,000 per month or $160,000 total.

Respectfully submitted by:

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*