# EXHIBIT 1

1      IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION

3   In re:                    §
                              §  Chapter 11
4   HIGHLAND CAPITAL          §
    MANAGEMENT, L.P.,         §  Case No. 19-34054-sgj11
5                             §
        Reorganized Debtor.   §
6

7

8

9      DEPOSITION OF DUSTIN NORRIS AND 30(b)(6) OF

10   HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,

11           AND NEXPOINT ADVISORS, L.P.

12                 Dallas, Texas

13           Friday, March 4, 2022

14              (REPORTED REMOTELY)

15

16

17

18

19

20

21

22

23      REPORTED BY:

24      Linda Russell, CSR

25      JOB NO:  207400

1                      NORRIS

2

3

4            March 4, 2022

5            9:33 a.m.

6

7

8       DEPOSITION OF DUSTIN NORRIS, conducted via

9  Zoom, taken before Linda Russell, Certified Court

10  Reporter No. 2965, pursuant to the Federal Rules of

11  Civil Procedure for the United States District

12  Court pertaining to the taking of depositions,

13  commencing at 9:33 a.m. Central Time, on

14  March 4, 2022.

15

16

17

18

19

20

21

22

23

24

25

1                         NORRIS

2                 A P P E A R A N C E S

3    (Attendees appearing via remote videoconference)

4

5    COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.:
         HAYLEY WINOGRAD, ESQ.
6        JOHN MORRIS, ESQ.
         Pachulski Stang Ziehl & Jones
7        780 Third Avenue
         New York, New York  10017
8

9

10   COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND
     ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.
11       DAVOR RUKAVINA, ESQ.
         THOMAS BERGHMAN, ESQ.
12       Munsch Hardt Kopf & Harr
         500 N. Akard Street
13
         Dallas, Texas 75201
14

15

16   ALSO PRESENT:
         La Asia Canty, Paralegal
17

18

19

20

21

22

23

24

25

1                        I N D E X

2                                                    Page
     DUSTIN NORRIS
3          BY MS. WINOGRAD                          7
           BY MR. MORRIS                          201
4    CERTIFICATE                                  274
     ERRATA SHEET                                 275
5

6

                        EXHIBITS MARKED
7
       No.            Description                 Page
8
     Exhibit 1      Highland's Second Amended       9
9                   Notice of Rule 30(b)(6)
                    Deposition to (A) Highland
10                  Capital Management Fund
                    Advisors, LP and (B) NexPoint
11                  Advisors, LP

12   Exhibit 2      HCMFA--HCMLP 2nd AR Shared     20
                    Services Agreement (Effective
13                  2.8.2013)

14   Exhibit 3      NexPoint Advisors_Shared       27
                    Services Agreement
15
     Exhibit 5      NexPoint Advisors_Sub-Advisory  80
16                  Agreement

17   Exhibit 6      NPA HCMLP Payroll Reimbursement 86
                    5.1.18
18
     Exhibit 8      HCMFA HCMLP Expense            104
19                  Reimbursement 5.1.18

20   Exhibit 11     Docket No. 1826 - Admin Claim   42

21   Exhibit 13     Docket No. 49 - Advisors'      184
                    Response
22
     Exhibit 14     Response to Debtor's Discovery 134
23
     Exhibit 26     Email from D Klos              227
24                  12_1_20_Advisors-Admin-000713

25

1    Exhibit 29     NexPoint HCMLP Shared Services      23
                    Agreement 6.5.13_ACL-080614
2
     Exhibit 30     Order on Motion for                 69
3                   Clarification of Ruling_dkt 935

4    Exhibit 34     Trey Parker March 2019             144
                    Compensation
5                   Statement_ACL-080630

6    Exhibit 35     Email chain attaching TerreStar    173
                    2.29.20 Draft
7
     Exhibit 41     Email from K. Irving re 3_31       178
8                   TerreStar Analysis_ACL-080672

9    Exhibit 51     Advisors_Admin_Supp_000010         259

10   Exhibit 54     Pyxis Shared Services Agreement     18
                    - 02.09.2012_ACL-081276
11
     Exhibit 55     Pyxis Amended Restated Shared       19
12                  Services Agreement -
                    09.12.2012_ACL-081289
13
     Exhibit 56     ACL-025012                         240
14

15

16

17

18

19

20

21

22

23

24

25

1                          NORRIS

2                  P-R-O-C-E-E-D-I-N-G-S

3              COURT REPORTER:  My name is Linda

4    Russell.  I am a certified court reporter in

5    association with TSG Reporting, Inc.

6              Today's date is March 4, 2022, and

7    the time is 9:33 a.m. Central Time.

8              Due to the severity of COVID-19 and

9    following the practice of social distancing, I

10   will not be in the same room with the witness but

11   will record this deposition remotely and will

12   swear the witness remotely.

13             Do all parties stipulate to the

14   validity of the remote recording and remote

15   swearing and that it will be admissible in the

16   courtroom as if it had been taken following

17   Rule 30 of the Federal Rules of Civil Procedures

18   and/or the State's rules where this case is

19   pending?

20             MR. RUKAVINA:  The Advisors so

21   stipulate.

22             MS. WINOGRAD:  Highland stipulates as

23   well.

24                  DUSTIN NORRIS,

25        having sworn or affirmed to tell the

```
 1                      NORRIS

 2          truth, the whole truth and nothing but the

 3          truth was examined and testified as

 4          follows:

 5                      EXAMINATION

 6    BY MS. WINOGRAD:

 7          Q.  Good morning, Mr. Norris.  My name is

 8    Hayley Winograd, I'm an attorney at the law firm

 9    of Pachulski Stang Ziehl & Jones, and I'll be --

10    I'll be taking your deposition today.  We

11    represent Highland Capital Management, LP.  Do

12    you understand that?

13          A.  Yes.

14          Q.  Okay.  And do you understand that

15    you're going to be deposed today in your capacity

16    as a 30(b)(6) witness on behalf of NexPoint

17    Advisors, LP?

18          A.  I do.

19          Q.  And can we refer to NexPoint Advisors

20    as NexPoint?

21          A.  Yes.

22          Q.  And you also understand that you are

23    going to be deposed in your 30(b)(6) capacity for

24    the entity Highland Capital Management Fund

25    Advisors, LP, right?
```

```
 1                     NORRIS
 2          A.  Yes.
 3          Q.  And can we refer to that entity as
 4   HCMFA?
 5          A.  Yes.
 6              MR. RUKAVINA:  I'm sorry, I can
 7   barely here you, Dustin.
 8              Can you hear him, Hayley, just fine?
 9              Dustin, just say --
10              MS. WINOGRAD:  I don't think -- can
11   you --
12              THE WITNESS:  Can you hear me -- if I
13   speak louder, is that better?
14              MR. RUKAVINA:  Yeah, that's better.
15              MS. WINOGRAD:  That's better.
16   BY MS. WINOGRAD:
17          Q.  I'm also going to ask that when I ask
18   you a question, you just wait for me to finish
19   the question before you begin your answer.  Is
20   that fair?
21          A.  Yes.
22          Q.  Okay.  And I'm going to be -- we're
23   going to be putting up documents on the screen
24   from time to time, so if you need to see any
25   other portion of the document in order to give a
```

```
1                          NORRIS

2   more complete answer, just let us know.

3          A.  Okay.

4          Q.  And if you need me to repeat a

5   question if you can't hear me, just ask me, and I

6   can repeat it.

7              Okay.  I'm going to ask my colleague

8   Ms. La Asia Canty to please put Exhibit 1 on the

9   screen.

10         (Exhibit 1 marked for identification.)

11  BY MS. WINOGRAD:

12         Q.  Okay.  Mr. Norris, have you seen this

13  document before?

14         A.  Yes.

15         Q.  Okay.  Do you understand that your

16  answers as the Advisors' corporate representative

17  will be binding on the Advisors?

18         A.  I do.

19         Q.  And that every time I ask you a

20  question, it will be in your 30(b)(6) capacity as

21  a witness unless I say otherwise?

22         A.  Yes.

23         Q.  And can you -- can you testify that

24  you -- can you confirm that you're prepared to

25  testify on all of the topics set forth therein?
```

```
 1                    NORRIS

 2        A.  Yes, I've -- I have spent time

 3   preparing, and I would note that there is a

 4   number of discovery items ongoing.  We have not

 5   deposed Mr. Waterhouse.  We haven't deposed

 6   Mr. Klos as well as Mr. Seery.  And we haven't

 7   had access to Mr. Waterhouse.

 8             So with that, yes, I've done the best

 9   that I can in preparing and spoken to a lot of

10   people and then prepared to answer the questions

11   to the best of my ability.

12        Q.  Okay.  Who did you speak to in

13   preparing?

14        A.  Yeah, so obviously spoke with outside

15   counsel, with Davor and his counterparts.  I

16   spoke with our in-house general counsel, which is

17   DC Sauter.  Spoke with Mr. Dondero.  I spoke with

18   Brian Collins, who's former HR director at

19   Highland, now Skyview.  Spoke with Stephanie

20   Vitiello who is chief compliance officer of our

21   Advisors.  And also spoke with Kevin Fullmer

22   who's on our product strategy team.  Brian Mitts

23   over time as well.  Brian Mitts, he's involved in

24   our Advisors.  And I think that's most of who I

25   spoke with.
```

1                          NORRIS

2          Q.  Okay.  And did you review any

3    documents in preparing?

4          A.  I did, yeah.  I reviewed all of the

5    filings, complaints, responses.  I reviewed the

6    Shared Services Agreements, the Payroll

7    Reimbursement Agreements.  I reviewed your

8    notice.  I reviewed documents that had been

9    provided in discovery from Highland that my

10   attorneys provided me.  Emails, calculations that

11   Mr. Klos and Mr. Waterhouse prepared.  I reviewed

12   emails that were responsive that I could try and

13   find within my system.  I searched our document

14   drive to find responsive documents, and so

15   reviewing quite a bit of material that I could.

16         Q.  Do you have a title at NexPoint?

17         A.  I do.

18         Q.  What is that title?

19         A.  Yeah, executive vice president --

20         Q.  Okay.

21         A.  -- of NexPoint.

22         Q.  How long have you held that title?

23         A.  I believe it was in 2018 or 2019 that

24   I became executive vice president.

25         Q.  Okay.  So was it like -- was it the

NORRIS

1
2    end of 2018?

3          A.   I can't remember the specific date.

4          Q.   Okay.  Do you have a title at HCMFA?

5          A.   Yes, the same, executive vice

6    president.

7          Q.   Okay.  And how long have you held

8    that title?

9          A.   Probably the same amount of time.

10         Q.   Okay.

11         A.   And I also function as -- my

12   operating role is to lead head of distribution

13   and chief product strategist.  So that's my title

14   that I also operate under.  As an officer of the

15   Advisors, it's executive vice president.

16         Q.   Got it.  And who is your employer

17   now?

18         A.   So NexPoint Advisors.

19         Q.   So they pay you?

20         A.   They do.

21         Q.   And who do you -- do you report to

22   somebody at NexPoint?

23         A.   Jim Dondero.

24         Q.   Okay.  So who controls the Advisors

25   today?

```
1                     NORRIS

2         A.   I think it's been clear in the record

3    Mr. Dondero owns and has controlling interest in

4    the Advisors.

5         Q.   Okay.  And when were the Advisors

6    formed?

7         A.   NexPoint Advisors I believe was 2011,

8    maybe 2012.  And Highland Capital Fund Advisors

9    was formerly known as Pyxis Capital.  Prior to

10   that name change was Highland Funds Asset

11   Management.  I don't know the specific date, but

12   it's been over a decade ago that HCMFA was

13   formed.

14        Q.   And James Dondero controlled the

15   Advisors since they were formed, right?

16        A.   I'm not sure on the total history.

17        Q.   Were they created at his direction?

18        A.   I don't know -- I don't know the

19   background of the formation other than, you know,

20   there was -- when they worked for him, there was

21   a number of independent boards involved.  These

22   Advisors are Advisors of '40 Act funds.  There

23   was a number of counsel in the discussion.  So it

24   was at the direction, I believe, of counsel and

25   several of the parties involved.
```

1                        NORRIS

2          Q.  But James Dondero was involved with

3    the formation, right?

4          A.  I would assume so, but I'm not sure.

5          Q.  So the Advisors are registered

6    investment Advisors, right?

7          A.  That's correct.

8          Q.  Okay.  And so in this role they

9    provide advisory service to certain funds, right?

10         A.  Funds and other entities, yeah.

11   Publicly traded REITs, private REITs, private

12   placement vehicles.  So funds and other vehicles,

13   investment vehicles.

14         Q.  Okay.  Can we call these -- they are

15   retail funds, though, right?

16         A.  Largely, yes.

17         Q.  So moving forward, can we refer to

18   these as "the funds"?

19         A.  That's fine.

20         Q.  And the Advisors provide these

21   advisory services to the funds pursuant to

22   certain written agreements, right?

23         A.  Correct.

24         Q.  And these are investment advisory

25   agreements, right?

1                         NORRIS

2          A.  Correct.

3          Q.  And these agreements are among the

4   most important agreements that the Advisors have,

5   right?

6          A.  Yes, among the most important.

7          Q.  And the reason for the Advisors'

8   existence is to service those funds, right?

9          A.  Yes.

10         Q.  So the funds are the principal source

11  of the Advisors' revenue, then, right?

12         A.  That's correct.

13         Q.  Okay.  So other than to service the

14  retail funds, there is no other reason for

15  Advisors' existence, right?

16         A.  The Advisors do have some investments

17  on their balance sheet, right.  So to say the

18  only reason, there's -- that's the principal

19  reason.

20         Q.  That's the principal one.  Okay.

21             So in your individual capacity, are

22  you an officer of any of the funds?

23         A.  I am.

24         Q.  Okay.  What's your title?

25         A.  So for our '40 Act mutual funds,

1                          NORRIS

2    closed-end funds, I am the executive vice

3    president.  I don't hold a title for our REITs

4    which are other entities advised by NexPoint.

5          Q.  Okay.  But the retail funds that we

6    talking about which we refer to as the funds, you

7    hold title with most of them?

8          A.  Well, I think -- I told you that the

9    funds were -- you referred to the vehicles, which

10   would include the retail funds and other vehicles

11   that I mentioned:  REITs, private placements, and

12   other investment vehicles you said, well, can we

13   refer to that as the funds.

14             So the funds is encompassing.

15   There's an aspect of it that's -- the '40 Act

16   registered funds I'm an officer of.  So that's

17   the funds.

18          Q.  Okay.  So the retail funds, though,

19   are the funds that the Advisors provided these

20   investment services to?

21          A.  That's some of what they provided

22   investment services.  They also provide

23   investment services to REITs, which are publicly

24   listed, some are private, some are other

25   vehicles.

1                          NORRIS

2          Q.  But when you said that the principal

3  source -- the principal reason that the Advisors

4  exist is to provide the investment advice to the

5  funds.  I was talking about the retail funds.

6          A.  Got it.  So if you were talking about

7  the retail funds, my understanding was you define

8  that as the funds as a whole, all of those

9  investment vehicles.  So if it's just the retail

10  funds, there is a lot of other things we provide,

11  which is publicly traded REITs which is material

12  part of the assets we manage, there is private

13  vehicles, there is -- and so there is -- there

14  is -- but those are all investment vehicles.

15          Q.  Okay.  But those -- those other

16  vehicles that you mentioned, the Advisors aren't

17  performing the services pursuant to those written

18  contracts, right?

19          A.  They are pursuant -- they are using

20  them -- they are managing them pursuant to

21  written investment advisory contracts.  They are

22  different contracts.  Each entity has an

23  investment advisory agreement with the Advisors,

24  one of or both of the Advisors.

25          Q.  Okay.

1                     NORRIS

2             MS. WINOGRAD:  Can we please pull up

3    Exhibit 54, La Asia.

4             (Exhibit 54 marked for identification.)

5    BY MS. WINOGRAD:

6        Q.  Okay.  Mr. Norris, do you see this

7    document?

8        A.  I do.

9        Q.  Okay.  Do you recognize it?

10       A.  I do.

11       Q.  Is this an original Shared Services

12   Agreement between Highland and an entity that you

13   mentioned earlier, Pyxis Capital, LP?

14            MR. RUKAVINA:  Objection.  Form.

15       A.  I don't know if it's an original, but

16   it is an Investment Advisory Agreement dated

17   effective December 15th, between Pyxis Capital,

18   formerly known as Highland Funds Asset

19   Management, which I waked through earlier when

20   they changed its name.  And I don't know if this

21   is the original or if it's -- it doesn't say

22   amended.  So it's Shared Services Agreement.

23   BY MS. WINOGRAD:

24       Q.  It's a Shared Services Agreement,

25   though.  Okay.  And did Pyxis Capital, LP turn

```
1                        NORRIS
2    into HCMFA by name?
3            A.  It did, yes, in February 2013, I
4    believe.
5            MS. WINOGRAD:  Okay.  La Asia, can we
6    now put Exhibit 55 on the screen, please?
7            A.  And by "turn into" -- you said "turn
8    into."  It's really the name change.
9    BY MS. WINOGRAD:
10           Q.  The name change, yeah.
11           A.  It was simply a name change.
12           Q.  Okay.  Thank you for clarifying.
13           (Exhibit 55 marked for identification.)
14   BY MS. WINOGRAD:
15           Q.  And then this is an Amended and
16   Restated Shared Services Agreement between
17   Highland and Pyxis Capital, LP, right?
18           A.  12th day of September 2012.  That's
19   what it says, yes.
20           Q.  And it's effective as of December
21   15th, 2011, right?
22           A.  Yeah, which is just the original date
23   on the last agreement.
24           Q.  Okay.
25           A.  Since it's amended and restated.
```

1                    NORRIS

2                  MS. WINOGRAD:  Okay.  And then,

3    La Asia, if we could put up Exhibit 2 now.

4         (Exhibit 2 marked for identification.)

5    BY MS. WINOGRAD:

6         Q.  Do you recognize this agreement?

7         A.  I do.

8         Q.  This is the Second Amended and

9    Restated Shared Services Agreement between

10   Highland and HCMFA, right?

11        A.  Right.

12        Q.  And this is the amendment to the

13   earlier Shared Services Agreements we just looked

14   at, right?

15        A.  It's a amendment.  I don't have

16   knowledge if there was one in between, but this

17   is a amendment.  Since it says "Second," I would

18   assume that's the second amended and restated.  I

19   don't know if there was another amended, but this

20   is the second amended and restated.

21             MS. WINOGRAD:  Okay.  Can we please

22   scroll to page 11.

23   BY MS. WINOGRAD:

24        Q.  This was signed by James Dondero on

25   behalf of Highland, right?

1                          NORRIS

2          A.   It appears so.  It says James Dondero

3    on the signature block.

4          Q.   And it's on behalf of HCMFA, right?

5          A.   It's by Strand Advisors, its general

6    partner of HCMFA, yes.

7          Q.   But that's Brian Mitts' signature,

8    right?

9          A.   It looks like Brian Mitts' signature,

10   and it says Brian Mitts there.  So I would assume

11   it's his signature.

12               MS. WINOGRAD:  And, La Asia, if we

13   could just go back to the first page, please.

14   BY MS. WINOGRAD:

15         Q.   This Second Amended and Restated

16   Shared Services Agreement became effective

17   February 8th of 2013, right?

18         A.   Yes, that's what it says.  Entered

19   into to be effective as of the 8th day of

20   February 2013, which was the time of the name

21   change, I believe, to Pyxis Capital -- or sorry,

22   Pyxis Capital to HCMFA.

23         Q.   Okay.  So under this Shared Services

24   Agreement, the Advisors who were at HCMFA agreed

25   to pay Highland for the actual cost incurred from

```
1                          NORRIS
2    certain back and middle office services, right?
3         A.  If you want to scroll down and point
4    to the section --
5         Q.  We can go to --
6         A.  I believe this was an actual cost
7    plus a margin amount of 5 percent.
8         Q.  Okay.  So who -- do you know who
9    drafted this?
10        A.  I don't.
11        Q.  Okay.  Do you know if this was the
12   subject of negotiation?
13        A.  It was definitely -- when you -- when
14   you look at all of the Shared Services Agreement,
15   there was negotiation.  As I mentioned, outside
16   legal counsel involved.  There was a Board of
17   Directors of the retail funds that was involved.
18   So there was definitely an extensive process that
19   went into this.
20             In this one in particular, I would
21   have to look.  I don't know if there is any
22   significant changes between the first and the
23   second.  Maybe you could tell me, but I believe
24   this one is just the name change on this -- this
25   document right here.
```

1                       NORRIS

2          Q.   Okay.  So did HCMFA have its own

3    counsel in the drafting of this agreement, if

4    we're just considering the original agreement,

5    the first one that we looked at?

6          A.   There was -- there was -- HCMFA

7    carried its own Advisor counsel, and the Board of

8    Directors has an independent counsel.  And there

9    was definitely outside counsel involved.

10         Q.   Okay.  Did Highland have its own

11   outside counsel separate from HCMFA's outside

12   counsel?

13         A.   I'm not sure.  Again, this was over a

14   decade ago, and these agreements have been --

15   they've been in place a very long time.  But

16   there was a lot involved here, and it was an

17   extensive discussion and conversation.

18         Q.   Okay.

19         A.   So I -- but, again, the original

20   agreement for Highland Funds Asset Management was

21   sometime before 2012, so over a decade ago.

22              MS. WINOGRAD:  Okay.  La Asia, can we

23   please look at Exhibit 29.

24         (Exhibit 29 marked for identification.)

25   BY MS. WINOGRAD:

1                           NORRIS

2          Q.  Okay.  Mr. Norris, do you recognize

3    this document?

4          A.  Yes.

5          Q.  Can you confirm this is the Shared

6    Services Agreement between NexPoint and Highland?

7               MR. RUKAVINA:  Well, in fairness,

8    scroll down, Dustin, if you need to, or Hayley

9    can represent that it's a full and, you know,

10   correct --

11              THE WITNESS:  Yeah, if you could

12   scroll down.  Keep going.  Scroll back up --

13   actually, no, keep going.  Yeah.

14              MS. WINOGRAD:  Yeah, we can scroll

15   all the way to -- if we can go to page 11.  Yeah,

16   there we go.

17   BY MS. WINOGRAD:

18         Q.  So you agree this was signed by James

19   Dondero on behalf of both NexPoint and Highland,

20   right?

21         A.  That appears to be his signature and

22   the signature block looks to -- it says James

23   Dondero, at least on the Highland one.  It

24   doesn't have his name written, but it does look

25   like his signature.  The bottom one just says

Page 25

1                       NORRIS

2    NexPoint Advisors and it says general partner and

3    I would say those signatures look pretty close,

4    but there is no name or title written.

5         Q.   Okay.  So do you know if this

6    agreement was subject to any negotiation?

7         A.   Yes, just like the HCMFA agreements,

8    there was detailed discussion, conversations.

9    And a big aspect of this is the retail board's

10   consideration was services provided couldn't

11   be -- between Advisors or affiliated Advisors

12   couldn't be a profit there.  And so a big part of

13   that negotiation was it needed to be a cost

14   plus-type arrangement where there was a

15   reimbursement, not a payment or a profit center

16   for an affiliated Advisor.

17        Q.   So was this the subject of

18   negotiation, yes or no?

19        A.   Yes, there was definitely

20   negotiation.  There was outside counsel involved.

21   There was extensive discussion.  There was an

22   independent board.

23        Q.   Who represent -- did somebody

24   represent NexPoint when the agreement was

25   negotiated?

```
 1                        NORRIS
 2          A.  Yes, I believe so --
 3               MR. RUKAVINA:  Hold on, Dustin.  Just
 4    objection.  Form.
 5               Go ahead and answer.
 6          A.  I don't know specifically.  Again, it
 7    was over a decade ago.  But as I mentioned, there
 8    was outside counsel involved.  There was board
 9    counsel.  There was an independent board.
10    BY MS. WINOGRAD:
11          Q.  So do you -- so you don't -- I just
12    want to make sure I have the answer.  So you
13    don't know if Highland and NexPoint had separate
14    counsel when this agreement was entered into at
15    the time?
16          A.  Generally -- generally Highland and
17    the retail advisors had different counsel and
18    there was an offsetting, but I don't know
19    specifically on this.
20          Q.  You don't know if they did with this
21    agreement, right?
22          A.  I don't know.
23          Q.  Okay.  So this agreement was amended
24    in 2018, right?
25          A.  I believe that's the case.  You have
```

```
1                    NORRIS

2   an amended 2018 agreement?

3           MS. WINOGRAD:  Yeah, La Asia, can we

4   go ahead and show Exhibit 3, please.

5           (Exhibit 3 marked for identification.)

6   BY MS. WINOGRAD:

7       Q.  Okay.  Do you recognize this?

8       A.  I do.

9       Q.  Okay.  So this is the Amended and

10  Restated Shared Services Agreement between

11  NexPoint and Highland, right?

12      A.  It looks to be, yes.

13      Q.  Okay.  And it's effective January 1st

14  of 2018, right?

15      A.  Dated effective January 1st, 2018.

16      Q.  Uh-huh.  And this was an amendment to

17  the Shared Services Agreement that we just looked

18  at, right?

19      A.  It doesn't reference -- whereas the

20  parties enter into a certain Shared Services

21  Agreement effective January 1st, the original

22  agreement.

23          So it appears to be that's the same

24  agreement.

25      Q.  Okay.  Great.
```

```
 1                         NORRIS

 2              MS. WINOGRAD:  Could we scroll to

 3    page 19, please.

 4    BY MS. WINOGRAD:

 5         Q.  Okay.  So this was signed by Frank

 6    Waterhouse on behalf of both NexPoint and

 7    Highland, right?

 8         A.  I don't -- again, just looking at the

 9    signatures, I see Frank's name there but don't

10    have any evidence, you know, that Frank actually

11    did sign.  In addition, I would also clarify in

12    all this that we will be deposing Frank.  And we

13    haven't had access to Frank in preparation for

14    this.

15         Q.  Okay.  I'm just going to have you try

16    to listen to the questions I'm asking and answer

17    those specific questions to the best of your

18    ability.

19              At the time this agreement was

20    entered into, was Frank Waterhouse the treasurer

21    of NexPoint?

22         A.  I don't know.  It says it on there,

23    but I'm not -- I'm not certain.

24         Q.  Okay.  So under the NexPoint -- under

25    this NexPoint Amended and Restated Shared
```

1               NORRIS

2   Services Agreement, the Advisors agree to pay

3   Highland for its middle and back office services

4   in the amount of $168,000 per month, right?

5          MR. RUKAVINA:  Objection to the

6   extent it calls for a legal conclusion.

7        A.  Can you repeat your question, please.

8   BY MS. WINOGRAD:

9        Q.  So the Advisors agreed to pay

10  Highland $168,000 per month for Highland's back

11  and middle office services, right?

12       MR. RUKAVINA:  Objection.  Legal

13  conclusion.

14       A.  Can you scroll to the section where

15  it actually shows what was agreed upon?

16       MS. WINOGRAD:  La Asia, could we

17  scroll up a little bit, maybe to the first page.

18       Okay.  So go down a little bit.  Keep

19  scrolling, please.

20       Okay.  Sorry.  Go to the top of

21  page 4.

22       MR. RUKAVINA:  Hayley, can we open

23  this in the Chat, and then Dustin and I can look

24  at it and move around?  I don't know how that

25  works.

```
1                        NORRIS
2            MS. WINOGRAD:  I think for now we'll
3    just look at the screen so that I can make sure
4    I'm on the same part as you guys.
5            THE WITNESS:  And I might have this
6    agreement up on my desk.  Hold on.
7            MS. CANTY:  I've been putting all the
8    exhibits in the Chat.
9            MR. RUKAVINA:  Oh, I know, but I just
10   don't know how to use it, honestly.  I guess I
11   can click Chat and see.
12           MS. WINOGRAD:  Okay.  Can you scroll
13   up a little bit, please.  Okay.  Just down.  I
14   want to get to Article 2.  So the bottom of that
15   page.  Okay.  Right there.
16   BY MS. WINOGRAD:
17        Q.  Do you see under Article 3,
18   Section 2.02(a), that says back and middle
19   office, right?
20        A.  It does say back and middle office.
21        Q.  Okay.  Let's stay there for a second.
22   And it says "assistance and advise with respect
23   to back and middle office functions including but
24   not limited to," and then it goes on to list a
25   number of services, right, if we scroll down a
```

1                           NORRIS

2    little bit?

3           A.   Investment research, trade desk

4    services, yeah, yeah, yeah, it goes on and on,

5    yes.

6           Q.   Okay.  So it's fair to say that based

7    on the terms of the agreement NexPoint was paying

8    Highland for back and middle office services,

9    right?

10          A.   That was the general -- yes, this was

11   shared services, primarily back and middle office

12   services provided to NexPoint Advisors.

13          Q.   Okay.  How was the $168,000 a

14   month -- how was this -- how was this figure of

15   $168,000 arrived at?

16          A.   Yeah, on this one, our -- in

17   preparation for this I prepared by, as I

18   mentioned, talking to a lot of different people.

19   The people involved in creating that calculation

20   were Dave Klos and Frank Waterhouse and the

21   accounting teams under them.  And so we haven't

22   had access to either of them and so we don't --

23   we don't know specifically on this $168,000 how

24   it was calculated.

25          Q.   Okay.

1                           NORRIS

2          A.  But we expect to ask Mr. Waterhouse

3    and Mr. Klos on that in their deposition, and

4    we'll get more information from them.

5          Q.  Okay.  So I just want to make sure I

6    have this straight.  So as the 30(b)(6)

7    representative for NexPoint, you don't understand

8    how certain terms of this Agreement came into

9    existence?

10         A.  As a 30(b)(6) witness, I did all of

11   the diligence that I could leading up to this to

12   determine that, but didn't have access, and

13   discovery is ongoing.  So we do believe that we

14   will be able to get answers on that --

15         Q.  I just asked a yes-or-no question.

16   So I just wanted to make sure the answer was no,

17   you didn't know?

18         A.  Can you ask your original question

19   again?

20         Q.  I said as a 30(b)(6) witness for

21   the -- for NexPoint Advisors, you don't

22   understand how certain terms in this agreement

23   were arrived at?

24         A.  I understand how the terms generally,

25   but I don't -- again, I did all my research as a

```
1                          NORRIS

2   30(b)(6) witness, and a key component of this is

3   people involved, we haven't had access to in

4   preparation.

5          Q.  Let me rephrase the question.  In

6   your individual capacity holding the title as

7   executive vice president of NexPoint, you don't

8   understand how the $168,000 figure was arrived at

9   in this agreement that NexPoint was a party to?

10         A.  No, in my individual capacity as

11  executive vice president, my job was not the

12  responsibility of calculating payments, doing

13  back office and middle office services.  It

14  wasn't agreements.  It wasn't legal services.  In

15  fact, we had outsourced and relied on Highland

16  for those specific services.  We had outsourced

17  accounting, legal services, calculation of these

18  types of things to Highland and relied heavily on

19  them.

20              I as executive vice president did not

21  have my own separate accounting team.  I don't

22  have a legal team, and so that was relied on

23  heavily by --

24         Q.  So the -- so the answer is no?

25              MR. RUKAVINA:  Objection.  Form.
```

1                           NORRIS

2     BY MS. WINOGRAD:

3           Q.  You don't know as the executive vice

4     president how the $168,000 was arrived at, yes or

5     no?

6           A.  I said exactly that.  But as the

7     executive vice president, that wasn't my

8     responsibility.  I don't know in an individual

9     capacity how the $168,000 was calculated.

10          Q.  And so there is nobody at NexPoint --

11    at NexPoint who -- who had any involvement in

12    arriving at this $168,000 number?

13              MR. RUKAVINA:  Objection.  Form.

14          A.  So if you look at the officers at

15    that time, Mr. Waterhouse was involved.  We had

16    outsourced -- again, NexPoint didn't have an

17    accounting group.  And this was created -- this

18    structure was created for efficiency and

19    effectiveness utilizing resources.  We weren't

20    paying someone else for additional accounting

21    services, this was done by Highland and NexPoint

22    didn't carry its own account back office and

23    middle office services group to do things like

24    this.

25    BY MS. WINOGRAD:

1                          NORRIS

2          Q.  Okay.  Can I refer to the HCMFA

3    Shared Services Agreement and the NexPoint Shared

4    Services Agreement as the Shared Services

5    Agreement going forward?  So if I say that, you

6    will understand what I mean; I'm talking about

7    both of them?

8          A.  That's fine.  I know there are

9    different provisions of each of those.  They

10   aren't identical.  So if you are just referring

11   to the general, that's great, but I do -- I do

12   know there are different provisions.

13         Q.  Okay.  So the Shared Services

14   Agreements were both in effect as of early 2013,

15   right?

16         A.  And sometime before that, yes, but as

17   of early 2013, they were both in effect.

18         Q.  Okay.  So other than to out- -- so

19   the purpose of these Shared Services Agreements

20   was to outsource certain middle and back office

21   functions, right?

