# EXHIBIT 5

Page 1

```
 1           IN THE UNITED STATES BANKRUPTCY COURT

 2          FOR THE NORTHERN DISTRICT OF TEXAS

 3                    DALLAS DIVISION

 4   IN RE:                        )
                                   )       CHAPTER 11
 5   HIGHLAND CAPITAL              )
     MANAGEMENT, L.P.,             )        CASE NO.
 6                                 )      19-34054-sgj11
         Reorganized Debtor.       )
 7   _____)
                                   )
 8   HIGHLAND CAPITAL              )
     MANAGEMENT, L.P.,             )
 9                                 )
         Plaintiff,                )        Adv. No.
10                                 )       21-03010-sgj
     VS.                           )
11                                 )
     HIGHLAND CAPITAL FUND         )
12   MANAGEMENT FUND ADVISORS,     )
     L.P. and NEXPOINT             )
13   ADVISORS, L.P.,               )
                                   )
14       Defendants.               )
     _____
15

16

17           REMOTE ORAL DEPOSITION OF

18                 FRANK WATERHOUSE

19            MONDAY, MARCH 28, 2022

20

21

22

23   REPORTED BY:

24   JANICE K. McMORAN, CSR, RDR, CRR, TCRR

25   JOB NO. 207406
```

Page 262
F. WATERHOUSE
2 A. That's what this projection denotes.
3 Q. Okay. Last few questions. There
4 came a time in Q4 2020 when the advisors
5 stopped making payments under the shared
6 services and the subadvisory agreements,
7 correct?
8 A. I'm sorry. I just want to go back to
9 the projected operating cash flows. Again, at
10 this time when this was prepared, there was
11 nothing that we were aware of could change
12 payment-wise for the shared services and
13 subadvisory expenses due to the stay.
14 Q. Okay. And when you use the word "we"
15 there, you're referring specifically to you,
16 Mr. Caruso, Mr. Ellington, Mr. Leventon, and
17 Mr. Klos. Do I have that correct?
18 A. Yes. Sorry. I use "we"
19 collectively. But it was out of those
20 discussions where I was told by Mr. Klos,
21 Mr. Ellington, and Mr. Leventon that nothing
22 could change, I mean, until -- and like I
23 testified earlier was nothing can change now,
24 deal with it at a later date. I didn't -- at
25 this time we didn't -- I didn't have an

Page 263
F. WATERHOUSE
2 understanding, neither did Dave, what a later
3 date meant. Well, actually, take that back. I
4 didn't have an understanding about what a later
5 date meant, so if you're putting the other
6 projection at this time, I mean, that's the
7 best available information we have.
8 Q. You mentioned the later date. You
9 haven't said that all day today. Who mentioned
10 a later date?
11 A. I said that earlier. That was when
12 we were talking with Fred. You can go back.
13 Yeah, at a later date. He said you can deal
14 with it at a later time, a later date.
15 Q. So Fred told you that?
16 A. Yeah. I mean, there was -- there was
17 someone in this -- someone in this part of the
18 discussion said we will deal with it later.
19 Q. Can you identify the person who said
20 that?
21 A. I don't know. But someone -- someone
22 in this process said we will deal with it
23 later.
24 Q. Okay. But you can't identify the
25 person who said that, correct?

Page 264
F. WATERHOUSE
2 A. I can't.
3 Q. Okay. Did you ever raise this issue
4 with me or any of my colleagues at Pachulski?
5 A. I did not.
6 Q. And you knew in December of 2019 and
7 January of 2020 that my firm was bankruptcy
8 counsel to the debtor, correct?
9 A. Yes.
10 Q. All right. So back to Q4 2020.
11 There came a time during that period when the
12 advisors stopped making any payments under the
13 shared services agreements or the payroll
14 reimbursement agreements, correct?
15 A. That is correct.
16 Q. Okay. Do you remember why that
17 happened?
18 A. Generally.
19 Q. Did Mr. Dondero instruct you not to
20 make any further payments of any kind to
21 Highland during the fourth quarter of 2020?
22 A. Yes.
23 Q. And is that the reason that --
24 withdrawn.
25 When you received that instruction