22         A.  The -- yes, to contract to achieve

23   certain back office and middle office functions

24   that the Advisors did not carry in-house.

25         Q.  Okay.  And other than to outsource

1                          NORRIS

2     these certain middle and back office functions,

3     was there any other purpose of the Shared

4     Services Agreement?

5          A.  I believe the agreements speak for

6     themselves for the services included and -- you

7     know, the services that are in there, that was

8     the purpose of contracting.

9          Q.  Can you think of any other purpose?

10         A.  Well, here is what I would say -- let

11    me -- let me go back to the agreement here you

12    have up.  The provision that says back and middle

13    office, that's 2.02(a).  Then you got (b), legal

14    compliance and risk analysis.  Legal compliance

15    and risk analysis, there is a lot there involved.

16    Within back office and middle office, it's a very

17    broad term.  But if you look at that, it says

18    "assistance and advice back and middle office

19    including but not limited to."  And it's a very

20    broad provision:  investment research, trade desk

21    services --

22         Q.  Okay.  Is there any service in the

23    Shared Services Agreement that you would not

24    categorize as a back and middle office service?

25         A.  Again, here you separated out back

                              NORRIS
1

2  and middle office, legal compliance, risk

3  analysis.  It even says investment research in

4  back and middle office.  So I think they're using

5  that term as one point.  And then now if you can

6  scroll down past legal compliance, risk analysis.

7  A lot of people would say that's not just back

8  office.  I think that's probably why it's a

9  separate function.

10       Q.  So I don't care what a lot of people

11  would say.  According to the Advisors, were they

12  categorizing these functions as back and middle

13  office services at the time this agreement was in

14  effect?

15       A.  Well, I don't think (b), (c), (d),

16  and beyond a sub-bullets of (a).  So they are

17  separate categories.

18       Q.  Okay.  So let's just look at

19  subsection (c), "Tax, assistance an advice with

20  respect to tax audit support, tax planning and

21  tax preparation."  Is this a back or middle

22  office function?

23       A.  I think we're splitting hairs here,

24  and I don't think it matters.  But there is no

25  defining big B, big M, you know, back and middle

1                          NORRIS

2    office as a defined term, unless you define

3    (a) -- again, I'm not an attorney and coming up

4    with the interpretation of a meaning in a

5    document, I can't do that.

6         Q.  So was the purpose of the Advisors

7    outsource -- outsourcing these services that are

8    listed in this agreement, were they to enable the

9    Advisors to comply with the Advisors' obligations

10   to the funds?

11        A.  They were a help.  They weren't to

12   enable.  And maybe backing up, I think it's

13   important to note even before these agreements

14   were in place, there was -- these retail advisors

15   did a lot of this on their own.  In fact, I was

16   an accounting manager for the retail advisors

17   doing back office services, including a separate

18   valuation committee.  There was essentially a

19   Chinese wall.  And we even had separate floors at

20   one point.

21             And this allowed them to centralize

22   it and to share in those thoughts between the

23   affiliated Advisors.  So you weren't duplicating

24   services.  So this enabled -- but this does

25   enable the Advisors to -- to perform their

1                          NORRIS

2   function under the 1940 Act of providing the

3   services needed.

4            So it's outsourcing a portion of

5   those services that we would otherwise have to

6   provide.  And if there is already a separate

7   group providing those, this created efficiencies.

8        Q.  Let me ask this.  If these agreements

9   were not in effect, would the Advisors still have

10  been able to fulfill their obligations to the

11  funds?

12       A.  They would have had to do that

13  through additional employees or other outsourced

14  Advisors or other outsourced services.  We

15  outsource a number of things today, and we

16  actually saw this when we transitioned away from

17  Highland.  There was a sub-period, it was only a

18  week, but where we had to --

19       Q.  You've answered my question.  So I

20  would like to move on now, if that's okay.

21       A.  Yeah, that's great.

22       Q.  Do the Advisors have contracts with

23  anyone other than the funds to provide services?

24       A.  Do our Advisors or -- sorry, can you

25  repeat the question?

1                       NORRIS

2          Q.   Okay.  So let me ask it this way.  So

3    do the Advisors perform any services to any

4    entities other than the funds through the Shared

5    Services Agreements?

6          A.   Through these Shared Services

7    Agreements?

8          Q.   Yes.

9          A.   These Shared Services Agreements are

10   services that HCMLP is providing to NexPoint

11   Advisors and HCMFA.

12         Q.   Right.  And as you said before, it's

13   to enable the Advisors to perform their

14   obligations to the funds, right?

15         A.   Correct.

16         Q.   So do the Advisors perform any

17   obligations to any entities other than the funds?

18         A.   We're talking just the retail funds?

19         Q.   Yes.

20         A.   Meaning any services at all?

21         Q.   Investment advisory services.

22         A.   Yeah, certainly we provide investment

23   advisory services under advisory contracts with

24   publicly traded REITs, private REITs, Delaware

25   statutory trusts that are 1031 DSTs, other

1                           NORRIS

2    private placements.  You have a couple of

3    co-invest opportunities.  So there is a number of

4    other vehicles other than the retail funds or the

5    '40 Act funds that the Advisors -- primarily

6    NexPoint Advisors provides investment advisory

7    services.

8         Q.  So prior to the execution of the

9    Shared Services Agreements, were these Advisors

10   receiving the services set forth in these Shared

11   Services Agreements from Highland?

12        A.  I don't believe so.  And as I

13   mentioned, I was actually involved in a large

14   part at the Advisors providing services to the

15   Advisors.  We weren't outsourcing.  I ran a trade

16   settlement group as well as an operations group

17   in accounting.  We had a number of -- we actually

18   had our own traders.  We had our own valuation

19   committee.  All these things are listed in here.

20             And so there was some of these

21   services, and it was phased in over time.  And so

22   there was a handoff and a coordination in order

23   to reduce the duplication of costs.  So...

24        Q.  Okay.  So they weren't receiving --

25   the Advisors weren't receiving these services

1                        NORRIS

2    prior to the Shared Services Agreements from

3    Highland?

4         A.   I'm not sure specifically on any of

5    them.  Again, it's over a decade ago, and that's

6    not something that I have an answer for.

7         Q.   Okay.  So let's move on.  Are you

8    aware that the Advisors filed an administrative

9    claim against Highland in January of 2021?

10        A.   I am.

11             MS. WINOGRAD:  Okay.  La Asia, can we

12   pull up Exhibit 11.  Scroll down a little bit,

13   please.

14             (Exhibit 11 marked for identification.)

15   BY MS. WINOGRAD:

16        Q.   Okay.  Do you recognize this

17   document?

18        A.   I do.  And I think I actually have it

19   on my desk.

20        Q.   So this is the administrative claim

21   filed by the Advisors on January 25th of 2021,

22   right?

23        A.   Yes.

24        Q.   So the facts set forth in this

25   document state the basis for the Advisors' claim

```
 1                        NORRIS
 2    against Highland, right?
 3         A.  As known at that time, yes.
 4         Q.  Is there anything inaccurate in this
 5    document?
 6         A.  Based on what we knew at that time,
 7    no.  And there's been a number of other things we
 8    have learned through discovery, and discovery is
 9    ongoing, as I mentioned.  We haven't had the
10    ability to talk to Mr. Waterhouse or Mr. Klos.
11    Mr. Seery will be deposed.
12         Q.  Okay.
13         A.  And so --
14              MS. WINOGRAD:  Can we please scroll
15    to paragraph 16.
16              MR. RUKAVINA:  I'll note for the
17    record that counsel keeps cutting off the witness
18    before he finishes his answer.  So that was an
19    example.
20              THE WITNESS:  True.
21    BY MS. WINOGRAD:
22         Q.  Okay.  Mr. Norris, looking at
23    paragraph 16, it says, "Beginning around
24    July 2020, Mr. Seery directed the Debtor to cease
25    providing to the Advisors as otherwise
```

NORRIS

1

2  contemplated under the Shared Services

3  Agreement" -- SSA stands for Shared Services

4  Agreement, right?

5       A.  Yes, it's defined as Shared Services

6  Agreement in this document.

7       Q.  Okay.  And PRAs, and that's defined

8  as Payroll Reimbursement Agreements, right?

9       A.  Correct.

10       Q.  Do the Advisors contend that this

11  statement is accurate?

12       A.  Yes.

13       Q.  Okay.  So in July of 2020, Mr. Seery

14  was Highland's CEO, correct?

15       A.  I'm not sure what his specific title

16  was in July of 2020.

17       Q.  Okay.  Can you tell me all of the

18  facts you're aware of that supports the statement

19  in paragraph 16 that I just read?

20       A.  Yeah.  And, again, I would point out

21  that discovery is ongoing.  There is a number of

22  facts that we hope to be able to obtain from

23  Mr. Waterhouse and Mr. Klos who haven't been able

24  to talk to us.  Obviously Mr. Klos, because he's

25  employed by the Debtor or employed by Highland,

NORRIS

1   and Mr. Waterhouse because his attorneys haven't

2   allowed us to talk to him.  And so we think we'll

3   get more information on this.

4           But -- and key here, beginning around

5   July 2020, there was a number of services.

6   Mr. Seery appeared in August with our retail

7   board and told them specifically he was not

8   allowing his employees, his legal team, his front

9   office investment teams under the Shared Services

10  and PRAs, the services they normally would

11  provide, to provide certain services related to

12  assets that were held across both entities.

13  There were multiple instances where they were no

14  longer going to be providing services.

15          Historically Highland had provided

16  our legal services, compliance services.  And so

17  there was a number of things specifically where

18  they were told do not work on.  Those were things

19  we normally would have help on.  That includes --

20  we had a conflicts committee any time there were

21  cross-held positions.  There were instances where

22  we had to convene our own investment research.

23  They had analysts in the front office that

24  covered these names; we were not.  And so we were

                              NORRIS

1

2    paying for front office services for investments

3    that our funds were invested in that we could no

4    longer receive those services for.  And we had to

5    do a number of things in order to plug those

6    holes.  But it was very clear, I even saw an

7    email from Mr. Seery to the legal team saying

8    they would be fired if they worked on a certain

9    matter.  That was an entity -- an asset that was

10   cross-held that -- obviously there is the

11   contention on Highland's side if there was

12   conflicts, but those were things that were

13   provided under the Shared Services Agreements and

14   PRAs prior that were no longer provided starting

15   on or around that time.

16        Q.   Okay.  So that was a lot, so I'm just

17   going to try to clarify a few things.

18             Can you specify what services you

19   were referring to?  You mentioned legal, but I

20   just want to make sure I understand the specific

21   services that you were stating there.

22        A.   Yeah.  Legal and compliance services.

23   There was litigation support as well.  There was

24   some items that we were involved in litigation on

25   that Mr. Surgent, for example, was participating

1          NORRIS

2  in.  He had to drop that at Mr. Seery's request

3  and turn it over to DC Sauter on our end.

4          There is front office investment

5  services related to certain entities.  There was

6  valuation related to that, valuation services.

7  There was committees and conflicts-related

8  committees that were always handled and run by

9  HCMLP and their legal compliance and investment

10 professionals.

11         Let me go to the advisory agreement

12 here, specifically.  If you want to pull up -- we

13 can go line by line if you -- actually, let me

14 pull up -- I think, again, that's a start.  And

15 there are other items.  And, again, discovery is

16 ongoing, but our position is that there were

17 significant items that would have normally been

18 provided during that time period under those

19 agreements.

20         Q.  What -- what exactly did Mr. Seery

21 say to Highland in July of 2020?

22         A.  What did he say to Highland?

23         Q.  Uh-huh.

24         A.  As in directed to the Debtor?

25         Q.  Yeah.  So looking at paragraph 16, it

1                      NORRIS

2    says, "Beginning around July 2020, Mr. Seery

3    directed the Debtor to cease providing services."

4              What did he say?

5         A.  Yeah, we -- again, discovery is

6    ongoing.  We're going to have a chance to

7    actually talk to Mr. Seery, too, get his

8    testimony.  But we know that he told the legal

9    team and the compliance teams to specifically not

10   work on certain things.  He told the investment

11   professionals as well.  He told our traders --

12   again, our traders cannot do something for us.

13   They were providing trading services, yet, the

14   traders were employed by our Advisors.  And so --

15   but there were specifically certain matters.

16             And he told Mr. Sauter that he had

17   instructed his team not to work on things that

18   were in opposition to the Debtor, which could be

19   understandable, but those services also impacted

20   our investments that they normally would work on

21   under the Shared Services Agreements.  And we had

22   to find ways to handle that.  So...

23        Q.  Okay.  Did Mr. Seery say all of these

24   things in person?

25        A.  The call that he had with our board

```
                            NORRIS
 1
 2   was he called -- he dialed in.  And I don't -- to
 3   the extent of certain individuals, some of it was
 4   in writing; some of it was in person.  We haven't
 5   actually seen one of the emails I referred to yet
 6   from your discovery.  That one hasn't been
 7   provided maybe because it was to the legal team,
 8   and there is a claim of privilege.  But he said
 9   to Mr. Sauter in email specifically that his
10   legal team was not allowed to work on certain
11   matters.  But there was other items that were
12   directed in person or by phone.
13        Q.  Okay.  And as a result of Mr. Seery's
14   statements, did the Debtor stop providing
15   services to the Advisors?
16        A.  Yes.
17            And I would also point out that there
18   was a number of things that typically -- and I
19   mentioned -- another one I thought of is there
20   were officers of our retail funds that were
21   employed by HCMLP.  That was one of the services.
22   And we had a number of board meetings and
23   matters, they just didn't join because there was
24   a potential conflict.  And that included Lauren
25   Thedford, Dave Klos, Frank Waterhouse.  And we
```

                                    NORRIS
1

2    would typically have had much more support under

3    the Shared Services Agreement.  And that was a

4    direct result of the concerns they had with even

5    potentially having an issue with Mr. Seery,

6    Mr. Klos, and Mr. Waterhouse have told me that

7    they were concerned that Mr. Seery had said

8    multiple times that they would have potential

9    personal liability and be fired if they did

10   anything that could be detrimental to the estate

11   or could harm the monetary interest of Highland.

12           So they were -- they were concerned.

13   And so they understandably were very cautious in

14   what they were doing and providing, and that

15   second -- you know, during that entire period

16   after that on or around July 20th, there was

17   significant less -- significantly less support

18   from the Highland group.

19           Q.  When did the Advisors first learn

20   that Highland stopped providing those services?

21           A.  There was -- you know, obviously --

22   in regard to just this or in regard to just

23   services in general?

24           Q.  The services that are referenced in

25   the second sentence of paragraph 16 that you just

1                    NORRIS

2  talked about.

3          A.  Yeah.  In regard to the Court's

4  concerns about providing certain services to

5  non-Advisors resulting in on or around.  I think

6  that's pretty clear, you know, as a result

7  beginning on or around July 20th.

8          Q.  Okay.  So the Advisors learned this

9  on or around July 2020?

10         A.  Uh-huh.

11         Q.  Okay.  So when they found out that

12 Highland stopped performing these services, what

13 did the Advisors do?

14         A.  Yeah, so we had a number of

15 discussions, including emails with Mr. Seery,

16 including discussions with Mr. Waterhouse,

17 Mr. Klos.  We had -- our attorneys had

18 discussions and conversations with Highland's

19 attorney.  There was an email back and forth

20 between your firm, Pachulski, and our attorney,

21 K&L Gates, in October.  Our board expressed

22 concerns when Mr. Seery was on the call in August

23 directly to him.  There was a number of

24 conversations.  Mr. Sauter had ongoing

25 conversations --

1                         NORRIS

2            THE WITNESS:  Excuse me, was that --

3            MR. RUKAVINA:  My fault.

4        A.   There was a number of discussions

5    regarding services being provided.  And granted

6    at this point -- up until this point, largely

7    both sides believed there would be an amicable

8    resolution to the whole bankruptcy, including

9    Mr. Seery who multiple times even told our board

10   that he viewed that there would be an amicable

11   resolution.  And so we had a lot of ongoing

12   discussion throughout all this, and the response

13   was, sorry, this is, you know, from

14   Mr. Waterhouse and Mr. Klos, this is what we've

15   been directed to do; there is an automatic stay.

16   I've been told we can't do this.  We have to be

17   careful.  We're worried about what Mr. Seery will

18   do.  And the direction from Mr. Seery to

19   Mr. Sauter was what you find in the email and

20   discussions.

21   BY MS. WINOGRAD:

22       Q.   Okay.  Just moving forward, I'm going

23   to ask you to just try to listen really carefully

24   to what I'm asking and keep your answer

25   responsive to my question.

```
1                        NORRIS

2              MR. RUKAVINA:  And I would ask you

3    when you find a convenient time for a restroom

4    break, no rush.

5              THE WITNESS:  I could use one, too.

6              MS. WINOGRAD:  Sure.  Let me just

7    finish this line of questioning, and then we'll

8    take a small break.  I should be done in a couple

9    of minutes.

10   BY MS. WINOGRAD:

11        Q.  Did the Advisors tell Highland in or

12   around July of -- July or August of 2020 that

13   Highland was in breach of the Shared Services

14   Agreements as a result of Mr. Seery's direction?

15        A.  Did we tell Highland that they were

16   in breach?  I'll just reiterate my -- there was a

17   lot of discussions ongoing about the concerns of

18   the services and -- including both the Shared

19   Services and Payroll Reimbursement Agreement.

20        Q.  Okay.  But there was no discussion

21   regarding a breach on Highland's part?

22        A.  Oh, I think there -- I don't know if

23   that's a defined term, "breach," but we certainly

24   clarified that we were paying for services we

25   were not receiving under both agreements, and
```

```
                         NORRIS
1
2    that was clear throughout.
3         Q.  Okay.  So as a result of Mr. Seery's
4    direction, did the Advisors in or around July
5    of 2020 and August of 2020 make a demand on
6    Highland that it perform under the Shared
7    Services Agreements?
8         A.  That specifically, we demand you
9    perform, no.  But we sent a letter, an email that
10   we thought that they were overbilling.  And we
11   actually asked for the invoices --
12        Q.  When --
13        A.  -- and none were provided to us.
14            What's that?
15        Q.  No, I didn't -- I thought you were
16   done.  Continue.
17        A.  Yeah, I cut off my train of thought
18   there.  But there was multiple requests
19   specifically to what they were charging us.
20   Because if you go back to the Shared Services
21   Agreement for HCMFA, it was a cost plus 5
22   percent.  If you go to the Payroll Reimbursement
23   Agreement, it was a reimbursement for actual
24   employee expenses.  So on or around this time, we
25   started asking for invoices, and we did that over
```

1                          NORRIS

2    many months asking many different people, and

3    they wouldn't provide it to us because they had

4    said they couldn't.  Mr. Seery wouldn't allow it.

5    We would ask; they couldn't.  And that was DSI,

6    that was Frank and Dave, that was directly to

7    Pachulski in multiple -- there was an email and

8    then there was a letter on December 11th.

9              So there was ongoing discussion

10   throughout this time period that we were trying

11   to get to the answer.  We didn't know.  We had

12   outsourced this to Highland to take care of, and

13   we assumed they were billing us for the proper

14   amount.  That's important.  We relied on Highland

15   for what they were billing us.  And so we assumed

16   they are doing less services.  Okay.  If they are

17   doing less services, they would bill us for

18   actual services.  We later found out that wasn't

19   the case.

20        Q.   Okay.  So other than asking Highland

21   for invoices, did the Advisors say to Highland in

22   or around July and August of 2020 that Highland

23   was not performing under the Shared Services

24   Agreement?

25        A.   Your language there "not performing."

```
 1                    NORRIS
 2    There were still certain services they were
 3    doing.  It wasn't they ceased all services.
 4    Right?  And what we did, instead of making a
 5    major issue about it, because we knew there was
 6    an automatic stay, we knew we couldn't terminate
 7    the agreement, what we did is we went and hired
 8    additional employees.  We brought Jason Post
 9    in-house.  He was a Highland employee.  That was
10    approved by Mr. Seery and Mr. Surgent.
11               We also hired another attorney
12    because we couldn't provide -- Highland wasn't
13    providing those services.  In addition, we had to
14    rely on firms like K&L Gates who was Advisor
15    counsel to provide an up- -- a big increase in
16    additional services during that time period that
17    we would have received from Highland.
18               Mr. Sauter -- you want to interrupt?
19               Mr. Sauter, who was hired as a -- an
20    attorney to work on real estate-related
21    acquisitions and transactions had to step in and
22    do a lot of things that Highland's legal and
23    compliance team would have done, and litigation
24    support would have done.
25               So there was the understanding that
```

1                           NORRIS

2    we were paying for services that were provided,

3    not paying for what wasn't provided, which is

4    what we ended up learning that, one, we paid for

5    services that weren't provided, which was a

6    reimbursement on both the PRAs and SSAs.

7              Q.  Are you done?

8              A.  I am, yeah.

9              MS. WINOGRAD:  I'm going to move to

10   strike all of that because none of it was

11   responsive to my question.

12   BY MS. WINOGRAD:

13             Q.  Did Highland in or around July or

14   August of 2020 tell the Advi- -- did the Advisors

15   tell Highland in or around July or August of 2020

16   that Highland was not performing under the Shared

17   Services Agreement, yes or no?

18             A.  I -- I know you moved to strike, but

19   I believe that was responsive in that we

20   provided -- my screen went blank.  Sorry.  It's

21   back.

22             All of that was explaining what we

23   actually notified Highland of and the discussions

24   we had had regarding the quality of service.

25             Q.  Okay.  So is there a document that

1                         NORRIS

2    reflects the Advisors telling Highland during

3    this time that Highland was not performing its

4    obligations under the Shared Services Agreements?

5         A.   Again, let's go back to "not

6    performing their obligation."  There is a number

7    of services they were providing.  We acknowledge

8    that.  It's just were we paying for what was

9    provided, right?  Did they -- did they drop all

10   services?  No.  They provided a number of

11   services.  And there was a lot of people working

12   really hard during this time period, a lot of

13   great -- great people that did great work.  But

14   they were charging us for the full amount of

15   services that they were providing pre-bankruptcy,

16   continued to charge us for the same amounts

17   without adjustments.

18              And on the PRAs, we didn't know that

19   they continued to charge us for employees that

20   were no longer hired or employed by Highland.  In

21   fact, many of them weren't even employed at the

22   filing of the bankruptcy.  And so at this point

23   we were relying on Highland to be paying the

24   proper amounts and to be billing us the proper

25   amounts, and they continued to charge for

```
 1                    NORRIS

 2   employees that weren't there.

 3             MR. MORRIS:  Can I have the question

 4   read back, please?

 5             MR. RUKAVINA:  I just want to note

 6   again that my witness was interrupted in

 7   mid-sentence.

 8             MR. MORRIS:  The question was whether

 9   there's anything in writing.  So let's have the

10   question read back, please.  These speeches are

11   getting a little longwinded.

12             MR. RUKAVINA:  Yeah, yeah.  I'll

13   answer that.  Is Mr. Morris asking the question

14   now, or is that coming from Hayley.

15             MR. MORRIS:  I want to know what the

16   question was asked, and then I will let

17   Ms. Winograd take over.

18              THE REPORTER:  QUESTION:  "So is there a

19              document that reflects the Advisors

20              telling Highland during this time that

21              Highland was not performing its

22              obligations under the Shared Services

23              Agreements?"

24        A.   There are emails saying that the

25   services -- we believed that we were paying for
```

1                          NORRIS

2    services not provided.  There is an email from

3    our counsel, K&L Gates, to Pachulski in October.

4    There is an email in December, December 11th that

5    was sent requesting documents.  There is emails

6    from myself and DC Sauter to Frank and Dave

7    trying to understand what we were paying for.

8    And a response saying that there was a profit

9    being charged and that they were charging for

10   employees that were no longer employed.  So that

11   is -- those are the -- those are the written

12   items.  There may be others.  Again, we haven't

13   had a chance to conclude our discovery.  We

14   haven't even spoken to Mr. Waterhouse on this.

15   He may know of other items.  We haven't spoken to

16   Mr. Klos.  We haven't deposed Mr. Klos.  But I

17   think there is a lot of written materials there.

18   BY MS. WINOGRAD:

19        Q.  Okay.  Mr. Norris, I don't care what

20   all of these other people know about this.  I'm

21   asking you as a 30(b)(6) witness just for the

22   record.  And so you mentioned that the Advisors

23   found out that -- that the Debtor stopped

24   providing these services as of July of 2020, but

25   then the first time that this was reflected in an

1                       NORRIS

2   email was October of 2020, as you just said.

3           A.  Yeah, I think the -- well, there may

4   be others, and there was conversations with our

5   board.  I'm sure there's board minutes.  There

6   was conversation with Seery in August where they

7   expressed concerns.

8                   But the key aspect here, even during

9   this timeframe when we found out, we assumed we

10  would be paying for actual services provided plus

11  5 percent.  If they stopped providing the

12  services for legal and compliance, if they

13  stopped providing certain services, we would

14  assume they wouldn't be billing us for that.  And

15  so was there a need?  Well, sure, certain

16  services dropped off.  We understood that the

17  Court had concerns.  We understood that there was

18  conflicts that people couldn't be working.  We

19  were understanding.  Like, this was a unique

20  situation.  But we didn't assume we would

21  continue to pay the same amount.

22                  You know, if someone's at one point

23  paying -- providing investment advisory services,

24  again, the Investment Advisory Agreement -- or

25  PRAs are a cost plus.

1               NORRIS

2               MR. RUKAVINA:  Is this a good point

3     for a restroom break?

4               MS. WINOGRAD:  I have one more

5     question before we take a restroom break.

6     BY MS. WINOGRAD:

7          Q.  If the Advisors knew as early as July

8     of 2020 that Highland wasn't performing its

9     obligations, why did it continue to pay for these

10    services for up until at least October of 2020?

11         A.  Yeah, and I'll -- I'll lay this out

12    again.  We didn't pay.  We had actually provided

13    and relied on Highland, HCMLP, and their

14    accounting services, their legal services to

15    continue to pay.  Highland employees prepared an

16    invoice, they made a payment, they actually had

17    access to our bank account, they continued to

18    make those payments all along the way.  We did

19    not know that we were paying for services that

20    were not provided.  We didn't know at that time

21    that we were paying for employees that were no

22    longer employed.  Had we known about it and we

23    started to get an understanding or started to

24    think that and we asked multiple times, and until

25    we actually got the data or started to get the

                                    NORRIS

1    data -- and, in fact, when we found out we were

2    paying for employees that were no longer

3    employed, we were shocked, looking at the actual

4    schedule of who they were charging for.

5             So what were we paying Highland for

6    if not for accounting back office payments,

7    accounts payable services, and Highland knew of

8    the overpayments and continued to process them in

9    the ordinary course.  And Dave and Frank told us

10   when we asked about it and finally found this

11   out.  They said they discussed it.  They even

12   created a calculation of overpayment.  They

13   discussed it with Highland counsel.  They

14   discussed it with management, and there was

15   nothing they -- they were told there was nothing

16   they could do because of the automatic stay.

17            And it's at that point that was the

18   first time -- I'm not an attorney, and I'm not a

19   bankruptcy attorney at all -- heard the word

20   "automatic stay."  So there is -- that's a

21   longwinded way of answering the question.

22        Q.  So NexPoint was paying almost

23   $200,000 a month, correct?

24        A.  The exact number -- NexPoint was

1                    NORRIS

2    paying $252 for -- $252,000 for payroll

3    reimbursement amount.

4         Q.  No, I'm talking about the -- under

5    shared services.

6         A.  Did you say HCMFA or NexPoint?

7         Q.  NexPoint.

8         A.  NexPoint I believe the number was

9    168,000.

10        Q.  168,000.  But it didn't know what it

11   was paying for, right?

12        A.  Can you clarify your question?

13        Q.  You said that -- earlier you said

14   Highland was paying, you said when I asked why

15   the Advisors continued to pay.  So NexPoint --

16   isn't it fair to say, then, that NexPoint was

17   paying all this money but that they didn't

18   understand what it was paying for during this

19   time?

20        A.  We thought we knew what we were

21   paying for, right?  And I'll clarify here.  There

22   is a NexPoint agreement that has a stated

23   $168,000 as you mention, and there's a HCMFA

24   agreement that's cost plus.  We thought we were

25   getting the services we bargained for, and we

1                       NORRIS

2    would assume that Highland would actually bill us

3    for the actual services provided, which we were

4    paying around $300,000 a month for HCMFA Shared

5    Services Agreement.  And it was $252,000 a month

6    for NexPoint Advisors PRAs, and the HCMFA PRAs

7    were $416,000 a month.  We can go through the

8    calculations on what we believe was the

9    overpayment during this entire period, but it's,

10   you know, significant, right?  We provided our

11   calculation, which is utilizing Ms. Hendrix

12   numbers for payroll that I believe was taken

13   directly from the payroll system, and that shows

14   $7.6 million for paying for employees that were

15   no longer employed.

16             MS. WINOGRAD:  Okay.  I'm going to

17   move to strike all of that.  It was unresponsive

18   to my question.  And we're going to now take a

19   five-minute break.  So why don't we come back at

20   11:45.

21             MR. RUKAVINA:  Can we take ten,

22   Hayley?  I've got to make a quick call.

23             MS. WINOGRAD:  Sure.  Let's come back

24   at 11:50.

25             MR. RUKAVINA:  Thank you.

NORRIS

1

2          (A break was taken from 10:39 a.m. to

3          10:52 a.m.)

4               MS. WINOGRAD:  I apologize for

5     interrupting you before.  I didn't intend to, and

6     I will try to make sure that you finish your

7     complete answer.  At times there was a little

8     pause and I maybe thought you were done and I got

9     ahead of myself.  But in turn, I would also ask

10    that you please listen carefully to my questions

11    and just answer the questions that I asked.  Is

12    that fair?

13              THE WITNESS:  Yeah, I -- no, I

14    appreciate that.  And I may well have been

15    attempting to answer the question the best I can.

16              MS. WINOGRAD:  Thank you.  All right.

17    We'll get through this.

18    BY MS. WINOGRAD:

19         Q.  So I just want to go back a little

20    bit about these -- you mentioned that the --

21    there were certain conflict issues relating to

22    Mr. Seery's directions to the Debtor, right?

23         A.  Uh-huh.

24         Q.  One of those issues involved OmniMax,

25    right?

Page 67

1                              NORRIS

2          A.   It did.

3          Q.   Were there any other conflicts that

4     existed other than OmniMax?

5          A.   There were a number of -- other

6     issues, investment -- in addition to OmniMax.

7          Q.   Okay.  Were there any issues

8     unrelated to issues of conflicts?

9          A.   So I think when you look at -- you

10    have conflicts, but then it started out with the

11    OmniMax transaction where no one can work on

12    this, and then it turned into, well, anything

13    that could be perceived as being amicable to the

14    Debtor, and then it turned into most of the

15    services, legal and compliance, just eventually

16    stopped.  And so it wasn't a, you know,

17    let's-halt-everything-can't-do-anything.  So

18    outside of conflict, there was a drop-off in the

19    overall services, I think also in line with what

20    was going on at this time.

21         Q.   Okay.  So just to confirm, the -- so

22    in paragraph 16 that we talked about for a while,

23    when Mr. Seery directed the Debtor as it's

24    alleged in the claim, there was -- those

25    directions related to issues of conflict, right?

1                      NORRIS

2          A.   Largely, yes.  And I would say

3     particularly at the start, yes.

4          Q.   Okay.  Did the Advisors inform the

5     retail boards that there were these issues going

6     on at the time?

7          A.   Yes.

8          Q.   Okay.  When, exactly, did they inform

9     them?

10          A.   As they were happening.  I kind of

11     laid out that timeframe, but as they were

12     happening.  We had -- I don't remember the

13     specific number, but it was around 24 retail

14     board meetings in 2020, and particularly around

15     this time period, beginning in July and on many

16     more.  And in the first two months of 2021, we

17     had a significant number of board meetings.  So

18     the board was very aware of all those challenges.

19     And Mr. Seery had joined the board meeting and

20     expressed some of those items directly to the

21     board.