Page 265
F. WATERHOUSE
2 from Mr. Dondero, did you convey that to
3 Mr. Klos and Ms. Hendrix?
4 A. I remember telling Mrs. Hendrix. I
5 don't recall if I told Mr. Klos.
6 Q. Do you recall if you ever told
7 Mr. Seery about the direction that you received
8 from Mr. Dondero?
9 A. I -- I didn't -- I don't recall.
10 Q. Do you know if Highland continued to
11 provide services under the shared services
12 agreements and the payroll reimbursement
13 agreements during the periods that the advisors
14 made no payments to Highland?
15 A. Is your question did Highland provide
16 services under the shared services without
17 being -- yes.
18 Q. Okay. Are you aware of any specific
19 service under the shared services agreements
20 that Highland failed to provide at any time
21 from the petition date until they were
22 terminated in early 2021?
23 A. I'm not aware.
24 Q. Did you ever have any discussion with
25 anybody at any time about Highland's failure or

Page 266

```
 1                     F. WATERHOUSE
 2    alleged failure to provide any services under
 3    the shared services agreement at any time from
 4    the petition date until they were terminated in
 5    early 2021?
 6         A.   Not that I recall.
 7         Q.   After the petition date, did you
 8    receive any money from either NexPoint or
 9    HCMFA, you personally?
10              MS. HARTMANN:  I'm going to object to
11    that as irrelevant.  There's already been a
12    settlement, John.  We don't want to get into
13    anything like that.
14              MR. MORRIS:  Okay.  I appreciate
15    that, and I'm really -- I promise you that I'm
16    not asking this for any attempt to take
17    discovery against Frank.  But I have two
18    entities here, HCMFA and NexPoint, who are
19    claiming that they overpaid Highland because
20    Highland didn't provide services that they were
21    entitled to, and I think it's completely
22    relevant to know whether or not those entities
23    were also making payments to Highland's
24    employees that were not disclosed.
25              So I'll ask my question again, and if
```

Page 267

```
 1                     F. WATERHOUSE
 2    you want to instruct him not to answer, that's
 3    certainly, you know, within your ability.  But I
 4    think it's -- I think it's very relevant, and
 5    everybody should be, you know, aware that we're
 6    going to be raising this issue at the trial.  So
 7    let me just ask one more time.
 8         Q.   (By Mr. Morris)  Mr. Waterhouse, I
 9    again --
10              MS. HARTMANN:  Break up the entities
11    and please do ask whether they were disclosed
12    to anyone.
13              MR. MORRIS:  Well, let me start --
14    let me start my questions and then we'll see
15    where we get.
16         Q.   (By Mr. Morris)  Mr. Waterhouse, did
17    you receive any payments of any kind after the
18    petition date from HCMFA?
19              MR. RUKAVINA:  Through what date?
20    He's a current employee.
21              MR. MORRIS:  Okay.  Thank you,
22    Mr. Rukavina.
23         Q.   (By Mr. Morris)  Mr. Waterhouse, did
24    you ever receive any payments from HCMFA from
25    the petition date until the day you left
```

Page 268

```
 1                     F. WATERHOUSE
 2    Highland's employ?
 3         A.   From HCMFA, no.
 4         Q.   Did you receive any payments from
 5    NexPoint at any time from the petition date
 6    until the day that you left Highland's employ?
 7              MS. HARTMANN:  Objection on
 8    relevance.
 9         A.   Yes.
10         Q.   (By Mr. Morris)  Okay.  How many
11    payments did you receive from NexPoint after
12    the petition date but before you left
13    Highland's employ?
14              MS. HARTMANN:  Objection to form and
15    relevance.
16         A.   One.
17         Q.   (By Mr. Morris)  Okay.  Do you
18    remember the amount of that payment?
19         A.   Approximately.
20         Q.   And what's the approximate amount of
21    that payment?
22              MS. HARTMANN:  Objection, form and
23    relevance, and it's subject to a settlement
24    already.
25         A.   $90,000.
```