22          Q.   Okay.  Do the Advisors contend that

23     the -- that Highland is required to perform

24     certain services that would have been adverse to

25     the Debtor?

```
1                         NORRIS
2            A.  I don't think that's our contention,
3     right?  There would be certainly areas where
4     there would be conflicts sort of -- yeah, that's
5     not our contention.
6            Q.  Okay.  Are you aware that in August
7     of 2020 the court -- the bankruptcy court issued
8     an order expressing concern regarding certain
9     Highland lawyers' conflicts of interest?
10           A.  Yeah, I think that's probably what we
11    referred to in our filing.
12           Q.  Uh-huh.
13           A.  If you can open it back up, I think
14    it says -- I don't have it in front of -- that
15    one right in front of me, but it said including
16    the Court's statements.
17           Q.  Okay.  So you are aware, right?
18           A.  Yes.
19           Q.  Okay.
20           MS. WINOGRAD:  So, La Asia, can we
21    please pull up Exhibit 30.
22           (Exhibit 30 marked for identification.)
23    BY MS. WINOGRAD:
24           Q.  This is it the order we just referred
25    to, right?
```

Page 70

```
1                         NORRIS

2          A.  I don't know.  I've never seen the

3    order.

4          Q.  Okay.  That's fine.  This was the

5    issued by the bankruptcy court on August 11th,

6    2020, right?

7          A.  Again, I don't know.  I'm not an

8    attorney.  I'm still learning what court

9    documents mean.  But it says "order" down below,

10   and it's signed August 11th.

11         Q.  Okay.  That's fine.

12         MS. WINOGRAD:  La Asia, can we scroll

13   to page 10, please.  There we go.

14   BY MS. WINOGRAD:

15         Q.  Do you see here in bold it says, "The

16   court trusts the Debtor's independent directors

17   and new CEO are scrutinizing the issue of

18   in-house lawyers potentially advising both the

19   Debtor and Highland Non-Debtor Entity targets"?

20         A.  Yes.

21         Q.  Okay.  And it's fair to say when the

22   Court refers to the new CEO, it's referring to

23   Mr. Seery, right?

24         A.  I'm not -- I'm not familiar with the

25   structure.  So I don't know that that's a safe
```

1                           NORRIS

2    assumption.  But if you tell me that's the case,

3    I'll take your word.

4         Q.   Okay.  Do the Advisors contend that

5    Highland breached its duties around July of 2020,

6    August 2020, by avoiding conflicts pursuant to

7    this language?

8         A.   And I don't believe that's our

9    stance, right?  The approach here is we were

10   paying for actual services provided, and if they

11   couldn't provide them because of conflicts, they

12   should have charged us for them or reduced our

13   billing.  Those services were normally provided.

14   Even if there is a conflict, you can't just bill

15   for the cost of something that was not provided.

16           So we don't contend that they should

17   have been providing services that were, you know,

18   in conflict to your own state.

19        Q.   Okay.  Was there anyone at the

20   Advisors charged with the responsibility of

21   making sure that the Advisors paid for services

22   that they were, in fact, receiving?

23        A.   We had outsourced that to Highland.

24   And -- and up until this point, we had believed

25   that Highland was doing the right thing.  And the

1                         NORRIS

2    agreements are very clear on what the

3    responsibilities in fair dealing are, and we had

4    tasked Highland with that.

5               At this time because of the

6    conflicts, other people started to get more

7    involved because Highland couldn't perform those

8    functions.  And that's when all of the -- all of

9    the things we've been talking about came about.

10              So we did not have an accounting team

11   or someone in-house that was tasked with

12   verifying the payments.  And because we had a

13   trusted -- we thought trusted group -- and even

14   then we think that the accounting team had done

15   the right thing in tracking it, but did not bring

16   it to our attention, the overpayment, because

17   they were told by Mr. Seery and their counsel and

18   DSI that they couldn't do anything about it

19   because of the automatic stay.

20         Q.  Okay.  But didn't the accounting team

21   report to Mr. Waterhouse?

22         A.  They did, who was the CFO of Highland

23   Capital Management, LP.

24         Q.  And he was also the treasurer of

25   NexPoint, right?

1                          NORRIS

2          A.  He was the treasurer of our Advisors,

3     correct.  But he performed those functions and

4     his accounting function that was outsourced

5     Highland.

6          Q.  Okay.  So did -- was Mr. Waterhouse

7     aware in July of 2020 of these issues of conflict

8     that we just talked about?

9          A.  I mean, we haven't had a chance to

10    talk to Mr. Waterhouse in preparation for this,

11    and we'll definitely ask him that in the

12    deposition.  But we don't -- I don't know what

13    Mr. Waterhouse knew and when.

14               MS. WINOGRAD:  Okay.  La Asia, can we

15    show Exhibit 11, please.  Yeah, can we scroll to

16    paragraph 17, please.

17    BY MS. WINOGRAD:

18          Q.  Do you see here in the second

19    sentence of paragraph 17 that it says, "For

20    example, upon information and belief, the Debtor

21    has booked a net income from the Shared Services

22    Agreement of approximately $10 million since the

23    petition date?

24          A.  I do.

25          Q.  Okay.  Do the Advisors contend that

NORRIS

1   this statement is accurate?

2        A.  Yeah, so based on at that time of

3   what we knew and understanding, we were taking

4   this from information that was relayed from

5   Mr. Klos and Mr. Waterhouse without seeing

6   documents.  Now that we have received the

7   discovery items, we believe this number is for

8   the Shared Services Agreements and PRAs, right,

9   that there had been profits.  We received the

10  calculation from Mr. Klos that shows $9.6 million

11  of annual profits that were reported.

12       Q.  Okay.  So I just want to make sure I

13  have this correct.  You said that the $10 million

14  is actually profits from both the Shared Services

15  Agreement and the Payroll Reimbursement

16  Agreement?

17       A.  Yeah.  And that was based on the

18  information we had at the time.  And that should

19  be Shared Services Agreements and PRAs.

20       Q.  Okay.  And the $10 million is

21  reflected in a document; is that right?

22       A.  Of approximately, yeah.  So in

23  discovery there was a document provided.  The

24  label is ACL025012.  This is Intercompany

```
 1                    NORRIS
 2   Services Agreement.  And it has a, quote,
 3   "estimated gain on all intercompany agreements of
 4   $9.6 million."
 5        Q.  Okay.
 6        A.  And that is -- in the email that was
 7   an annual amount, and we're talking 16 months in
 8   the bankruptcy filing until the end of the SSAs
 9   and PRAs, so arguably that is higher.
10        Q.  Okay.  And then it says in the first
11   sentence of paragraph 17, "The Advisors continued
12   to pay for those services under the Shared
13   Services Agreements and PRAs consistent with
14   historical practice despite the fact that the
15   Debtor is not providing all of the required
16   services.
17             So what do the Advisors mean by
18   historical practice?
19        A.  Yeah, the historical practice was we
20   outsourced payments, calculation of those
21   payments to Highland, and the actual -- they had
22   access to our bank accounts to make the actual
23   wires and approve those.  So that continued.
24             The accounting team over there,
25   Kristin, Dave, Hayley, Frank, they continued to
```

1                    NORRIS

2    make those payments.  And we assumed that they

3    were continuing to make the payments based on the

4    actual services provided.

5         Q.  Okay.  So before making the payments

6    each month, did the Advisors take any steps to

7    ensure that it was paying for service it

8    received?

9              MR. RUKAVINA:  Objection.  Form.

10        A.  Again, we relied on the provided

11   services -- and if you look at the Shared

12   Services Agreement, it's accounts payable, it's

13   accounting services, and that was what we relied

14   on.

15   BY MS. WINOGRAD:

16        Q.  Okay.

17        A.  We didn't -- sorry.  Go ahead.

18        Q.  No, continue.  I thought you were

19   done.

20        A.  I'm good.

21        Q.  Okay.  So in that same paragraph in

22   the last sentence, it states that, "The Advisors

23   have incurred significant additional expenses

24   obtaining services elsewhere that the Debtor was

25   required to provide under the Shared Services

1                       NORRIS

2    Agreements."  Do you see that?

3         A.   I do.

4         Q.   Okay.  What services are the Advisors

5    referring to here?

6         A.   Yeah, so specifically this is legal

7    and compliance services.  And so there were

8    significant additional costs.  I mentioned we had

9    to hire another attorney who is not -- doesn't do

10   any litigation-related work or related bankruptcy

11   work.  It's general legal services.

12              And then Jason Post, who was hired

13   directly to the Advisor, while we continued to

14   still pay the same dollar amounts even after he

15   moved over.  So those -- those were the

16   additional expenses.

17              In addition, there were outside legal

18   expenses.  We had to lean heavily on K&L Gates

19   and Davor and his team.  But, you know, we had

20   considered including those expenses here, the

21   outside legal expenses, but in order to not waive

22   privilege, we're not going to try and quantify

23   those.  We quantified what we believe is the cost

24   for the additional attorney and Mr. Post for the

25   five months Post -- that they moved over or were

1                        NORRIS

2   hired.  But those are the significant additional

3   expenses for the Shared Services Agreements.

4        Q.  Okay.  And are there documents to

5   reflect these additional expenses you just talked

6   about?

7        A.  Yeah, we have hiring documents.

8   There is emails coming from Mr. Surgent to

9   Mr. Sauter saying that these -- that Jason Post

10  needs to move over, that it's been approved, the

11  reason and rationale.  And then we have -- it's

12  just a simple math, what was their pay.  And I

13  confirmed with our payroll team, accounting team

14  on what the compensation for the additional

15  attorney from the time he was hired in October

16  until the end.  And then Mr. Post's compensation

17  during that time as well.

18       Q.  Okay.  Those documents that you just

19  mentioned, do you know if those have been

20  produced to Highland?

21       A.  The emails between Mr. Surgent and

22  Mr. Sauter are in your possession.  The

23  additional payroll items I'm not sure.  I can

24  check with Mr. Rukavina.

25       Q.  Uh-huh.

Page 79

1                          NORRIS

2          A.   And I can talk about the amounts, if

3    you want, what we assume the amounts to be.

4          Q.   Okay.   Can we go to paragraph 19,

5    please.

6               Okay.   It says here, "The Advisors

7    have brought these issues to Mr. Seery's

8    attention."

9               We kind of touched on this earlier,

10   but I want to get a little bit more specific.

11   What issue is this sentence referring to?

12         A.   I would -- it's probably in the

13   paragraphs above.   Maybe we scroll back up and

14   see what "these issues."

15         Q.   Are these issues relating to the

16   conflicts issues?

17         A.   I don't see -- the paragraph

18   immediately above said, "There have also been

19   similar overpayments under the PRAs.   There is a

20   schedule attached to PRAs of investment

21   professionals whose compensation would be

22   reimbursed by the Advisors, but this schedule is

23   incredibly outdated and includes many

24   individuals, for example, who departed the Debtor

25   before the petition date or during the bankruptcy

```
1                         NORRIS
2    case.  As a result, the Advisors estimate that
3    since the petition they've overpaid under the
4    PRAs more than $9 million."
5              That is certainly an issue that would
6    be these issues.  If you scroll up to 17, maybe
7    you can scroll up, we can take a look at that.
8         Q.  Okay.  And so do you know when the
9    Advisors brought these issues to Mr. Seery's
10   attention?  Was it -- yeah, do you know when?
11        A.  There was multiple times throughout
12   that time period, that late 2020 period.
13        Q.  Okay.
14             MS. WINOGRAD:  La Asia, can we please
15   pull up Exhibit 5.  Thank you.
16        (Exhibit 5 marked for identification.)
17   BY MS. WINOGRAD:
18        Q.  Are you familiar with this document?
19        A.  Very high level.
20        Q.  Okay.  Can you confirm this is a
21   Sub-Advisory Agreement between Highland and
22   NexPoint?
23        A.  This Sub-Advisory Agreement dated
24   effective January 1st, entered into between
25   NexPoint and -- yeah, that looks to be the case.
```

1                           NORRIS

2          Q.  Okay.

3              MS. WINOGRAD:  La Asia, can we please

4     scroll to page 13.  Thank you.

5     BY MS. WINOGRAD:

6          Q.  So this was signed by Frank

7     Waterhouse on behalf of both Highland and

8     NexPoint, right?

9          A.  Again, that appears to be the case.

10    Without checking with Mr. Waterhouse, I don't

11    know that he personally signed, but it does

12    appear to be his signatures.

13         Q.  Okay.  And as you just said, this --

14    this agreement was effective January 1st of 2018,

15    right?

16         A.  We'd have to go back up and look.  I

17    think that was the date.

18         Q.  We'll just go back to the first page

19    just to confirm.

20         A.  Yeah, effective as of January 1st,

21    2018, that's correct.

22         Q.  Okay.  Do you know the purpose of

23    this agreement?

24         A.  So on this, I do not.  Again, this is

25    one that we have not had access to

1                          NORRIS

2   Mr. Waterhouse, who signed this, in understanding

3   the purpose of this.

4              If you go down reading the agreement,

5   if you want to scroll down, I believe this was to

6   provide compensation for certain front office

7   services.

8        Q.  Uh-huh.  And are front office

9   services, are they investment advisory-type

10  services?

11       A.  Again, let's look -- and I'm not as

12  familiar with this document.  I know I had seen

13  it at some point, but maybe you can scroll down.

14       Q.  Yeah, let's go to Section 1.  There

15  we go.  It says here, "Limited Scope of

16  Services."  Do you see here in subsection (a) it

17  says, "Highland is hereby appointed a Sub-Advisor

18  to the Management Company for the purpose of

19  assisting the Management Company in managing the

20  Portfolios of each Account pursuant to the

21  Management Agreement and Related Agreements"?

22       A.  Yes.

23       Q.  Okay.  So is it fair to say based on

24  that language that this agreement related to

25  investment services?

```
 1                          NORRIS

 2          A.   It appears that way, but I'm not

 3    great at interpreting legal documents, because

 4    I'm not an attorney.

 5          Q.   Okay.  So do you know if this was

 6    subject to negotiation?

 7          A.   I -- I do not know on this one.  And

 8    this is one that I asked -- in preparation for

 9    this, I spoke with different people, and I don't

10    know the process that went into the creation of

11    this document.

12               MS. WINOGRAD:  Okay.  Can we go to --

13    go to page 3, please.

14    BY MS. WINOGRAD:

15          Q.   Do you see here where it says

16    "Compensation" under subsection 2?

17          A.   Uh-huh.

18          Q.   And it says here, "As compensation

19    for its performance of its obligations as

20    Sub-Advisor" -- and Sub-Advisor, can we agree,

21    refers to Highland?

22          A.   Yes.

23          Q.   Okay.  And then it says, "...the

24    Sub-Advisor will be entitled to receive a monthly

25    fee in the amount of $252,000," right?
```

1                         NORRIS

2          A.  Yes.

3          Q.  Do you have any idea how this number

4     was arrived at?

5          A.  I do not.

6          Q.  Okay.

7          A.  Again, we haven't had access to

8     Mr. Waterhouse and Mr. Klos, who I believe

9     prepared that.  And the number is, I would say,

10    the exact number that is from the Payroll

11    Reimbursement Agreement, which was instituted and

12    may have, I think, took over this agreement

13    effective the same date, and was applied to a

14    certain number of employees and their specific

15    allocations of time and compensation.  So I don't

16    know for certain that that's -- it just happens

17    to be the same amount, but then the other

18    agreement came in as effective the same date.  We

19    haven't been able to speak to Mr. Waterhouse to

20    get the full details, but I -- I think it's based

21    on the reading here and the number, it is based

22    on if it were the same exact number of the same

23    agreement, which was, I think, superseded this,

24    effectively the compensation for those front

25    office employees at that time.

1                         NORRIS

2          Q.  Okay.  So it's fair to say, then,

3    based on this agreement, what we're looking at,

4    that this is the number that the Advisors paid to

5    Highland for certain sub-advisory services

6    rendered by Highland, right?

7          A.  Only to the extent this agreement was

8    in force.

9          Q.  Okay.  Perfect.

10             Do you know when this agreement was

11   terminated?

12         A.  I don't.  And you have the --

13   actually, I have the PRA for NexPoint Advisors.

14         Q.  Okay.  We'll -- we'll get to that,

15   but we -- we can get there in a second.  So --

16         A.  I think it was -- sorry, go ahead.

17         Q.  So just to stick with this specific

18   agreement for a second before we move on to the

19   PRAs.

20             So people employed by Highland had

21   been providing advisory services to the Advisors

22   since the Advisors were formed, right?

23         A.  Sorry, go ahead.  Can you repeat

24   that?

25         Q.  Highland employees had been providing

```
 1                    NORRIS

 2   Advisory services to the Advisors since the

 3   Advisors were formed, right?

 4         A.  Not necessarily.  There was -- like I

 5   mentioned earlier when the Advisors were first

 6   formed, there were a number of employees employed

 7   directly by the Advisors and providing those

 8   services.  And, in fact, some of the services

 9   that HCMFA continues to provide has front office

10   services from certain employees.  So there may

11   have been some services provided prior to that,

12   but I don't know the extent.

13         Q.  Okay.  That's fine.

14             MS. WINOGRAD:  La Asia, can you pull

15   up Exhibit 6.

16         (Exhibit 6 marked for identification.)

17             MS. WINOGRAD:  Okay.  Thanks.

18   BY MS. WINOGRAD:

19         Q.  Are you familiar with this document?

20         A.  I am.

21         Q.  Okay.  This is a Payroll

22   Reimbursement Agreement between Highland and

23   NexPoint, right?

24         A.  It is.

25         Q.  And it's entered into May 1st of
```

```
 1                     NORRIS
 2    2018, right?
 3         A.  Yes.  Effective January 1st, 2018.
 4         Q.  Great.  That was my next question.
 5    Okay.  And this was four months after the
 6    Sub-Advisory Agreement became effective, right?
 7         A.  That is correct.
 8              MS. WINOGRAD:  Okay.  Can we go to
 9    page pdf 526, please.
10    BY MS. WINOGRAD:
11         Q.  Does that look like Frank
12    Waterhouse's signature to you?
13         A.  I would assume so, but I would be
14    speculating.  There is no name or title there,
15    but --
16         Q.  That's fine.
17         A.  -- it looks similar to the other ones
18    we saw.
19         Q.  Do you know who drafted this Payroll
20    Reimbursement Agreement?
21         A.  I do not.
22         Q.  Okay.  So the Payroll Reimbursement
23    Agreement provided that the Advisors would pay
24    Highland for Highland providing certain
25    sub-advisory -- certain advisory investment
```

```
 1                    NORRIS
 2   services, right?
 3        A.  It would not pay.  It would be a
 4   reimbursement.  And this, again, gets back to a
 5   point I made earlier that this was an important
 6   point, we couldn't be a profit center.  This is a
 7   reimbursement for actual expenditures for -- if
 8   you go to the top, I think you can see the
 9   provision.  It's dual employees -- maybe you can
10   scroll up to --
11        Q.  Let's go to page 1, Section A,
12   because that spells it out.
13        A.  Yeah:  Dual employees who are
14   providing investment and -- who are dual
15   employees and providing investment advisory
16   services.
17             And, again, it's a reimbursement for
18   the actual cost, which historically -- and if you
19   see in the appendix it's what percentage of their
20   time was allocated to services provided, whether
21   a dual employee and providing investment advisory
22   services.
23        Q.  Okay.  Fair enough.
24             So if we look at recital Section A,
25   it says "HCMLP" -- which you agree refers to
```

1                          NORRIS

2      Highland, right?

3           A.  Yes.

4           Q.  -- "will seek reimbursement from

5      NexPoint for the cost of certain employees who

6      were dual employees of HCMLP and NexPoint and who

7      provide advice to registered investment companies

8      advised by NexPoint under the direction and

9      supervision of NexPoint as more fully described

10     in this Agreement below."

11          So it's fair to say that these were

12     similar types of services that Highland was

13     providing under the terms of the Sub-Advisory

14     Agreement, right?

15          A.  Again, I'm not certain.  I believe

16     this was to supersede that.  And the

17     understanding was the way that was drafted was

18     not appropriate, given the nature of the '40 Act

19     funds they were serving.  But, again, we need to

20     talk to Mr. Waterhouse for the intent or the

21     reason for the two different agreements.  But our

22     understanding was this agreement, the other one

23     was drafted, and this is to replace that.  And

24     that's why it's effective the same date and has

25     the same amounts.  But it is not sub-advisory

1                          NORRIS

2    services but reimbursement for actual costs.

3          Q.  Okay.  So dual employees, as that is

4    set forth in the agreement of Highland, were

5    providing these investment services, right?

6          A.  Yes.  Dual, and there may have been

7    some dual employees that weren't providing --

8    weren't providing investment services.  So this

9    was they had to be a dual employee and providing

10   services.

11         Q.  Right.  Dual employees that were

12   providing -- the employees that worked at

13   Highland that were providing these services under

14   this agreement, they were called dual employees?

15         A.  Well, they are in this agreement

16   because they are dual employees, right.  If they

17   are in that appendix, they were dual employees,

18   not the other way around.

19              MS. WINOGRAD:  Okay.  Can we go to

20   page 7, please.

21   BY MS. WINOGRAD:

22         Q.  Okay.  This is an Exhibit A to the

23   Payroll Reimbursement Agreement, right?

24         A.  It is.

25         Q.  Okay.  And this is the list of the

1                         NORRIS

2    dual employees we just talked about, right?

3         A.   No.   This is a starting point of the

4    dual employees as of January 1st, 2018.  And

5    these were the percentages at that time of the

6    dual employees.

7              A dual employee, as you note, is an

8    employee that is employed, and in order to be an

9    employee, has to be employed and providing

10   services.  So we're talking postpetition claim

11   here.  Almost -- more than half of these

12   employees weren't even employed as of the

13   petition date of the bankruptcy filing date.

14        Q.   Okay.

15        A.   But -- go ahead.

16        Q.   But this -- these are the employees

17   that as of the time this agreement was entered

18   into who were -- who were supposed to provide

19   these services, right?

20        A.   Yes, that's correct.

21        Q.   Okay.

22        A.   And I would note subject -- at that

23   time, it's a point in time.  So -- well, go

24   ahead.  Go ahead.

25              MS. WINOGRAD:  Can we -- can we go

```
1                          NORRIS
2    back to -- okay.  Let's go to -- let's stay on
3    this page, actually.
4    BY MS. WINOGRAD:
5         Q.  Do you see Matthew Gray here?
6         A.  I do.
7         Q.  Okay.  And Matthew -- so what do
8    these percentage allocations mean in simple
9    terms?
10        A.  Yeah, so I -- and agree it may
11   specify it, but it's the percentage of their time
12   that was spent providing investment advisory
13   services to this particular Advisor.
14        Q.  Okay.
15        A.  Matthew Gray, for example, was
16   employed by HCMLP.  He worked for the
17   organization.  He did a lot of work on different
18   entities including HCMLP, but 9 percent of his
19   time for his allocation of costs were allocated
20   to NexPoint Advisors as of this point in time.
21             MS. WINOGRAD:  Okay.  Could we scroll
22   to Section 3.01 -- I'm sorry, actually -- yeah.
23   BY MS. WINOGRAD:
24        Q.  So it says here, "Actual Cost
25   Allocation.  The Actual Cost of any Dual Employee
```

1                        NORRIS

2    relating to the investment advisory services

3    provided to a Fund shall be allocated based on

4    the Allocation Percentage.  For purposes of this

5    Agreement, 'Allocation Percentage' means the

6    Parties' good faith determination of the

7    percentage of each Dual Employee's aggregate

8    hours worked during a quarter that were spent on

9    NexPoint matters."  Do you see that?

10        A.  I do.

11        Q.  So was there a way for the Advisors

12   to track the aggregate amount of hours that an

13   employee worked during a quarter?

14        A.  We would -- and, again, this says the

15   parties' determination.  So Highland as well was

16   responsible, and they were tasked with seeking

17   reimbursement, right?  So they had a process.  I

18   don't know exactly the process.

19             And, again, we haven't deposed

20   Mr. Waterhouse and Mr. Klos, who would have been

21   performing this.  So this is the service --

22   accounting services we outsourced or leaned on

23   Highland to provide, but also they would know the

24   percentage of time that their employees spend.

25             And clearly in the appendix they have

1                    NORRIS

2    an allocated percentage.  And -- so there -- I

3    assume there is a mechanism and there was a

4    mechanism, and I would even go to Mr. Klos'

5    calculation that he did for the overpayment that

6    we received in discovery.

7              He actually has an amount of actual

8    investment support provided as of that point in

9    time in late 2019 -- or late 2020, for the year

10   period, with that.  So it appears they have a

11   methodology, but we'll learn more of that from

12   Mr. Klos and Mr. Waterhouse.

13        Q.  Okay.  And just to kind of remind you

14   to answer the questions I've asked.  I asked if

15   the Advisors had a way to know, but it sounds

16   like your answer is no, right?

17        A.  Specifically, again, these were

18   employees of HCMLP.  We didn't have access to

19   their specific timesheets or their process.  So

20   we didn't -- no, we, again, we relied on Highland

21   for that.

22        Q.  Okay.  So did Highland decide on

23   these allocation percentages?

24        A.  Again, as -- on this one in

25   particular, the actual details around how these

1                              NORRIS

2     numbers were calculated, we don't know.  Based on

3     the information that I was able to glean as a

4     30(b)(6) witness from many discussions, we don't

5     know.  We are going to be relying -- not relying.

6     We're looking forward to learning that from

7     Mr. Klos and Mr. Waterhouse, but the actual

8     specifics, we don't know.

9          Q.  Okay.  And if we go back to actual

10    costs, if we just scroll down a little bit.

11          MS. WINOGRAD:  La Asia, if we could

12    scroll down a tiny bit.  Thank you.  Up a little

13    bit.  It's in the definitions section.

14    BY MS. WINOGRAD:

15          Q.  So there it is, yeah.  So it says

16    here the actual costs -- it says, '"Actual Cost'

17    means, with respect to any period hereunder, the

18    actual costs and expenses caused by, incurred or

19    otherwise arising from or relating to each Dual

20    Employee, in each case during such period.

21    Absent any changes to employee reimbursement, as

22    set forth in Section 2.02, such costs and

23    expenses are equal to $252,000 per month."

24    Right?

25          A.  That's what it says.

1                          NORRIS

2          Q.  Okay.  And so as we just talked

3    about, this is the same number that was reflected

4    in the Sub-Advisory Agreement, right?

5          A.  It is.

6          Q.  Okay.  So -- so it says here, "Absent

7    any changes to employee reimbursement as set

8    forth in Section 2.02, such cost and expenses are

9    equal to $252,000 a month."  That statement makes

10   sense to you, right?

11         A.  Does it make sense?

12         Q.  If you -- okay.  Let me rephrase it.

13   Do you see that, what I just read?

14         A.  I do.

15         Q.  Okay.  So it mentions Section 2.02.

16             MS. WINOGRAD:  La Asia, can we scroll

17   to Section 2.02, please, to just try to get

18   context for what that sentence means.

19   BY MS. WINOGRAD:

20         Q.  So now we see under Article II it

21   says -- under Section 2.02, "Changes to Employee

22   Reimbursement.  During the Term, the Parties may

23   agree to modify the terms and conditions of

24   NexPoint's reimbursement in order to reflect new

25   procedures or processes, including modifying the

```
 1                     NORRIS
 2   Allocation Percentage (defined below) applicable
 3   to such Dual Employee to reflect the then current
 4   fair market value of each such Dual Employee's
 5   employment.  The Parties will negotiate in good
 6   faith the terms of such modification."
 7            Do you see that paragraph?
 8        A.  I do.
 9        Q.  Okay.  So at any time that this
10   Payroll Reimbursement Agreement was in effect,
11   did anyone at the Advisors seek to modify the
12   terms and conditions of the $252,000
13   reimbursement?
14            A.  Yeah, there was an amendment done in
15   2018.  And the way we understand it, the intent
16   of this was a reimbursement for actual employee.
17   And to make that easier, instead of a monthly
18   true-up with trying to calculate everyone's time,
19   there was an annual amount.  And the procedures
20   then were essentially changed.  In 2018, there
21   was an annual true-up done in December.  And I
22   learned this from talking to Dave Klos and Frank
23   Waterhouse when they first told us about the
24   amount they had continued to charge throughout
25   the postpetition period and why they didn't
```

1                      NORRIS

2    modify them and why there was no true-up done,

3    that the function was at the end of the year they

4    ran the numbers, they figured out the

5    allocations, and we provided, I believe, in

6    discovery the amendments that were done in

7    December 2018.  And at that point we actually

8    owed Highland and paid it to Highland an amount

9    for additional services.  And so there was no

10   true-up done in 2019.  There was no true-up done

11   in 2020.  Our view is that it should have been

12   done.  And, in fact, the parties will negotiate

13   in good faith as a key part of this here, the

14   terms of any modification.

15                 Similarly in 4.02, I think it says

16   should either party determine a change to

17   employee reimbursement is appropriate, we do know

18   that Mr. Klos and Mr. Waterhouse knew and

19   calculated and provided -- in discovery you

20   provided us their overpayment calculations.  And

21   in the email Mr. -- I have it right here, it even

22   says that they knew about this the year before

23   and they were just rolling forward the analysis

24   done for DSI the previous fall.

25                 So there was clear knowledge by the

1                          NORRIS

2    Advisors -- by Highland, and they knew the

3    intents of this was the reimbursement, and they

4    did not modify in good faith or even tell us

5    until we found out about it.  And when we found

6    out about it, they specifically said they

7    couldn't even provide the calculation.

8         Q.  Okay.  So just backing up for a

9    second, because, again, I'm just trying to

10   understand this, so I want to take this one step

11   at a time.

12        A.  Yes.

13        Q.  So Section 2.02 says -- again, it

14   says that during the term, the parties may agree

15   to modify the terms in order to reflect new

16   procedures or processes, including the

17   modification of the allocation percentage.

18             And you answered that there was this

19   amendment done later in 2018.  Do I have that

20   right?

21        A.  Yes, December 2018, there was an

22   amendment to each payroll reimbursement for each

23   HCMFA and NexPoint separately.

24        Q.  And was this amendment a result of

25   the Advisors invoking their right pursuant to

1                    NORRIS

2    Section 4.02 which you just talked about?

3         A.  Again, on this, this was based on our

4    ability to understand why the amendment was made

5    and to what extent.  We don't have an answer.

6    Again, we haven't completed discovery with

7    Mr. Waterhouse and Mr. Klos.  They were the ones

8    involved in this, and so we look forward to

9    hearing their discussion on this.

10        Q.  Okay.

11        A.  But our understanding was that -- and

12   our understanding is that was done to be able to

13   out -- to actually come up with the proper

14   reimbursement.  Because, again, the agreement is

15   a reimbursement of actual costs of employees that

16   were dual employees providing investment advisory

17   services.  So there is a calculation done to

18   determine if there needs to be a true-up.

19        Q.  Okay.  So let me phrase it this way.

20   During the time that this agreement was

21   effective, did the parties ever -- did NexPoint

22   ever -- did the -- did NexPoint ever notify

23   Highland on the last business day of any calendar

24   month that a change to employee reimbursement

25   needed to occur?

1                         NORRIS

2          A.  Again, key aspect here:  The Highland

3    employees were the ones tasked with creating the

4    calculations, making the payments.  And our

5    understanding is they were reimbursing for actual

6    employees.  And so we did not understand that

7    they were not.  And as soon as we did, we asked

8    for a modification, right?  We asked for a

9    calculation.  And I should clarify, not even

10   asking for a modification.  We -- we began to --

11   I should say we asked on several occasions for

12   the actual calculation of who they were even

13   paying for.  They wouldn't provide that to us.

14            We asked DSI, we asked Highland, we

15   asked your counsel for the calculations of who

16   they were charging for which employee, and the

17   answer eventually from your counsel was, maybe

18   you need to file an admin claim.  And so we filed

19   an admin claim.  And so we filed an admin claim.

20   We sought out remedies at that point once we had

21   found out.  But there was -- yeah, that's --

22        Q.  When were you -- when is the first

23   time the Advisors asked for that calculation?

24        A.  So we found out about this in late

25   November, early December.  And me and DC Sauter

1                         NORRIS

2    asked Frank and Dave for the calculation, and

3    they said that they will check, but they would

4    not -- didn't think that Seery would allow it.

5    They said they couldn't provide it.  We then

6    asked for it again.  We asked for it in a letter

7    on December 11th.  We asked for it again in

8    January multiple times from DSI, in talking to

9    Fred Caruso, Brad Sharp.  We asked again multiple

10   times from Dave Klos and Brian Collins and Frank

11   Waterhouse in January.

12               So once we found out and were frankly

13   shocked that we were paying for these

14   employees -- and Dave and Frank said they had

15   talked to counsel, they had talked to Highland's

16   counsel, and the answer was, we can't do anything

17   about it because of the automatic stay.

18               And at that point we couldn't just

19   march in and say, "Well, we're just changing the

20   amount," because we didn't want to disrupt the

21   challenges that we were already facing with the

22   court, right?  There was an automatic stay.  And

23   so we sought through our proper remedies an admin

24   claim, and that's where we sit today.

25               Q.   Okay.  So just coming back to the

1                         NORRIS

2    original question, you said -- and I just want to

3    make sure I have this right -- you said before

4    late October, early November, before this time

5    NexPoint had not -- had not tried to change the

6    conditions of NexPoint's reimbursement under this

7    agreement?

8         A.   Up until this point, we assumed

9    incorrectly that Highland was doing the right

10   thing and reimbursing for actual costs.  What

11   were we paying them for as our accounting and AP

12   services, as our legal services to be able to

13   perform under agreement and to act in good faith.

14   So, no, we didn't know.  We assumed that they

15   were paying the actual allocations, not the

16   allocations from January 1st, 2018, for

17   75 percent of the employees that are no longer

18   even employed.  Partners, I would say.