Page 269

```
 1                     F. WATERHOUSE
 2         Q.   (By Mr. Morris)  And do you know the
 3    circumstances under which that payment was made
 4    to you?
 5              MS. HARTMANN:  Same objection.
 6         A.   I guess I don't understand the
 7    question.
 8         Q.   (By Mr. Morris)  Do you know why
 9    NexPoint paid you $90,000 after the petition
10    date when you were an employee of Highland?
11              MS. HARTMANN:  Same objection.
12         A.   I don't know the specifics, but --
13         Q.   (By Mr. Morris)  Did you have a
14    conversation with anybody in the world about
15    why you were paid $90,000 from NexPoint after
16    the petition date?
17              MS. HARTMANN:  Objection to form.
18    And obviously, he's not asking you about
19    lawyers.
20         A.   No.  I was -- I was told by the
21    director of HR that I was going to receive a
22    payment.
23         Q.   (By Mr. Morris)  And that director is
24    Mr. Collins?
25         A.   Yes.
```

Page 270

F. WATERHOUSE

2  Q. And when did Mr. Collins tell you
3 that you would be receiving a payment from
4 NexPoint?
5  A. I don't recall the date.
6  Q. Did you ever discuss this payment --
7 excuse me, I'm sorry. Withdrawn.
8   Did you ever discuss this payment
9 with anybody other than Mr. Collins?
10   MS. HARTMANN: Same objection of
11 relevance and form, and don't reveal privilege.
12  A. I don't -- I mean, I don't -- I don't
13 remember.
14  Q. (By Mr. Morris) Did you ever discuss
15 this payment with Mr. Dondero?
16   MS. HARTMANN: Objection, relevance.
17  A. I don't recall.
18  Q. (By Mr. Morris) Did you ever discuss
19 this payment with anybody other than
20 Mr. Collins or your counsel that you can
21 recall?
22   MS. HARTMANN: Asked and answered.
23  A. I don't remember.
24  Q. (By Mr. Morris) Okay. As the
25 treasurer of NexPoint, are you aware of any

Page 271

F. WATERHOUSE

2 payments that NexPoint made after the petition
3 date through the end of 2020 to Scott
4 Ellington?
5   MS. HARTMANN: Objection, form and
6 relevance.
7  A. Yes.
8  Q. (By Mr. Morris) Okay. Do you know
9 how many payments were made by NexPoint to
10 Mr. Ellington after the petition date but
11 before December 30th, 2020?
12   MS. HARTMANN: Objection, form.
13  A. I'm aware of one.
14  Q. (By Mr. Morris) Are you aware of the
15 approximate amount of that payment?
16   MS. HARTMANN: Objection, form.
17  A. I don't recall.
18  Q. (By Mr. Morris) Do you recall how
19 you became aware of that payment?
20   MS. HARTMANN: Objection to form.
21  A. Yes.
22  Q. (By Mr. Morris) How did you learn of
23 the payment by NexPoint to Mr. Ellington after
24 the petition date but before December 31st,
25 2020?

Page 272

F. WATERHOUSE

2   MS. HARTMANN: Objection, form.
3  A. Mr. Collins told me.
4  Q. (By Mr. Morris) I apologize, but
5 going back to the payment that you received
6 from NexPoint, did Mr. Collins give you any
7 explanation as to why NexPoint was making that
8 payment to you?
9   MS. HARTMANN: Objection to form.
10  A. Not that I recall.
11  Q. (By Mr. Morris) Do you recall if you
12 asked Mr. Collins why NexPoint was making that
13 payment to you?
14   MS. HARTMANN: Objection, form.
15  A. I don't -- I don't remember.
16  Q. (By Mr. Morris) Did Mr. Collins
17 explain to you why NexPoint was making a
18 post-petition payment to Mr. Ellington?
19   MS. HARTMANN: Objection, form.
20  A. I don't -- I don't recall.
21  Q. (By Mr. Morris) Did you ask
22 Mr. Ellington -- withdrawn.
23   Did you ask Mr. Collins why NexPoint was
24 making a post-petition payment to Mr. Ellington?
25   MS. HARTMANN: Objection, form.

Page 273

F. WATERHOUSE

2  A. I don't remember having that
3 discussion.
4  Q. (By Mr. Morris) As the treasurer of
5 NexPoint, did you authorize the making of the
6 payments to you and to Mr. Ellington?
7   MS. HARTMANN: Objection, form.
8  A. No.
9  Q. (By Mr. Morris) Do you know who --
10 do you have any understanding as to who
11 authorized the payments to you and to
12 Mr. Ellington?
13  A. It was -- my understanding is it was
14 Mr. Dondero.
15  Q. Okay. Do you know if NexPoint made
16 any post-petition payments to Isaac Leventon?
17   MS. HARTMANN: Objection, form.
18  A. Yes.
19  Q. (By Mr. Morris) And how did you
20 learn that?
21  A. From Mr. Collins.
22  Q. Did Mr. Collins tell you how much
23 NexPoint had paid to Mr. Leventon?
24   MS. HARTMANN: Objection, form.
25  A. I don't remember.