19              If you look at Andrew Parmentier, he

20   was a partner who was fired before the bankruptcy

21   filing; yet, we were paying 40 percent of his

22   compensation from NexPoint Advisors and

23   40 percent from HCMFA, all the way through

24   postbankruptcy up until the end of the agreement.

25              So we didn't know, and once we knew,

1                    NORRIS

2  we went through our normal remedies of an admin

3  claim.

4           MS. WINOGRAD:  Okay.  La Asia, can

5  you pull up Exhibit 8.

6           (Exhibit 8 marked for identification.)

7  BY MS. WINOGRAD:

8      Q.  Okay.  Are you familiar with what

9  this document --

10      A.  I am.

11      Q.  Okay.  This is the payroll

12  reimbursement between Highland and HCMFA, right?

13      A.  It is.

14      Q.  And it's effective as of January 1st,

15  2018, right?

16      A.  Correct.

17      Q.  And it was entered into May 1st of

18  2018, right?

19      A.  I don't know if it was May -- oh,

20  yeah, first day of May 2018, effective

21  January 1st, 2018, correct.

22           MS. WINOGRAD:  Okay.  And can we

23  scroll to page 5 and 6, please.  I think it's

24  last part of 5, beginning of 6.  Thanks.

25  BY MS. WINOGRAD:

page106

```
1                        NORRIS

2         Q.  So this agreement was signed, right?

3         A.  It was signed, yes.

4         Q.  Okay.  Do you know who drafted this

5   agreement?

6         A.  I don't.

7         Q.  Okay.  So pursuant to this

8   agreement -- so let's go back to Recital A, so we

9   have the terms in front of us.

10          So pursuant to Recital A, Highland

11  employees were to provide investment advisory

12  services to HCMFA, right?

13        A.  Sorry, can you repeat the question?

14        Q.  So pursuant to subsection "A,"

15  Highland was to provide investment advisory

16  services to HCMFA as set forth -- under the

17  direction and supervision of HCMFA as set forth

18  in the agreement, right?

19        A.  I think "A" speaks for itself, but

20  I -- and it says -- well, I don't know that this

21  agreement mandates they perform the services, but

22  it says we -- HCMLP will seek reimbursement for

23  such services.

24          MS. WINOGRAD:  Okay.  Can we --

25  BY MS. WINOGRAD:
```

1                        NORRIS

2        Q.  Well, backing up a second, do you

3  know if this agreement was negotiated?

4        A.  Same answer on this one as the other

5  one is we don't know.  We weren't -- based on the

6  conversations I had, and we're going to be -- we

7  haven't been able to talk to Mr. Waterhouse

8  regarding this and nor have been able to talk to

9  Mr. Klos, and we believe that they have more

10  information.

11        MS. WINOGRAD:  Okay.  Could we scroll

12  to page 7.

13  BY MS. WINOGRAD:

14        Q.  Okay.  So similar to the NexPoint PRA

15  reimbursement agreement we just looked at, at

16  times I might say PRA, but I'm referring to the

17  Payroll Reimbursement Agreement.

18        A.  Uh-huh.

19        Q.  These percentage allocations reflect

20  how much time a particular Highland employee was

21  to work on HCMFA matters, right?

22        A.  Again, my answer for NexPoint would

23  apply here, but you said the time they were to.

24  I would say that was at the time -- again, I

25  don't know how these numbers were calculated

1                          NORRIS

2    specifically, but based on the agreement, this

3    was laid out that those were the percentages of

4    their time being spent on services provided as a

5    dual employee for providing advice under this

6    agreement.

7          Q.  Okay.  And did HCMFA ever seek to

8    change the reimbursement amount under this

9    agreement?

10         A.  I would use my -- go back to my same

11   exact answer I used for NexPoint Advisors.  Same

12   answer applies for both agreements.

13         Q.  Okay.  And do you know who decided

14   these allocations?  Was that Highland, also?

15         A.  I don't know.

16         Q.  Okay.  Can I refer to the two -- like

17   the HCMFA Payroll Reimbursement Agreement and the

18   NexPoint one as just the Payroll Reimbursement

19   Agreements unless I specify which one it is?

20         A.  Yes.

21         Q.  So at the time the Advisors entered

22   into the Payroll Reimbursement Agreements, the

23   Shared Services Agreement had been in effect for

24   about five years, right?

25         A.  At least, or approximately, yeah.

1                          NORRIS

2          Q.  And during those five years, were the

3   Advisors receiving investment advisory

4   services -- any investment advisory services from

5   Highland?

6          A.  I'm not certain, but maybe you could

7   pull up the Shared Services Agreements.  I think

8   one of them we looked at earlier I think talks

9   about investment services, and so those services

10  may have been provided under the Shared Services

11  Agreement.  I'm trying to --

12         Q.  Okay.

13         A.  I know we were looking at one, and

14  one of those under the middle and back office

15  said investment services, investment advisory

16  services.  But so -- let me go back to your

17  question.  I don't know the answer.

18         Q.  Okay.  And that's fine.

19             Do you know who made the decision to

20  enter into the PRAs or Payroll Reimbursement

21  Agreements?

22         A.  We don't.  Based on my analysis and

23  discussion with various people, no one had any

24  recollection of -- of that.  And so, again, you

25  know, we're going to talk to Frank Waterhouse.

1                    NORRIS

2    We haven't had access to him, and Dave Klos, who

3    we believe were very involved in preparation and

4    creation of these.

5         Q.  Okay.  So do you know -- do you know

6    who decided who these employees would be that are

7    listed here?

8         A.  I don't, but just based on the

9    agreement and my understanding of the intent, it

10   was to list all of the dual employees that were

11   providing investment advisory services to

12   retail advisors.  And having worked here, looking

13   at the list, this looks like a comprehensive list

14   of the individuals that were providing investment

15   advisory services to the retail advisors at a --

16   not their whole time but as a percentage of their

17   time.  And I have interacted with each one of

18   them and knew each one of them and would say this

19   is a reasonable list of individuals that were

20   providing investment advisory services --

21   employed by Highland and providing investment

22   advisory services and acting as a dual employee

23   of HCMLP and the Advisors.

24        Q.  Okay.  So just to sort that out a

25   little bit, does that mean that, for instance,

1                     NORRIS

2    when Highland was providing investment advisory

3    services under the Sub-Advisory Agreement, is it

4    fair to say that these are the people that would

5    have been providing those services under the

6    Sub-Advisory Agreement, also?

7         A.   They both have the same effective

8    date.  So I don't know -- I -- going back to my

9    other answer, I don't know the origin or the

10   creation of that Sub-Advisory Agreement, but

11   these people -- this is the same effective date,

12   and this says as of January 1st, 2018.  So that

13   appears reasonable.

14        Q.   Uh-huh.  So -- and this is just me

15   wanting to clarify what you said before.  So the

16   Advisors -- did the Advisors ever try to figure

17   out whether the dual employees were allocating

18   their time pursuant to this Agreement?

19        A.   I don't know.

20        Q.   Okay.

21        A.   And I need to go back.  HCMLP will

22   seek reimbursement, right?  A reimbursement is on

23   their end telling us what the actual costs were.

24   And we had a great relationship.  We were

25   affiliates.  We relied on Highland.  We trusted

1                          NORRIS

2    their calculations and judgment.  And it was

3    their responsibility to seek reimbursement of

4    actual costs of what the employees who were, one,

5    dual employees employed, and, two, providing

6    investment advisory services to us.

7          Q.  Okay.  Let's look at an example that

8    might just make things a little bit more

9    concrete.  Let's look at Nathan Burns.

10         A.  Yeah.

11         Q.  You've heard his name, right?

12         A.  I have.  I've worked with him for

13   years.

14         Q.  Great.  So he's listed as a dual

15   employee on both of the PRAs, right?

16         A.  Yeah.

17         Q.  Okay.  So pursuant to the NexPoint

18   PRA which we're looking at, he was -- at the time

19   this was executed --

20         A.  This is the HCMFA PRA, sorry to

21   interrupt, but you said NexPoint.

22         Q.  Oh, got it.  Okay.  So, yeah, you're

23   right.  So I did mean to say NexPoint.

24              So pursuant to NexPoint's -- the

25   NexPoint PRA, he was supposed to allocate

```
 1                      NORRIS
 2   70 percent of the time working for NexPoint,
 3   right?
 4         A.  I see that.  I got it here.
 5         Q.  So the --
 6         A.  No, no, going back.  It wasn't he was
 7   supposed to, that's the time he would have been
 8   spending on NexPoint Advisors work.
 9         Q.  That's -- okay.  That's fair enough.
10   Thank you for the clarification.
11             And so pursuant to the HCMFA PRA
12   which we're looking at right now, he was --
13   Nathan Burns was allocating 10 percent of his
14   time to HCMFA matters, right?
15         A.  So he wasn't allocating it, he was
16   working that amount of time, assuming Highland's
17   numbers are correct here.  But they are
18   allocating his time that that's what he worked.
19         Q.  Okay.  So based on these numbers,
20   Highland was allocating 10 percent of his time?
21         A.  Yeah.
22         Q.  Okay.  Was anyone at the Advisors
23   charged with the responsibility of making sure
24   that Nathan allocated 70 percent of his time to
25   NexPoint matters?
```

1          NORRIS

2          A.  Again, this is -- he wasn't -- he

3     didn't have to allocate.  This is the calculation

4     of what his time allocation was.  But I can tell

5     you just sitting here today, I can look at the

6     numbers and I knew what people did and I

7     interacted with them.  Nate Burns' was -- primary

8     job was Nexpoint Capital, Inc., our BDC, the

9     healthcare-focused BDC.  That's advised by

10    NexPoint Advisors.  That's 70 percent of Nate's

11    time.  So very reasonable.

12          We knew what these people did.  It's

13    not a big organization.  But to answer your

14    question, did we have someone at the Advisors

15    responsible for ensuring their time was spent

16    here?  No, this is HCMLP responsible for seeking

17    reimbursement.

18          Q.  Okay.

19          A.  So that's them -- they need to --

20    they are responsible for seeking reimbursement.

21          Q.  Are you familiar with a former HCMFA

22    employee named Andrew, I think, Hilgenbrink?

23          A.  I am.

24          Q.  Okay.

25          A.  Sorry.  Let me correct you here.

1                          NORRIS

2    Andy was not an HCMLP employee, my understanding,

3    he was an HCMFA employee.

4            Q.  Oh, yeah.  I thought I said HCMFA.

5            A.  Maybe you did.  Maybe you did.

6            Q.  Okay.  So are you aware that Andrew

7    worked for HCMFA as a portfolio manager of a fund

8    managed by the Advisors?

9            A.  During which time period?

10           Q.  Up until 2019?

11           A.  Yes, he was the portfolio manager of

12   the Highland Longshore Healthcare Fund.  And

13   prior to that time, he worked as an investment

14   analyst or a senior analyst covering healthcare.

15   He covered biotech, pharmaceuticals.  He had a

16   Ph.D. in biochemistry, Dr. Hilgenbrink.  Smart

17   guy.  So, yes.

18           Q.  Okay.  So are you aware that he

19   resigned from this position as portfolio manager

20   of this healthcare fund on April 24th of 2019?

21           A.  That seems about right, yeah.

22           Q.  Okay.  Are you aware that on the same

23   date Nathan Burns became the portfolio manager of

24   the healthcare fund?

25           A.  I'm not specifically aware of the

```
1                      NORRIS
2    date, but I believe Nate was portfolio manager of
3    that fund.  And I should say he was providing
4    research to the healthcare team prior to that as
5    well.
6         Q.  Okay.  But around that date he --
7         A.  Yeah.
8         Q.  -- right?
9         A.  Yeah.
10        Q.  Okay.  So HCMFA was aware that Nathan
11   took over Andrew's role around the time that
12   Andrew left, right?
13        A.  Yeah.
14        Q.  Okay.  So one year after the
15   payroll -- the HCMFA Payroll Reimbursement
16   Agreement became effective, Nathan started
17   performing additional services for HCMFA, right?
18        A.  Well, here is what I would say.
19   Maybe not at this -- maybe the percentage
20   allocation would have swapped, he was 70 percent
21   of his time of NexPoint Advisors, 10 at HCMFA,
22   combined 80.  Maybe it was a movement between,
23   and he would have allocated to the other entity.
24   The other 20 percent, HCMLP.  I would also note
25   that I do know that Nate became a key contributor
```

1                          NORRIS

2      to the healthcare private equity fund at that

3      time, which he hadn't been primarily focused on.

4                   So, yes, your point is Nate was

5      providing more services now at HCMFA.  He only

6      has a hundred percent of his time.  Was it just

7      the movement of the 5?  What is the allocation?

8      I'm interested to see -- and one thing I would

9      point out here, I would love to see this, is Dave

10     Klos created this classification with

11     Mr. Waterhouse at the end of 2020, so after this

12     time period we're talking about where he actually

13     calculated the amount of investment services

14     under the Payroll Reimbursement Agreement.  And

15     we've asked for the backup of this multiple

16     times.

17                   Davor told me he has asked Mr. Morris

18     for the actual support of the spreadsheet behind

19     it, including a name of the spreadsheet, which we

20     haven't received yet.  So maybe Highland has been

21     already allocating -- and I would hope they

22     would, that's what we would hope that Highland

23     was giving the proper allocation for these

24     people's time, but we haven't seen that yet.

25                   So I don't know if that's already

1                    NORRIS

2    been updated or changed or what.  Dave Klos I

3    would assume who was the controller at that time,

4    now CFO of Highland, would have had proper access

5    to these numbers.

6         Q.  Okay.  So just taking a step back.

7    Focusing on just this -- you said that HCMFA knew

8    that he started providing these additional

9    services relating to this healthcare fund?

10        A.  Again, I didn't say additional

11   services.  It's he's providing additional time

12   maybe allocated to HCMFA.  Again, I don't know if

13   it's more time.  I mean, this is a really small

14   healthcare fund with public equities.  Nate was

15   already covering securities, covering healthcare.

16             And I don't know the specifics of his

17   time.  I would have to look to you.  We were

18   aware that he was portfolio manager.  We were

19   aware he has been contributing names.  There's a

20   lot of things.

21        Q.  Okay.  So if he took on this new

22   role, did HCMFA ever seek to make sure that the

23   10 percent allocated was still accurate?

24        A.  Again, I'll go back to my same

25   comments.  Until late 2020, we had expected and

1                  NORRIS

2   outsourced and hoped and fully believed that

3   Highland was doing that, right?  And we believed

4   that we were reimbursing -- the intent of this

5   wasn't to keep charging the same amount.  We

6   thought Highland was, and so we think that there

7   should be a proper calculation done that would

8   allocate the proper amount spent.

9       Q.  Okay.  Are you familiar with an

10  individual named Ajit Jain?

11       A.  I am.  It's Ajit, not Ajit.

12       Q.  Ajit.  Okay.  Do you know what his

13  title was -- did he work at Highland?

14       A.  He worked at Highland.

15       Q.  Do you know what his title was?

16       A.  I don't remember his specific title,

17  but I bet you have it right there to tell me.

18       Q.  Does it sound familiar if I say he

19  was a risk management -- he was head of the risk

20  management program?

21       A.  I know he -- I don't know if I would

22  say he's the head of risk management.  Joe Sowin,

23  I think he reported to Joe.  But he oversaw risk

24  management, yeah.  And so there was some trading

25  of derivatives and certain things he did.

1                              NORRIS

2          Q.  Okay.  So in his role it's fair to

3   say he performed advisory services for the

4   Advisors, right?

5          A.  I wouldn't necessarily say they were

6   advisory services.  I mean, risk management is

7   more of a middle office-type function.  Trading

8   services, which were fully under the Shared

9   Services Agreement, I would say -- I would

10  classify Ajit more of a middle office type, back

11  office type -- not back office but middle office

12  services providing risk management and more of a

13  compliance/risk management and trading service.

14         Q.  Okay.  Did Ajit provide any

15  investment advisory services for the Advisors?

16         A.  I don't know.  I don't know.

17              And along with this, we're not

18  contending that there's not a true-up of certain

19  aspects of this that need to be made.  If HCMLP

20  has employees that they are arguing were

21  providing advisory services, we would love to see

22  it, but we haven't seen any yet.  And we would

23  love to have an opportunity to negotiate in good

24  faith a resolution on it.  So we're welcome to

25  see if -- if I'm following your line of

1                     NORRIS

2    questioning, you're saying that you think Ajit

3    was providing investment advisory services.  We

4    could argue otherwise; but, you know, we would

5    love to hear if you think there is other

6    employees.

7         Q.  Okay.  Well, no, I mean, I'm still

8    trying to get a sense of how these lists in these

9    allocations work.  So I'm just trying to

10   understand, and maybe you can answer this.  If

11   Ajit was providing investment advisory services

12   to the Advisors, do the Advisors contend -- or to

13   HCMFA, would --

14        A.  Yeah, maybe I think -- I think Ajit

15   was hired -- do you have the date there he was

16   hired?  I think it was maybe 2015 or 2016.

17        Q.  Well, he started performing services

18   for the Advisors around May 21st of 2018.

19        A.  So I believe he was hired in 2016,

20   and his role remained largely the same his entire

21   time here.  So we have a point in time,

22   January 1st, that Highland, who prepared -- we

23   believe prepared this -- and, again, we don't

24   have the insight of Frank and Dave and what we're

25   going to be able to depose them, and we don't

NORRIS

1

2 have the backup of Frank's spreadsheet. But I do

3 know very well that Ajit -- why wouldn't they

4 have included him here as of January 1st. And

5 I'll -- I'll stop there.

6          Q.   Okay.  So let me go back to the

7 question I was going to ask.

8               So if Ajit provided investment

9 advisory services to HCMFA, do the Advisors

10 contend that Ajit should have been on the list of

11 dual employees?

12          A.   I would say -- I would say we don't

13 believe there is anyone that's not on the list

14 that shouldn't have been added, right?  And

15 the -- if you look at Agit's -- let's ignore

16 Ajit.  Let's look at what was provided.  And even

17 Agit's role as being -- I would say is more

18 middle office.  And we can go back and look at

19 the agreements: trading services, compliance,

20 risk management may even be mentioned.  Those are

21 all things Ajit was doing.  I think that's

22 probably why he wasn't included.

23               Again, I'm only speculating, because

24 we haven't asked Mr. Waterhouse around why these

25 were formed.  So I would leave it as we'll wait

1                           NORRIS

2    to depose Mr. Waterhouse and Mr. Klos on this.

3           Q.  Okay.  So are you saying -- again,

4    I'm just trying to understand what you're saying.

5    Are you saying there was nobody that was working

6    at Highland that was providing investment

7    advisory services to the Advisors who was not

8    included on the list?

9           A.  In 2018.

10              MR. RUKAVINA:  Objection.  Form.

11          A.  Again --

12   BY MS. WINOGRAD:

13          Q.  Okay.

14          A.  -- our understanding is that was a

15   list of the dual employees that were providing

16   investment advisory services and -- it's an

17   and -- dual employee and providing investment

18   advisory services.  If Highland decided, hey,

19   they weren't going to include someone, I would

20   love to know why, but we can't speculate on that.

21          Q.  Okay.  So let's just go back to 2018.

22   Was there anybody providing investment advisory

23   services to the Advisors in 2018 who was not on

24   that list?

25          A.  Not that I'm aware of.

1                     NORRIS

2          Q.  Okay.  And if they were, is it the

3     Advisors' contention that that person should have

4     been on the list?

5          A.  I think that's probably asking for a

6     legal conclusion and, again, I don't -- I

7     don't -- I'm not an attorney.

8          Q.  Okay.  But based on the terms of

9     the -- but the purpose of the agreement was so

10    that Highland could provide employees to service

11    the Advisors regarding these investment advisory

12    services, right?

13         A.  Yes.  It was to reimburse for actual

14    services provided for dual employees that were

15    providing investment advisory services.  And I

16    mentioned it, if there were employees that were

17    providing those services that Highland didn't

18    mention, we would love to learn, right?  We would

19    love to see the support and have a good faith

20    discussion on that.  And I think, you know, we'll

21    be interested to see the calculation that

22    Mr. Klos provided at the end of December -- or

23    December of 2020 where he has a list of who he

24    included -- who Highland included as dual

25    employees providing investment advisory services.

1                          NORRIS

2          Q.  Okay.  So if there is a person that

3    should have been included on that list because

4    they were providing investment advisory services

5    but that wasn't on that list, do the Advisors

6    contend they should have paid for that person?

7          A.  Again, I'll -- I'll -- knowing the

8    process and the true-up -- I don't know what went

9    into the 2018 true-up, right?  Was Agit's numbers

10   or someone else -- there clearly was someone

11   else, or we believe there was maybe more at that

12   time, or other services provided, because we had

13   to pay Highland.  Clearly there is a number of

14   employees here.  Our number shows it's worth over

15   $7.6 million of services we paid for for

16   employees that were no longer there, not even

17   services but cost, reimbursement for employees

18   there were no longer there.

19         Q.  Okay.

20             MR. RUKAVINA:  When you find a

21   convenience time, please, let's take a break.

22   Again, no rush.

23             MS. WINOGRAD:  Why don't we take a

24   five-minute break right now.

25             (A break was taken from 12:00 p.m. to

1                    NORRIS

2          12:50 p.m.)

3    BY MS. WINOGRAD:

4          Q.  So I just want to go back to

5    something you said before our lunch break.  You

6    said that, and correct me if I'm wrong, but that

7    Klos and Waterhouse did some sort of analysis

8    that led to the amendment.  Do you have the

9    document that reflects the analysis?

10         A.  I would say that's an assumption.  I

11   would assume that in order to calculate an amount

12   they did an analysis, but we haven't been able to

13   speak to them and we don't have a document

14   relating to that.  It hasn't been provided in

15   discovery on your end, and we don't -- we aren't

16   aware of what it looks like.  But if you have

17   that, we would love to see it.

18         Q.  Okay.  And, then, so the Advisors

19   contend in their administrative claim, as we

20   discussed earlier this morning, that Mr. Seery

21   directed -- that in or around July of 2020,

22   Mr. Seery gave some directives to the Debtor.  Do

23   you remember that?

24         A.  I remember our discussion earlier and

25   the question --

1                    NORRIS

2         Q.  Exactly.  So do the Advisors contend

3    that Highland failed to perform any services

4    before July of 2020?

5         A.  In regards to the PRAs, yes, right,

6    we believe that prior to that there was

7    significant overcharging with paying for

8    employees that were no longer employed.  But as

9    far as damages and calculations that we're

10   proposing here on the Shared Services Agreement,

11   it's that period beyond.  What I talked about, it

12   was having to hire an outside attorney, having to

13   bring in Mr. Post.

14        Q.  Okay.

15        A.  And there may have been services that

16   had been reduced, right, and I would point to

17   those are the specific ones that we can point to.

18   But if there were services prior that we were

19   being charged for that we weren't receiving, then

20   that should be calculated in as well.  But we

21   haven't finished our deposition of Mr. Klos and

22   Mr. Waterhouse, who are closest to that

23   information.

24        Q.  Okay.  And, then, do you remember

25   when I asked you a couple of questions about the

NORRIS

1

2    sub-advis- -- the NexPoint sub-advisory

3    agreement?

4         A.  I do.

5         Q.  And do you remember when you said

6    that the NexPoint PRA replaced the sub-advisory

7    agreement?

8         A.  I think I said I thought.  I don't

9    have all the details of what went into that, as I

10   explained.  And we don't.  So, yes.

11        Q.  Okay.  So why do you think the PRA

12   replaced the sub-advisory agreement?

13        A.  They had the same intent of

14   investment advisory agreements.  And based on the

15   limited knowledge that we're able to gain was

16   that it was a replacement, right?  But that was

17   put in place, and there was some advice from

18   counsel that it needed to be drafted in another

19   way, that it couldn't just be an absolute payment

20   or an advisory agreement.  It had to be a

21   reimbursement for services provided.  There was

22   sensitivity from the '40 Act perspective that you

23   can't have a profit center at an affiliated

24   Advisor, and it needed to be a reimbursement.  So

25   that's the limited knowledge we have.  Again, we

1                    NORRIS

2    haven't been able to talk to Mr. Klos and

3    Mr. Waterhouse, who we believe have more

4    information on that.

5         Q.  Okay.  So do you know whether the

6    sub-advisory agreement would have required a vote

7    of the retail funds?

8         A.  A vote of retail funds?  No, there

9    wouldn't be -- the Advisor enters into the

10    agreements.  However, yes, there is no vote of

11    the retail funds related to advisory,

12    sub-advisory or Shared Services Agreement.

13         Q.  Okay.  So like the sub-advisory

14    agreement didn't meet any kind of shareholder

15    approval?

16         A.  No.  We have exemptive relief.  And,

17    again, I don't know how this one -- just

18    generally a sub-advisory agreement we have

19    exemptive relief to appoint sub-Advisors without

20    the vote of shareholders.

21              But, again, this particular instance,

22    an affiliated sub-advisor, I don't know what

23    analysis went into it and what would have been

24    the requirement.

25         Q.  Okay.  So Mr. Waterhouse was the

1                   NORRIS

2   treasurer of NexPoint during the time the Shared

3   Services Agreement was in effect, right?

4        A.  I don't know if it was the entire

5   time the Shared Services Agreements were in

6   effect, but for a portion of it.

7        Q.  Okay.  But you said that he was the

8   treasurer of the Advisors for a portion of the

9   time these agreements were in?

10       A.  Correct.

11       Q.  Okay.  So as his role, he was -- is

12  it fair to say he was involved in the financing

13  of the Advisors?  Let me rephrase that.  In the

14  financial affairs of the Advisors?

15       A.  Well, we had outsourced to Highland

16  the books and records for the actual Advisors as

17  well.  So the accounting team at HCMLP and all

18  the accounting team members performed those

19  accounting functions for the Advisors.

20       Q.  Okay.  So the Advisors relied on

21  Highland to make determination regarding the

22  accuracy of the allocations in the PRAs, right?

23       A.  You want to repeat that one more

24  time.

25       Q.  So you had said earlier -- and

1              NORRIS

2    correct me if I'm wrong -- but that the Advisors

3    relied on Highland to make sure that the

4    allocations in the PRAs were accurate, right?

5         A.  We had relied on them to actually

6    submit reimbursements for the appropriate amounts

7    and pay the appropriate amounts, yes.

8         Q.  And to make sure that an employee on

9    the PRA list, that that percentage allocation was

10   accurate for a particular employee, right?

11        A.  Generally speaking, we assumed that

12   those numbers were being updated and were

13   accurate.  And there was an operating procedure

14   before bankruptcy where they did a true-up, as

15   you talked about, at the end of 2018.  And so

16   they had been -- up until that point we assumed

17   they had been continuing to do so.

18        Q.  Okay.  And did the Advisors, when

19   they were advising -- when they were relying on

20   Highland, were they also relying on

21   Mr. Waterhouse?

22        A.  I don't know if Mr. Waterhouse --

23   again, we haven't had the chance to depose

24   Mr. Waterhouse, but it was the accounting team:

25   Mr. Klos, Mr. Waterhouse, Hayley, Kristin.  There

1                       NORRIS

2    was a team of people involved that were Highland

3    employees tasked with the accounting.

4          Q.  Okay.  So it's fair to say

5    Mr. Waterhouse was on that team?

6          A.  He was the CFO of HCMLP.

7          Q.  So he was involved with that process,

8    then, right?

9          A.  I would think so.  Again, we haven't

10   asked Mr. Waterhouse.  We didn't have access to

11   him prior to this.  So we look forward to what

12   we'll hear from him.

13         Q.  Okay.  So I want to just hear more

14   about what -- you mentioned there was this

15   true-up.  What is a true-up?

16         A.  Yeah, so -- and I call it a true-up

17   because that's the terms that Dave Klos told me

18   that were used.  But essentially it is a -- it is

19   very challenging on a monthly basis to figure out

20   what the allocations were, figure out who the

21   employees were, because things did change, as we

22   see.  There was a number of employees, almost 75

23   percent of the schedule, maybe more, that were no

24   longer employed.

25               And so they would do a calculation to

1                    NORRIS

2    say, I'm assuming -- again, we haven't spoken to

3    Dave and Frank to try to understand the

4    process -- but assuming that the process was,

5    given what they told us a true-up, what are the

6    actual expenses.  The true-up was not done in

7    2019 and 2020.  There were no adjustments made.

8    And even in 2018 when it happened, we wrote a

9    check -- the Advisors wrote a check to Highland

10   because we consumed additional services.  We very

11   clearly believe, and I think there's plenty of

12   evidence here, that we overpaid in '19 and '20,

13   but there needs to be a true-up.

14        Q.  Okay.  So in simple terms, a true-up

15   is -- so it's an analysis that helps the Advisors

16   understand if the payments they were making were

17   for the employees that they had assumed were

18   there at the -- working for the Advisors?

19        A.  I wouldn't say it's to help us assume

20   or understand the allocation.  It's to figure out

21   what the true reimbursement amount is.

22        Q.  Okay.

23        A.  And that is what is the actual costs

24   incurred, and reimburse that.  And so it wasn't

25   something that was done, our understanding, prior

1                         NORRIS

2    to the end of 2018, because operationally it

3    wasn't efficient.  And so they did it once a

4    year.  Would it have been done in 2019?  Dave

5    Klos said yes, but they filed for bankruptcy in

6    October, and for whatever reason, they decided

7    not to do it.

8         Q.  Okay.  So the true-up would have been

9    done at the end of 2019?

10        A.  That is our understanding.

11        Q.  Do you know around what month in

12   2019?

13        A.  It was done in December of 2018.  One

14   could speculate -- again, agreements were put in

15   place in January 2018.  They did it in

16   December 2018.  Logically, it would be an annual

17   process, and Dave even said it would have been

18   done at the end of the year.  Seems like the

19   year-end would be a great time to do it.

20        Q.  Um-hum.

21            So was it the Advisors' contention

22   that the true-up wasn't performed in 2019 because

23   of the bankruptcy?

24        A.  We were told by Mr. Klos and

25   Mr. Waterhouse that there were no adjustments.

1                    NORRIS

2    The amounts continued because of, they thought,

3    the automatic stay prevented it.  And so that was

4    their contention.  And, again, our recourse here

5    was to file an admin claim, and that's -- that's

6    the route we went.

7         Q.  Okay.

8             MS. WINOGRAD:  La Asia, can we show

9    Exhibit 14, please.

10            (Exhibit 14 marked for identification.)

11   BY MS. WINOGRAD:

12        Q.  Mr. Norris, are you familiar with

13   this document?

14        A.  I am.  I believe I have it printed

15   here, if it's the same one.  Hold on.

16            This is Defendants' Objections and

17   Responses to Plaintiffs' Requests for Admissions.

18            Maybe you can scroll down, and I can

19   look at the document?

20        Q.  Yeah, why don't we do that.

21        A.  I believe this is the ones responsive

22   to discovery and --

23        Q.  Yes.

24        A.  Okay.

25        Q.  These are the Advisors' responses

1                                NORRIS

2    responsive to Highland's discovery request,

3    right?

4            A.  Here it is.  I believe it's the same

5    one.  18 pages long?  Yes.

6            Q.  Okay.  Is the information contained

7    in this -- in these responses, was it true and

8    accurate at the time it was written?

9            A.  Yes.

10           Q.  Okay.  Do you think there is anything

11   that needs to be amended?

12                MR. RUKAVINA:  We -- I'll answer

13   that.  We're going to supplement one of the

14   interrogatories.

15                If you can scroll down.

16                We are going to supplement an

17   interrogatory.  I'm trying to find the document.

18   Oh, I'm sorry.

19                I'm sorry, Ms. -- okay.  She just

20   shared it.

21                MS. CANTY:  It's also in the Chat,

22   guys.

23                MR. RUKAVINA:  I just did that.  Let

24   me just pull it up.