Page 274

F. WATERHOUSE

2  Q. (By Mr. Morris) Did Mr. Collins
3  explain to you why NexPoint was paying money to
4  Mr. Leventon?
5      MS. HARTMANN: Objection to form.
6  A. I don't recall.
7  Q. (By Mr. Morris) Do you recall if you
8  asked Mr. Collins why NexPoint was paying money
9  to Mr. Leventon?
10     MS. HARTMANN: Objection, form.
11 A. Same as before. I don't -- I didn't
12 ask.
13 Q. (By Mr. Morris) Do you -- as the
14 treasurer of NexPoint, do you know if the
15 payments to you and to Mr. Waterhouse --
16 withdrawn.
17     As the treasurer of NexPoint, do you
18 know if the payments to you and Mr. Ellington and
19 Mr. Leventon are reflected on NexPoint's books
20 and records?
21     MS. HARTMANN: Objection, form.
22 A. Yes.
23 Q. (By Mr. Morris) And would they --
24 where in the books and records would the
25 payments be reflected?

Page 275

F. WATERHOUSE

2      MS. HARTMANN: Objection, form.
3  A. They would be on the P&L -- on the
4  income statement.
5  Q. (By Mr. Morris) Okay. After the
6  petition date, did NexPoint make any payments
7  to Thomas Surgent?
8      MS. HARTMANN: Objection, form.
9  A. Yes.
10 Q. (By Mr. Morris) And how did you
11 learn that NexPoint had made one or more
12 payments to Mr. Surgent after the petition
13 date?
14     MS. HARTMANN: Objection, form.
15 A. I talked with Mr. Collins.
16     MR. MORRIS: La Asia, you can take
17 down the exhibit.
18 Q. (By Mr. Morris) Mr. Waterhouse, so
19 you discussed the payments that were being made
20 by NexPoint to you and Mr. Leventon,
21 Mr. Ellington, and Mr. Surgent, correct?
22     MS. HARTMANN: Objection to form.
23 A. I was made aware of it.
24 Q. (By Mr. Morris) Okay. And did he
25 make you aware of them in a conversation? In a

Page 276

F. WATERHOUSE

2  meeting? By e-mail? How did he make you aware
3  of those payments?
4      MS. HARTMANN: Objection, form.
5  A. It was just a conversation.
6  Q. (By Mr. Morris) Okay. And was there
7  just one singular conversation that covered all
8  the payments to the four individuals that we've
9  identified, or was it more than one
10 conversation?
11     MS. HARTMANN: Objection to form.
12 A. I don't remember.
13 Q. (By Mr. Morris) Do you know if
14 NexPoint made one or more payments to
15 Mr. Surgent?
16     Are you thinking, Mr. Waterhouse? your
17 screen froze, at least for me.
18     MR. MORRIS: Is it frozen for anybody
19 else?
20     THE REPORTER: Yes.
21     (Off the record to resolve Zoom
22      issue.)
23     MS. HARTMANN: Here, I'm going to
24 give him my screen.
25     MR. MORRIS: Perfect.

Page 277

F. WATERHOUSE

2      THE WITNESS: Sorry.
3      MR. MORRIS: Thank you. No problem.
4  Q. (By Mr. Morris) Do you know whether
5  the payments that were made -- withdrawn.
6      Do you know whether NexPoint made any
7  payments to any Highland employee after the
8  petition date other than to the four people that
9  we've identified?
10     MS. HARTMANN: Objection to form.
11 A. I don't -- I don't know.
12 Q. (By Mr. Morris) You're not aware of
13 any?
14 A. I'm -- I don't know. I'm not aware.
15 Q. Okay. Do you know if anybody ever
16 informed Highland's board of independent
17 directors of any of these payments prior to
18 confirmation in early February 2021?
19     MS. HARTMANN: Objection to form.
20 A. I'm -- you know, that -- typically
21 things like this are -- our compliance group
22 does that, right? So I don't know -- I don't
23 know what Thomas did.
24 Q. (By Mr. Morris) Did you personally
25 ever tell any of the independent board members