25                MR. MORRIS:  Can you just tell us

```
 1                    NORRIS
 2   what the amendment is?
 3              MR. RUKAVINA:  Well, that's what I'm
 4   trying to --
 5              MR. MORRIS:  Okay.  I'm sorry.
 6              MR. RUKAVINA:  If you would, maybe
 7   it's fastest if you scroll down through the
 8   interrogatories.
 9              MS. WINOGRAD:  They start at -- go to
10   page 11, I think.  Yeah, there we go.
11              MR. RUKAVINA:  All right.  Please
12   scroll down.  Stop there.
13              Please scroll down.  Stop there.
14              Please scroll down.
15              All right.  Scroll back up to 12.
16              Okay.  Then, I apologize, maybe I'm
17   wrong.  We were going to -- just so, John, you
18   know, we were going to change the amount of
19   damages from 14 million to 10 million.  I'm using
20   round numbers.  I thought it was in here
21   somewhere but I don't want to waste --
22              MR. MORRIS:  All right.  But he's
23   going to testify to it anyway when I ask him
24   about damages.
25              MR. RUKAVINA:  Then I apologize
```

```
1                          NORRIS
2    for taking everyone's time.
3               MR. MORRIS:  No problem.
4               MS. WINOGRAD:  I'm sorry, can you
5    hold on for one second?
6               Okay.  Can you hear me okay?
7               THE WITNESS:  I can.
8    BY MS. WINOGRAD:
9         Q.  Okay.  So can we scroll to page 12,
10   please.
11              Okay.  Do you see here in
12   Interrogatory Number 3, Highland asked the
13   Advisors to identify the date on which they
14   believed that the former dual employees
15   identified on the lists we just discussed
16   attached as Exhibit A departed the Debtor?  Do
17   you see that?
18        A.  Yes.
19        Q.  Okay.  And then in the Advisors'
20   response they list all of the dual employees and
21   then the corresponding date that they contend
22   those employees departed the Debtor?
23        A.  Yes.
24        Q.  Okay.  And so the Advisors -- the
25   Advisors were generally aware of the employees'
```

```
 1                    NORRIS

 2   terminations and departures as they occurred,

 3   right?

 4              MR. RUKAVINA:  I think there is a

 5   question on here.

 6              MS. WINOGRAD:  Yes, it's the next

 7   one.

 8              THE WITNESS:  Yeah, let's go to the

 9   next one, and I would say our response is

10   accurate.

11              MS. WINOGRAD:  Okay.  So we can just

12   scroll through it, La Asia.

13        A.   There you go.  The Advisors were

14   generally aware of the employees' terminations

15   and departures as they occurred.

16   BY MS. WINOGRAD:

17        Q.   Okay.  So does this mean that the

18   Advisors became aware of the employees'

19   departures at the time the employees left?

20        A.   As they -- maybe not the same day,

21   but we were generally aware.  We knew people had

22   left.  We also receive a monthly report from HR

23   at HCMLP of employees that had departed.

24        Q.   Okay.  Great.

25              So within a week were the Advisors
```

1                          NORRIS

2    generally aware that employees had left?

3          A.  Again, so there's a monthly report,

4    if it was the beginning of the month, it may have

5    been a month, but generally as they occurred.

6          Q.  Okay.  So for any --

7              MS. WINOGRAD:  Can we go back to

8    page 12, La Asia.

9              Thanks.

10   BY MS. WINOGRAD:

11         Q.  So for any of the employees listed

12   here, if we could scroll down just a tiny bit,

13   and then a little bit more, because I think there

14   is one employee -- there we go.  That's fine.

15             For any of the employees listed here,

16   did the Advisors exercise their rights under

17   Section 4.02 of the Payroll Reimbursement

18   Agreement after they left?

19         A.  4.02.  The Advisors?

20         Q.  Do you want to go back to

21   Section 4.02, or do you have it in front of you?

22         A.  Yeah, I think -- and if I'm looking

23   at this as -- hang on, I'll come back to it.

24             I would say it gets back to we were

25   aware they left.  We had relied on Highland to

1                              NORRIS

2  perform the calculations.  And 4.02 clearly says,

3  should either party determine that a change to an

4  employee reimbursement is appropriate, Highland

5  knew they had left, they knew they continued to

6  charge us more.  Why didn't they make an update,

7  right?  And that's our contention.

8                We relied on Highland to do the

9  calculation, as I discussed earlier, and we

10 assumed, and appropriately here, that they were

11 doing that.  Again, that wasn't the fault of the

12 individuals.  They were told they couldn't

13 because of the automatic stay, and they even had

14 the overpayment calculation, what the actual

15 proper calculation should be.

16                And again, we haven't received the

17 backup detail from Mr. Klos's calculation.  But

18 looking at the numbers, she was calculating an

19 actual amount when they had dropped these

20 employees.

21        Q.  Okay.  But the employees didn't --

22 did the employees ever ask Highland if the list

23 should be -- if the allocation should be changed?

24        A.  The employees, as in these employees

25 that left?

1                    NORRIS

2         Q.  Yeah, locations on the list, yeah.

3         A.  I don't know that these employees

4    were involved at all in the calculation or the

5    allocations.  The employees leaving requesting a

6    change to the allocations, the employees didn't

7    really impact that, to my understanding.

8         Q.  So you're saying that if an employee

9    on the Exhibit A of the Payroll Reimbursement

10   Agreement left, then that wouldn't affect that

11   person's name appearing on that list?

12        A.  It would, but you asked if that

13   employee would ask for the allocation to be

14   updated.

15        Q.  No, no, I think that -- let me -- I

16   think there was a misunderstanding.

17             So after an employee left, did the

18   Advisors ask Highland if -- if the -- if the list

19   should be updated?

20        A.  We had hired Highland for accounting,

21   payables, all of this, including the calculations

22   within that realm.  We thought that they had --

23   that was being updated, right?  And it wasn't.

24   Or maybe it was, they just didn't notify us or

25   bring it to our attention because they were told

```
1                         NORRIS
2   they could not.
3          Q.  But the Advisors -- but the Advisors
4   kept paying Highland the same amounts per month
5   even after certain employees left, right?
6          A.  No, the Advisors never voluntarily
7   said, yeah, let me pay the same amount.  We were
8   under the understanding that Highland, who was
9   handling our payments -- again, the entire
10  Highland accounting team had access, was creating
11  the calculations, created an invoice for the
12  wrong amount, transferred the cash, had access to
13  our bank account, with no one at the Advisors
14  even knowing that was happening.
15          And so we didn't -- we didn't pay.
16  It was paid by Highland employees, and that was
17  the process.
18          Q.  Okay.  So after any of these
19  employees departed the Debtor, were there any
20  specific services that the Advisors stopped
21  receiving from Highland?
22          A.  Yeah.
23          Q.  Can you identify an employee who
24  got -- you know, who that would apply to?
25          A.  Yeah, that's just -- here is one real
```

1                      NORRIS

2    easy one:  Trey Parker.  He was the chief

3    investment officer.  He left.  Joe Sowin was

4    appointed as chief investment officer or co-CIO

5    with Jim.  Joe Sowin is an HCMFA employee.  And

6    that's a simple one.

7              John Poglitsch, head of credit

8    research, left December 22nd, 2020.  There was no

9    head of credit research when John left employed

10   at HCMLP providing that service.

11             Yeah, I can go down the list if you

12   want, but, you know, there is -- each one of

13   these, there was not a hire made to replace, my

14   understanding, any of these people by HCMLP.

15   They were in bankruptcy, right?  They were a

16   debtor in possession.  They weren't hiring new

17   people to replace these individuals.

18             And so that is -- that's our belief

19   and our position.

20        Q.   Okay.  So I'm going to skip ahead to

21   a question here about Trey Parker because you

22   just mentioned him.  So what title -- can you

23   repeat for me what title Trey Parker held?

24        A.   He was co-CIO.

25        Q.   Okay.  So he held the title of

1                    NORRIS

2    co-head of private equity; is that right?

3          A.  He may have.

4          Q.  Okay.

5          A.  I don't know.  In his actions

6    regarding our retail funds, the co-CIO is the

7    role in which we interacted with him.

8              MS. WINOGRAD:  Okay.  La Asia, can

9    you put up Exhibit 14 for a moment.

10             MS. CANTY:  This is 14.

11             MS. WINOGRAD:  I'm sorry.

12   Exhibit 34.

13         (Exhibit 34 marked for identification.)

14   BY MS. WINOGRAD:

15         Q.  Okay.  So this is Trey's compensation

16   statement.  Right?

17         A.  Yeah.

18         Q.  Okay.  And it says here that he has a

19   title of partner co-head of private equity,

20   right?

21         A.  According to this.

22         Q.  Okay.  So it's fair to say that was

23   his title at Highland, right?

24         A.  I mean, at the top it says partner

25   and co-CIO, which is --

1                    NORRIS

2          Q.   Okay.  But it says that effective

3     March 1st, 2019 his new title will be partner

4     co-head of private equity.

5          A.   Got it.  And maybe it was at that

6     time that Joe Sowin took over the role, again, an

7     HCMFA employee.

8          Q.   Okay.

9          A.   Maybe at that point Trey Parker

10    wasn't providing as much services to the

11    retail advisors.  Because the private equity was

12    largely on the institutional side and -- so,

13    yeah, I see what it says here in the title.

14         Q.   Okay.  I just wanted to make sure we

15    were on the same page about what his title was.

16              MS. WINOGRAD:  La Asia, can we go

17    back to the Exhibit 14, please.

18              Thank you.

19    BY MS. WINOGRAD:

20         Q.   So in his role, what services did

21    Trey perform?

22         A.   Yeah, he was the portfolio manager

23    for our Highland Floating Rate Opportunities

24    Fund, changed its name to Highland Income Fund.

25    He was a portfolio manager on the Opportunistic

```
 1                     NORRIS
 2   Credit Fund.  He helped manage the investment
 3   services of our credit investments that were in
 4   our retail funds.
 5              He also handled private equity
 6   investments of which the Debtor had a significant
 7   portion on their balance sheet.  And so -- but
 8   his largely was the overseeing the investment
 9   process.
10              And how that applied to our Advisors
11   was he was a named portfolio manager on a couple
12   of our funds, including the Highland Income Fund,
13   the Opportunistic Credit Fund, maybe another fund
14   or two, but those were his primary duties in
15   interacting with us.
16         Q.  Okay.  Are you familiar with
17   TerreStar Investments?
18         A.  I am.
19         Q.  Okay.  Did Trey perform investment
20   services for TerreStar?
21         A.  My understanding is that he did.
22         Q.  Okay.  And TerreStar was a big
23   investment held by the funds, right?
24              MR. RUKAVINA:  Objection.  Form.
25         A.  Yeah, big?  Sorry.
```

1                     NORRIS

2    BY MS. WINOGRAD:

3          Q.  How would you categorize it?

4          A.  It was a material position held by

5    one fund and held in a few of our other funds.

6    Yeah.

7          Q.  Okay.  So it was a significant

8    investment for the funds, right?

9          A.  Funds, plural, no.  One singular

10   fund, it was an important position.

11         Q.  Was it -- was it a significant

12   investment -- investment for the Global

13   Allocation Fund?

14         A.  Are we talking a legal term

15   "significant"?

16         Q.  Was it a large investment for the

17   Global Allocation Fund?

18         A.  By and large.

19         Q.  More than -- among the top ten or

20   just holdings for the fund?

21         A.  Yeah, yeah.

22         Q.  Was it among the top --

23         A.  Sorry, go ahead.

24         Q.  I was just going to say, is it among

25   the top ten largest holdings for the NexPoint

1                        NORRIS

2    Strategic Opportunity Fund?

3           A.  I don't know on the position side.

4    It was much smaller in that fund.

5           Q.  Okay.  Nexpoint Capital, Inc., was it

6    among the top ten largest holdings of this fund

7    as of 2020?

8           A.  I don't know without having the

9    answers -- again, this is not something I believe

10   was on the preparation material, so as the -- I'm

11   not prepared to answer the holding sizes of

12   positions.  But that would be factual information

13   that you could find.

14          Q.  Okay.  But TerreStar was -- but

15   TerreStar was a significant investment for some

16   of the funds, right?

17          A.  At least the Global Allocation Fund.

18   Again, we haven't defined "significant" but it

19   was a top ten position, if that was your

20   definition.  That one, I do know.  On the others,

21   I don't know if it fell into the top ten or was

22   further down, but I know it was much smaller than

23   the other funds.

24          Q.  Okay.  So is it fair to say Trey

25   spent a significant amount of his time servicing

1                    NORRIS

2  TerreStar?

3        A.  I don't know that's the case.  It was

4  one position.  I think they covered hundreds of

5  positions.  So I don't know what times -- you

6  know, Trey's time was allocated to TerreStar.

7        Q.  Okay.  Do you have, like, a rough

8  estimate of what percentage of Trey's time he

9  spent on TerreStar?  Was it over 50?

10       A.  Oh, I would imagine it's much smaller

11 than 50, but I would be speculating.  Again, I

12 think they covered hundreds of positions, and he

13 was the CIO and, you know, head of credit

14 research before that.  He oversaw the investment

15 process and he had a large, you know, commitment

16 of time.

17            My understanding of TerreStar is

18 there was only two board members.  Trey was one

19 of them.  And there was periodic meetings.  But

20 it was not an operating company, it's an asset.

21 But I don't think there was that much ongoing

22 time, based on our understanding.  But I don't --

23 I'm, again, speculating.

24       Q.  Okay.  So when -- so the Advisors

25 contend Trey Parker left the Debtor on

1                    NORRIS

2    February 28th of 2020, right?

3         A.  Based on this schedule, which I

4    believe these dates were taken from the Debtor's

5    schedules that we received from Debtor employees.

6         Q.  And when Trey left, did the Advisors

7    exercise their rights under Section 4.02 and

8    Section 2.02 of the PRA?

9         A.  I'll just go back to my previous

10   answer on that.  When you asked about any of

11   these employees, it's the same answer.

12        Q.  After Trey left, did the Advisors

13   stop receiving investment advisory services

14   relating to TerreStar?

15        A.  Not that I know of.

16        Q.  And after Trey left, did the Advisors

17   stop receiving any of the investment advisory

18   services that Trey had performed?

19        A.  Certainly, yeah.  There was a lot of

20   his time allocation that there was no replacement

21   person.  We certainly -- there was -- you take a

22   senior partner away, who was doing a lot for our

23   funds, we had to replace him with HCMFA

24   employees.

25             Joe Sowin, I know, was appointed as a

1                           NORRIS

2    portfolio manager of one of the funds.  One of

3    the other funds we had to liquidate.  So, yeah,

4    we had a drop-off.  We didn't receive any

5    replacement services largely for what Trey

6    performed.

7         Q.  Okay.  So you mentioned specifically

8    the services that he was -- what were the

9    services that he was providing that you're saying

10   were no longer provided?

11        A.  Yeah, the -- the day-to-day -- let's

12   go to -- let's go to his payroll reimbursement,

13   for Trey Parker is 30 percent of his time to

14   HCMFA and NexPoint Advisors is 15 percent maybe.

15             So you take approximately 45 percent

16   of a person's time that was at some point

17   committed to these Advisors, and he leaves, there

18   was no person hired to handle the credit

19   research, there was no person hired by HCMLP to

20   handle his portfolio management duty, and the

21   income -- the Highland Income Fund was a billion

22   dollar fund.  Right?  There was a lot going on

23   with that fund.

24             The Opportunistic Credit Fund, which

25   Trey was a portfolio manager of.  We didn't have

NORRIS

1
2    a replacement portfolio manager, support

3    management services, credit research, all of

4    those, those services.  He also did some public

5    equity stuff, oversaw a lot of the investment

6    profits.  So I do know that -- yeah.

7            Q.  So as a result of Trey's departure,

8    were the Advisors unable to perform certain

9    services to those funds that you just mentioned?

10           A.  No.  We had to adjust -- right -- and

11   reallocate our existing resources.  I mentioned

12   reallocating Joe Sowin as a portfolio manager.

13   Jim had to step in where he didn't before

14   previously before do some of the day to day in

15   some of the investments.  We have other employees

16   that are at the Advisors that are front office

17   employees that had to pitch in and perform those

18   duties.

19           Q.  And are those -- did that -- did that

20   cost the Advisors to incur additional expenses?

21           A.  None that -- I guess in this instance

22   we're asserting that we paid for services we

23   weren't receiving.  Right?  I'm not prepared to

24   talk about other additional costs.  I'm sure,

25   again, we had to reallocate people and time, so I

1                                NORRIS

2    don't know the answer to that.

3          Q.  Okay.  You just talked about those

4    services that the Advisors were no longer

5    receiving as a result of Trey's departure --

6          A.  And here is another point on that, to

7    be -- you know, Trey's departure came at a time

8    when the -- and going back to our firm, a lot of

9    what he had been focused on, our credit business

10   went from having 20 analysts at Highland to, I

11   don't know, a handful, maybe three, two.  The

12   private equity book had shrunk significantly.

13   And so his responsibilities over time related to

14   our Advisors had also shrunk.

15              And so are we able to continue

16   performing our services, yes, with the existing

17   resources and maybe we had to hire one or two

18   more.  And then eventually hired some of the

19   front office people from Highland to help fill

20   those holes after the transfer.

21         Q.  Um-hum.  And so -- when this was all

22   happening, did the Advisors tell Highland that it

23   was unable to perform these services -- that the

24   Advisors were unable to perform these services?

25         A.  Well, no, because we didn't tell them

1                    NORRIS

2    that the Advisors were unable to perform the

3    services because Highland was in bankruptcy, we

4    were aware of that.  We were performing them

5    ourselves at this point.  We were not unable, we

6    were able to perform the services.

7         Q.  I'm sorry, say that last part again.

8    I don't think I understood you.

9         A.  Yeah, you asked did we tell them we

10   were unable to perform these services, and I

11   said, no, we didn't tell them that because we

12   were able to.  We didn't tell them we were unable

13   to, we were able to.  And we were performing the

14   services.

15        Q.  Okay.  I thought you just said that

16   after Trey left the Advisors weren't able to

17   perform certain services for the funds when Trey

18   left, right?

19        A.  What I -- and maybe you

20   misunderstood.  Highland didn't perform those

21   services, the Advisors, our Advisors had to step

22   in.

23        Q.  Okay.  And then my question is after

24   Trey left and the Advisors were no longer able to

25   perform these services, did the Advisors tell

1           NORRIS

2  Highland that the Advisors were not able to

3  perform certain services?

4           A.  No, because we were able to perform

5  the services.

6           Q.  Okay.  So you're saying -- are you

7  saying -- you said that the Advisors weren't able

8  to perform certain services, but then are you

9  saying --

10          A.  I don't think I said that.

11          Q.  So -- okay.  So --

12          A.  And maybe I misunderstood your

13  question.

14          Q.  Okay.  Let's take a couple of steps

15  back.

16              So after Trey left, you're saying the

17  Advisors weren't receiving certain services from

18  Highland that Trey had been performing.  Right?

19          A.  Correct.

20          Q.  Okay.  So does that mean that as a

21  result of Trey's departure, the Advisors were not

22  able to perform its own services to the funds?

23          A.  No.  We, with our personnel, were

24  able to perform the required services under our

25  advisory agreements.

1                    NORRIS

2          And some of that was spread to other

3   Highland employees, it wasn't just that Trey

4   left, it was, okay, well, now, Matthew Gray,

5   you're going to cover this name and, you know,

6   whoever else is still here is going to cover a

7   different name.  Nate Burns, you know, you are

8   going to cover that.  And they reallocated his

9   work without hiring additional people.

10          Q.   Okay.  And so then when you're saying

11  that you guys had to shuffle things around and

12  hire other people after Trey left, did the

13  Advisors tell Highland that that was going on?

14          A.   At this time we were all under the

15  same roof.  Right?  This is February 2020,

16  beginning of bankruptcy.  We're all working

17  together.  We knew what the responsibilities

18  were.  It wasn't -- so certainly Highland, you

19  know, the Advisors and Highland had that

20  communication, because we were working closely

21  together.

22          It's not the position you sit in

23  today where we're in separate offices and there

24  is litigation back and forth.  It's a frame

25  February 2020, there was a belief that the

1                      NORRIS

2    bankruptcy would happen very quickly.  Trey

3    Parker had already planned to leave

4    pre-bankruptcy, or just after, my understanding.

5    But in anticipation that this would be a quick

6    resolution, and all these people were working

7    closely together cooperatively with no issues.

8         Q.  Okay.  So just to make sure I have

9    this right, you're saying that when Trey left,

10   the Advisors reshuffled things, hired their own

11   people to replace Trey's services, were no longer

12   able to receive certain services from Highland

13   and didn't tell Highland directly that it was --

14   that it was reshuffling things?

15        A.  I think that's a -- that's not the

16   way at all that I would explain it.  I explained

17   it that we were all there -- there was not like,

18   let me formally send Highland -- we were in the

19   same office working collaboratively together as

20   affiliates, right, up until just, you know,

21   around that time.

22             And so it was very -- I mean, some --

23   you were literally in the same office.  Some were

24   Advisor employees, some were HCMLP employees.

25   They worked closely together.  And with Trey

1                    NORRIS

2    leaving, all right, we're going to -- some of

3    HCMLP employees will do the job and some of the

4    Advisors -- a lot of it was the Advisor

5    employees, including the key -- the key aspects

6    of his job of portfolio management, which we used

7    our existing advisor employee Mr. Andrews for his

8    replacement.

9           Q.  Okay.  So let's stay on this list for

10   a second.  So it says on this list that Michael

11   Phillips left Highland February 20th of 2018,

12   right?

13          A.  Yes.

14          Q.  And then Jake Tomlin left Highland

15   February 20th of 2018, right?

16          A.  Yes.

17          Q.  Sanjay Gulati left March of 2018?

18          A.  Yes.

19          Q.  Phil Ryder left Highland April of

20   2018, right?

21          A.  Yes.

22          Q.  So there is a total of four employees

23   that left Highland before May 1st of 2018, right?

24          A.  I can't see the top, but if you tell

25   me that's the case, then that's the case.

1                          NORRIS

2          Q.  Okay.  We can scroll up a little bit.

3               Okay.  And this was before the

4    Payroll Reimbursement Agreements were executed,

5    right?

6          A.  Yes.  But that was effective

7    January 1st, 2018.  So before they quit, the

8    effectiveness of the agreement.

9          Q.  Okay.  But the Advisors were aware --

10   excuse me -- of these four employees' departures

11   prior to executing the payroll reimbursement,

12   right?

13         A.  Again, that would be on Frank.  The

14   Advisors -- I go back to my same answer.  We knew

15   when employees left, and we relied on Highland

16   for the actual preparation of the calculation.

17         Q.  Okay.  So let me ask you this.  Did

18   anybody at the Advisors review this agreement

19   before the Advisors entered into it?

20         A.  We don't know.

21         Q.  Okay.  So the Advisors may have

22   entered this agreement without understanding its

23   terms?

24         A.  Again, we haven't deposed

25   Mr. Waterhouse, who signed the agreement, I

1                    NORRIS

2    believe is what -- this specific agreement.

3            And you've got to believe -- I

4    can't -- as an individual looking at this, say,

5    oh, we knew nothing, we didn't understand the

6    agreement.  There was knowledge entering into the

7    agreement, we just need to understand from Frank

8    and Dave what the process and who those were

9    involved.

10           Q.  Okay.  So the Advisors entered into

11   this agreement knowing that four of those

12   employees were no longer working at Highland?

13           A.  I don't know if that's -- I don't

14   know.

15           But, again, the effective -- there is

16   a really clear reason why you would want to

17   include them.  It's effective and payments were

18   effective as of January 1st.  So for the

19   sub-period that they were employed, they would

20   have paid for their costs.  So it was logical to

21   think that even if they knew that they were no

22   longer employed, that they would include them on

23   there because they were employed effective

24   January 1st, and there was work performed.

25           Q.  But they weren't going to be working

1                    NORRIS

2   after May 1st of 2018, right?

3          A.  Yes, exactly.  And that is exactly

4   why we shouldn't be paying for them.  And why we

5   were shocked that we continued to pay at the same

6   rate in 2020, the end of 2020, for exactly the

7   people that were no longer employed in

8   February 2018, well before the actual filing of

9   the bankruptcy.

10              So there was obviously a true-up in

11  2018, so one would speculate that Mr. Klos

12  updated for those and factored that in, and we

13  would hope that's the case.  But nothing happened

14  in 2019, nothing happened in 2020, and the

15  amounts that are considered on here and the

16  amounts paying match up to what these employees

17  were as of this date.

18          Q.  Okay.  But if the -- if the Advisors

19  don't contend that they shouldn't have been

20  paying for these four employees, why did they

21  enter into an agreement to pay for these four

22  employees?

23          A.  Again, the effective date is

24  January 1st.  Again, and I don't have all the

25  background.  I'm sure Mr. Waterhouse and Mr. Klos

1                    NORRIS

2   would have a good understanding, but one could

3   speculate, and I don't have to tell you, one

4   could speculate that that's fair, they are going

5   to be paid during that period, and after that

6   they wouldn't be paid.  Because it's actual cost,

7   it's reimbursement for services of people that

8   are dual employees.  If they are not longer

9   employed, logically you would think, sure, of

10  course we're not going to pay them.  Why in the

11  world would you pay for someone that is no longer

12  employed?

13              And so logically that was actually

14  the intent of the agreement.  They would drop

15  off, okay, we are not going to reimburse because

16  they are no longer employed and they're no longer

17  providing services.

18              And this states -- the agreement

19  clearly states we reimbursed for employees that

20  are, one, employed as a dual employee, and, two,

21  providing investment advisory services.

22              So, again, speculation, but it seems

23  completely reasonable to me why they would have

24  included them if the effective date is January

25  1st.

1                    NORRIS

2         Q.  But if the Advisors knew of their

3    departures around the time they left, why didn't

4    the Advisors exercise their rights under

5    Section 4.04 to adjust the allocations?

6         A.  I'll go back to my previous responses

7    on the same topic, which is, we relied on

8    Highland, and you can go look at every other

9    response I had on this.  And we assumed that it

10   would be done the correct way, and in 2018, our

11   understanding is it was.

12              There was a true-up in December.  And

13   so why didn't we adjust it?  Well, the operating

14   procedure at that point was to adjust at the end

15   of the year.  There is nothing in these

16   agreements that say you can't adjust something

17   after the fact, and that was what was done, and

18   we expected it would have continued to be done

19   after that.

20         Q.  So if you were relying -- if the

21   Advisors were relying on Highland to make sure

22   all of these allocations were accurate, what was

23   the purpose for Section 4.04?

24         A.  That's a great question.  Again, we

25   weren't involved in the drafting of agreements.

1                    NORRIS

2    And I think that the intent is very clear in what

3    an agreement -- the agreement is for.  It's a

4    reimbursement.  Right?  It's not, you're going to

5    pay a fixed cost to us.  It's, you are going to

6    reimburse for actual cost of what it cost to

7    employ someone as a dual employee and if they are

8    providing services.

9             That is the intent of the agreement.

10   And I don't know how you interpret reimbursement

11   as anything other than paying for someone that's

12   provided -- it's a reimbursing.

13        Q.  So I understand that you're -- that

14   the Advisors are contending that they have relied

15   on Highland to ensure that these allocations were

16   accurate, but did the Advisors have any way of

17   ensuring that the allocations were accurate?

18        A.  We, as I already said, we didn't have

19   a separate group running calculations.  We don't

20   an accounting group.  We don't have a legal

21   services group.  That's why we paid Highland to

22   do this.  So we didn't have a way of double

23   checking or hiring someone else to come in and

24   sleuth it because that was what we paid Highland

25   to do.

1                          NORRIS

2              Q.  Are you aware that certain employees

3      of Highland took over Trey Parker's title after

4      he left?

5              A.  Which title?

6              Q.  The co-head of private equity.

7              A.  I'm aware that the -- there were some

8      people in the legal team that had already been

9      providing similar services to some of these

10     companies, were given certain additional titles,

11     so their titles of counsel or general counsel or

12     whatever.  Our understanding of that and our

13     position is that that was somewhat of a carrot.

14     During the middle of bankruptcy, we need to

15     provide something for employees to -- additional

16     for them to feel good about, and it was in

17     addition to their other services that they were

18     providing.

19             Q.  Okay.  Are you aware that on the very

20     day Trey Parker left, JP Sevilla became co-head

21     of private equity?

22             A.  I believe that your documents you

23     sent over last night, that was the first time I

24     had realized that or seen that.  And, again,

25     given that I'm here, it wasn't allowed.  Now JP

1                    NORRIS

2    is doing Trey's job.  It was a maybe you could

3    help cover one of the names from a legal

4    perspective.  And, again, context is important.

5    2020, we had a whole team of talented people.

6    You file for bankruptcy.  You've got to try and

7    retain them.  And giving people additional titles

8    is a carrot, right, and I think that's a big part

9    of it.  And maybe we can ask JP how did -- how

10   did his role change?  Our view was it didn't

11   change really at all.  Maybe there was a little

12   bit of an allocation, that he was performing

13   work, as we know he was on TerreStar.  Did he

14   attend a board meeting once a quarter, what was

15   his time allocation.  Again, I mentioned before,

16   if there's a good faith estimate or, you know,

17   something that the Debtor would like to

18   negotiate, we would love to hear it.

19             In this instance, due to, you know,

20   he was helping with TerreStar, maybe there is a

21   time allotment, and we can get J.P.'s time,

22   right?  But that -- he did not take over the job

23   of Trey.

24             And as I mentioned before, private

25   equity was on its downswing.  You can probably

1                        NORRIS

2    look and track the private equity investments.

3    Trey's main job related to our Advisors was a

4    portfolio management role, an investment analyst

5    role for our closed-end fund, our open-end fund,

6    and overseeing the profits on the investments

7    that rolled into -- rolled into our funds.  And

8    nobody stepped in from that legal team to do

9    those services.

10        Q.  So when JP took over Trey's title on

11   the day Trey left, did JP start performing any of

12   the functions that Trey performed previously?

13        A.  I don't know.  I would have to ask.

14   I'm not -- other than helping with TerreStar, I

15   think it was probably -- I think it was a group

16   effort.  I know Jim pitched in.  I know there

17   were other people.  It was a group effort.  But,

18   again, a company with no operations, no cash

19   flows, it's literally an asset.  And so I don't

20   know what else JP did, but we can certainly ask

21   him.

22        Q.  Okay.  But JP did start helping on

23   TerreStar, right, when Trey left?

24        A.  I believe that's the case, but I'm

25   not certain.  I know he had given a few updates

1                          NORRIS

2      occasionally.  My interaction there was very

3      limited because I don't think there was much for

4      him to do.

5           Q.  Okay.  But TerreStar -- okay.  So --

6      so did the Advisors contend that they shouldn't

7      pay for J.P.'s time working on TerreStar?

8           A.  If there was a portion of his time,

9      again, we'd love to hear if he was providing

10     investment advisory services.  If he's providing

11     legal and compliance services related to a

12     company that one of our funds owns, then, again,

13     there's splitting hairs on what it actually was

14     that he did.  But, again, you mentioned there was

15     a significant size of his overall allocation

16     time.  Doesn't mean there was a lot of work

17     involved when JP came in.

18           Q.  But even if JP spent, let's just say,

19     an hour a week on TerreStar, do the Advisors

20     contend they shouldn't have to pay for that?

21           A.  Again, like I said, we are open to

22     hearing, and specifically if there are areas

23     where people who were providing were dual

24     employee, one, and providing investment advisory

25     services that meet the definitions of the

NORRIS

1

2 agreement, we're happy to discuss that. And if

3 there should be a true-up, let's do a true-up.

4 That's what we've been clamoring for since we

5 first found out about this. And so definitely

6 open to hearing what you have from a document in

7 evidence standpoint.

8         Again, I'll go back to in December

9 2020, the Debtor's CFO and Controller created a

10 calculation of what the front office services

11 should have been for 2020, and that was well

12 after Trey Parker left and JP was appointed

13 co-head of private equity and continued his

14 normal role as associate counsel or whatever he

15 was at HCMLP. But we haven't had the backup yet.

16 Maybe it's already in there or maybe it's not,

17 but if it's not, I would be curious on why Dave

18 wouldn't have included that if HCMLP knew you was

19 providing those services.

20         Q. So there was a group of people that

21 started working on TerreStar after Trey left,

22 right?

23         A. I don't know if "a group of people"

24 is accurate. I mean, he is who I heard a couple

25 of updates from. And, again, I don't know if

                            NORRIS

1

2   there is a material amount of time.  I guess one

3   hour a week -- sure, let's run the numbers.  One

4   hour divided by his sixty hours, it's 1.6 percent

5   of his time.  And if his pay is, let's just

6   assume, I don't know, $600,000.  9,999.  We'll

7   cut you a check for that amount.  And our numbers

8   we're showing are $7.7 million.  So I think we're

9   talking about a small amount.  But we're open to

10  it.  We've asked.  We've asked for what we were

11  paying for.  We've asked many times over many,

12  many months and haven't received it until

13  discovery.  And so we've been open all along to

14  have those conversations and would love to do it.

15          When I say write that check, I say

16  that somewhat sarcastically.  We overpaid by

17  7.6 million.  So we can net it against at least

18  the 7.6 million.  Dave Klos' number is actually

19  larger.  He shows a larger amount.  We'll get

20  into damages when we talk with Mr. Morris.  But

21  we're not contending that we shouldn't pay for

22  dual employees that are providing investment

23  advisory services.

24          Q.  Okay.  But, again, you are not

25  contending that what?  I couldn't hear that last

                             NORRIS

1

2    part.

3          A.   That we shouldn't pay for dual

4    employees that are providing investment advisory

5    services under the Payroll Reimbursement

6    Agreement.

7          Q.   Okay.  So were there employees

8    providing advisory services that aren't part of

9    this list?

10         A.   We don't believe there is.

11         Q.   But didn't you just say JP Sevilla

12   was providing advisory services?