Page 278
1         F. WATERHOUSE
2   of the payments that -- the payment that you
3   received?
4         MS. HARTMANN: Objection to form.
5         A.  I did not.
6         Q.  (By Mr. Morris) Okay. Do you know
7   if any recipient of any of the payments ever
8   informed any member of the independent board
9   about any of the payments that were made by
10  NexPoint to the four individuals we've
11  identified?
12        A.  I'm not aware.
13        Q.  Do you know if anybody ever informed
14  me or anybody at my firm of any of the payments
15  that we've described as having been made by
16  NexPoint post-petition?
17        MS. HARTMANN: Objection, form.
18        A.  I'm not aware.
19        MR. MORRIS: I have no further
20  questions.
21        Mr. Waterhouse, thank you very much.
22        I always appreciate your indulgence.
23        MR. RUKAVINA: Let's take a 10-minute
24  break, and I'll try to get done in 30, 45
25  minutes.

Page 279
1         F. WATERHOUSE
2         (Recess taken 4:52 p.m. - 5:06 p.m.)
3              EXAMINATION
4   BY MR. RUKAVINA:
5         Q.  Mr. Waterhouse, good afternoon.
6         A.  Good afternoon.
7         Q.  You were asked about the payroll
8   reimbursement agreements.
9         MR. RUKAVINA: Mr. Nguyen, why don't
10  you just pull up my Number 3 just so that
11  Mr. Waterhouse has it in front of him.
12        Q.  (By Mr. Rukavina) So obviously it's
13  called a reimbursement agreement. It uses the
14  word reimbursement repeatedly. It talks about
15  reimbursement to Highland. How did you
16  understand the word reimbursement to apply or
17  what did it mean to you when you signed this
18  agreement?
19        MR. MORRIS: Objection to the form of
20  the question.
21        A.  I think it's consistent with what I
22  testified with Mr. Morris is that the purpose
23  of the agreement was to reimburse Highland for
24  costs that it incurred. So to the extent that
25  costs were incurred for the individuals that

Page 280
1         F. WATERHOUSE
2   are laid out in the reimbursement agreement,
3   NexPoint or HCMFA would pay that allocable
4   cost.
5         Q.  (By Mr. Rukavina) And obviously
6   you're a CPA, you're a highly sophisticated
7   man. What do you understand the word
8   reimbursement to mean?
9         A.  I mean, reimbursement is to, again,
10  reimburse an entity or someone for, like I
11  said, costs that have been incurred. So you're
12  reimbursing them for, you know, those -- those
13  costs -- I mean, for these agreements, it's
14  those costs. So they're -- so the net effect
15  is they're not out, you know, any dollars.
16  It's like you get reimbursed, you know, if you
17  have an employee expense and you get reimbursed
18  for -- let's say you get paid -- your firm pays
19  lunch, you get reimbursed for lunch, right?
20  Something to that effect.
21        Q.  So was there an intent in these
22  contracts when you signed them that Highland
23  make a profit under these contracts, the two
24  payroll reimbursement agreements?
25        MR. MORRIS: Objection to the form of

Page 281
1         F. WATERHOUSE
2   the question.
3         A.  That was not my understanding.
4         Q   (By Mr. Rukavina) That would be
5   incompatible with your understanding of the
6   word reimbursed, correct?
7         A.  Yes.
8         Q.  Was there an intent for these two
9   payroll reimbursement agreements that Highland
10  mark up its actual costs?
11        MR. MORRIS: Objection to the form of
12  the question.
13        A.  Not that I was aware of.
14        Q.  (By Mr. Rukavina) Again, that would
15  be incompatible with your understanding of the
16  word reimbursement?
17        A.  Yes.
18        Q.  Now, Mr. Morris took you through how
19  the agreements talk about reimbursement, and
20  then they set a monthly amount. Was it your
21  understanding that the fundamental purpose of
22  these two contracts was to provide for
23  reimbursements or to pay those monthly amounts
24  as set amounts, as set dollar amounts?
25        MR. MORRIS: Objection to the form of