13         A.   Again, I don't -- advisory -- I

14   wouldn't contend that at all, and I didn't say

15   that.  He was sitting on the board of a portfolio

16   management company I believe that was already

17   owned, that was already in operation, and he

18   wasn't giving any recommendations, to my

19   understanding, in advisory service on what we

20   should do with TerreStar.  He was acting in an

21   operational or legal capacity.  So we would

22   contend that, no, that's not investment advice.

23   He wasn't giving advice.  He was providing

24   information for the company, very standard from a

25   legal and compliance perspective.

1                         NORRIS

2          Q.   Okay.  Are you aware that five other

3    employees got title changes the day Trey left?

4          A.   I believe I saw that in the documents

5    you sent last night, uh-huh.

6          Q.   Okay.  And just tell me again -- if

7    you have already, I apologize -- but I'm just

8    trying to understand why did this -- why did this

9    all happen the day he left?

10         A.   Yeah, again, I'll go back to our view

11   is, look, you had someone that was high profile

12   leave.  He left when private equity had

13   diminished, and there were a lot of employees who

14   wanted time retained.  And that was done to help

15   them feel good about the opportunity, stick

16   around.  I think most of them probably did stick

17   around.  But that's -- you know, when someone

18   leaves, sometimes you reappoint titles.  And --

19   but our view is we didn't see anything

20   significant in any way from any of them from an

21   investment advice standpoint.

22         Q.   Okay.  So, again --

23         A.   Sorry.  Go ahead.

24         Q.   -- do the Advisors contend that these

25   six individuals who got the title changes, for

1                    NORRIS

2    those individuals their work didn't actually

3    change, it was just their title?

4         A.   Largely, yes.

5              Now, their work was -- their work was

6    legal and compliance services, litigation

7    support, and those were services that were paid

8    for under the Shared Services Agreement.

9              Again, but I don't -- I don't have

10   detailed knowledge.  I haven't spoken to them

11   regarding how their title changed.  I wasn't

12   prepared to really address what happened in their

13   role.  First time I saw this and was brought to

14   my attention was the documents you sent last

15   night.  Wasn't on our radar at all because in our

16   view their role did not change.

17        Q.   Their role didn't change.  Okay.

18             MS. WINOGRAD:  Can we pull up

19   Exhibit 35.

20             (Exhibit 35 marked for identification.)

21   BY MS. WINOGRAD:

22        Q.   Okay.  Have you seen this email

23   before?

24        A.   No.

25        Q.   Okay.  This is an email from Katie

1                        NORRIS

2   Irving to Dave Klos, James Mills, Will Duffy,

3   cc'ing Tim Cournoyer and JP Sevilla, right?

4        A.  Yes.

5        Q.  And it's dated March 3rd of 2020,

6   right?

7        A.  Looks like it, yes.

8        Q.  And it's just less than a week after

9   Trey departed the Debtor, right?

10       A.  Yes.

11       Q.  And it's just less than a week after

12  Katie, Tim, and JP took on new titles with

13  Highland, right?

14       A.  I don't know that Katie or Tim.  I

15  believe that was in your materials, but I'll take

16  your word for it if that's the case.

17       Q.  Okay.  Because I can show their title

18  changes if you want.

19       A.  I'll take your word for it.

20       Q.  Okay.  And the subject of this email

21  is "Draft TerreStar Valuation," right?

22       A.  Yes.

23       Q.  What's the purpose of this email?

24       A.  I have no idea.  Houlihan Lokey

25  helped provide third-party support.  Seems like a

```
1                    NORRIS
2    logical service here, something related to
3    valuation, which we were paying Highland for
4    under our Shared Services Agreement.
5              But I -- "any info you have on
6    TerreStar opinions or its valuation."  Looks like
7    a very simple email requesting information
8    regarding valuation.
9        Q.  Okay.  Is this a type of valuation
10   analysis Trey would have been involved in when he
11   worked at Highland?
12       A.  I don't know.  But Highland was
13   performing valuation services of which part was
14   Trey sat on the valuation committee and we were
15   paying them for valuation services of which
16   included the performance of various employees
17   related to valuation.
18       Q.  So it's fair to say he would have
19   probably been cc'd on this email or otherwise
20   included in some way?
21       A.  I don't know.  My guess is -- I can't
22   speculate on that.
23       Q.  Okay.  But he was involved in
24   TerreStar valuation analyses while he was working
25   at the Debtor?
```

1                         NORRIS

2           A.  I'm not -- again, I don't -- I don't

3    know the specifics of his involvement in the

4    valuation process of TerreStar.  I know he was

5    involved with TerreStar from an investment

6    perspective.  He sat on the valuation committee.

7    But I don't know particularly any specifics.

8           Q.  Do you know if Katie had any

9    involvement with TerreStar prior to Trey's

10   departure?

11          A.  I don't know.

12          Q.  Do you know if -- do you know if Tim

13   did?

14          A.  I don't know.  And I don't even

15   recollect having any discussion with Tim after

16   this on TerreStar in any way.

17          Q.  Okay.  So do you know if JP did?

18          A.  Prior?

19          Q.  Prior to his title change?

20          A.  I'm not sure.

21          Q.  Okay.

22          A.  He may have.  I think he may have,

23   but I'm not sure.  And I would say the legal team

24   regularly provided support to investment

25   professionals on agreement review, on

1                         NORRIS

2      structuring.  So it would be very realistic to

3      think that JP and Tim had some involvement on

4      TerreStar prior to that.

5           Q.  Right.  But this is more focused on

6      investment advisory topics, right?  This is --

7           A.  I don't think so -- I'm sorry, go

8      ahead.

9           Q.  No, I was just going to say this is

10     more about valuations rather than legal advice,

11     right?

12          A.  Yeah, but valuation is not investment

13     advice.  That's covered under back and middle

14     office-type services which were provided under

15     the Shared Services Agreement.  It mentions

16     valuation services in the Agreement.  That's

17     front and center of what shared services is,

18     which that was across many different teams.  The

19     legal team had a lot to play on any given month

20     related to valuation.  In fact, legal and

21     compliance, I believe, ran the valuation

22     committee with Thomas Surgent and Jason Post,

23     like, they were integral into the valuation

24     process.

25          Q.  Okay.  So Katie and Tim and JP, are

1                        NORRIS

2    you saying they would have been involved in this

3    type of email before Trey left?

4         A.  I don't know.

5         Q.  Do you know if these individuals on

6    this email continued to provide services for

7    TerreStar in April?

8         A.  In April?

9         Q.  Of 2020.  So like the following

10   month?

11        A.  I don't know.  My only personal

12   knowledge was Katie was involved in the

13   beginning, and I haven't heard anything else from

14   Katie on TerreStar.  It's been JP.  So I haven't

15   actually heard from Katie in a very long time.  I

16   don't even know if she's still employed by

17   Skyview or Highland.

18        Q.  Okay.

19        A.  I don't know.

20             MS. WINOGRAD:  Can we show

21   Exhibit 41.

22         (Exhibit 41 marked for identification.)

23             MS. CANTY:  Give me just one second.

24   BY MS. WINOGRAD:

25        Q.  Okay.  Do you see the document?

1                         NORRIS

2          A.  Yes.

3          Q.  Okay.  So this is an email from Katie

4    Irving on April 6th of 2020, right?

5          A.  Yes.

6          Q.  Okay.  So she says, "Good afternoon,

7    this looks fine.  Approved.  Thank you."

8               What exactly is she approving?

9          A.  I don't know.  First time I've seen

10   the email.

11         Q.  Okay.  So it says "3/31 TerreStar

12   analysis."  Do you have any idea what this could

13   be referring to?

14         A.  Let me read here.  "Tim/JP/Katie,

15   Please find the draft 3/31 TerreStar valuation

16   attached.  The equity mark movement was driven

17   by:  Updated financials, debt balance increased

18   2.1 million; updated transaction weightings, due

19   to the passage of time."

20              "The debt mark decreased slightly due

21   to 0.25 percent."

22              "See page 16 for the enterprise value

23   conclusion."

24              "Term Loan."

25              "Please let us know if you have

1                      NORRIS

2    comments.  As a reminder, we'll need a simple

3    approval from you before incorporating these

4    marks in the NAVs for the retail funds."

5              "Simple approval" is what this looks

6    like, of -- in order to incorporate into the

7    NAVs, based on the email.

8              But, again, I'm not on the email.

9    I've never been -- it's been many, many years

10   since I was involved in the valuation process,

11   but standard valuation-related work.

12        Q.   Okay.  Do you know if Trey ever

13   approved valuations like this?

14        A.   I'm not sure.

15        Q.   Okay.  So for the work that Katie and

16   JP and Tim and the total of six employees we

17   discussed, they were working on TerreStar issues

18   after Trey left, right?  Whether we want to call

19   those investment advisory or not, right?

20        A.   I mean, issues, I see this -- all

21   you've shown me so far is an mail saying, can you

22   provide me valuation data and then looks fine,

23   approved.  If that's -- and it's just Katie.  I

24   don't have any -- there is no evidence who

25   provided things.  The others are working on it.

```
                          NORRIS
 1
 2   So I don't know.
 3          Q.  Tim and JP were cc'd on all these
 4   emails.  You already said JP was involved in
 5   TerreStar issues.  So it's fair to say there were
 6   people working on TerreStar after Trey left,
 7   right, on some level?
 8          A.  Yeah.  And, again, here we've got
 9   value -- very valuation-specific items.
10   And -- but your comment was a team of five, and
11   here is two.  I know JP.  Katie had a couple of
12   emails.
13          Q.  Okay.  So do --
14          A.  I have no evidence to support -- or
15   unless you have it, pull it up on Tim's
16   involvement.
17          Q.  Okay.  Well, Tim was cc'd on these
18   emails.  Do you see his name?  It says to Tim on
19   April 6?
20          A.  Yeah, I -- just, I mean, I get sent
21   emails and cc'd on emails all the time, and
22   doesn't mean that I did work on it.
23          Q.  Okay.  So is it the Advisors'
24   contention that whatever work Tim and JP and
25   Katie did on TerreStar, the Advisors shouldn't
```

1                    NORRIS

2    have to pay for it under the PRAs?

3         A.  I think we would have to

4    understand -- I mean, this is the first time we

5    even saw this last night, the document.  It's not

6    something we had discussed or prepared for in

7    detail.  I don't know if it's part of the topics

8    that -- I don't know the level of work they put

9    into it.  So I don't know what they were doing.

10   I don't have background.  There's no -- other

11   than a couple of emails you showed me.  I have no

12   personal experience, and I don't have any other

13   based on my preparation.

14              MS. WINOGRAD:  Okay.  I think that I

15   want to take a little break right now before we

16   move on.  So let's just plan on coming back at

17   3:10, if that works for everybody.

18              THE WITNESS:  Yeah.

19         (A break was taken from 1:58 p.m. to

20         2:18 p.m.)

21   BY MS. WINOGRAD:

22         Q.  So I may have misunderstood you, but

23   you had talked about an analysis conducted by

24   Frank Waterhouse and Dave Klos in 2020.  I think

25   it may have been December of 2020.  Can you give

```
 1                       NORRIS
 2   me the Bates number for that document?
 3              THE WITNESS:  Davor, I don't know
 4   Bates numbers.  Is that the ACL thing, or is that
 5   something else?
 6              MR. RUKAVINA:  Ask again, please,
 7   Ms. Winograd.
 8              MS. WINOGRAD:  Yeah, there was --
 9              THE WITNESS:  You provided it.  All I
10   remember I sent him ACL-025012.  Is that the
11   Bates?  I don't know.
12              MR. RUKAVINA:  It's one of them.
13   It's been produced in several different numbers,
14   but that's it.
15   BY MS. WINOGRAD:
16       Q.  Okay.
17       A.  We don't have the underlying support,
18   as I've mentioned several times here.  And I
19   believe Mr. Morris said before you got back on
20   that he would get that to us by Monday.
21              MR. MORRIS:  Yeah, I promise to get
22   that to you.
23              Can you just read it again, slowly,
24   Mr. Norris, so I can tie it together?
25              THE WITNESS:  Yeah.  ACL025012.
```

1            NORRIS

2            MR. RUKAVINA:  Thanks so much.

3       A.  I believe Mr. Rukavina also provided

4  file an actual file name, an Excel file name for

5  the underlying support.

6  BY MS. WINOGRAD:

7       Q.  Okay.

8       A.  Which we haven't received yet, but so

9  you can help in finding that.

10       Q.  You had also mentioned that Dave Klos

11  said that a true-up couldn't be done in 2019

12  because of the bankruptcy, right?

13       A.  So he told -- he told us that a

14  true-up was not done because of the automatic

15  stay.  They were told, and they brought this to

16  the attention of DSI and Highland, Highland's

17  counsel and I believe Mr. Seery, because of the

18  automatic stay.  That was what they pulled up.

19       Q.  Is that in writing?

20       A.  I don't believe it's in writing, but

21  myself and DC Sauter heard directly from him and

22  Mr. Waterhouse on that matter.

23            MS. WINOGRAD:  Okay.  Can we go to

24  Exhibit 13, please.

25            (Exhibit 13 marked for identification.)

1                          NORRIS

2    BY MS. WINOGRAD:

3         Q.  Okay.  Are you familiar with this

4    document?

5         A.  Yes, I believe I have it here.  This

6    is just your response to our -- our claim; is

7    that right?

8         Q.  This is the Advisors --

9         A.  Oh, it's ours, yes.  This is -- yes.

10   If you scroll up, it was filed on 12-22?

11        Q.  Yes.

12        A.  Yes.

13             MS. WINOGRAD:  And so can we scroll

14   to page -- pdf page 3, please.

15             Actually, let's go to page 8.  Okay.

16   Just go up a little bit.  A little bit more.

17   BY MS. WINOGRAD:

18        Q.  Okay.  So do you see here it says --

19   let me ask it this way:  The Advisors contend

20   that they -- that they paid under the agreement

21   due to a mistake of facts, right?  Under the

22   Payroll Reimbursement Agreement due to a mistake

23   of facts, right?

24        A.  We contend that we -- we didn't pay.

25   We were relying on Highland for those payments.

1                          NORRIS

2          Q.  Right.  But you're saying that -- the

3   Advisors are saying that they paid because they

4   were -- the Advisors contend that they overpaid

5   under the PRAs for employees that were no longer

6   at the Debtor, right?

7          A.  Because we were relying on the Debtor

8   to determine that, yes.  I'm sorry, maybe ask

9   your question one more time.

10         Q.  Okay.  So do the Advisors contend --

11  don't the Advisors contend that they overpaid

12  under the Payroll Reimbursement Agreements

13  because they were paying for employees who were

14  no longer at the Debtor?

15         A.  I believe that's a part of it.  I

16  think this is in our response.  This talks

17  specifically about the voluntary payment rule in

18  our stand here, but that's a part of it, that we

19  overpaid for --

20         Q.  But with regard to the overpayments

21  for the Payroll Reimbursement Agreements, the

22  core of the Advisors' claim is that they overpaid

23  because they were paying for employees who were

24  no longer employed at the Debtor, right?

25         A.  The core issue is we were relying on

```
 1                    NORRIS
 2    Highland to make the payments, and we were
 3    relying on Highland to prepare the calculations
 4    appropriately and to seek reimbursement for
 5    employees that provided actual services and were
 6    dual employees.  So, yes, we were paying.  And
 7    you'll see in our calculation there's -- and
 8    based on the schedule we discussed, we were
 9    paying for employees that were no longer
10    employed.
11         Q.  Okay.  So let's go to paragraph 21
12    quickly.  It says, "Here, the Advisors were not
13    aware of all of the facts until late
14    November 2020."  Do you see that?
15         A.  I do.
16         Q.  Okay.  So are the facts that the
17    Advisors were not aware of that certain employees
18    were not employed at the Debtor?
19         A.  No.  And I've answered that multiple
20    times for you.  We were aware that they were no
21    longer employed.  We just weren't aware that
22    Highland had been paying the same amount for
23    those employees that are no longer here, or no
24    longer employed.
25         Q.  Okay.  Prior to the termination of
```

1           NORRIS

2    the Payroll Reimbursement Agreements, were the

3    Advisors ever in breach of their obligations to

4    the retail funds?

5           A.   The Advisors meaning us in breach of

6    our duties to the retail funds?

7           Q.   Uh-huh.

8           A.   No.

9           Q.   Okay.  Did the Advisors ever tell the

10   retail board that Highland was in breach of any

11   of its obligations under the Payroll

12   Reimbursement Agreements?

13          A.   Once we found out, we let the board

14   know that we were paying for employees that were

15   no longer employed, or they have been continuing

16   to charge the same amount that they had been

17   charging pre-bankruptcy even though they were no

18   longer employed.

19          Q.   Okay.  Who at the Advisors told them?

20          A.   Who would we have told?

21          Q.   No, who at the Advisors told the

22   retail board?

23          A.   It would have been DC Sauter or

24   myself.  In -- we had, as I mentioned, a number

25   of board meetings throughout this time period.

1                              NORRIS

2          Q.  So when did the Advisors tell the

3    retail board that Highland was in breach?

4          A.   It would have been sometime -- DC and

5    myself found out in late November/early December

6    when we found out they continued to pay these

7    amounts, and there would have been multiple

8    conversations thereafter we had board meetings in

9    December.  We had multiple board meetings in

10   January, had multiple board meetings in February,

11   and it was a topic of conversation.

12         Q.  So did the Advisors tell the retail

13   board, then, in December of 2020?

14         A.   I don't remember specifically.

15         Q.   Okay.  But it was after -- it was

16   December 1st -- it was after December 1st?

17         A.   I don't remember the exact time

18   period, but all of this happened, and once we

19   knew -- it wasn't -- as soon as we find out -- we

20   needed to find out the details, and we had been

21   asking for specific details for quite a while.

22   But I don't remember the exact time period or the

23   exact date, but we had board meetings in December

24   multiple board meetings in January, board

25   meetings in February, and it was discussed

1                      NORRIS

2    multiple times with the board.

3         Q.  Okay.  Is there any document

4    reflecting the Advisors telling the retail board

5    this?

6         A.  I don't know.  I believe we provided

7    all documents that are responsive.  I don't know

8    if there's -- we keep minutes of board meetings.

9    I don't know if that was included.

10        Q.  And I apologize if this covers

11   something you already said, but just for my own

12   clarity, what exactly did the Advisors tell the

13   retail board?

14        A.  Yeah, we told them -- we explained

15   the key different -- the key agreements which is

16   the Shared Services Agreement and the Payroll

17   Reimbursement Agreement.  They were very aware we

18   had to hire Jason Post.  In fact, that was at

19   their urging, knowing that we were continuing to

20   pay the same amount to Highland under the Shared

21   Services Agreement.  So that was a very clear

22   communication.  In addition, we had told them

23   that we were paying for certain investment

24   professionals under the Payroll Reimbursement

25   Agreement for the schedules based on employees

1                          NORRIS

2    largely that no longer were employed.  So that

3    was communicated to the board.

4         Q.  Okay.  So the Advisors told the

5    retail board about the -- about Highland's breach

6    under the Payroll Reimbursement Agreements at the

7    same time they told the retail board about the

8    breach under the Shared Services Agreements?

9         A.  And, again, breach, I don't know if

10   you're using the right term there.

11        Q.  Let me rephrase it.  That Highland

12   wasn't performing under the --

13        A.  Again, our claim isn't that you

14   weren't performing all services under the

15   agreement, we were just being billed the wrong

16   amount, right?  So -- but the board was very

17   aware of our concerns and they, themselves, had

18   concerns about the services provided and

19   expressed those.  And that was a meaningful part

20   of the conversation, so much, in fact, that they

21   had concerns about allowing us to hire Skyview,

22   who was hired -- created from the old Highland

23   employees because they were concerned it was

24   going to be the same people providing shared

25   services, and they had concerns about the

1                    NORRIS

2   services that were provide before.  So it was a

3   two-way conversation and understanding with our

4   board throughout this process.

5          Q.  Okay.  So -- and I want to get

6   straight what the Advisors' claim is with the

7   PRAs.  The Advisors are contending not that

8   Highland -- they are not contending that Highland

9   didn't perform under the PRAs, they are -- right?

10         A.  And I don't know if performing under

11  an agreement sounds like a legal term.  I don't

12  know that I'm able to answer or make that

13  determination, but it's very simple.  We

14  overpaid.  We are to reimburse for actual

15  employees, and so our contention is we overpaid

16  for the services provided.  This was not a you

17  provide the services you get paid regardless.

18  It's we're reimbursing you for actual costs of

19  those employees.  And so they were charging us

20  too much money, and we have provided a

21  calculation of what we believe that is.

22         Q.  Okay.  But the Advisors contend that

23  the services were being provided, right?

24         A.  There were investments -- we are

25  saying there's not investment advisory services

1                          NORRIS

2    of dual employees.  And, in fact, this report we

3    send shows there's still dual employees providing

4    investment advisory services.  So it was a use

5    it, right, and pay.  And so there was not a,

6    okay, you're no longer providing these services.

7    Same thing with shared services with the

8    agreement HCMFA was paying a cost plus 5 percent,

9    and it should just be the cost, not a stagnant

10   amount based on pre-bankruptcy billings.

11        Q.  Okay.  Because I'm just trying to

12   understand if the Advisors are saying that the

13   investment advisory services were being performed

14   by Highland but that the specific employees just

15   weren't providing them and that that was why

16   Highland breached under the PRAs.

17        A.  The services changed dramatically,

18   the amount of services provided, but that was

19   fully functional under the agreement.  You could

20   provide this level of service, and we would pay

21   this level plus 5 percent.  Or you could provide

22   this level of service, and we would provide this

23   plus 5 percent.

24             And naturally the head count shrunk

25   dramatically at Highland pre-bankruptcy and

1                              NORRIS

2      through the bankruptcy as people left, and there

3      were investment advisory services that continued,

4      and there were a number of them that did not.

5      And that was -- our view is that was what the

6      agreement contemplated.  You pay for the

7      reimbursement of or the services provided.  And

8      that continued -- the services continued, again,

9      at a lower level, but we were overcharged and

10     Highland paid for us too much.

11         Q.   Okay.  So are the Advisors contending

12     that they overpaid for services that they weren't

13     receiving under the PRAs, that they overpaid for

14     employees that weren't working there under the

15     PRAs, or both?

16         A.   The PRAs -- the services provided are

17     investment advisory services.  Those -- the

18     number of people and actions providing those was

19     significantly reduced.  The head count was

20     significantly reduced.  And we were paying based

21     on the old rates.  So it's -- the services

22     provided is not services detailed in there other

23     than dual employees, and there's not a

24     requirement that they have to have a certain

25     number of dual employees.  We were overpaying

1                         NORRIS

2    because we were paying for employees that were no

3    longer employed, and there was not a new person

4    replacing that other -- that other

5    responsibility.

6          Q.  Okay.  And are you -- are you aware

7    in your individual capacity that in the fall of

8    2020, the retail board conducted an annual review

9    of whether to renew its agreement with the

10   Advisors?

11         A.  Yes.

12         Q.  Okay.  And this is called the 15(c)

13   review, right?

14         A.  Yes.

15         Q.  Okay.  And you're aware that part of

16   this involved an analysis of the quality of

17   services that the Advisors are performing to the

18   retail funds, right?

19         A.  Yes.

20         Q.  Okay.  Did you participate in that

21   annual review in your --

22         A.  I did.

23         Q.  -- individual capacity?

24         A.  I did.

25         Q.  What parts did you participate in?

1          NORRIS

2          A.  I participated in the board meetings

3   where they were discussed, I gave business

4   updates.  My job is running the sales and

5   distribution effort.  So I provided updates on

6   our sales successes.  I was involved in the

7   conversations throughout.  We relied heavily on

8   HCMLP's employees in regards to the services and

9   the shared services, but I was involved in the

10  conversations.  Not all the conversations but the

11  board meetings that were 15(c) we discussed.

12         Q.  And so is it fair to say you're

13  familiar with the board minutes from those

14  meetings?

15         A.  I would be familiar with what we

16  discussed, but the board minutes, I don't know

17  that I've read board minutes.

18         Q.  Okay.  So just going back to the

19  meetings themselves and the fact that you were

20  there, was there anything -- was there anything

21  inaccurate that was said at those board meetings?

22         A.  Inaccurate?

23         Q.  Uh-huh.

24         A.  Not that I know of.

25         Q.  Okay.  And are you familiar with the

```
1                        NORRIS
2   reports that the Advisors sent to the retail
3   board in connection with the 15(c) review?
4           A.  The memos, is that what you mean?
5           Q.  Yes, the memos.
6           A.  I'm generally familiar with them,
7   yes.
8           Q.  Okay.  Are you aware of anything
9   inaccurate in those memos?
10          A.  I haven't read the memos, so -- and
11  you are asking me in my personal capacity, I
12  believe, so I'm not aware.  Again, I haven't read
13  them.  I may have read portions of them, but I
14  didn't read the whole memos.
15              MS. WINOGRAD:  Okay.  I might be
16  close to finishing up, I just want to take --
17  let's take like a -- let's take like a
18  three-minute break.  Let's come back at 3:40.  I
19  just want to look through some documents.
20              THE WITNESS:  Okay.
21          (A break was taken from 2:36 p.m. to
22          2:41 p.m.)
23  BY MS. WINOGRAD:
24          Q.  Do you know if, as the 30(b)(6)
25  witness, between the petition date and the date
```

1                     NORRIS

2      of the administrative claim, did the Advisors

3      ever say any -- did the Advisors ever make any

4      inaccurate statements to the retail board?

5             A.   None that I know of that would have

6      been intentional.  And I say that "intentional"

7      because also a point in time, it's important to

8      note that particularly in this fall 2020 period,

9      we mentioned the 15(c) process, we had -- it was

10     more of an iterative process, and we were going

11     through usually the board would approve things

12     over two meetings because of everything going on

13     with the Shared Services Agreement and the

14     bankruptcy, it lasted longer.  And also during

15     this time period, the tenor of the entire

16     relationship with Highland started to change.

17     And so some statements that may have been given

18     in September, October, may have changed

19     dramatically by November once the services had

20     changed, or once things had changed.  So I don't

21     think there was anything intentional.

22             I know that there was a question of

23     some -- some documents that had been provided by

24     Frank Waterhouse that were related to a note.

25     And it mentioned -- it was -- in looking back at

1                           NORRIS

2      it, we looked at those, the numbers didn't make

3      sense to the Advisors.  And I don't remember all

4      the particulars, but I think that came up in

5      another case, and there was a contention that

6      that wasn't completely accurate, but it wasn't an

7      intentional item.

8                MS. WINOGRAD:  Okay.  So I'm going to

9      move to strike that.

10     BY MS. WINOGRAD:

11          Q.  Are you aware today as you sit here

12     of any inaccurate statements that were made to

13     the retail board between the petition date and

14     the date of the admin claim filing?

15          A.  In all instances we tried to be a

16     hundred percent forthright with the board.  The

17     accuracy at the time of each submission was --

18     our view was things were accurate.

19          Q.  So earlier when I asked you who you

20     spoke to to prepare for today's deposition as a

21     30(b)(6) witness, you named a few people.  And

22     correct me if I'm wrong, but I heard -- I heard

23     James Dondero, Collins, Vitiello, Mitts.  And was

24     it Fuller?  I couldn't hear --

25          A.  Yeah, Fullmer.  Kevin Fullmer.

```
 1                          NORRIS
 2          Q.  Okay.  And am I missing anybody that
 3   you said you spoke to?
 4          A.  DC Sauter, my outside counsel.  I got
 5   some numbers from Hayley Eliason, who is in
 6   accounting.  I think that's everyone.
 7          Q.  Okay.  And you said that you reviewed
 8   a number of documents, right?
 9          A.  I did.
10          Q.  Okay.  So based on the people that
11   you spoke to, the people that you just named, and
12   all of the documents reviewed, you answered my
13   questions today with all of the facts that you
14   had knowledge of, right?
15          A.  Yes.
16          Q.  You answered my questions to the best
17   of your knowledge today, right?
18          A.  I did.
19          Q.  Okay.
20          A.  And I think I said it I don't know
21   how many times, but, you know, we unfortunately
22   did not have access to Mr. Waterhouse, and that
23   would have been helpful.  At his attorney's
24   suggestion and requirement, we couldn't prep or
25   use him or talk to him in this.  And then
```

```
 1                    NORRIS
 2   obviously we couldn't talk to Mr. Klos.  And
 3   they'll both be deposed, and we'll find more
 4   additional information.
 5        Q.  Okay.  So we're finishing up here,
 6   and the last thing I want to ask you is:  Is
 7   there any answer that you gave me today that you
 8   want to supplement or amend?
 9        A.  I don't think so.  I probably talked
10   more than you wanted me to.  I think that -- I
11   think that covers the items.
12            MS. WINOGRAD:  Okay.  Well, that's
13   all I have.  So thank you very much, Mr. Norris.
14   And I'm going to let John Morris now take this
15   over.  So I will say goodbye.  Thank you again.
16            THE WITNESS:  Thank you.
17                    EXAMINATION
18   BY MR. MORRIS:
19        Q.  Hi, Mr. Norris.
20        A.  Hello.
21        Q.  So I just want to cover the singular
22   topic of damages.
23        A.  Yes.
24        Q.  Are you aware that damages was one of
25   the topics on the 30(b)(6) notice?
```

1                                    NORRIS

2              A.  Yes.

3              Q.  And are you prepared to share with me

4      all information that you have that relates to

5      that topic?

6              A.  I am.

7              Q.  Okay.  The Advisors' administrative

8      claim is based on its contention that Highland

9      has breached two different Shared Services

10     Agreements and two different Payroll

11     Reimbursement Agreements; do I have that right?

12              MR. RUKAVINA:  Objection.  Form.

13              A.  Yeah, again, the language I talked

14     about earlier is breached.  I, again, believe

15     that the issue at hand is that we've been paying

16     for services or overpaying for services that we

17     never received and that Highland, who we had

18     outsourced and relied on for payment of these,

19     continued to pay at a higher rate.  So that's

20     the --

21     BY MR. MORRIS:

22              Q.  So you are uncomfortable using the

23     word "breach"?  Do I have that right; you don't

24     want to use that word?

25              A.  Yeah, again, I'm not an attorney.

1                          NORRIS

2    And as I look at this, there were services

3    provided under the Shared Services Agreement and

4    the intent, again, was to be -- particularly the

5    HCMFA and then payroll reimbursement the

6    cost-plus agreement, and the view here is there

7    were services provided -- right -- and they

8    performed under those agreements.  A lot of good

9    people working hard.  It was just that we were

10   billed at a prepetition rate for services that

11   were postpetition and employees that were no

12   longer there.

13         Q.  Let's take them one at a time.

14             Are you -- do you have an

15   understanding of HCMFA's claims under the Shared

16   Services Agreement?

17         A.  I do.

18         Q.  Okay.  Does HCMFA claim that Highland

19   breached its obligations under the Shared

20   Services Agreement?

21         A.  I have the same answer I just

22   provided on breach.

23         Q.  Can you just answer my question.

24   Does HCMFA contend that Highland breached any

25   obligation under the Shared Services Agreement?

1                      NORRIS

2          A.  Well, particularly if you look at the

3   responsibility to handle accounting and payroll,

4   we relied on them for those calculations, and

5   particularly related to this agreement, there was

6   overbilling and overpayments.  But whether you

7   call that a breach or not, that's what we

8   contend.

9          Q.  Okay.  Are there any other breaches

10  that HCMFA contends Highland did with respect to

11  the Shared Services Agreement?

12         A.  No.  Again, I would point out that

13  discovery is still ongoing.  We haven't talked to

14  Mr. Waterhouse.  But as we sit here today, it's

15  very simple, straightforward.  We paid for

16  services we didn't receive.

17         Q.  Okay.

18         A.  And we were overbilled, we overpaid

19  for whatever reason.  Those are the damages.

20         Q.  Okay.  I just want to make sure that

21  we're on the same page here.  I'm only talking

22  about HCMFA, and I'm only talking about the

23  Shared Services Agreement.  Do you understand

24  that?

25         A.  I do.

1                            NORRIS

2         Q.   Okay.  How much do the -- does HCMFA

3    contend it is entitled to recover from Highland

4    under the Shared Services Agreement?

5         A.   Yeah, so under the Shared Services

6    Agreement, in going into this, there is two

7    aspects of this.  One is the calculation.  That

8    is the payroll reimbursement.  We had to hire

9    additional employees to compensate for reduction

10   in services from Highland.  And so that's the

11   damages.  There was a hire of Rob Harris, an

12   outside attorney who came in, and hiring of Jason

13   Post.  Jason Post split his duties between HCMFA

14   and NexPoint Advisors.

15             In addition, those are the direct

16   costs that we had to pay.  The others are, as you

17   will recall, you provided a calculation for

18   Mr. Klos on the amount of Shared Services

19   Agreement payments for overpayments.  So there's

20   a number on there that shows a $1 million gain

21   unrelated to the Shared Services Agreement, and

22   that's the damages that we assert related to the

23   Shared Services Agreement.

24             One million was an annual number, and

25   so you take 16 months, which is the period, and

1                          NORRIS

2    amounts to approximately 1.3 million.  And that

3    is split between HCMFA.  It has it on its

4    schedule, and I'll point you back to it.  We

5    haven't received the support yet which you said

6    you would provide by Monday, and the amount

7    listed for a point in time, the annual

8    profitability at that time was 0.4 million for

9    NexPoint Advisors and HCMFA $600,000.  So if

10   we're just talking HCMFA, it's $600,000.

11            The additional employees is $425,000

12   between Rob and Jason Post.  And we can talk

13   about allocations, but an even split between the

14   two entities is a logical split.

15        Q.  I'm sorry, I'm going to try this a

16   little bit different.

17            Can you give me the total number, and

18   then we'll break it down?  What is the total

19   amount that HCMFA claims it is due as a result of

20   Highland's either breach or failure to perform

21   under the Shared Services Agreement?

22        A.  Yeah.  So it is one -- HCMFA, I've

23   got an aggregate number of 1.3 million, which is

24   HCMFA $600,000, based on Dave Klos' spreadsheet,

25   which is an annual number, which is $800,000.  So

```
 1                    NORRIS

 2   $800,000 for overbilling of services that were

 3   not received, right, for overpaying.  And then

 4   hiring of additional employees is $212,000 for

 5   HCMFA and $212,000 for NexPoint Advisors.  And I

 6   apologize for the -- I have the overall number

 7   for both entities, 1.3 million plus 425,000, and

 8   that is split between the two entities.

 9          Q.  So the 1.3 million is total for both

10   entities, right?

11          A.  Sorry, the 1.3 is related to

12   overpayment for the shared services, and 425,000

13   for the additional employees.  And -- maybe that

14   wasn't --

15          Q.  So let me try again.

16          A.  Yeah, yeah.

17          Q.  You said it's 600,000 from the cost

18   analysis for HCMFA?

19          A.  Related to the shared services for

20   one year, and it was 16 months, so it was

21   800,000.

22          Q.  Okay.  800?

23          A.  800.

24          Q.  And then how much -- is the same

25   analysis done for NexPoint?
```

NORRIS

1

2      A.  Yes.  And that's $500,000 for

3   NexPoint.

4      Q.  Okay.  So -- and then you took the

5   425 for Harris and Post, and you split it between

6   the two?

7      A.  Correct.

8      Q.  Okay.  So that -- do I have this

9   right, for HCMFA the total claim has two

10  components, one of which is $800,000.  That comes

11  from the Klos analysis.  And the other is

12  $212,000, which is one-half of the total cost of

13  Harris and Post for a total of $1,012,000?

14     A.  Yes.

15     Q.  Perfect.

16         Does HCMFA rely on anything other

17  than the cost analysis to support the $800,000?

18  Are there any other facts that you're aware of

19  that support that number?

20     A.  This -- obviously this is the best

21  available information prepared by the Debtor

22  employees at this time and, you know, they were

23  the closest to the numbers.  We don't have the

24  backup for this, so we would love to see more.

25  But we're going to be able to talk to Mr. Klos

NORRIS

1

2  and Mr. Waterhouse as well.  We tried to

3  receive -- you sent us invoices that we barely

4  got with passwords protected.  We got the

5  passwords removed, that had invoice amounts and

6  dollar amounts paid and tried to back into

7  numbers.  But ultimately don't have the level of

8  info that Mr. Klos and Mr. Waterhouse do, and

9  their analysis here I think is the best available

10  information.

11      Q.  Okay.  So subject to any further

12  information you may obtain, HCMFA's sole basis

13  for the $800,000 number is the cost analysis,

14  correct?

15      A.  That's -- that's one analysis.  And

16  also the analysis that we knew we were getting

17  less service during this time period but paying

18  the same dollar amount.  So we were paying -- we

19  did additional digging in those invoices you

20  provided, and in some of those months we were

21  paying for employees that we know were not

22  providing us any services.  So HCMFA is at cost

23  plus 5 percent and the response and discussion we

24  had with Mr. Klos was, well, we just continued to

25  charge the same amount.  So it matches up with

1                     NORRIS

2    our understanding and our research that we were

3    being overbilled, and Dave Klos already came up

4    with the calculation.  So it's our understanding

5    of the situation combined with his analysis.

6         Q.   Okay.  And did HCMFA ever make any

7    attempt to quantify the dollar value of the loss

8    of services that it sustained?

9         A.   Yeah.  And we did an analysis.  We

10   actually -- and I mentioned this earlier, but we

11   included -- we had to incur additional legal

12   bills.  We had to incur additional time of

13   Mr. Sauter who was spending significant amounts

14   of time that otherwise would have been litigation

15   support and legal services, and we did quantify

16   that.  However, we chose at this time to exclude

17   those.  So we're not seeking the additional

18   damages or costs that we incurred in K&L Gates

19   and Davor's firm and D.C.'s time to maintain

20   attorney-client privilege.

21        Q.   So the $800,000 piece from Mr. Klos,

22   is that $50,000 a month?

23        A.   In his calculation he has $600,000

24   divided by 12, $50,000 a month.

25        Q.   Okay.  And do you understand what the

1              NORRIS

2    basis for that $50,000 monthly figure is?

3         A.  No.  We're waiting on the backup

4    from -- from you, from Mr. Klos.  Now, I can

5    speculate because we have other invoices that we

6    got from you that show we were paying, for

7    example, for compliance and legal services that

8    we know were not performed.  We were paying for

9    bonuses for insiders that were not giving

10   bonuses.  We were paying for a number of

11   things -- and we can speculate.  Again, that's

12   all speculation.

13        Q.  I'm going to be rude and interrupt

14   and say -- I think Mr. Rukavina will join me in

15   saying we don't want you to speculate.

16            MR. MORRIS:  So I'm going to move to

17   strike and just ask the question again very

18   simply.

19   BY MR. MORRIS:

20        Q.  Does HCMFA know the basis today of

21   the $50,000 monthly figure that Mr. Klos arrived

22   at?

23        A.  No.

24        Q.  Thank you.

25            Is it -- is it HCMFA's contention

1                          NORRIS

2    that the diminished services from Highland were

3    equal from the petition date until the end of

4    2020?  Was it constant over that period of time?

5          A.  No, it -- it -- as I had discussed

6    earlier in the deposition, things changed over

7    time, right?  And the quality of service changed

8    over time.  The number of employees serving us

9    was reduced over time.  So it was over time

10   reduction and quality of services -- or not

11   quality but the actual services provided were

12   reduced.

13         Q.  And, in fact, for the first few

14   months of the bankruptcy, Mr. Dondero retained

15   control of both the Advisors and Highland,

16   correct?

17         A.  I'm not sure what the first few

18   months was from a legal perspective.  I wasn't

19   involved in November and December, January prior

20   to Jim completely ceding control.  So I don't

21   know what the mechanism was.

22         Q.  I think the pleading says that the

23   diminishment of services began with Mr. Seery's

24   directive in July of 2020.  Do I have that right?

25         A.  I'd have to -- you have to pull it

1                    NORRIS

2    up.  I don't know that that was the beginning,

3    but that was -- there were certain things that

4    very specifically were diminished at that point.

5         Q.  Okay.  Did the -- does HCMFA contend

6    that Highland failed to provide any services

7    prior to July of 2020?

8         A.  There were certainly services that

9    were not provided at the same level as

10   pre-bankruptcy.  And, you know, that's -- that's

11   very clear.  The level of service dropped off.

12   But, again, the HCMFA agreement is a cost plus 5

13   percent.  There was a lot of things we had to do,

14   even before July, that required additional work

15   on our end and we filled it.  Right?

16              And we were all working towards a

17   peaceful resolution.  I believe everyone thought

18   there was going to be an amicable resolution,

19   even Mr. Seery, and so everyone did their best

20   effort, but it was -- but there were some things

21   that were not provided.

22              There were people that I interacted

23   with that I never saw.  Highland wasn't coming in

24   to the office.  We were.  I know there was

25   COVID-related items, but the level of interaction

                              NORRIS

1

2    and service dropped off.

3         Q.  When did the drop-off begin?

4         A.  When you filed for bankruptcy.

5         Q.  Okay.  Can you tell me how the filing

6    for bankruptcy, what specific services that

7    Highland failed to provide on the day it filed

8    for bankruptcy?

9         A.  Again, service -- services provided

10   is we're paying for the services that are

11   provided.  Right?  It's a cost plus 5 percent

12   here.  So go through the chain, everything became

13   harder after the bankruptcy filing.  You had, for

14   example, PR, legal, litigation support.  Those

15   people were all wrapped up in all the other

16   stuff, and so they were providing less of a

17   service for what we were doing.

18            It was -- you had the same number of

19   people -- actually you had far less, because

20   people started to quit, and there weren't large

21   hires to replace that.  So just naturally there

22   was a -- across all of the services, a diminished

23   impact.

24        Q.  So it's HCMFA's contention that the

25   moment Highland started -- filed for bankruptcy

NORRIS

1    that -- withdrawn.

2            Based on the information you have

3    today, it's HCMFA's contention that from the

4    moment Highland filed for bankruptcy it ceased to

5    provide services on a monthly basis that were

6    valued at $50,000, and that monthly valuation of

7    loss of services continued until the end of

8    December 2020.  Do I have that right?

9    A.  Again, we're taking Dave Klos's

10   calculations.  We need to see the backup, because

11   we don't have an insight into your actual

12   services you billed us for, which is a key

13   component.  What were you actually providing and

14   what were we paying.

15           We were paying for a prepetition

16   amount for actual services plus 5 percent, yet

17   they continued to bill us for the work that was

18   done thereafter.

19           And, again, this is not getting too

20   complex.  Here is Mr. Klos's analysis showing --

21   related to both entities' overall gain.  And

22   there is other things in there that we could

23   argue, but that's -- that's the simple analysis.

24   Q.  Okay.  I'm just asking you as the

1                         NORRIS

2    30(b)(6) witness charged with the responsibility

3    of answering questions about damages, what

4    HCMFA's position is.  Do you understand that?

5         A.  I do.

6         Q.  Okay.  When did HCMFA first learn

7    that Highland was providing less service?

8         A.  As I mentioned, it was ongoing

9    throughout.  It was -- we knew it was happening,

10   but all the way up through that point, from day

11   one on, the goal was to have a quick resolution

12   in this.  You were even working for Mr. Dondero,

13   right?  He hired you.

14            And then things changed.  Right?

15   There was a gradual iterative process.  And even

16   until late 2020 we continued to work.  Everyone

17   worked hard.  We tried to resolve things.  We

18   took on more as the Advisors.  The goal and

19   vision was that things would be wrapped up

20   amicably.

21        Q.  Okay.  You know Frank Waterhouse.

22   You've mentioned him quite a few times today,

23   correct?

24        A.  I do know Frank, yes, and I have

25   mentioned him a quite a few times.

1                          NORRIS

2          Q.  You know that during the relative

3    time period prior to the filing of the

4    administrative claim, Frank Waterhouse was

5    Highland's CFO, correct?

6          A.  Prior to the filing of what, sorry?

7          Q.  The administrative claim in January

8    of 2020.

9          A.  Yes.

10         Q.  I apologize.  Let me withdraw that.

11             You understand that Mr. Waterhouse

12   was Highland's CFO from the petition date through

13   at least the date that the Advisors filed their

14   administrative claim in January 2021, correct?

15         A.  I believe that's the case.

16         Q.  Okay.  Do you have any reason to

17   believe that Mr. Waterhouse didn't have full

18   access to Highland's accounting system?

19         A.  We had access to Highland's

20   accounting system.

21         Q.  And he also had access to Highland's

22   books and records, correct?

23         A.  He did.

24         Q.  And he also served as the Advisors'

25   treasurer during the same period of time,

1                    NORRIS

2    correct?

3         A.  I believe that's the case, yes.

4         Q.  And he was an officer of the -- of

5    the Advisors during the same period of time,

6    correct?

7         A.  An officer of the Advisors, is that

8    what you said?

9         Q.  Yes.

10        A.  That was -- you said treasurer, I

11   believe, that's the --

12        Q.  First I asked about treasurer and

13   then I'm asking about his status as an officer.

14   So let me just ask the questions again.

15            You are aware that from the petition

16   date until the date the Advisors filed their

17   administrative claim, that Mr. Waterhouse served

18   as the treasurer of the Advisors, correct?

19        A.  I believe that's the case, yeah.

20        Q.  And during the same period of time he

21   was an officer of the Advisors, correct?

22        A.  Yeah, I believe the treasurer is an

23   officer role.

24        Q.  Okay.  Was Mr. Waterhouse the person

25   charged with the responsibility of authorizing

1                         NORRIS

2  payments to be made on behalf of the Advisors?

3        A.  Either Mr. Waterhouse or Mr. Klos.

4        Q.  And you understand -- I'm sorry.

5        A.  Go ahead.

6        Q.  You understand that Mr. Klos reported

7  at all times to Mr. Waterhouse, correct?

8        A.  I believe that's the case.  And if

9  you tell me, then I'll believe that.

10       Q.  Do you have any reason to believe

11  that Mr. Klos ever did anything without the

12  knowledge of Mr. Waterhouse, at least with

13  respect to the payments that were made under the

14  Shared Services Agreement and the Payroll

15  Reimbursement Agreements?

16       A.  I don't know.  And, again, we haven't

17  been able to depose both of them.  But I know

18  both of them knew of the overpayment.  Both of

19  them had raised the issue to DSI and to Highland

20  and to counsel.  And even the support that you

21  provided us shows that they had an email in this

22  calculation that was just a roll-forward of the

23  analysis that had been done previously for DSI.

24          So they knew.  They told us that they

25  had -- couldn't do anything about it or were told

1                        NORRIS

2    by Highland's counsel there was nothing they

3    could do about it, and so they were in a tough

4    position.  Right?  Frank and Dave were in a tough

5    position, being stuck between both Advisors and

6    having threats of their personal liability and

7    firing, if they did anything to harm the economic

8    interest of Highland.

9              So I see where you're coming from,

10   but that's -- that's our view is they knew about

11   it, they worked together, they raised the issue

12   on multiple occasions, but we don't have all

13   those details, other than what they told us in

14   December of 2020.

15        Q.  Did they raise the issue at any time

16   before December 2020?

17        A.  To me and -- and, again, it was

18   around the end of November, beginning of 2020, I

19   don't know if they raised the issue to me

20   personally or to -- or they didn't to me or DC.

21   We know they raised it -- you're saying to the

22   Advisors or to Highland?

23        Q.  To the Advisors.

24        A.  Not that I'm aware of.  Right?  The

25   first time we had heard about it was around that

1                          NORRIS

2    timeframe, and we were shocked, including

3    Mr. Dondero.  Right?  This is an important time

4    period, and myself and DC when we found out.

5         Q.  That's because -- that's because

6    Highland had just -- all of this came to light

7    after Highland gave notice of termination of the

8    Shared Services Agreement on November 30th,

9    correct?

10        A.  I don't think so.  I think that it

11   had started earlier.  And we actually sent, I

12   think, a letter to your firm in October where we

13   suspected we were overpaying, and we asked for

14   the invoices.

15            And so DC and myself started to get

16   involved in October, November, December because

17   there were certain employees that couldn't be

18   providing those services due to, you know, as we

19   talked about earlier in the deposition, all of

20   the things that were going on.

21            And so we started to understand a

22   little bit more.  We found out, we thought, on

23   certain aspects of it, but it was that October,

24   November, December timeframe.

25        Q.  You mentioned that part of HCMFA's

NORRIS

1

2  damages are half the cost of Harris and Post; do

3  I have that right?

4      A.  That's correct.

5      Q.  Okay.  Over what period of time does

6  HCMFA contend Highland should have to reimburse

7  it for for their services?

8      A.  Yeah, so the period of time is from

9  the time period which Jason Post moved over until

10  the termination of the agreement, not the

11  termination notice, but the actual termination of

12  the agreements, and then from the time period

13  that Mr. Harris was hired, which was in October,

14  until the end of the Shared Services Agreement.

15  He was hired specifically to fill the avoid of

16  the legal services that had been provided

17  previously.  And Mr. Post was moved over, yet we

18  continued to pay for his services.

19      Q.  Do you know what Mr. Post's salary

20  is?  Withdrawn.

21          Is that $425,000 number based on

22  anything other than their salary, their W-2

23  salary?

24      A.  It's salaries, bonuses and benefits

25  received during that time period.

1                          NORRIS

2          Q.  And how much salary, bonus and

3    benefits did Mr. Post receive during that time

4    period?

5          A.  I don't have the breakout.  I got

6    this -- I got the total numbers from -- from

7    Brian Collins.  So I just have the total number.

8          Q.  Do you know if any documents have

9    been produced in discovery that would support

10   your contention as to the cost of those two

11   employees?

12              MR. RUKAVINA:  If you have knowledge,

13   John.  If you would like them, we'll produce them

14   in confidence.

15              MR. MORRIS:  I'm happy to take them

16   in confidence.  But, yes, I would like any

17   document that the Advisors contend supports their

18   damage theory.

19              MR. RUKAVINA:  We'll get that to you

20   ASAP.  Just because it's personal, I just --

21              MR. MORRIS:  No problem.

22   BY MR. MORRIS:

23          Q.  Okay.  Is there any difference in the

24   analysis under the NexPoint shared services

25   damage calculation than what we just talked about

1                          NORRIS

2    for HCMFA, other than the fact that I guess the

3    monthly number is a little bit less.

4          A.  It's the same.

5          Q.  It's otherwise the same theory, do I

6    have that right?

7          A.  Yes.

8          Q.  Okay.  So it's half the cost of

9    Harris and Post's salary benefits and bonuses

10   from the period they were hired until the

11   termination date; is that right?

12         A.  That's correct.

13         Q.  And then you took the annual cost

14   under the Shared Services Agreement -- actually,

15   you know, I'm going to ask another question, go

16   back to that $800,000 question.

17              I understand that it's $500,000 a

18   month, but what portion of the annual payments

19   under the Shared Services Agreement does the

20   $800,000 represent?

21         A.  If you look at Dave's analysis, it

22   was during the time period he looked at, current

23   charges of 3.6 million, shared services costs,

24   3 million, so the 600,000 for the year divided by

25   3.6 is approximately 16.66 percent, I believe.

1          NORRIS

2    600 divided by --

3          Q.  Okay.  So, again, you're just relying

4    on Mr. Klos's analysis at this time?

5          A.  That's correct.  It was prepared by

6    the Debtor as an estimate of overpayments.

7          Q.  Did you talk to Mr. Klos about that

8    analysis?

9          A.  So he told me it existed.

10   Mr. Waterhouse as well.  But I asked for a copy

11   of it, he said he would have to check and didn't

12   believe that they would allow -- you, Highland,

13   would allow him to provide it.  And that was the

14   case, you wouldn't allow him to provide it.

15          So we talked to him and Frank about

16   the overpayments that occurred in the analysis,

17   but we didn't actually get a copy of it until

18   discovery.

19          Q.  And Mr. -- after Mr. Waterhouse left

20   Highland but before his lawyer, I guess,

21   intervened and said you're not allowed to speak

22   with him, did anybody from the Advisors ask him

23   about that analysis?

24          A.  After he left?

25          Q.  Uh-huh.

1                          NORRIS

2          A.  I don't remember -- no, he left at

3    the end of February, right?

4          Q.  Right.

5          A.  Yeah, I don't -- we had talked to

6    him, I don't know the time period, but we had

7    talked to him about this in that period of

8    December/January/November, same time as Dave

9    Klos.  I don't know that there was discussion

10   with him.  There may have been, but I don't know.

11         Q.  Did Dave or Frank tell you or anybody

12   at the Advisors, prior to the filing of the

13   administrative claim, what the overpayment number

14   was?

15         A.  Yeah, there was discussion.  Dave

16   wouldn't give specifics except that it was large,

17   you know, close to -- I believe there were

18   estimates.  And I believe Frank had said

19   something like $14 million, which amounted to --

20   which was a source of what we included in our

21   admin claim.  We included 14 million originally.

22              So it was all verbal.  And so what we

23   -- we were working off the best available

24   information, and they -- they were in a tough

25   spot, too.  They couldn't provide the

```
1                    NORRIS

2   information.  They couldn't give us the detailed

3   calculation.  I think they gave us rough

4   ballpark.

5              MR. MORRIS:  La Asia, can you pull up

6   Exhibit 26, please.

7              (Exhibit 26 marked for identification.)

8              MS. CANTY:  Sure, give me one second.

9   Let me see if I have it.

10  BY MR. MORRIS:

11       Q.  So do you see you wrote an email on

12  December 1st, 2020?

13       A.  Yeah.

14       Q.  And do you remember writing this

15  email?

16       A.  I do.

17       Q.  And this is at 8:53 in the morning,

18  after Highland has given notice the prior day of

19  termination of the Shared Services Agreement.

20              Do you remember that?

21       A.  I actually had not received the

22  shared services termination at that time.  And I

23  don't know -- I do recall I didn't hear about it

24  until later, and I wasn't copied on the original

25  notice.
```

1                      NORRIS

2          Q.   It couldn't have been too much later

3    because you refer to the termination notices in

4    your December 1st email at 8:53 a.m., right?

5          A.   Oh, I must have, yeah, you're right.

6          Q.   What's --

7          A.   When was the date of the termination

8    notices?

9          Q.   I'll represent to you that it was

10   November 30th.

11         A.   Perfect.  Yeah.  So evidently I don't

12   remember as many details about writing this

13   email.  I have to look back at this.

14         Q.   Okay.  So before 9:00 o'clock on the

15   morning after the termination notice is sent --

16   how come -- how come you're doing this analysis

17   that morning, do you remember?

18         A.   Well, even prior to this, D.C. and I

19   were trying to understand the separation -- the

20   separation of all the agreements.  At this time

21   now Highland was moving towards a liquidation.

22   We were now going to be responsible for our own

23   services.  And so I was trying to understand --

24   this is when I first got a glimpse into these

25   numbers, was trying to understand what we were

1                      NORRIS

2    paying and for what.  And you can clearly tell

3    from this and his responses we didn't know

4    exactly the amounts that were being paid for what

5    specifically.  And that's what we were trying to

6    do.

7         Q.  Okay.  Do you see that your total is

8    $14 million?

9         A.  I do, yeah.

10        Q.  That's the number that you came up

11   with, right?

12        A.  No, this is actually taken directly

13   from materials, the trailing 12 months ended

14   6-30.  This is the actual services.  This isn't

15   an overpayment calculation.  This is an actual

16   services provided.  And I believe I stripped this

17   from materials that Mr. Klos had provided to our

18   board.

19        Q.  Do you know what materials those are?

20        A.  If it's related to income statement

21   items, which I believe this is, he provides an

22   annual as part of the 15(c) process expenditures

23   that are paid.  I think that may have been the

24   source of it, but I'm not sure.  These were items

25   I stripped from materials that Mr. Klos had

                              NORRIS

1

2     already prepared or Mr. Waterhouse or their

3     accounting team.

4          Q.   And they are numbers that come off

5     the income statement, correct, your

6     understanding?

7          A.   I believe so.  Yeah.  And you have an

8     expense line item, right?  That would be from the

9     income statement.

10         Q.   And would the -- would the Advisors'

11    books and records reflect amounts paid to

12    Highland under the Shared Services Agreement and

13    Payroll Reimbursement Agreement?

14         A.   Would the Advis- -- sorry, can you

15    repeat that?

16         Q.   Would the Advisors' books and records

17    reflect all payments made to Highland under the

18    Payroll Reimbursement Agreement and the Shared

19    Services Agreements?

20         A.   They should, right?  You have just

21    the cash -- cash going out and an expense line

22    item, and what we've said all along here is we

23    were relying on Highland to outsource the

24    accounting and the books and records, including

25    payments to them, and they were booking them as

1                          NORRIS

2    they came through.

3         Q.  Okay.  So -- so would the payments --

4    do you understand whether the payments made by

5    the Advisors to Highland would be reflected in

6    the general ledger of the Advisors as payable on

7    the accounts -- withdrawn.  Let me ask a better

8    question.

9              Do you understand that all payments

10   made by the Advisors to Highland would be

11   reflected on the Advisors' respective accounts

12   payable ledger?

13        A.  If they were approved, a payable is a

14   liability and would be a payable on accounts

15   payable ledger.  An actual accounts paid or

16   expenditures or cash outflows ledger, I mean,

17   we're talking about specifics, but they would

18   have been reporting what they were charging us

19   and what they were billing us, which we contend

20   is an overbilling for services actually provided.

21   We're not intending --

22        Q.  Let me interrupt.

23             MR. MORRIS:  I'm going to move to

24   strike and ask you to listen carefully to my

25   question.

1                          NORRIS

2      BY MR. MORRIS:

3           Q.  Do you know whether payments made by

4      the Advisors are reflected in the Advisors'

5      respective accounts payable ledger?

6           A.  I don't know.  I've never seen the

7      accounts payable ledger.  But Mr. Klos and

8      Mr. Waterhouse would have maintained that and

9      their team.  So we would be able to find out.

10          Q.  Do you know where in the Advisors'

11     books and records payments made by them to

12     Highland under the Shared Services Agreements and

13     the Payroll Reimbursement Agreements would be

14     reflected?

15          A.  Do you want the debits and credits?

16     I'm a CPA, but I haven't actually done accounting

17     in a long time.

18          Q.  I'm asking for your knowledge.

19          A.  It's an income statement, right?  I

20     mean, you have an expense line item and, you

21     know, and then you're also going to hit the

22     balance sheet because you have cash flowing out.

23     It's going to reduce the assets.  Our assets were

24     reduced.  And our claim here is our assets were

25     reduced far more than they should have been

1                       NORRIS

2    because we were overpaying for services.  And the

3    expense line item would have been too high

4    because we were paying for things that we

5    shouldn't have.

6         Q.  Do you know if the Advisors' income

7    statements were distributed to its officers on

8    any periodic basis, whether it's monthly or

9    quarterly or semiannually?

10        A.  I don't know.

11        Q.  Did you in your capacity as the

12   Executive Vice President of the Advisors ever

13   review the Advisors' financial statements?

14        A.  Not in the context of they sent them

15   to me to review.  Occasionally I would look at

16   them on the 15(c) materials, which were usually

17   published as of June 30th, because those meetings

18   were in August and September.  But that was more

19   of a cursory review from, hey, I'm curious.  It

20   wasn't my responsibility to handle any of the

21   accounting or the financials.  I rarely even

22   understood the financials from that perspective.

23        Q.  Prior to the end of 2020, from the

24   petition date until December 31st, 2020, do you

25   know whether the Advisors had any monthly expense

1                         NORRIS

2    greater than the expenses they were paying to

3    Highland under the Shared Services Agreements and

4    the Payroll Reimbursement Agreements?

5          A.   Sorry, from what period?

6          Q.   From the petition date until the end

7    of December 2020.

8          A.   I don't know.  Again, I -- I don't

9    know.

10         Q.   Can you identify any service provider

11   that the Advisors had during that period of time

12   which either of the Advisors paid, you know, more

13   than a hundred thousand dollars?

14         A.   I wasn't involved in the financials.

15   Again, we outsourced that.  We relied on Highland

16   and Frank and Dave and his team.  So I'm not

17   familiar with the actual financials and all the

18   service providers involved, so I can't answer

19   that.

20         Q.   When you -- when you spoke with

21   Mr. Dondero in preparation for your deposition

22   today, did you ask him if he was aware of the

23   amounts that the Advisors were paying to Highland

24   under the Shared Services Agreement and the

25   Payroll Reimbursement Agreements after the

1                          NORRIS

2    petition date?

3          A.   Of the specific dollar amounts?

4          Q.   Just whether he was aware.

5          A.   Yeah, we talked about -- I asked him

6    if he was aware that we were paying for services

7    we weren't receiving and that we were overpaying.

8    And he said, no, up until the point when we

9    discovered it, he did not know.

10         Q.   Did you ask him if he knew of the

11   services that weren't being provided?

12         A.   We discussed more generally services

13   that weren't being provided, particularly the

14   employees that were no longer employed, some of

15   the legal and compliance services, more

16   generally.  He didn't get into "do you know the

17   specifics."  But his understanding was there were

18   services not being provided.

19              And he said -- this is what he said,

20   he said, "Well, our understanding is we were in

21   discussions and Mr. Seery had said that those

22   items would be netted out."

23              We were working towards an amicable

24   resolution and Mr. Seery had represented -- and

25   this is coming from Mr. Dondero -- that those

1                    NORRIS

2    items would be netted out.

3              And so there was discussions, I'm

4    sure there was knowledge of certain overpayments,

5    underpayments, but these items would have been

6    resolved.

7         Q.  Did you ask Mr. Dondero why the

8    Advisors continued to pay full freight when they

9    knew that they weren't getting full services?

10         A.  We did not -- yeah, we discussed

11    that.  He did not know and I did not know and no

12    one that we spoke to knew that we were paying,

13    you call it full freight, I would say full

14    freight plus some, because we weren't paying for

15    the services received, we were paying for

16    employees no longer there.

17              And that's the big part of it, the

18    payroll reimbursement.  We talked about the

19    numbers related to Shared Services Agreement, but

20    these payroll numbers which we provide in our

21    analysis are pretty significant.  And we -- and

22    his view, too, is what were we paying Highland

23    for if not to provide the actual accounting and

24    payables and calculations correctly.

25         Q.  Did he provide any explanation as to

                            NORRIS

1

2  why the Advisors have been unaware until October

3  or November 2020 that they were overpaying?

4       A.  Yeah.  Yeah.  Actually, he said to

5  me, he said, "You don't have" -- "We don't have a

6  separate accounting team."  Right?  "We don't

7  have duplicate, we're not hiring someone else to

8  come in and check, we're relying on Highland."

9            And up until that point we expected

10  to be charged and billed the proper amount.  So,

11  yeah, we did discuss that and those are some of

12  the things I've been representing today.

13       Q.  Okay.  Do you know if anybody on

14  behalf of the Advisors had any conversation with

15  Mr. Waterhouse between the moment that he left

16  Highland and the moment that his lawyers said you

17  can no longer speak to him about these issues of

18  damages and amounts paid and due under these

19  agreements?

20       A.  I know there were discussions where

21  he reiterated that a calculation was done and

22  Dave Klos prepared it, but I don't know who or

23  when.  And I think even then he was reserved on

24  what he could or couldn't provide, given the

25  threats that had been provided to him that he

1                        NORRIS

2    would be personally responsible for any economic

3    damages.

4         Q.   Okay.  During your diligence in

5    preparing for this deposition, did anybody tell

6    you that Frank Waterhouse had provided any

7    information about amounts paid or overpaid under

8    these agreements between the time he left

9    Highland and the time his lawyer said he could no

10   longer speak with the Advisors?

11        A.   No.  And -- and he, from the

12   beginning, you may remember there was limited

13   amount we could access Mr. Waterhouse.  And so

14   all of our communication, I believe, is before

15   the filing.  And he didn't have access to his

16   files.  He left the firm.  He didn't have emails.

17   He didn't have the calculation from Mr. Klos.

18   And so there's limited things that he could

19   provide.

20             MR. MORRIS:  I'm going to move to

21   strike.  And I'm going to ask you to listen

22   carefully to my question.

23   BY MR. MORRIS:

24        Q.   During your diligence did anybody

25   tell you that Mr. Waterhouse said anything

1                       NORRIS

2    between the period between leaving Highland and

3    the time his lawyer said he could no longer speak

4    with the Advisors concerning amounts paid or

5    overpaid under the four agreements?

6         A.  No, not in my -- my diligence in

7    preparing.

8         Q.  Thank you very much.

9              MR. RUKAVINA:  John, when you find a

10   convenient time, I request a restroom break.

11             MR. MORRIS:  I'll do it right now for

12   you, Mr. Davor.

13        (A break was taken from 3:29 p.m. to

14        3:41 p.m.)

15   BY MR. MORRIS:

16        Q.  Mr. Norris, we're going to put up on

17   the screen the document that you were kind enough

18   to identify and I just want to ask you a few

19   questions about it.  Is this the document you

20   were referring to?

21        A.  Which one am I referring to?

22        Q.  The analysis that was prepared by

23   Mr. Klos.

24        A.  No, this is -- this is the analysis

25   that I prepared regarding --

1                    NORRIS

2         Q.  Oh, you're right.  You know what, I

3  don't have that other one.

4              MR. MORRIS:  Can we take this down

5  for the moment?

6              MS. CANTY:  Do you want the other

7  one?

8              MS. WINOGRAD:  I wanted the one with

9  that Bates number HCL-025012.

10             MS. CANTY:  Okay.  Give me one minute

11 to get it up.

12             MR. MORRIS:  Okay.

13                (Discussion off the record.)

14        (Exhibit 56 marked for identification.)

15 BY MR. MORRIS:

16        Q.  Okay.  So is -- let's just -- let me

17 say for the record that we're -- we've put up on

18 the screen a document bearing Bates number

19 ACL-025012.  Do you see that, sir?

20        A.  I do, yes.

21        Q.  And is it your understanding that

22 Dave Klos prepared this document?

23        A.  My understanding based on the email

24 that went from Dave to Mr. Waterhouse.  But,

25 again, I'm making assumptions that the file was

1                           NORRIS

2     sent from Dave to Frank.  And my understanding is

3     Frank -- or Dave created this.

4           Q.  Okay.  Has -- your understanding is

5     who prepared this?

6           A.  Dave.  However, that's just based

7     on -- the discussions we had in December 2020,

8     where he said he had prepared analysis.  I don't

9     know if this is it.  I'm assuming this is it.  It

10    matches the description.  So we'll have to figure

11    out when Dave is deposed if he did in fact create

12    this.

13          Q.  Did anybody other than Mr. Waterhouse

14    acting on behalf of the Advisors ever speak with

15    Mr. Klos about this document?

16          A.  Myself and DC Sauter.  Not the

17    individual line items, but Dave told us he had --

18    there had been an analysis done that showed

19    significant overpayment.

20          Q.  Okay.  Tell me everything that

21    Mr. Klos told you and Mr. Sauter about this

22    document that you can recall.

23          A.  Yeah, it was -- we were going through

24    the numbers and it was very high level of there

25    was an analysis done, he was very guarded because

1                          NORRIS

2     he was afraid of what he could or could not tell

3     us.  And he told us there was an analysis done

4     that showed the overpayments.  And so we asked

5     for that and it wasn't provided.

6              Q.  Did he say anything else in this

7     conversation?

8              A.  The conversation was related to

9     transition services.  We were going through a

10    host of other things on how can we transition

11    agreements and a number of things.  That was --

12    in regard to the overpayment, it was very

13    general.

14             Q.  Was this a telephone conversation or

15    was it in person?

16             A.  Pretty sure it was a telephone

17    conversation, but -- pretty sure it was

18    telephone.

19             Q.  Do you remember when it took place?

20             A.  It was early December.  Early

21    December.

22             Q.  Did he tell you why he had prepared

23    the analysis?  Withdrawn.

24             Did he tell you that he personally

25    prepared the analysis?

1                          NORRIS

2         A.  I don't remember.  I don't remember

3    him saying him personally, but -- my recollection

4    isn't perfect on that.  I don't recall.

5         Q.  Do you recall if he told you who did

6    prepare the analysis?

7         A.  No.

8              And then I would note in discovery we

9    see, though, that it is a roll-forward -- this is

10   a roll-forward of the information prepared for

11   DSI and SCI last fall, which I would assume is

12   fall 2019.  So there was obviously a calculation

13   in '19 prepared for DSI and SCI, but we don't

14   have an indication of who prepared that, but we

15   will be able to ask Mr. Klos.

16        Q.  Did Highland at any time ever ask the

17   Advisors to extend the Shared Services Agreement

18   for any purpose other than completing an orderly

19   transition?

20        A.  Did Highland ask to extend it?  I'm

21   not aware of the discussions that went on.  They

22   may have, but -- I don't know if that was

23   something on the preparation.  It's not something

24   I prepared for in discussing the negotiation of

25   termination of shared services.

1                    NORRIS

2          Q.  You were involved in the process of

3    negotiating the transition of services, correct?

4          A.  Correct.

5          Q.  And during the conversations -- and

6    that process began in the summer of 2020, right?

7          A.  Summer of 2020?

8          Q.  July, August, September.

9          A.  The second half of 2020, yes.  My

10   involvement really started much later.  And I

11   would say up until later 2020, the plan was that

12   a plan would actually work, that there would be a

13   negotiated agreement.  And then once we realized

14   that really wasn't happening, we had to prepare

15   for Plan B and then Plan C and Plan D.  But that

16   was late 2020, and my involvement started end of

17   November, beginning of December, and really in

18   earnest about mid-January.

19         Q.  I'm going to ask you this question in

20   your personal capacity.

21              In your personal capacity are you

22   aware of any proposal by Highland to extend

23   either of the Shared Services Agreements?

24         A.  A proposal to extend them?

25         Q.  Uh-huh.

1                          NORRIS

2          A.  Any proposal to extend them?

3          Q.  Correct, other than for the purpose

4    of completing the orderly transition, because

5    there were a couple of extensions in January and

6    February.  I'm not talking about that.

7          A.  Yeah.  My understand of the

8    extensions was to complete the transition.  But

9    there was a lot going on, and if you're asking in

10   my personal, I don't have any other recollection

11   or knowledge personally on that.

12              And, again, I wasn't involved in the

13   shared services negotiation prior to -- really

14   prior to receiving the notices.  And then even

15   directly thereafter it was just helping

16   transition items in negotiations of the actual

17   transition.

18         Q.  Do you know why this document was

19   prepared?

20         A.  I don't.

21         Q.  So Mr. Klos did not tell you during

22   your conversation why this document was prepared,

23   correct?

24         A.  No.  If I look at the emails that

25   Klos attached it, it obviously wasn't the first

1                          NORRIS

2    time, it was a roll-forward.  So why was it first

3    prepared in 2018 -- or, I'm sorry, 2019 with DSI

4    and SCI, I have no idea other.  And we'll find

5    that out with Mr. Klos.

6          Q.  But Mr. Klos -- your recollection is

7    that Mr. Klos specifically told you that an

8    analysis was done that showed overpayments; do I

9    have that right?

10         A.  Yes.  It was the amount that had been

11   profit were overpayments to Highland.

12         Q.  Did he say "profits" or

13   "overpayments," if you remember?

14         A.  I don't remember.

15         Q.  It could have been either one of

16   those?

17         A.  Well, profits would have resulted

18   from the overpayment.  So it could have been

19   either of them.  But, yeah, I don't remember

20   from --

21         Q.  Okay.

22         A.  -- the individual discussions.

23         Q.  Just a little patience with me,

24   please.  I'm asking you to put yourself back in

25   time and to try to remember the conversation that

NORRIS

1

2   you had with Mr. Klos.  What did he say?

3        A.  We definitely talked about

4   overpayments, that we were paying for employees

5   that were not there.  So that was part of it.

6   And whether that created a profit.

7             He did say even by email -- there is

8   communication by email that there was a profit.

9   So I think it was both.

10            In the conversation we were talking

11  about paying more than we owed.  And in the

12  email, it was written profit, right?  He noted

13  that there was a significant profit to Highland

14  from those contracts.  Which, again, is against

15  the intent of the agreement, which was a

16  reimbursement for actual costs.

17            MR. MORRIS:  I'm going to move to

18  strike the last portion of your answer and again

19  just ask you respectfully to listen to my

20  question.  I'm just asking you about the

21  conversation you had with Mr. Klos.  I don't need

22  commentary.  I don't want the commentary.

23  BY MR. MORRIS:

24        Q.  Other than the one conversation --

25  withdrawn.

1                    NORRIS

2            Do you recall anything else about

3    this particular conversation that you and

4    Mr. Sauter had concerning this document?

5            A.  No.

6            Q.  Do you know whether anybody acting on

7    behalf of the Advisors ever had any other

8    communication with Mr. Klos concerning this

9    document?

10           A.  I know that DC continued to ask for

11   it.  I continued to ask for it.  I asked for it

12   in January from Mr. Klos.  I asked for it from

13   DSI, DC and myself and Fred Caruso, and in

14   February maybe had a call with Pachulski on that

15   we talked to Brad Sharp.

16           And at this point I'm not even

17   certain what the analysis would include.  But we

18   knew it existed and I continued to request it.

19   We requested it in a December 11th letter to your

20   firm from our counsel.  And it -- so it was -- it

21   was requested many times, but there was not a lot

22   of information given.

23           Q.  Okay.  Can you share with me your

24   interpretation of this document?  What do you

25   think this document reflects?

1                              NORRIS

2          A.  Yeah.  So as we read through this,

3    you have at the top the actual allocations and

4    shared services and investment support, which is

5    payroll reimbursement, right?  What is the front

6    office support that's being provided --

7          Q.  I apologize.  I'm going to interrupt.

8    Can you just be a little bit more specific like

9    where on the document you're looking at?

10         A.  Yeah, so at the top section, the

11   summing number that sums the 3.3 million and

12   3.7 million.

13         Q.  Yes.  Thank you.

14         A.  Yeah, so NPA allocation and HCMFA

15   allocation.  You've got an allocation of

16   investment support and shared services.  Just as

17   the agreement state, they will allocate and

18   charge us for actual cost, a cost at margin.

19   This is what they're showing here.  He breaks it

20   out by line item.  So legal and compliance, what

21   is the actual allocation of cost .2 and .3,

22   that's 200,000, 300,000.

23              So you take those same numbers down

24   to the bottom and you say, okay, now -- he did

25   basically a subtotal of front office, which is

                              NORRIS
1
2    also above incorporated in investment support.

3    And so the investment support group charge is

4    $3 million.  You can go and add up all the line

5    items for investment support and it equals three

6    dollars, or $3 million for NPA allocation and

7    $5 million for HCMFA allocation.  So if you

8    recall we're paying for actual costs of these

9    services.

10              The investment support, this is the

11   charge, the 3 million and 5 million.  We were

12   being charged 8 million a year and Highland was

13   receiving cash and utilizing that to pay their

14   operating expenses.

15              The investment support is what was

16   actually provided.  And that adds up to a

17   profitable number, profitability, or overpayment

18   of 2.3 million for NexPoint and $4.3 million for

19   HCMFA for a total of 6.6.  You carry that down to

20   the next row.  Unadjusted gain is $6.6 million.

21   And --

22         Q.  Hold on one second.  So that 6.6 is

23   the 2.3 plus the 4.3?

24         A.  2.3 plus the 4.3, yeah.

25         Q.  I'm going to stop you just for a

NORRIS

1
2 second and make sure I understand.

3          So above the line you have the annual

4 payments due under the NPA -- this is -- this is

5 the Payroll Reimbursement Agreement, right?

6     A.  Correct.

7     Q.  This has nothing to do with shared

8 services, right?

9     A.  It does --

10     Q.  At the bottom.

11     A.  Once again, on front office payroll

12 reimbursement.  Right?

13     Q.  Okay.  So the NPA Allocation column

14 is Highland's attempt to allocation among the

15 various services the payments that are due on an

16 annual basis under the NexPoint Payroll

17 Reimbursement Agreement, right?  That's how you

18 get to $3.3 million?

19     A.  3.3 and 3.7 are the actual charges.

20 So these were -- I'm assuming these are just

21 stagnant numbers or -- the stagnant numbers --

22 no, no, sorry.  You're right.  The 3.3 and 3.7

23 are the actual allocations of those actual costs.

24     Q.  Okay.  Do you know why the current

25 charges of $3 million and $5 million are

```
1                        NORRIS

2    different?

3            A.  Yes.  Because there was a -- if you

4    go back to the Payroll Reimbursement Agreement,

5    the dollar amounts are based on the employee

6    services from Appendix A.  Those current charges,

7    $3 million, tie directly to the original amounts

8    that were being charged, which was $252,000 for

9    NexPoint Advisors and $416,000 for HCMFA as a

10   reimbursement for employees that were providing,

11   one, investment advisory services, and, two, were

12   dual employees.

13           So those are different because the

14   amount of services provided to each entity varied

15   when the contract was created and they continued

16   to roll forward the same exact billing and so you

17   see a three and a five.  That's why they differ.

18           Q.  Okay.  So is it your understanding

19   that the difference between the current charge

20   and the profitability is the value of the

21   services actually provided?  That's $700,000 for

22   each -- that's shown as investment support.

23   That's the value of investment support that was

24   provided and so that's reduced from the current

25   charges to get the net profitability?
```

1                          NORRIS

2          A.  Yeah.  And just as an independent

3   analysis, you can look at the numbers that we

4   used from Kristin using the actual payroll of the

5   employees that were employed during that time

6   period and it lines up pretty close.

7          Q.  Okay.  Okay.

8              Let's go to shared services and I may

9   come back to this.  Can we scroll up a little bit

10  to make sure there's nothing below the line here?

11             So, shared services.  Do you know

12  what "Current Charges" represent?

13         A.  The current charges are the amounts

14  that are being invoiced.  And my understanding is

15  that's at a constant rate and wasn't adjusted for

16  actual services provided, which is the next line

17  down, shared services.

18         Q.  And do you have any idea how those

19  numbers are derived, the 2.6 million and the

20  3 million?

21         A.  We would have to ask Mr. Klos, or

22  maybe you're, you know, additional support you

23  provide us will have that, but I'm making the

24  broad assumption here that it is for actual

25  services provided.  And we would love to see the

1                        NORRIS

2    support just to --

3         Q.  Yeah, I do apologize, Mr. Norris.

4    It's my fault.  Mr. Rukavina has asked me for it

5    a couple of times.  I've responded to a number of

6    requests and that's just one that fell through

7    the cracks and I take responsibility for that.

8    Okay?

9         A.  Yeah, no problem.  I won't bring it

10   up again.

11        Q.  I don't mind you bringing it up, but

12   I think you deserve an explanation.

13            And so then you get a net

14   profitability, that 400,000 and that 600,000, and

15   those are the numbers you extrapolated over the

16   entire postpetition period; do I have that right?

17        A.  Yes.  The million is just taken from

18   Klos's numbers.

19        Q.  Yeah.  Okay.

20            Do you know what's to the right

21   outside the box, the supplemental column?

22        A.  I don't.

23        Q.  Do you have an understanding of what

24   that is?

25        A.  No, I don't.  But I'm assuming -- I

1                          NORRIS

2    can only make assumptions.  Klos will know.

3          Q.  Perhaps.  I would assume that either

4    he or Waterhouse would.

5                And do you know what the last column

6    is:  Total allocated costs less all entities?

7          A.  It's the summation of the three

8    columns before, I believe:  7.5 plus 3.7 plus

9    3.3, I believe.  Add those up, six, seven, plus

10   7.5.  That adds up.  So...

11         Q.  Is it fair to say that the Advisors'

12   entire damage claim is the $9.6 million at the

13   bottom of this page plus the $425,000 for the two

14   employees that they were required to hire?

15         A.  No.  There's -- there's -- let's

16   point out the 9.6, there are two numbers in here

17   which aren't part of these agreements.  One is an

18   offset that they have in there for Non-Debtor

19   Employees providing services to the Debtor.  We

20   want to learn more about that.  We aren't

21   including that number.

22                Our damage number is very simple.

23   One, you could take -- you have the shared

24   services number were taken directly from here,

25   and the payroll reimbursement would be a range

1                    NORRIS

2    between our calculation and this, which actually

3    are approximately the same, $6.6 million.  If you

4    annualize -- that's an annual number.  If you

5    take it for the 16 months and use the proration

6    for 16 months, it's $8.8 million.

7              So 8.8 plus 1.3 million -- right --

8    gets you to -- nine point -- sorry.  8.8 plus

9    1.3 -- I'm -- 8.8 plus 1.3 gets you 10.1, plus

10   the 425,000, that's approximately 10 and a half

11   million between HCMFA and NPA.

12             If you go the -- using our

13   calculation that I provided to you, our estimate

14   of the payroll reimbursement amounts are not 6.6

15   times 16 months divided by 12 multiplied by 16 at

16   8.8, it's 7.6.  And, you know, we can talk about

17   why there may be a difference, but we need the

18   backup.  But 7.6 million plus the 1.3 plus the

19   425 gets you to approximately nine and a half

20   million dollars.

21             So whether you use the payroll

22   amounts from Dave Klos that gets you to

23   approximately ten and a half million, you use our

24   calculation without knowing full details, it

25   could be even more when we understand the

1                          NORRIS

2    difference, nine and a half to ten and a half

3    million dollars.

4          Q.  I just want to make sure there is no

5    dispute about this.  The Advisors didn't pay any

6    amounts under any of the four agreements in

7    December or January in December 2020, correct?

8          A.  That's my understanding, that there

9    was no payment in December or January.

10         Q.  Okay.  And payment was made in

11   February because that was part of the negotiation

12   for the extension of the termination notice,

13   correct?

14         A.  It was payment.  We don't -- we don't

15   admit or say that it was payment for shared

16   services that were provided.  We reserved all

17   rights related to that.

18              And so, yeah, there was a payment

19   made and we were really forced into it.  There

20   was no negotiation on moving that amount.  It was

21   take it or leave it, we're cutting you off or you

22   pay it.  So akin to extortion.

23         Q.  Well, I mean, you're allowed to

24   negotiate and decide what terms you're willing to

25   accept; isn't that right?  Do you have any

NORRIS

1

2  problem with that from a philosophical

3  perspective?

4      A.  Yeah, the options were to cut the

5  services when we weren't expecting them to be cut

6  and could have had had detrimental impact.  You

7  know, we could have handled it, but we did choose

8  to pay the amounts that were requested, but we

9  reserved all rights and continue to reserve those

10 rights.

11     Q.  Did the Advisors contend that

12 Highland didn't give sufficient notice as

13 required under the various agreements?

14     A.  There was notice given.  And then we

15 were working towards a negotiated agreement with

16 a peaceful transition and we were waiting on a

17 term sheet -- I don't want to rehash it all, but

18 I think there was a good faith effort.  And then

19 all of the sudden it was, "Pay it or we're

20 cutting," right?

21         We all thought we were moving towards

22 a peaceful resolution and we would get things

23 done.  And then things changed and there was a

24 demand for payment or we're cutting you off.  And

25 so, yeah, there was -- under the agreements you

1                              NORRIS

2    provided the notice, but things, as they

3    progressed near the end of that changed.

4         Q.  And you actually got to a complete

5    agreement that was acceptable to everybody, every

6    single term, except the Debtor refused to lest

7    Mr. Dondero back in the offices.  That was the

8    only issue that stood between the parties,

9    correct?

10        A.  If I recall correctly, yes.  We

11   negotiated hundreds of points.  We all worked

12   really hard.  And the Debtor would not allow

13   Mr. Dondero to be in the office that we would be

14   leasing and perform his duties as the president

15   of the company.  So that was -- that was the

16   sticking point for both sides.  The Debtor didn't

17   allow it and Mr. Dondero required it and there

18   was no agreement.

19        Q.  Let's -- let's see if we can finish

20   up.

21             MR. MORRIS:  Can we put that other

22   document back up on the screen, please?  La Asia,

23   I think it was Exhibit 51.

24             (Discussion off the record.)

25             (Exhibit 51 marked for identification.)

1                    NORRIS

2    BY MR. MORRIS:

3         Q.  Mr. Norris, is this the Advisors'

4    damage calculation relating to the alleged

5    overpayments under the Payroll Reimbursement

6    Agreements?

7         A.  Based on the best information we have

8    at this time, yes.

9         Q.  Okay.  Did the Advisors ever seek

10   leave to file a prepetition claim arising from

11   any overpayments under the Payroll Reimbursement

12   Agreements?

13        A.  I don't remember the specifics --

14   sorry, can you repeat the question?  There are

15   legal terms that I want to make sure I get right.

16        Q.  Sure.  I don't mean to trick you at

17   all.

18             Do you understand that the damages

19   reflected on this page are called administrative

20   expenses because they allegedly arose after the

21   petition date?

22        A.  Yeah.  This is a postpetition claim

23   and we're only talking about postpetition

24   damages.

25        Q.  Okay.  Did the Advisors ever file a

1                    NORRIS

2    prepetition claim?

3         A.  I believe there were claims filed

4    more as placeholders, but not specifically

5    related to overpayments.

6         Q.  Okay.  So is it fair to say that to

7    the best of your knowledge the Advisors never

8    sought damages on account of prepetition claims

9    arising under the Shared Services or Payroll

10   Reimbursement Agreements?

11        A.  Yeah, I think in one of our answers

12   that you asked do we have a prepetition claim, I

13   think the answer was -- it was under

14   interrogatories or responses, however we said it

15   there, and I would refer you there, but it was

16   something to the extent of, "We don't deny" --

17   "We don't say we didn't have damages," it was,

18   "There was never a claim admitted by the Court

19   related to that."

20        Q.  Okay.  Let me see if I can try and

21   characterize this document in a way that you

22   think is fair.

23        A.  Uh-huh.

24        Q.  The starting point for the Advisors

25   was to determine how much was paid under the

1              NORRIS

2    Payroll Reimbursement Agreements from the

3    petition date until the end of December 2020; is

4    that right?

5         A.  Now, what we did is from the petition

6    date through February 19th, 2021.  And I broke it

7    into three groups here until 11-30, because

8    that's largely the period where we had been

9    making payments or overpayments, the period of

10   the two months of December and January and then

11   the 19-day extension.

12        Q.  Okay.  So the first column is a

13   subtotal of the second two columns; do I have

14   that right?

15        A.  Correct.

16        Q.  And there's three pieces to it based

17   on three different periods of time?

18        A.  Yes.

19        Q.  And the first period of time, the

20   first line, the $9 million number, that

21   represents the total amount paid from the

22   petition date until November 30th, 2020, correct?

23        A.  The amount invoiced and paid by

24   Highland's employees on behalf of us.

25        Q.  Okay.  And then the $1.336 million

1                      NORRIS

2     number is the amount that was paid for the

3     two-month period December 1st, 2020, to

4     January 31st, 2021, correct?

5          A.  It would have been the amount billed

6     or invoiced based on the previous amount.  So

7     it's not the amount paid, it's the amount billed

8     based on the original employee.

9          Q.  Did NPA or HCMFA pay any portion of

10    the $1.336 million?

11         A.  I don't believe there were any

12    payments in December and January.  And that's...

13         Q.  So that that $1.336 million number is

14    different than the $9 million number above

15    because it only represents what was invoiced as

16    opposed to what was paid, correct?

17         A.  Yes.

18         Q.  Okay.  And is the same true for the

19    $453,000 number near the bottom in the third

20    period, is that moneys that were actually paid or

21    is that moneys that were only invoiced?

22         A.  Those were actually paid.  That's the

23    amount paid for the extension -- along with the

24    extension period.

25         Q.  Okay.  And then from the amounts

1                     NORRIS

2    invoiced and/or actually paid you deduct the

3    estimated actual cost with the appropriate

4    employees; do I have that right?

5         A.  Yeah.  I'm deducting the actual

6    employees because that's what should have been

7    billed.  We should have reimbursed for actual

8    cost of employees that were, one, providing

9    investment advisory services and, two, that were

10   dual employees.  So these are the list, and

11   you'll see the backup on the sheet that shows

12   each individual employee.  But that's the amount

13   of their -- our estimate of their comp which

14   comes just directly from Ms. Hendrix' file that

15   you allowed us to use.

16        Q.  Okay.  So I'm looking at the total,

17   the $7.649 million.  Do you see that?

18        A.  I do.

19        Q.  And am I correct that that represents

20   the difference between the amounts invoiced and

21   what the Advisors contend should have been

22   invoiced based on the estimated actual cost for

23   the appropriate employees?

24        A.  Yeah, that 7.6 million represents --

25   I'm sorry, the difference -- the second line is

1                    NORRIS

2    what you're saying, the second row of each is the

3    amount that we should have been invoiced.

4         Q.  Right.  But the $7.6 million at the

5    bottom -- right -- is total overbilling for

6    payroll reimbursement --

7         A.  Yeah.

8         Q.  -- from the bankruptcy filing until

9    February 19th, 2021, is $7.649 million

10   approximately, correct?

11        A.  That's right.

12        Q.  And that number is derived by

13   subtracting from the totaled invoiced amount for

14   that period the estimated actual costs with

15   appropriate employees, that second line in each

16   period, correct?

17        A.  Correct.

18        Q.  Okay.  But --

19        A.  It's simple math.

20        Q.  Right.  That's all this is, is

21   arithmetic, right?

22        A.  It is.  It's here are the employees

23   using the data provided by Highland and adding up

24   what was paid, which is this stagnant amount, and

25   it's just -- so I'm not coming in here and we're

1                           NORRIS

2    not -- this is not an expert analysis, it's

3    literally just arithmetic.

4           Q.  Okay.  And I appreciate that.  That's

5    what I saw.

6                But that $7.649 million is overstated

7    by the $1.336 million in the middle piece because

8    that amount wasn't ever actually paid, right?

9           A.  It wouldn't be overstated by the

10   1.33, it would be potentially the 264, which

11   would have been -- that we hadn't paid.  Right?

12   So you're looking at the difference.

13               But your point is valid in that we

14   aren't denying that there was something incurred

15   in December and January, but we didn't pay

16   because we believed we had been far exceeding the

17   payments that were.  And so -- yeah.

18          Q.  Your damage calculation should be the

19   difference between what you paid and what you

20   think you should have paid; is that fair?

21          A.  My understanding is you're demanding

22   or still demanding those other payments and so

23   that's part of the calculation.

24          Q.  Okay.  That's fair.  But from your

25   perspective, because you don't think that

1              NORRIS

2  Highland is entitled to those payments, correct?

3      A.  Not the amounts that are at the

4  constant rate based on 2018 employee count.

5      Q.  Okay.  So if I took $6.2 million from

6  the first period and I added $372,000, which is

7  the net of the third period, and I added --

8  withdrawn.  That's okay.  You know what...

9          When was this prepared?

10     A.  I believe it was last week.

11         THE WITNESS:  Davor, I don't know if

12  you have any other --

13     A.  I believe it was last week.

14  Finalized last week.

15         MR. RUKAVINA:  I can get you the

16  date, Mr. Morris, that he prepared it.

17  BY MR. MORRIS:

18     Q.  Did you personally prepare it?

19     A.  I did.

20     Q.  And did you personally prepare it for

21  this litigation?

22     A.  I did.

23     Q.  Okay.  What information did you rely

24  on to prepare this report?

25     A.  I relied on the information that was

1                          NORRIS

2     provided by -- in the file that Davor provided

3     you that has the payroll file that Ms. Hendrix'

4     prepared, and I confirmed that that is an export

5     from their payroll system.  So that's the data.

6              There is one point I discussed with

7     Mr. Collins, Brian Collins, regarding employee

8     benefits.  That's detailed in this support.  So

9     it's really the actual documents that came from

10    the payroll system.

11         Q.  And is everything behind this

12    document, can it fairly be characterized as

13    either the backup or the buildup to these

14    numbers?

15         A.  Yeah.  And we provided that.  You

16    have it in other documents too.

17         Q.  I think if we just scroll down to the

18    next page, for example, you've got the buildup

19    for each of the Advisors, right?  You've got

20    this -- this the buildup for NPA on the Payroll

21    Reimbursement Agreement, correct?

22         A.  Yeah, I guess if that's the word,

23    "buildup."  This is just the actual data and now

24    it adds up to the front page.  The front page is

25    just literally summing the individual months and

1                      NORRIS

2    the period.

3        Q.  Okay.  That's what I mean by

4    "buildup."  That number in the lower right-hand

5    corner, would we find that on the first page?

6        A.  No.  If you go to the next page I can

7    tell you how you get to the numbers on the first

8    page.

9        Q.  Okay.  Let's do that.

10       A.  So the numbers at the top are --

11   sorry, the top orange numbers, this is HCMFA's.

12   If you add up just the periods I have, this is

13   the total monthly actual cost of these employees.

14   You add up those months, just literally sum those

15   up and they go to that time period on the front.

16            The next page is NexPoint Advisors.

17   And if you go to the actual payments paid, that's

18   the next to second orange row, 208,000, 416, 416.

19   Oh, now on next page.  Same thing here where it

20   starts with 50,000, 100,000, 100,000 and goes

21   down.  That is the actual employees.  And that is

22   just calculated as arithmetic of what was their

23   total compensation times the percentage

24   allocation on Appendix B.

25       Q.  Okay.  Does this take into account

NORRIS

1    services that Highland provided -- withdrawn.

3         I think in your answers earlier you

4    acknowledge that some of the services provided by

5    departing employees were subsequently provided by

6    other Highland employees; is that generally fair?

7         A.  I would say to a limited extent.  We

8    don't believe that there was -- yeah, say here

9    provided by other Highland employees, yes, to a

10   limited extent, or by Advisors employees.  There

11   is a number of things that departing individuals

12   that we took on in-house.

13        Q.  Okay.  But this analysis doesn't take

14   into account the value of any services that may

15   have been picked up by Highland employees

16   following the departure of the dual employees

17   that are subject to the Payroll Reimbursement

18   Agreements, correct?

19        A.  Well, when you look at this, I think

20   it does, because most of those employees were

21   working -- were already listed here as front

22   office employees.  To my understanding, there

23   were no front office employees hired from the

24   petition date through the end of the Shared

25   Services Agreement.  We weren't hiring front

1                          NORRIS

2     office employees that then were providing

3     services.  So it's allocated these are the front

4     office employees.

5              So, you know, John Poglitsch picked

6     up and ran with Trey Parker's or, you know, other

7     people pitched in and started doing things when

8     someone had left.

9         Q.  That happened or didn't happen?

10        A.  It did happen.  They would

11    allocate -- you know, simple example:  John

12    Poglitsch who was the head of credit research

13    under Trey Parker, CIO.  When Trey left there was

14    stuff that John did.

15              In addition, I mentioned earlier Joe

16    Sowin, who was the portfolio manager, was added

17    to the funds.  He was an Advisor employee not an

18    HCMLP employee.  But most everything was filled

19    with the existing front office employees.

20        Q.  The front office employees of

21    Highland, right?

22        A.  Highlands and the Advisors.

23        Q.  Okay.

24        A.  There were a number of things that we

25    had to begin doing on our own.

1                    NORRIS

2         Q.  Okay.  But this analysis, I don't

3    mean to wrestle with you, I think it's fairly

4    simple based on what we're looking at here, this

5    analysis doesn't take into account the services

6    that were picked up by other Highland employees,

7    does it?

8         A.  Well, if those employees are listed

9    on this list, it does, but if they're not, then

10   that's where we say, "Hey, if there's someone

11   else you said really started doing a true job

12   that meets the degree of the agreement, we'd love

13   to hear it.  Right?  We'd love to have good faith

14   negotiation on what that looks like.

15        Q.  Okay.  And even for a guy like -- I'm

16   going to mispronounce it -- Poglitsch, if he was

17   allocated 29 percent under the agreement but now

18   he's taking on some of Parker's role so that he's

19   at 40 percent, this analysis wouldn't capture

20   that, right?

21        A.  We're using the percentages that were

22   provided in the agreement.  And, you know, maybe

23   that's the difference between ours and Dave

24   Klos's, he was adjusting the percentages, but --

25   but it does not have a change analysis.

1                              NORRIS

2                  MR. MORRIS:  Okay.  Let's take just a

3      short break.  I may be done.

4                  The time now is 5:24, let's come back

5      really in six minutes at 5:30.

6            (A break was taken from 4:24 p.m. to

7            4:31 p.m.)

8                  MR. MORRIS:  Mr. Norris, on behalf of

9      Ms. Winograd and myself, thank you for your time.

10     We have no further questions.  And I do intend to

11     get you that backup document no later than

12     Monday.

13                  THE WITNESS:  Thank you.

14            (TIME NOTED:  4:31 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2

     STATE OF TEXAS    )
3                      )
     COUNTY OF HARRIS  )

4

5          I, LINDA RUSSELL, a Certified Court

6    Reporter within and for the State of Texas, do

7    hereby certify:

8          That DUSTIN NORRIS, the witness whose

9    deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of the testimony given by such witness.

12         I certify that review of the transcript by

13   the deponent was requested.

14         I further certify that I am not related to

15   any of the parties to this action by blood or

16   marriage; and that I am in no way interested in

17   the outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto set my

19   hand this 4th day of March, 2022.

20
                           _Linda Russell_

21         _____
           LINDA RUSSELL, Texas CSR #2965
22         Expiration Date:  4/30/2023

23         TSG Reporting, Inc.
           Firm Registration No. 615
24         228 E. 45th Street, Suite 810
           New York, New York 10017
25         (212) 702-9580

Page 275

1      ERRATA SHEET FOR THE TRANSCRIPT OF:

2    CASE NAME: In re: Highland Capital Management, LP

3    DEP. DATE: March 4, 2022

4    DEPONENT:  DUSTIN NORRIS

5                    CORRECTIONS:

6    Pg.   Ln.   Now Reads        Should Read      Reason

7    ____  ____  _____  _____  _____

8    ____  ____  _____  _____  _____

9    ____  ____  _____  _____  _____

10   ____  ____  _____  _____  _____

11   ____  ____  _____  _____  _____

12   ____  ____  _____  _____  _____

13   ____  ____  _____  _____  _____

14   ____  ____  _____  _____  _____

15   ____  ____  _____  _____  _____

16   ____  ____  _____  _____  _____

17   ____  ____  _____  _____  _____

18

19                            _____

20                            DUSTIN NORRIS

21   SUBSCRIBED AND SWORN BEFORE ME

22   THIS_____DAY OF_____, 2022.

23

24   _____

25    (Notary Public)   MY COMMISSION EXPIRES:_____