

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 30, 2022**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff, | Adversary Proceeding No. |
| vs. | 21-03010-sgj |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P., | |
| Defendants. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF A JUDGMENT: (A) GRANTING BREACH OF CONTRACT CLAIMS ASSERTED BY THE REORGANIZED DEBTOR; AND (B) DENYING DEFENDANTS' REQUESTS FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS**

## I.    INTRODUCTION

The above-referenced adversary proceeding ("Adversary Proceeding") is related to the Chapter 11 bankruptcy case of Highland Capital Management, L.P. (the "Debtor" or "Highland"), which was filed on October 16, 2019 (the "Petition Date"). Highland is now a Reorganized Debtor (sometimes referred to as such, herein). It obtained confirmation of a plan on February 22, 2021. The plan went effective on August 11, 2021.  On direct appeal to the Fifth Circuit, Highland's confirmation order was affirmed in substantial part, on August 19, 2022.

A few days before confirmation of its plan, Highland filed the complaint ("the Complaint") initiating this Adversary Proceeding.[1] The defendants in the Adversary Proceeding are two very significant ***non-debtor entities*** within the massive Highland complex of companies:  one known as Highland Capital Management Fund Advisors, L.P. ("HCMFA") and the other known as NexPoint Advisors, L.P. ("NexPoint" or sometimes "NPA").  These two companies are sometimes collectively referred to as the "Advisors" or "Defendants."  It is undisputed that, at all relevant times, the Advisors have been controlled by James Dondero ("Mr. Dondero"), the co-founder and former CEO of the Debtor.[2]  Early during the Highland bankruptcy case (on January 9, 2020), Mr. Dondero's tenure as CEO of Highland was terminated, and three new independent directors (the "Independent Board") were appointed to manage the affairs of the Debtor, pursuant to a settlement

---

[1] Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Damages and for Declaratory and Injunctive Relief, filed February 17, 2021, DE # 1 in the AP. Note: all references herein to "DE # ___" shall refer to the docket entry number at which a pleading appears in the docket maintained in the Highland main bankruptcy case. All references to "DE # ___ in the AP" refer to the docket entry number at which a pleading appears in the docket maintained in this Adversary Proceeding.

[2] Joint Pretrial Order, DE # 92 in the AP at p. 9, ¶ 35. *See also* Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 14:19-20.

between the Debtor and Official Committee of Unsecured Creditors ("UCC"), approved by the bankruptcy court.[3]

The Adversary Proceeding involves Highland's breach of contract allegations against the two Advisors arising under four different agreements: (a) two Shared Services Agreements (one between Highland and each of the two Advisors); and (b) two Payroll Reimbursement Agreements (again, one between Highland and each of the two Advisors).[4] As later further explained, the Advisors are "registered investment advisors" who manage approximately $11 billion of assets for numerous clients, including retail investors (the retail investor funds constitute about $3 billion of the $11 billion of assets under management). [5] Pursuant to the two Shared Services Agreements, Highland provided the "back-office" and "middle-office" services (i.e., accounting, legal, regulatory compliance, human resources, information technology, etc.) that enabled the Advisors to operate as a business. And pursuant to the two Payroll Reimbursement Agreements, Highland provided "front-office" advisory services (i.e., investment advisory personnel) that enabled the Advisors to provide investment services to the funds under their management. To be clear, Highland maintained a full staff of actual employees and essentially contracted out to the Advisors

---

[3] The settlement between the Debtor and UCC is sometimes referred to by the parties as the "corporate governance settlement," and it was entered into to avert the likely appointment of a Chapter 11 trustee.

[4] The Debtor originally asserted three claims in the Complaint: Count One, seeking declaratory relief, as to the parties' respective rights and obligations under the two Shared Services Agreements; Count Two for Breach of Contract under the two Shared Services Agreements; and Count Three, seeking injunctive relief requiring the Advisors to cooperate in an orderly transition of services away from the Debtor, under the Shared Services Agreement. DE # 1 in the AP. On February 24, 2021, following an evidentiary hearing, the bankruptcy court entered an order resolving the claims for declaratory and injunctive relief (Counts One and Three) of Highland's Complaint. Subsequently, on August 4, 2021, the parties entered into a stipulation that the claims for declaratory and injunctive relief were finally resolved by the prior order. DE # 36 in the AP. Thus, the only claims remaining from Highland's Complaint to be considered are those for breaches of contract (Count Two). Notably, the parties' Joint Pretrial Order expanded Highland's Count Two to include breaches of the Payroll Reimbursement Agreements and not simply breaches of the Shared Services Agreements. DE # 92 in the AP, ¶¶ 15, 69, 71, 73, 74, 75, 76, 78, 79, 80, 81 & 85.

[5] Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 106:13-16.

for the necessary services, so that the Advisors could manage funds for their clients. The Advisors themselves had relatively few employees.

The Shared Services Agreements, later more fully defined, will sometimes collectively be referred to herein as the "SSAs," and the Payroll Reimbursement Agreements, also more fully defined herein, will sometimes be referred to as the "PRAs." The cash flow streams from the SSAs and PRAs were a significant source of revenue and liquidity for Highland. And, of course, the Advisors, themselves, earned significant fees from the contracts that they had with their clients to manage the $11 billion of assets (the Advisors' revenue numbers are not in evidence).

Highland asserts that breaches of contract occurred due to the Advisors' failure—late during Highland's bankruptcy case, when things had become very contentious between Highland and Mr. Dondero—to pay amounts due and owing under the four agreements (specifically, after Highland had given notice on November 30, 2020, of Highland's intent to terminate the SSAs, in 60 days, in connection with its chapter 11 plan).[6] Highland asserts that the Advisors thereafter failed to pay some $2,747,000 due and owing under the four agreements, in late 2020 and early 2021.

Meanwhile, shortly before the filing of the Adversary Proceeding, on January 24, 2021, the Advisors filed their *Application for Allowance of Administrative Claim* in the underlying bankruptcy case.[7] On May 5, 2021, Highland filed its *Objection to Application for Administrative Claim of Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*[8] Contrary to Highland's position that the Advisors owe Highland money for unpaid services that

---

[6] Highland planned to reduce its workforce in February 2021, in connection with confirmation of its plan, and anticipated it would have insufficient personnel to perform under the agreements thereafter.

[7] DE # 1826.

[8] DE # 2274.

Highland provided, the Application asserted ***claims back against Highland*** for: (1) alleged post-petition overpayments by the Advisors to Highland under the PRAs, throughout the bankruptcy case (under a theory that the fees payable to Highland under the PRAs were tied to the headcount of employees providing services, and Highland allegedly improperly charged the Advisors the same fixed, monthly amount under the PRAs, over time, as employee headcount at Highland dwindled); (2) alleged post-petition breaches of the SSAs by Highland, for allegedly failing to provide certain legal and compliance services contemplated under the SSAs—causing the Advisors to have to hire their own employees to provide such services; and (3) alleged post-petition overpayments by the Advisors to Highland under the SSAs for the services that Highland allegedly failed to provide. The Advisors have asserted up to $14 million in administrative expense claims against Highland.

On August 6, 2021, the parties stipulated that the contested matter created by the Advisors' Application for Allowance of Administrative Claim (and Highland's objection thereto) should be consolidated with the Debtor's breach of contract claims within this Adversary Proceeding.[9] All consolidated, competing claims of the parties were tried before the bankruptcy court on April 12 and April 13, 2022, with closing arguments heard on April 27, 2022 (the "Trial"). The court heard from six witnesses and admitted nearly 200 exhibits.

For the reasons set forth below, the bankruptcy court has determined that the Advisors have failed to meet their burden of proving: (i) that they made any "overpayments" under the PRAs; (ii) that Highland breached the SSAs; or (iii) that the Advisors "overpaid" under the SSAs. The court also has determined that, even if the Advisors had met their burden of proving that they "overpaid"

---

[9] Stipulation (A) Amending Scheduling Order and (B) Consolidating and Resolving Certain Matters, DE # 36 in the AP.

under the PRAs, the Advisors claims were waived. The Advisors' claims for "overpayments" under the SSAs were likewise waived. No administrative expense claims will be allowed.

The bankruptcy court has further determined that Highland has met its burden of proving its breach of contract claims against the Advisors for failure to pay certain amounts due under both the SSAs and PRAs in late 2020 and early 2021.

Accordingly, the bankruptcy court *denies* the request for allowed administrative expense claims by the Advisors. Further, the bankruptcy court *grants* the relief requested by Highland under its claims for breach of contract in this Adversary Proceeding. Highland is entitled to the damages set forth at the end of this document.

Set forth below are the court's Findings of Fact and Conclusions of Law, pursuant to Fed. R. Bankr. Proc. 7052. Any Finding of Fact that should be more appropriately characterized as a Conclusion of Law should be deemed as such, and *vice versa*.

## II.    FINDINGS OF FACT

The Defendant/Advisor known as HCMFA was formed on or around February 2, 2009, and was previously known as Pyxis Capital, L.P. ("Pyxis").[10] The Defendant/Advisor known as NexPoint was formed on or around March 20, 2012. It is undisputed that, at all relevant times, both Defendants (i.e., the Advisors) were controlled by Mr. Dondero.[11]

The Advisors are registered investment advisors under the Investment Advisers Act of 1940. They serve as the investment managers for, among other things, certain retail funds (the

---

[10] Joint Pretrial Order, DE # 96 in the AP at p. 10. *See also* Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 14:19-20.

[11] *Id.* at p. 9.

"Retail Funds") that are regulated pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940.

The Advisors provide investment advisory services to their clients pursuant to written investment advisory agreements (the "Investment Advisory Agreements"). These Investment Advisory Agreements are: (a) the principal source of the Advisors' revenue, and (b) are the reason for the Advisors' existence.

An individual named David Klos ("Mr. Klos") served as Highland's Controller and Chief Accounting Officer during the times relevant in this Adversary Proceeding (including overseeing the SSAs and PRAs between Highland and the Advisors) and reported directly to an individual named Frank Waterhouse ("Mr. Waterhouse"), who served as both: (a) Highland's Chief Financial Officer ("CFO"), while simultaneously serving as (b) the Treasurer for each of the Advisors. Both Mr. Klos and Mr. Waterhouse testified at Trial and seemed to be the witnesses who were most involved with the Agreements at the time of their execution, implementation, and during performance thereof.

Mr. Klos now works as CFO of the Reorganized Debtor.  Mr. Waterhouse no longer has any employment position with the Reorganized Debtor, but he still serves as an officer and/or employee of both of the Advisors and of Skyview—the latter of which is an entity that many former Highland employees transitioned to around the time that the Highland plan was confirmed, and they were terminated from Highland (Skyview now provides middle- and back-office services to the Advisors).[12]  The court found Mr. Klos to be a credible and knowledgeable witness.  The court found Mr. Waterhouse's testimony to have been only moderately helpful.  Mr. Waterhouse

---

[12] *See* Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 55:3-21.

testified either "Not that I recall," "I don't recall," "Not that I'm aware of," or "I don't remember," more than 75 times, during two hours and 26 minutes of testimony regarding the SSAs and PRAs.[13]

A. <u>The SSAs</u>

    i. *The HCMFA SSA.*

On February 9, 2012, Highland and HCMFA (then operating as Pyxis) entered into a *Shared Services Agreement*, effective as of December 15, 2011 ("Original HCMFA SSA").[14] On September 12, 2012, the parties entered into an *Amended and Restated Shared Services Agreement*, effective as of December 15, 2011.[15] Subsequently, the parties entered the *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013—which is the SSA that was in place between Highland and HCMFA during the bankruptcy case and is at issue in this litigation (the "HCMFA SSA").[16]

To understand the impetus for the HCMFA SSA (and, for that matter, all of the agreements at issue in this Adversary Proceeding) one must fully appreciate that the Defendants/Advisors had relatively few employees of their own during the times relevant in this Adversary Proceeding. Rather, the Defendants/Advisors essentially contracted for services and/or personnel employed by the mothership, Highland.  Pursuant to the HCMFA SSA, HCMFA agreed to pay Highland for costs relating to certain shared services requested by HCFMA and provided by Highland, including, in pertinent part: (i) finance and accounting, (ii) human resources, (iii) marketing, (iv) legal, (v) corporate, (vi) information technology, and (vii) operations.[17]    According to all

---

[13] With all due respect, the court realizes that most witnesses do not have perfect memories and occasionally testify "I don't recall" or "I don't know" during testimony. Indeed, during this Trial, other witnesses sometimes testified as such.  But Mr. Waterhouse's lack of answers to important questions was somewhat troubling to the court.
[14] Pl. Ex. 54.
[15] Pl. Ex. 55.
[16] Pl. Ex. 2.
[17] *See id.* at Article II, Section 2.01.

witnesses, these services are commonly referred to in the industry as "middle- or back-office" services, in contrast to "front-office" services that would be investment advisory services.

Pursuant to the HCMFA SSA, HCMFA was required to pay Highland its allocable share of the "Actual Cost" of "Shared Services" and "Shared Assets" based on an "Allocation Percentage," as those terms are defined in the HCFMA SSA.[18] To determine the amounts owed, (a) Highland was to prepare Quarterly Reports setting forth the cost allocations and detailing amounts paid during the applicable quarter; (b) the parties were to agree on the allocations set forth in the Quarterly Reports and prepare invoices; and (c) the invoiced amounts were to be paid within 10 days.[19] In contrast to the other SSA with Nexpoint (described below) and the PRAs (also described below), the HCMFA SSA is stipulated to have been a ***variable fee arrangement*** between the parties.

ii.    *The NexPoint SSA.*

On June 5, 2013, Highland and NexPoint entered into their original *Shared Services Agreement*, effective as of January 1, 2013 (the "Original NexPoint SSA").[20] The Original NexPoint SSA was modelled after the HCMFA SSA and included a formula for determining NexPoint's share of allocable cost of "Shared Services" and "Shared Assets," which did not rely on an actual analysis of cost, but rather a percentage of managed fund assets.[21] This contract covered the same "middle- or back-office" services provided under the HCMFA SSA.

Subsequently, Highland and NexPoint amended the Original NexPoint SSA. The parties entered into the *Amended and Restated Shared Services Agreement*, effective as of January 1, 2018—which is the SSA that was in place between Highland and NexPoint during the bankruptcy

---

[18] *See id.* at Section 4.01.
[19] *See id.* at Sections 5.01, 5.02, & 5.03.
[20] Pl. Ex. 29.
[21] *See id.* at Sections 4.01, 5.01, 5.02, & 5.03.

9

case and is at issue in this litigation (the "NexPoint SSA").[22] The notable changes made to the NexPoint SSA included that: (a) the "asset based" formula (which was calculated using the asset values of a fund advised by NexPoint) for determining the value of Highland's services was replaced with a monthly, "flat fee" arrangement; and (b) Highland was provided with exculpation and indemnification rights. The monthly flat fee charged by Highland to NexPoint in the amended NexPoint SSA was $168,000.[23]

NexPoint agreed to pay Highland the flat monthly fee of $168,000, due before the first business day each month, in exchange for the shared services provided by Highland.[24] Additionally, under Section 6.03 of the NexPoint SSA, Highland is entitled to recover its costs and expenses, including attorney's fees, incurred in connection with the defense or settlement of indemnifiable claims.[25]

The NexPoint SSA was signed by Mr. Waterhouse on behalf of ***both*** Highland (in his capacity as Treasurer of Strand Advisors, Inc., the general partner of Highland) and NexPoint (in his capacity as Treasurer of NexPoint Advisors GP, LLC, the general partner of NexPoint).

On November 30, 2020, Highland—with confirmation of its plan pending, which contemplated a separation of Highland from Dondero-controlled entities—exercised its right to terminate both the HCMFA SSA and NexPoint SSA, by providing a written termination notice to the Advisors, indicating Highland's intent to terminate them, effective January 31, 2021 (the "Termination Date"). However, on January 29, 2021, Highland agreed to extend the Termination Date by two weeks (to February 14, 2021), due to ongoing negotiations for an orderly transition of services, provided the Advisors paid for the services in advance. Highland has credibly

---

[22] Pl. Ex. 3.
[23] *Id.* at Article III, Section 3.01.
[24] *See id.*.
[25] *See id.* at Section 6.03.

represented that it believed termination without a service provider in place to fill Highland's role would have had dire consequences to the Retail Funds and their investors. The parties later agreed to extend the Termination Date one final time in February 2021, to extend the deadline through the end of February 2021.

The Advisors do not contend that Highland failed to perform under the SSAs, other than, perhaps, providing certain legal and compliance services to the Advisors a handful of times, at a point in time during the bankruptcy case when the Debtor believed it would be a conflict of interest to do so (as the Debtor and Advisors were becoming adverse). Further, it is agreed that the NexPoint SSA contemplated a fixed fee arrangement of $168,000 per month. To reiterate, the HCMFA SSA was *not* a fixed fee arrangement, but the amounts invoiced under the HCMFA SSA generally ranged between $300,000 to $310,000 each month.

B. The PRAs

In addition to the two SSAs, Highland and each of the Advisors/Defendants were parties to two "Payroll Reimbursement Agreements" (the "PRAs" and together with the SSAs, the "Agreements"). The PRAs—in contrast to the SSAs that were designed to compensate Highland for the Defendants' usage of "middle- and back-office" services—were designed to compensate Highland for the Defendants usage of ***"front-office"*** services.

There is a confusing history leading up to execution of the PRAs. Notably, prior to the year 2018, Highland had provided "front-office" services to the Advisors *for free*. Also notably, in early 2018, the parties embarked on documenting a new arrangement whereby Highland would henceforth be compensated for "front-office" services through the mechanism of "sub-advisory agreements" with the Advisors (which would be typical in the industry generally, as a way to

11

compensate a party for "front-office" services).  But the parties ended up using the PRAs instead, as set forth below.

>    i.    *Events Leading up to the PRAs.*

As noted above, prior to the year 2018, Highland had provided "front-office" services to the Advisors for free, for six years.[26]  But at the end of 2017, Highland was operating at a loss and those losses were expected to increase in 2018.[27] According to the credible testimony of Mr. Klos at Trial, Mr. Dondero came up with a number of $6 million that the Defendant NexPoint should be paying Highland, every year in the aggregate, to compensate for the mounting operating losses at Highland—which also had the added benefit of reducing NexPoint's taxable income that it was generating, that happened to be flowing up to Mr. Dondero.[28]

So, on or about January 11, 2018, Highland and NexPoint entered into that certain *Sub-Advisory Agreement*, effective as of January 1, 2018 (the "Initial Sub-Advisory Agreement"). Notably, a typical sub-advisory agreement might provide for compensation for front-office services in a myriad of ways, including possibly:  based on actual costs; flat fees; or percentage of assets under management ("AUM"), using basis points computed on assets managed.[29] Pursuant to the Initial Sub-Advisory Agreement, Highland would be providing certain "front-office" services to NexPoint to enable it to fulfill its obligations to its Clients under its Investment Management Agreements.[30] In exchange, NexPoint agreed to pay a flat monthly fee of $252,000, while each of the parties agreed to bear their own expenses.[31] As with the NexPoint SSA, Mr. Waterhouse signed the Sub-Advisory Agreement on behalf of ***both*** Highland and NexPoint.  The

---

[26] Tr. Transcript 4/12/22, Part 1 of 2, [DE # 110] at 69:13-71:19.
[27] Pl. Ex. 86 at p. 2.  *See* Tr. Transcript 4/12/22, Part 1 of 2 [DE # 110], at 65:13-22.
[28] Tr. Transcript 4/12/22, Part 1 of 2, [DE # 110] at 66:6-71:19.
[29] Tr. Transcript 4/13/22, Part 1 of 2, [DE # 114] at 37-47.
[30] Joint Pretrial Order, DE # 96 in the AP at p. 11.
[31] NexPoint Sub-Advisory Agreement, Pl. Ex. 5, §2(a)-(b).

payment of $252,000 times 12 equaled $3,024,000; meanwhile NexPoint would be paying Highland $168,000 per month under the fixed fee NexPoint SSA, and $168,000 times 12 equaled $2,016,000. Thus, by the court's calculations, this would mean that NexPoint would be paying Highland not quite $6 million per month for "back-", "middle-", and "front-office" services. However, the court understands that a subsidiary of NexPoint, called NREA, would be paying an additional $80,000 per month flat amount for "back- and middle-office" shared services, which would total $248,000 per month for shared services being paid from NexPoint (inclusive of its subsidiary) to Highland.[32] $248,000 times 12 equals $2,976,000 and, when added to the $3,024,000 being paid for "front-office" sub-advisory services, this totaled exactly $6 million.

Each year, Mr. Waterhouse and Mr. Klos prepared a written analysis of Highland's past and projected financial performance (each, an "Annual Review") that they presented to Mr. Dondero and Mark Okada (the latter of whom was Highland's other co-founder).[33] The 2017/2018 Annual Review included statements and information that: (i) Highland was projected to incur operating losses of $12 million in 2018;[34] (ii) the agreements of NexPoint to pay $6 million in fees to Highland was to "remain unchanged;"[35] (iii) the aggregate of $6 million to be paid by NexPoint to Highland was projected to be unchanged in 2018, 2019, and 2020;[36] and (iv) changes through new hires, internal transfers, terminations, and compensation and benefits paid had been made across the Highland platform.[37]

But, a hugely significant event occurred that affected Highland's cash flow right after the 2017/2018 Annual Review was presented. On January 30, 2018, a former Highland employee

---

[32] Pl. Ex. 146. *See also* Tr. Transcript 4/12/22, Part 2 of 2 [DE # 113], at 70:6-17.
[33] *See, e.g.,* Pl. Ex. 86 (2017/2018 Annual Review), Pl. Ex. 142 (2018/2019 Annual Review), & Pl. Ex. 143 (2019/2020 Annual Review).
[34] Pl. Ex. 86 at p. 2.
[35] *Id.* at p. 36.
[36] *Id.* at p. 46.
[37] *Id.* at pp. 29-33, 48.

13

named Joshua Terry commenced an involuntary bankruptcy case against Acis Capital Management, L.P. ("Acis") in this bankruptcy court (Mr. Terry had obtained a large arbitration award and judgment against Acis and was being frustrated in his efforts to collect upon it). At that time, Acis was an affiliate of Highland that managed certain collateralized loan obligations ("CLOs"). To perform its duties, Acis had earlier entered into its own sub-advisory and shared services agreements with Highland (the "Acis Agreements"). The Acis Agreements were a vital source of Highland's revenue. Highland was projected to receive almost $10 million in revenue in 2018 alone from the Acis Agreements—Highland's second-highest source of revenue representing nearly 12% of its total projected operating income.[38]

So, on March 7, 2018, just weeks after the 2017/2018 Annual Review was presented—and in an attempt to make up for anticipated lost revenue from Acis—Highland decided to create a Sub-Advisory Agreement ***also for HCMFA***, initially for a flat monthly fee of $450,000, retroactive to January 1, 2018. Recall that, heretofore, Highland had been providing front-office services to HCMFA for free. A week later, a draft Sub-Advisory Agreement modeled on the NexPoint Initial Sub-Advisory Agreement was prepared for HCMFA.[39]

Notably: (a) the 2017/2018 Annual Review presented to Mr. Dondero and Mr. Okada just six weeks earlier ***did not contemplate that HCMFA would be party to a Sub-Advisory Agreement or otherwise would be compensating Highland for investment advisory services Highland was providing***, and (b) both the title and terms of the draft HCMFA Sub-Advisory Agreement corroborated Highland's contention that the parties intended to create a "fee for service" advisory relationship.

---

[38] Pl. Ex. 86 at p. 35 ("Highland 2.0 CLOs" refers to the CLOs managed by Acis).
[39] *See* Pl. Ex. 87 (e-mails between March 7 and March 15, 2018).

But, alas, the Initial Sub-Advisory Agreements for both HCMFA and NexPoint were not to be, because Highland learned: (a) from its outside counsel that (i) the Advisors' Retail Board[40] needed to approve the Sub-Advisory Agreements during an ***in-person*** meeting, and that (ii) the two Sub-Advisory Agreements ***could not be made retroactive to January 1, 2018***, and (b) that the next in-person meeting of the Retail Board would not be until ***June 2018***.[41]  This was a problem because Highland needed cash-flow immediately and could not wait until June 2018.

Based on this legal advice, the parties concluded that they could not utilize the contemplated Sub-Advisory Agreement structure because: (a) Highland would not be able to earn any revenue for sub-advisory services until June, the earliest date the Retail Board could approve of the Sub-Advisory Agreements during an in-person meeting, and (b) it could not be retroactive to January 1, 2018, meaning that Highland would be unable to receive six months' of needed revenue. So, another method was needed to overcome these obstacles—and the Payroll Reimbursement Agreements were born.[42]

ii.      *The Use of PRAs instead of Sub-Advisory Agreements to Compensate Highland for "Front-Office" Advisory Services.*

So, the next month, Highland prepared a draft PRA that did not need the Advisors' Retail Board's approval and could be made retroactive to the beginning of the year.

While the Initial Sub-Advisory Agreements had clearly contemplated that a flat fee for front-office services would be paid to Highland, Mr. Klos expressed concerns, after reviewing the draft PRAs, about language therein—and an Exhibit A chart attached thereto, listing out 25 "Dual

---

[40] The "Retail Board" is essentially an independent board of trustees or board of directors for retail funds managed by the Advisors. Tr. Transcript 4/13/22, Part 1 of 2 [DE # 114], at 4:22-24.

[41] *See* Pl. Ex. 87 (March 15, 2018 e-mails from Lauren Thedford ("Ms. Thedford"), an attorney employed by Highland but who also served as an officer of the Advisors).

[42] No one ever explained at Trial the exact reasons that a document entitled "Sub-Advisory Agreement" would require in-person Retail Board approval and could not be retroactive in effect. But no one seemed to dispute this fact.

Employees" who would be working both for Highland and the Advisors, and suggesting the percentage of time they might be working for the Advisors—that payments to Highland would be based on "actual costs" *associated with specific employees.* Mr. Klos was worried about the cumbersomeness of the PRAs and wrote to Highland inhouse attorney Lauren Thedford ("Ms. Thedford"), who also served as an officer of the Advisors, that:

> Does it have to be framed as reimbursement of actual costs? *We'd much rather it be characterized as just an agreed upon amount between the two entities.* It's not a small task and involves subjective assumptions to allocate individual employees, so as it's written, *it would be creating a ton of work that isn't creating any value to the overall complex.*[43]

In response, Ms. Thedford stated that she was "open" to changing the "definition of Actual Costs" but observed that there "needs to be some method of determining the amounts" and that it was "important" to treat the agreement as one for "reimbursement." In response, Mr. Klos stated:

> Could we say that Actual Cost is being determined *at the outset of the agreement, have a schedule as of Jan. 1, 2018 and say that Actual Cost shall be as set out in that schedule and shall be paid in monthly installments for the term of the agreement . . . that way the exercise is only performed once.*

> Beyond that year, termination provision kicks-in, so if there's a belief that Actual Costs have changed materially, either party could terminate and/or renegotiate for an amended agreement.[44]

At Trial, Mr. Klos credibly testified that the Exhibit A list of employees attached to the PRAs, and the allocation made for employees created in connection with the PRAs, were created to be the same monthly fees previously contemplated under the Initial Sub-Advisory Agreement.[45] Further, Mr. Klos testified that the estimates, despite being made in good faith, were based on his own subjective assessments and were only created as a proxy for the flat monthly fees previously envisioned by Mr. Dondero, to get Highland needed cash flow.[46]

---

[43] Pl. Ex. 129 (emphasis added).
[44] *Id.* (Klos e-mail to Thedford sent on April 17, 2018, at 10:56 a.m.) (emphasis added).
[45] Tr. Transcript 4/12/22, Part 1 of 2, at 104:9-24.
[46] Tr. Transcript 4/12/22, Part 1 of 2, at 104:19-106:16.

On or around May 1, 2018, Highland and NexPoint entered into that certain Payroll Reimbursement Agreement (the "NexPoint PRA").[47] The NexPoint PRA replaced the NexPoint Initial Sub-Advisory Agreement that had been effective as of January 1, 2018.[48] Then, on or around May 1, 2018, Highland and HCMFA entered into that certain Payroll Reimbursement Agreement, also effective as of January 1, 2018 (the "HCMFA PRA").[49]

Except for the (a) names of the parties, (b) the amount of monthly payments thereunder, and (c) the list of "Dual Employees" and their respective allocations set forth in Exhibit A to each of the PRAs, the NexPoint PRA and HCMFA PRA were identical.

So, to be clear, whereas the SSAs were to provide compensation for "middle-" and "back-office" services provided by Highland to each of the Advisors, the PRAs were, generally, structured for the Advisors to pay Highland amounts in recognition of the "front-office" services provided by the Dual Employees to the Advisors (which "Dual Employees" were technically employed by Highland).

To be further clear, both the NexPoint PRA and HCMFA PRA stated that the Advisors were required to pay Highland the "Actual Cost" to Highland for the Dual Employees pursuant to Section 2.01.[50] However, "Actual Cost" was defined in each of the PRAs as:

> with respect to any period hereunder, the actual costs and expenses caused by, incurred, or otherwise arising from or relating to each Dual Employee, in each case during such period. ***Absent any changes to employee reimbursement, as set forth in Section 2.02, such costs and expenses are equal to [$252,000 for NexPoint and $416,000 for HCMFA] per month***.[51]

---

[47] Pl. Ex. 6 (NexPoint PRA)
[48] Joint Pretrial Order, DE # 96 in the AP at p. 11.
[49] *Id.*
[50] Pl. Ex. 6 §§ 2.01, 3.01; Pl. Ex. 8 §§ 2.01, 3.01.
[51] Pl. Ex. 6 at Article I (fixing the costs and expenses at $252,000 per month for NexPoint) (emphasis added); Pl. Ex. 8 at Article I (fixing the costs and expenses at $416,000 per month for HCMFA) (emphasis added).

Significantly, pursuant to Section 2.02, the parties could agree to modify the Actual Cost if they believed a change to employee reimbursement was appropriate, and each party was required to negotiate any change in good faith.[52]  The Advisors contend that Section 2.02, in conjunction with Section 4.02, imposed an affirmative obligation on Highland to update the Exhibit A list of Dual Employees and unilaterally adjust the monthly payments, but no such obligation exists under the clear language of the PRAs.[53]

The undisputed evidence establishes that: (a) neither Mr. Klos nor anyone else ever updated the Exhibit A list of Dual Employees attached to the PRAs; (b) neither Mr. Klos nor anyone else was ever instructed to update Exhibit A attached to the PRAs; (c) at all relevant times, the Advisors and Highland had access to the same information concerning the amounts paid under the PRAs, the amounts projected to be paid under the PRAs, the termination of Dual Employees, the compensation of Dual Employees, and the investment advisory services provided by Highland to each of the Advisors; and (d) as discussed below, the parties knew of and relied on Section 2.02 in December 2018 to amend the PRAs while Mr. Dondero was still fully in control of the entire Highland complex. The undisputed evidence was also that four out of the twenty-five Dual Employees listed on the Exhibit A's attached to the PRAs were no longer employed as of the May 1, 2018 date on which the PRAs were executed (although they had been employed as of the January 1, 2018 effective date of the PRAs).

Without considering any extrinsic evidence, the court finds the clear and unambiguous language of the definition of "Actual Cost" in the PRAs indicates that these were intended to be

---

[52] Pl. Ex. 6 § 2.02; Pl. Ex. 8 § 2.02 ("During the Term, the Parties may agree to modify the terms and conditions of [NexPoint's/HCMFA's] reimbursement in order to reflect new procedures or processes, including modifying the Allocation Percentage (defined below) applicable to such Dual Employee to reflect the then current fair market value of such Dual Employee's employment.  The Parties will negotiate in good faith the terms of such modification.").

[53] Pl. Ex. 6 § 4.02 ("Should either Party determine that a change to employee reimbursement is appropriate, as set forth in Section 2.02, the Party requesting the modification shall notify the other Party on or before the last business day of the calendar month"); Pl. Ex. 8 § 4.02 (same).

fixed amount contracts, *simply plugging in a set monthly amount for front-office services that—absent agreed modifications—were never required to be adjusted based on particular employees' daily activities or their comings-and-goings, despite the use of the words "Actual Cost."* Further, the clear and unambiguous language of Sections 2.02 and 4.02 of the PRAs contemplated possible agreed modifications and required "the Party requesting modification [to] notify the other Party" before the end of the month to change the employee reimbursement amount and the parties had to agree on any change to in amount.[54] The requirement that such notification and agreement be made shows the monthly payment was intended to be fixed and provided no mandatory obligation to update it, based on the Dual Employees' allocation of time or employment at any time. The court finds these provisions, taken together, leave no ambiguity or lack of clarity that the terms of the PRAs generally intended to set a fixed monthly amount for front-office services, for ease of implementation. The parties could always terminate with or without cause,[55] or seek to modify the PRAs if the plugged-in amount seemed unreasonable over time.[56]

C. The Amendments to the PRAs

On December 14, 2018, (a) Highland and NexPoint entered into that certain *Amendment Number One to Payroll Reimbursement Agreement* (the "NexPoint PRA Amendment"), pursuant to which NexPoint paid an extra $1,300,000 to Highland, and (b) Highland and HCMFA entered into that certain *Amendment Number One to Payroll Reimbursement Agreement* (the "HCMFA PRA Amendment" and together with the NexPoint PRA Amendment, the "PRA Amendments"), pursuant to which HCMFA paid an extra $1,200,000 to Highland.[57]

---

[54] *See id.*
[55] Pl. Exs. 6 § 5.02; Pl. Ex. 8 § 5.02.
[56] Pl. Ex. 6 § 2.02; Pl. Ex. 8 § 2.02.
[57] Pl. Ex. 7 (NexPoint PRA Amendment); Pl. Ex. 9 (HCMFA PRA Amendment).

These PRA Amendments are short, sparsely worded documents. They simply indicate that the Advisors are agreeing to pay the additional amounts to Highland "representing an estimate of additional Actual Costs owed under the [PRAs] for additional resources used."[58] At Trial, Mr. Klos credibly testified that neither he, nor anyone else to his knowledge, ever performed an analysis of Highland's actual costs under the PRAs to determine the extra amounts that ended up being paid to Highland under the PRA Amendments, and the PRA Amendments were only made because Highland was losing money rapidly and the Advisors had taxable income.[59] Additionally, by December 1, 2018 (before the PRA Amendments were executed), the Advisors had knowledge that *nine of the twenty-five Dual Employees listed in Exhibit A to the original PRAs were no longer employed by Highland*.[60] Yet, the Advisors made **additional lump sum payments** exceeding the fixed monthly amounts set forth in the PRAs. The Advisors claim it was their standard practice to perform annual "true-ups" of the various contracts in the Highland complex and that these the PRA Amendments were a "true-up," which should be used to find that the PRAs did not contemplate flat amounts for services. But this would mean that the Advisors paid Highland $2.5 million on a PRA "true-up," when they knew that over one-third of the Dual Employees under the PRAs were terminated during the relevant time period. Further, neither the Advisors nor any individual ever requested Exhibit A to the PRAs to be amended at any time prepetition. As of the Highland bankruptcy Petition Date (October 16, 2019), fourteen of the twenty-five Dual Employees were no longer employed at Highland. Mr. Dondero controlled both Highland and the Advisors at this time. To be clear, the Advisors had never taken the position that there were "overpayments" under the PRAs as of the Petition Date or sought modification of the PRAs. Mr.

---

[58] *Id.*
[59] Tr. Transcript 4/12/22, Part 1 of 2, at 113:4-21.
[60] Pl. Ex. 14 (responses to Interrogatories 3 and 4).

Waterhouse, who signed the PRA Amendments on behalf of both Highland and the Advisors, testified that he had no recollection of how the amounts set forth in the PRA Amendments were determined or whether it was actually a "true-up."

The court finds that nothing in the record suggests that the Advisors were doing a "true-up" when implementing the PRA Amendments. Nor do the additional amounts that were paid by the Advisors to Highland under the PRA Amendments suggest that the previously fixed monthly amount set forth in the PRAs was intended to be a variable amount. The court finds that the PRA Amendments were simply made with the purpose of funneling in more money to Highland to help with its liquidity crisis—with the added benefit of reducing the Advisors' taxable income.

### D. Extrinsic Evidence: Post-Petition Communications and Continued Payments under the PRAs and SSAs

The court will now roll forward and consider the extrinsic evidence from the postpetition time period that might shed light on the disputes in this Adversary Proceeding. Both Highland and the Advisors have taken the position that the Agreements are ***unambiguous***—although they each have different interpretations as to what the Agreements mean. While the court is hard-pressed to find any ambiguity in the ***content*** of the Agreements,[61] the court will analyze the extrinsic evidence presented, since the parties have submitted it, and want the court to consider it if ambiguity is deemed to exist as to the Agreements.

In January 2020 (early during the Highland bankruptcy case), in response to inquiries from the Advisors' Retail Board, Ms. Thedford sought information concerning expense reimbursements and allocations under the PRAs. Mr. Klos thereafter informed Ms. Thedford that such information "doesn't exist in terms of current percentages." Ms. Thedford then asked whether such information

---

[61] The court does think the ***title*** of the PRAs—Payroll Reimbursement Agreement—is rather ambiguous, given the content of the document. Also, the Exhibit A list of employees further injects some ambiguity, given the overall content of the Payroll Reimbursement Agreements.

was contained in Exhibit A to the PRAs. In response, Mr. Klos reminded Ms. Thedford that the

allocations in Exhibit A were:

> *a point in time estimate as of 2018. Half the people are gone now and if you were to reallocate them now, all the percentages would be different*. On top of that, we don't have anything comprehensive that is comparable for back office people so the only thing we can really provide is a stale percentage on a small subset of the overall population.

> Would be much more logical to do the yes/no and then as *a blanket statement say that HCMFA/NPA pay $x/$y annually to HCMLP for these employees' services*.[62]

Ms. Thedford responded by simply writing "Got it, thanks."[63]

Also, in January 2020 (again, early in the Highland bankruptcy case and the month Mr.

Dondero ceded control of Highland to the Independent Board under a stipulated corporate

governance order), Mr. Waterhouse, the Treasurer of each of the Advisors, requested information

from Mr. Klos concerning the "monthly amount for each agreement."[64] Mr. Klos responded to Mr.

Waterhouse confirming the fixed amounts under the Agreements:

> Monthly amounts below

> HCMFA
> $416k *flat* for investment support
> $290k-300k for shared services

> NPA
> $252k *flat* for investment support
> $248k *flat* for shared services ($168k from NPA directly; $80k from NREA, but assume you're looking for a consolidated number)[65]

There is no credible evidence that Mr. Waterhouse ever raised any concerns about the fixed

monthly amounts being charged and, in fact, he continued approving payments for these exact

---

[62] Pl. Ex. 151 (emphasis added).
[63] *Id.*
[64] Pl. Ex. 146.
[65] *Id.* (emphasis added).

amounts. Payments did not stop until December 2020, when Mr. Dondero, wearing his Advisors' hat, directed Mr. Waterhouse to stop paying the amounts due under the Agreements. Then the Advisors filed their Application for Administration Expense Claim the very next month.[66] While there was some testimony suggesting that concerns had been raised in early January 2020 regarding possible overpayments under the PRAs to an individual named Fred Caruso (a financial advisor for the Debtor at the firm DSI),[67] the court did not have compelling evidence of this—Fred Caruso did not testify, and Frank Waterhouse had a generally poor memory for the details about this.

The court finds that these continued communications to officers of the Advisors confirming the amounts being paid under the Agreements, and the continued payments by the Advisors, after obtaining this information, is further evidence of the intent of the parties to structure the Agreements as fixed amount contracts.

E. Extrinsic Evidence: Highland Performed under the Agreements Postpetition

Significantly, there was extensive evidence at Trial that Highland performed at all times under the Agreements, and the Advisors made contemporaneous and repeated representations to their Retail Board that Highland was providing all services required under the Agreements.

All parties agreed that, as required by the Investment Company Act, the Retail Board for the Advisors conducts an annual review whereby it determines whether to extend its own Investment Advisory Agreements with the Advisors. This is referred to as a "15(c) review" process. A witness Ethan Powell, a member of the Retail Board, credibly testified about all this.[68]

---

[66] Pl. Exh. 11.
[67] Tr. Transcript 4/13/22, Part 2 of 2 [DE # ], at 144.
[68] Tr. Transcript 4/13/22, Part 1 of 2 [DE # 114], at 4-34.

As part of this "15(c) review" process, and at other times during Highland's bankruptcy case, the Advisors provided the Retail Board with information concerning the status of the shared services relationship, Highland's provision of services thereunder, and contingency planning in case the Advisors' shared services relationship with Highland was terminated.

The Advisors provided this information to the Retail Board either in writing or orally during meetings of the Retail Board (the "Retail Board Meetings"). Minutes from the Retail Board Meetings were created in the ordinary course (the "Retail Board Minutes"). Ethan Powell testified that the Retail Board Minutes were adopted only after, among other things, the Advisors had an opportunity to review and edit their content to assure their accuracy.[69]

The Retail Board Minutes recite, among other things, that one or more of the Advisors' officers (i.e., Mr. Waterhouse, Mr. Norris, Ms. Thedford, or Mr. Post) or their attorneys (i.e., Dennis C. Sauter, the Advisors' in-house counsel, or K&L Gates, their outside counsel) were present and participated in every applicable Retail Board Meeting.[70]

Mr. Powell further testified that the Retail Board: (a) assumed that the Advisors made the statements and representations reflected in the Retail Board Minutes on an informed basis after conducting due diligence, and (b) the Retail Board relied on the statements and representations made by or on behalf of the Advisors in the Retail Board Meetings.[71]

It is important to note that, in January 2020, Mr. Dondero had avoided the likely appointment of a Chapter 11 trustee in the Highland bankruptcy case, by ceding control of Highland to the three new Independent Board members. With Mr. Dondero's loss of control of Highland, the Retail Board naturally sought information about whether this change would impact

---

[69] *Id.*, at 9:15-10:24.
[70] *See generally* Pl. Exs. 57-73.
[71] *See* Tr. Transcript 4/13/22, Part 1 of 2 [DE # 114], at 11:22-12:6, 13:1-13.

Highland's staffing.  Thus, the Retail Board Minutes from the Retail Board Meeting, held on

January 22, 2020, included the following entries:

> Ms. Thedford noted that ***the Meeting Materials included a headcount report that
> lists each employee associated with HCMLP and the Advisers and identifies
> whether the employee is dually employed by both HCMLP and an Adviser*** or
> pursuant to a separate arrangement, such as Mr. Norris' employment with the
> Funds' distributor, NexPoint Securities, Inc. . . .

> Mr. Norris discussed the shared services arrangements that each Adviser is a party
> to with HCMLP pursuant to which the Adviser may utilize employees from
> HCMLP for the provision of various services such as human resources, accounting,
> valuation, information technology services, compliance and legal.  Mr. Norris
> noted, however, that many of these "third party" services are readily available on
> the open market.[72]

In response to the Retail Board's request, the Advisors included in the "Meeting Materials"

a list of every person employed in the Highland complex, including (a) name, (b) title, (c)

department, (d) employing entity (e.g., Highland, HCMFA, NexPoint), (e) whether the person was

a Dual Employee, (f) office location, and (g) whether the person was an "investment professional"

or was providing "back office" services."[73]

In mid-June 2020, Jason Post ("Mr. Post"), the Advisors' Chief Compliance Officer,

assured the Retail Board that the Advisors were "monitor[ing]" the "level and quality" of

Highland's shared services and that he was unaware of any disruptions:

> Mr. Post described the team members providing compliance and legal support
> services to the Funds and the Advisers. . . . Mr. Post stated he believed the
> Compliance department was adequately staffed.

> Mr. Post also discussed the quality and continuity of services provided to the Funds
> by HCMLP pursuant to shared services agreements with the Advisers in the context
> of the HCMLP bankruptcy.  A discussion ensued during which Mr. Post responded
> to questions from the Board.  ***He noted the regular updates provided to the Board
> and also discussed how the level and quality of services are being monitored and***

---

[72] Pl. Ex. 57 at pp. 2-3.
[73] Pl. Ex. 75.

***confirmed that he is not aware of any disruptions in the service levels provided to the Funds***.[74]

In August 2020, Dustin Norris ("Mr. Norris"), an Executive Vice President of each of the Advisors, represented to the Retail Board that "there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter," although James P. Seery, Jr. ("Mr. Seery"), Highland's new CEO (and a member of the court-appointed Independent Board), advised the Retail Board that certain conflicts might arise, given the differing investment strategies being adopted by Highland, on the one hand, and the Advisors, on the other:

> Mr. Norris next provided an overview of the 15(c) review materials and process and discussed the expected timeline with respect to Board consideration of approval of the renewals. ***He noted that there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter***.

> Mr. Seery then pointed out to the Board a potential conflict of interest that had arisen with respect to an investment held by both HCMLP-advised funds and certain of the Funds. Mr. Seery explained that the HCMLP-advised funds were likely to seek to sell their interests in the investment. This divergence of investment objectives of HCMLP and the Funds, and the overlapping portfolio and administrative personnel of HCMLP and HCMFA and the NexPoint Advisors working on the matter, created a potential conflict between the two groups.[75]

In advance of a Retail Board Meeting to be held in September 2020, the Advisors sent a memorandum to the Retail Board in which they stated, among other things, that the "Advisors and HCMLP believe the current shared services being provided are generally consistent with the level of service that historically been received," and further addressed potential conflict issues.[76]

During the two-day Retail Board meeting held on September 17-18, 2020, the Retail Board was advised that Highland continued to perform all of the shared services and was provided with additional information concerning potential conflicts:

---

[74] Pl. Ex. 58 at p. 20 (emphasis added).
[75] Pl. Ex. 59 at pp. 6, 11.
[76] Pl. Ex. 18 at ACL 080581 (response to question 3).

Mr. Surgent joined the Meeting. During the discussion, he responded to the 15(c) follow-up questions submitted by the Board relating to HCMLP matters. *He provided the Board with a status update on the HCMLP bankruptcy and discussed the impact of the HCMLP bankruptcy on the shared services arrangements with the Funds, noting he does not expect that the level and quality of services would change in the immediate term*. Regarding the bankruptcy, Mr. Surgent reiterated Mr. Seery's stated goal to achieve a consensual, omnibus resolution by the end of the year. To the extent this was not achievable, Mr. Surgent noted that an alternative plan had been filed by HCMLP. . . . *He indicated that at this time it was business as usual with respect to the services provided to the Funds* and that the Board would be notified immediately of any developments.[77]

On October 9, 2020, Mr. Norris sent an e-mail to the Retail Board and other officers and agents of the Advisors (including outside counsel) to provide an interim update in which he advised the Retail Board that NexPoint was working on contingency plans to "ensure that there is no disruption in services":

We are working on full responses to your with [sic] 15(c) follow-up questions attached, however we want to keep you updated as it pertains to the continued developments with shared services and your first question on the attached. As it stands today, NexPoint's senior management's plan as a backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by 12/31/2020. *This will help ensure that there is no disruption in services to the Funds. Once we have further details of this we will advise. In the interim the plan is to continue with existing shared services*.[78]

A few days later, on October 13, 2020, Mr. Norris informed the Retail Board during a regularly scheduled meeting that, with respect to shared services, "all operations continued in the normal course there [sic] had been no material impact on the day-to-day operations of the Funds" and that contingency plans were "in place to continue to provide the same level and quality of services to the Funds":

Mr. Ellington then explained three various potential scenarios contemplated during the ongoing negotiations, including a full or partial buyout of certain creditor claims by Mr. Dondero or no agreement, which could potentially lead to liquidation of HCMLP and termination of all HCMLP employees. . . .

---

[77] Pl. Ex. 60 at pp 12-13 (emphasis added).
[78] Pl. Ex. 81 (emphasis added).

Mr. Sauter also discussed the status of the shared services agreements. In response to another question, *Mr. Norris discussed the morale employees [sic] and noted that all operations continued in the normal course there [sic] had been no material impact on the day-to-day operations of the Funds*. He indicated that there would not likely be any material developments with respect to the status of HCMLP until the end of the year at the earliest. The Board requested that the Advisers continue working toward developing definitive plan to *ensure that the resources, both of personnel and equipment, are in place to continue to provide the same level and quality of services to the Funds* and to continue to report back to the Board on the status.[79]

On October 23, 2020, the Retail Board asked whether there were "any material outstanding amounts currently payable or due in the future (e.g., notes) to HLCMLP [sic] by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds."[80] As to that question, the Advisors informed the Retail Board that "*[a]ll amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter*."[81]

On October 28, 2020, the Retail Board was again told that: (i) Highland was expected to continue to provide shared services without interruption, (ii) the parties continued to work on a "seamless transition," (iii) according to Mr. [Brian] Collins [HR manager], there had been no "significant departures" of employees, and that (iv) the "quality and level" of services had not been negatively impacted by Highland's bankruptcy:

Mr. Ellington provided an update on the HCMLP bankruptcy, focusing on the contingency plan for fund service providers if HCMLP is unable to perform its current functions. . . . He also noted that based upon on-going discussions with HCMLP, as well as in view of these alternative contingency plans, *the Advisers do not expect any interruption to the services to the Funds that are currently being provided by HCMLP pursuant to the Shared Services Agreement*.

Mr. Collins noted that, although employees of HCMLP were not yet able to be released subject to confirmation of the plan of bankruptcy, *he was confident in the firm's ability to retain talent throughout this process based on discussions with*

---

[79] Pl. Ex. 61 at pp. 2-3.
[80] Pl. Ex. 22 at 2.
[81] *Id.*

28

> *the employees. He noted that every employee team leader had been spoken to and also noted that there have been no significant departures to date. . . .*
>
> *The Advisers represented that the quality and level of services provided to the Funds by the Advisers and pursuant to the shared services arrangements had not been negatively impacted to date and that adequate plans were in place prevent any diminution of services as a result of any potential issues relating to the HCMLP bankruptcy that might arise. . . .*
>
> *The Board noted that the level and quality of services to the Funds by the Advisers and its affiliates had not been materially impacted by the HCMLP bankruptcy and took into account the Advisers' representations that the level and quality of the services provided by the Advisers and their affiliates, as well as of those services currently being provided by HCMLP pursuant to the Shared Services Agreement, would continue to be provided to the Funds at the same or higher level and quality.*[82]

A week later, Mr. Norris again reassured the Retail Board that Highland continued to provide shared services on an uninterrupted basis and that no issues of "conflict" arose:

> *Mr. Norris then noted that there has not been any disruption to the services provided to the Funds by HCMLP pursuant to the Shared Services Agreement and that he expects that such services will continue to be provided in normal course.* In addition, Mr. Norris noted that there have been no issues with an HCMLP employee being conflicted out since the last update.[83]

By December 1, 2020: (a) Highland had sent the Termination Notices, indicating its intent to termination the Agreements; and (b) the Advisors had allegedly discovered the "overpayments under the Agreements."[84] Yet, the Advisors continued to reassure the Retail Board that everything was proceeding normally and that the parties were working to achieve an orderly, seamless transition.

Indeed, on December 1, 2020, Mr. Post confirmed that Highland sent the Termination Notices and informed the Retail Board, among other things, that:

> On November 30, 2020, HCMLP provided notice of termination of the Shared Services Agreement to HCMFA/NPA, effective January 31, 2021. However, based

---

[82] Pl. Ex. 62 at pp. 2-3, 7.
[83] Pl. Ex. 63 at p. 3.
[84] Pl. Ex. 13 ¶16.

upon on-going discussions with HCMLP, ***HCMFA/NPA expects to be able to continue to receive these services through a transfer of personnel, equipment and facilities from HCMLP*** either to HCMFA/NPA or to a third-party service provider.[85]

On December 7, 2020, the Advisors provided written responses posed by Blank Rome, outside counsel to the Retail Board. In response to a question about who "is responsible for putting together the plan to continue to provide/transition shared services for the retail complex," the Advisors stated:

> The senior management team of the Advisors is responsible for the transition of services, and this group is made up of Jim Dondero, D.C. Sauter, Jason Post, and Dustin Norris. ***This group is working with HCMLP management to ensure an orderly transition***.[86]

The Retail Board also asked for a "matrix of current services provided and services that will be transferred." In response, the Advisors stated:

> Please see Appendix A below, which includes the list of services provided under the shared services agreement with HCMLP. These services fall into two broader categories: 1) Employees performing services and 2) Systems, infrastructure, software and supplies/equipment. As we understand it, the bankruptcy plan of reorganization approved by the bankruptcy court (the "Approved Plan") anticipates the termination of all HCMLP employees by 1/31/21. ***The Advisors anticipate extending employment offers to the vast majority of HCMLP's employees such that the employees would be rehired immediately upon termination of their employment with HCMLP. This will cover all of the services under category 1 above***.[87]

During a Retail Board meeting held on December 10-11, 2020: (a) Mr. Norris reviewed the "current services provided under the shared services agreement with HCMLP and discussed the current plans for ensuring the continuation of those services after a plan of reorganization is

---

[85] Pl. Ex. 16. (December 1, 2020 email from Mr. Post) (emphasis added).
[86] Pl. Ex. 10 at 1 (emphasis added).
[87] *Id.* at 2 (emphasis added).

approved"; and (b) Mr. Sauter "noted that there has been no material attrition to date with respect

to employees":

> Mr. Norris provided responses to the Board's follow up questions that had been
> submitted on their behalf prior to the Meeting. Among these items, ***Mr. Norris
> reviewed a matrix of current services provided under the shared services
> agreement with HCMLP and discussed the current plans for ensuring the
> continuation of those services after a plan of reorganization is approved***. Mr.
> Norris noted that these shared services fell into two broader categories: (1)
> employees performing services and (2) systems, infrastructure, software and
> supplies/equipment. With respect to the first category, Mr. Norris discussed plans
> by the Advisers to extend employment offers to the vast majority of HCMLP's
> employees such that the employees would be rehired immediately upon termination
> of their employment with HCMLP. In the alternative, these employees could join
> a newly formed entity (New Co) and continue to provide services to the Funds
> through NewCo. ***With respect to the second category, Mr. Sauter noted that the
> Advisers and HCMLP were in agreement that these would be assigned with a
> payment from the Advisers*** and that there were working groups set up that were
> pursuing an orderly transition of all of these items, which included orderly
> assignment and assumption of the relevant agreements needed to continue with all
> current services. ***He noted that there has been no material attrition to date with
> respect to employees***. . . . Mr. Norris also discussed the Advisers' proposed
> alternative plan and confirmed that ***regardless of whether the Advisers and
> HCMLP came to an agreement on shared services, such services would be
> continued to be provided to the Funds without interruption***.[88]

By January 2021, Highland had become embroiled in litigation with Mr. Dondero and had

obtained temporary injunctive relief against him. However, the Advisors assured the Retail Board

that this had no impact on the Advisors' ability to obtain access to information and resources

concerning the Retail Funds:

> Mr. Norris confirmed that ***the Advisers did not feel limited by the temporary
> restraining orders relating to the HCMLP bankruptcy with respect to access to
> Fund information***. Mr. Norris then updated the board on a number of employee
> moves from HCMLP to NexPoint. In response to a question, Messrs. Post and
> Norris confirmed that there was sufficient legal and compliance coverage for the
> Funds.
>
> Mr. Norris then provided an update on the negotiations with HCMLP on the
> transition of shared services. He noted that both sides had agreed in principle on

---

[88] Pl. Ex. 64 at pp. 7-8.

the transition of services and cost sharing but that it was not yet memorialized in a contract and a number of details still needed to be resolved. *He confirmed that the Advisers continued to receive full access to information and resources with respect to the Funds.*[89]

On January 29, 2021, Jackie Graham, NREA's[90] Director of Investor Relations and Capital Markets, sent an e-mail to Mr. Dondero, Mr. Sauter, and others in advance of a Board call in which she attached an outline of certain issues concerning shared services provided by Highland and stated, among other things, that:

> Because the [relevant Funds] are externally managed by external advisors (NexPoint Real Estate Advisors, L.P. and its affiliates (the "Advisors")), the [relevant Funds] rely on the Advisors to provide certain services to them. *The Advisors utilize Highland Capital Management, L.P. ("HCM") to provide a certain subset of these services under a shared services agreement between HCM and the Advisors.* . . .

> Employees of the Advisors are working with HCM to provide a transition of shared services from HCM to the Advisors or third party providers. . . . Specifically, the Advisors and affiliate advisors would pay a one-time fee of $400,000 and ongoing monthly costs of $270,000. Additionally, *HCM may require the Advisors and affiliate advisors to pay previously unpaid fees allegedly owed to HCM totaling $5.5m.* . . .

> Winston is reviewing potential legal remedies *in the event HCM breaches the shared services* by denying us access to our data held by HCM or otherwise attempts to cause harm to our shareholders . . .[91]

Eventually, a transition of shared services from Highland to a Newco entity known as Skyview was effectuated (Skyview being owned and operated by individuals previously employed by Highland). As the transition of the shared services from Highland to Skyview was nearing completion, the Advisors continued to reassure the Retail Board that all was well. On February 26, 2021, Mr. Norris provided an update on the transition:

> Mr. Norris provided an update on the shared services arrangements and employee transitions. *He indicated that there would be no impact as a result of certain*

---

[89] Pl. Ex. 66 at pp. 2-3.
[90] "NREA" stands for NexPoint Real Estate Advisors, L.P., a subsidiary of NexPoint.
[91] Pl. Ex. 84 at FUNDS 0000043-44 (emphasis added).

*employees not transitioning to the Advisers* and discussed the team in place and their qualifications. He noted that the current shared services arrangements with HCMLP would cease at the end of February and that the Advisers wish to move forward with new Shared Services Agreements between each Adviser and NewCo. He then stated that these Agreements were in the process of being drafted and finalized and will be reviewed with the Board at its next meeting. *He indicated that there had been no major issues in connection with the transition and that the personnel from the Advisers had met with HCMLP with respect to data files and are comfortable that HCMLP will be providing the necessary information.* In response to a question from the Board, he indicated that there was not an immediate need for such data and confirmed that the Advisers had the data and information files they needed with respect to Fund operations and services.[92]

Based on all the information and representations made by the Advisors, the NexPoint Diversified Real Estate Trust (one of the Advisors' Clients) filed its annual report with the SEC in early *2022* (about a year after Highland commenced this Adversary Proceeding and the Advisors filed their administrative expense claims) in which it disclosed, among other things, the following:

> The Fund has retained NexPoint Advisors, L.P. (the "Investment Adviser") to manage the assets of the Fund pursuant to an investment advisory agreement between the Investment Adviser and the Fund (the "Agreement"). . . . *The Board of Trustees noted that the level and quality of services to the Fund by the Investment Adviser and its affiliates had not been materially impacted by the HCMLP bankruptcy* and took into account the Investment Adviser's representations that the level and quality of the services provided by the Investment Adviser and their affiliates, as well as of those services provided by Skyview to the Investment Adviser under the Skyview Services Agreement, would continue to be provided to the Fund at the same or higher level and quality.[93]

Pursuant to the evidence set forth above, the court finds that the Advisors made *numerous representations* to the Retail Board, before and after the Advisors allegedly became aware of the "overpayments" and ceased making payments to Highland under the Agreements, indicating that Highland had sufficiently performed all services provided under the Agreements. The court notes that, many times, the communications between the Advisors and the Retail Board (or the Retail

---

[92] Pl. Ex. 73 at pp. 9-10 (emphasis added).
[93] Pl. Ex. 77 at 41, 43

Board Minutes) refer to no interruption in "shared services." The court interprets this to generically mean shared services under both the SSAs and PRAs. This is strong evidence that Highland, indeed, performed all services contemplated under the Agreements.

F. Extrinsic Evidence that the Advisors had Knowledge of Employees Hired and Terminated by Highland, Both Pre- and Post-Petition

In addition to the evidence detailed above, there is still more credible evidence that the Advisors had knowledge of when employees of Highland, including the Dual Employees, were hired and terminated by Highland. Among other things:

- In their written responses to interrogatories, the Advisors admitted that they had contemporaneous knowledge of the termination of every Dual Employee;[94]

- Every month from at least October 2017 through January 2021, Highland's Human Resources department (under the direction of a Mr. Brian Collins) prepared a "Monthly Headcount Report" (the "Monthly Headcount Reports") listing every employee in the Highland complex and highlighting new hires and terminations and distributed such reports to numerous people, including the Advisors' officers (i.e., Mr. Waterhouse, Ms. Thedford, and Mr. Norris);[95]

- Mr. Dondero was provided with extensive information concerning hires, terminations, and employee compensation and benefits during the Annual Reviews;[96]

- In early 2020, the Advisors provided detailed information to the Retail Board concerning all of Highland's employees;[97]

Yet, despite having knowledge of Highland terminating certain employees, both when it was controlled by the Independent Board and when it was controlled by Mr. Dondero, the Advisors continued to approve and make payments in the same monthly amounts under the Agreements.

---

[94] Pl. Ex. 14 at pp 12-13 (responses to Interrogatories 3 and 4).
[95] Pl. Exs. 88-127.
[96] Pl. Ex. 86 at pp. 29-33; Pl. Ex. 142 at pp. 6-10.
[97] Pl. Ex. 57; Pl. Ex. 75.

As earlier noted, as of May 1, 2018, when the Advisors entered the PRAs, four of the twenty-five Dual Employees on Exhibit A had already been terminated, and Mr. Waterhouse had every reason to know that cost allocations for terminated employees were being used when he signed the Agreements.[98]

As also earlier noted, as of December 14, 2018, when the PRA Amendments paying Highland $2.5 million of extra compensation were entered, nine of the twenty-five Dual Employees on Exhibit A had already been terminated. Finally, as of the Petition Date, fourteen of the twenty-five Dual Employees on Exhibit A had already been terminated.

Still, no change in the monthly payments (only the unexplained *increase* in payment made by the Advisors under the PRA Amendments that had no analysis done in connection with it) were ever made or requested by the Advisors under the PRAs.

The court finds the Advisors had knowledge of the termination of Dual Employees under Exhibit A of the PRAs. Further, the court finds the Advisors continued making the same monthly payments under the PRAs, despite knowledge of the terminations, for 35 months.

G.  The Advisors Knowingly and Intentionally Made All Payments under the Agreements until November 30, 2020

The evidence is undisputed that, from January 1, 2018 through November 30, 2020, the Advisors made all of the same monthly payments under the Agreements in exchange for the back-office, middle-office, and front-office services provided to them by Highland. Each of the payments that the Advisors made under the Agreements between January and November 2020 (when the new Independent Board controlled Highland) were exactly the same (or, in the case of the HCMFA SSA, utilized the exact same methodology) as the payments that the Advisors made

---

[98] Tr. Transcript 4/12/22, Part 2 of 2 [DE # 113], at 111:22-112:5.

under the Agreements between January 1, 2018 and December 31, 2019 (when Mr. Dondero still controlled Highland).

It cannot be legitimately disputed that the Advisors had knowledge of the payments made under the Agreements. The evidence shows: (1) the Agreements were signed by Mr. Waterhouse, the Treasurer of the Advisors and the CFO of Highland;[99] (2) Highland sought and obtained permission from Mr. Waterhouse before making payments under the Agreements as the officer of the Advisors;[100] (3) Mr. Waterhouse testified that he, in his role as the Treasurer of the Advisors, was responsible for ensuring the Advisors paid the proper amounts under the Agreements;[101] and (4) the Advisors represented to the Retail Board that "[a]ll amounts owed by each of NPA and HCMFA pursuant to the shared services arrangement have been paid."[102]

The Advisors made an argument in their trial brief that Highland was simply paying itself without any involvement from any Advisor employee or officer. This statement is disingenuous, given Mr. Waterhouse's testimony that he was the officer in charge of making sure the proper amounts were transferred under the Agreements and his regular approval of payments.

The court finds, when considering the collective of this evidence, that the Advisors had knowledge of and authorized the payments by the Advisors to Highland under the Agreements.

H. The Advisors' Stoppage of Payments under the Agreements Late in the Bankruptcy Case

As stated above, from the January 1, 2018 until November 30, 2020, the Advisors paid Highland the same fixed monthly amounts due and owing under the Agreements, without change or objection.[103]

---

[99] There is one exception. The NexPoint SSA, executed in 2013, was signed by James DOndero and by an individual named Brian Mitts. Pl. Exh. 2.
[100] See, e.g., Pl. Exs. 147, 152.
[101] Tr. Transcript 4/12/22, Part 2 of 2 [DE # 113], at 69:19-25.
[102] Pl. Ex. 22 at ACL 080593 (response to Question 2).
[103] And, notably, without any request for a modification or "true-up" post-petition.

By the end of November 2020: (i) the Independent Board had demanded Mr. Dondero's resignation (from his post-petition role as a portfolio manager for Highland); (ii) Mr. Dondero had begun interfering with Highland's business and engaging in conduct that ultimately led to the imposition of injunctive relief; and (iii) Highland had delivered the termination notices for the SSAs.[104]

It was around this time when Mr. Dondero instructed Mr. Waterhouse to stop making any payments to Highland on account of the Agreements. As a result, the Advisors failed to make payments under the Agreements for the months of December 2020 and January 2021 (and, in the case of the HCMFA SSA, also the month of November 2020). The court finds, and there is no dispute by the Advisors, that the Advisors intentionally did not make these payments to Highland under the Agreements.

## I.   The Advisors' Lack of an Attempt to Modify the PRAs

As earlier noted, the Advisors claim that, in late 2019 or early 2020, after Highland had filed bankruptcy, Mr. Waterhouse raised the existence of overpayments with Fred Caruso ("Mr. Caruso"), an employee of Development Specialists, Inc. ("DSI"), before the new Independent Board of Highland was even appointed. Another employee of DSI, Brad Sharp, serve as the Chief Restructuring Officer in the bankruptcy, at that time (again, before the Independent Board was appointed). However, despite what was alleged in the Advisors' pleadings, Mr. Waterhouse testified that he does not remember ever asking Mr. Caruso to amend the amounts under the PRAs, only that he made him aware that there might be overpayments.[105] The Advisors and Mr.

---

[104] The termination notices did not mention the PRAs. Mr. Seery credibly testified that he does not know why the PRAs were not mentioned in the termination notices, but that they were rejected as part of the confirmed plan. Tr. Transcript 4/13/22, Part 1 of 2 [DE #114], at 62:1-63:21.
[105] Tr. Transcript 4/12/22, Part 2 of 2, at 109:18-110:4.

Waterhouse claim that Mr. Caruso told Mr. Waterhouse that the PRAs could not be amended because of the automatic stay in place from the bankruptcy. There is no documentation of this discussion or any subsequent documentation of what Mr. Caruso or Mr. Waterhouse discussed—only the testimony of Mr. Waterhouse where he couldn't remember specifics. Mr. Caruso did not testify at Trial.

There is no evidence that Mr. Waterhouse might have followed up with Mr. Caruso. Mr. Waterhouse never told anyone else affiliated with the Advisors that he had learned of potential overpayments, other than Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") with Highland's legal department, and this included not telling Mr. Dondero.[106] Mr. Waterhouse never made Highland's new Independent Board aware of the alleged potential overpayments, despite many interactions with the Independent Board.[107] And notably absent from his testimony, was any claim that he made a formal request for modifications to the PRAs as the Advisors' Treasurer, despite having knowledge of the alleged overpayments since at least late 2019, and likely since the PRAs were signed.

Viewing the evidence in the light most favorable to the Advisors, they only raised the issue of potential overpayments to Highland in late 2019, through Mr. Caruso, Mr. Ellington, and Mr. Leventon. The Advisors never subsequently followed up with Mr. Caruso or informed Highland's new Independent Board of the alleged overpayments after the Independent Board was put in place shortly after the alleged conversations with Mr. Caruso. Further, and most importantly, the court finds that the Advisors, based on the testimony of Mr. Waterhouse, never made a request to modify

---

[106] Tr. Transcript 4/12/22, Part 2 of 2, at 111:18-112:8.
[107] Tr. Transcript 4/12/22, Part 2 of 2, at 114:15-25.

the payments under the PRAs during the relevant period before payments were withheld in November 2020.

### III. CONCLUSIONS OF LAW

#### A. Jurisdiction and Venue

Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding, pursuant to 28 U.S.C. § 1334(b), and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O). The court has Constitutional authority to enter a final judgment in this Adversary Proceeding. While Defendants, in their Original Answer, initially contested that core matters were involved and they did not consent to bankruptcy court adjudication,[108] the parties later stipulated to final adjudication of these matters in the bankruptcy court.[109] Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

#### B. Choice of Law

The four relevant documents in the Adversary Proceeding are the HCMFA SSA, NexPoint SSA, HCMFA PRA, and NexPoint PRA. All four of these contracts contain choice of law provisions that the Agreements "will be governed and construed in accordance with the laws of the State of Texas."[110] Accordingly, Texas law applies to the claims at issue.

#### C. The Advisors' Claims for Overpayment under the PRAs

The Advisors seek an administrative expense claim for alleged overpayments they made under the PRAs from the Petition Date until November 30, 2020 (the date the Advisors ceased making any payments under the PRAs).

---

[108] DE # 33 in AP, ¶ 10.
[109] DE # 37 in AP, ¶ 2.
[110] Pl. Ex. 2 § 9.05; Pl. Ex. 3 § 8.04; Pl. Ex. 6 § 6.05; Pl. Ex. 8 § 6.05.

As set forth in the Joint Pretrial Order filed in this Adversary Proceeding, the Advisors contend that each of the Advisors were required to reimburse Highland for its actual costs of the Dual Employees listed on the Exhibit A's to the PRAs, but that as of the Petition Date, many of the Dual Employees (fourteen out of twenty-five) were no longer employed at Highland. Therefore, the Advisors argue, during this period, they were essentially paying Highland for Dual Employees who were no longer employed by Highland and that such payments constituted overpayments under the PRAs. The Advisors maintain that their monthly payments under the PRAs resulted in overpayments by the Advisors to Highland totaling $7,649,942, broken down as $4,928,103 in post-petition overpayments by HCMFA and $2,721,839 in post-petition overpayments by NexPoint. The Advisors' overpayment claim is premised on the contention that the Advisors were only required to pay for "actual costs and expenses" relating to each particular Dual Employee.

Alternatively, the Advisors argue that if their interpretation of the PRAs is incorrect—such that the PRAs contemplated fixed monthly payments and Section 2.02 of the PRAs would have required a modification of the PRAs in order to reduce the required monthly payment to conform to a smaller number of Dual Employees—then the court should find that the Advisors did, indeed, seek to modify the fixed monthly amounts under Section 2.02, but that Highland failed to negotiate the same in good faith as required by such section.

In response, Highland argues that the PRAs clearly and unambiguously require that the Advisors pay a flat monthly amount for investment advisory services rendered, regardless of which employees actually performed those services, unless the parties agreed otherwise in writing pursuant to Section 2.02. Highland also argues that parole evidence and the parties' uninterrupted course of dealing proves that the parties intended for the Advisors to pay a fixed monthly amount

for investment advisory services, unless modified pursuant to Section 2.02. Highland further argues that the Advisors never sought modification and that their claims have been (a) waived and (b) are barred by the voluntary payment rule.

### i.     The PRAs are Unambiguous as a Matter of Law

Under Texas law, a party claiming breach of contract has the burden to prove the following elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach." *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018) (internal citations omitted). The court's primary role in interpreting a contract is "to determine the parties' intent as reflected in the [contract's] terms." *Chrysler Ins. Co. v. Greenspoint Dodge of Houston Inc.*, 297 S.W.3d 248, 252 (Tex. 2009). "Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law." *Id.* "If the contract is capable of being given a definite legal meaning, parole evidence is generally not admissible to create an ambiguity." *Kendziorski v. Saunders*, 191 S.W.3d 395, 405 (Tex. App. – Austin 2006). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered into." *BCC Merchant Solutions, Inc. v. Jet Pay, LLC*, 129 F.Supp.3d 440, 466 (N.D.Tex. 2015) (internal quotations omitted); *see also Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982) ("[W]hen a question relating to the construction of a contract or its ambiguity is presented, the court is to take the wording of the contract in the light of the surrounding circumstances, in order to ascertain the meaning that would be attached to the wording by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration").

A contract is unambiguous and will be enforced as written where it is "susceptible to only one reasonable construction." *BCC Merchant*, 129 F.Supp.3d at 477. "[A] cardinal rule of contract interpretation under Texas law is that the entire writing must be examined" and "no single provision taken alone [may] be given controlling effect." *Id.* (citing Texas law) (internal quotations omitted). "Where the language is clear and definite, the contract is not ambiguous, and a court must apply the plain language as a matter of law." *Main Street Bank v. Unisen*, No. H-06-3776, 2008 WL 11483415, at *4 (S.D.Tex. Feb. 15. 2008).

Thus, the court begins its analysis by looking at the plain language of the PRAs. In both of the PRAs, Section 2.01 mandated that the Advisors were required to pay Highland the "Actual Cost" of the services provided by the Dual Employees.[111] However, despite the use of the words "Actual Cost," and an Exhibit A attachment purporting to list out the Dual Employees, the PRAs defined that term "Actual Cost" under Article I as a specific dollar amount. The PRAs defined "Actual Cost" as equal to $252,000 per month for NexPoint and $416,000 per month for HCMFA.[112] There was no requirement of periodic reevaluation of the Actual Cost; no automatic adjustments to the Actual Cost amounts, for such things as employee comings-and-goings or employee changes in job duties; and no mention of a "true-up" annually or at any other time. The PRAs simply plugged in a decisive monthly amount.

Section 4.02 of the PRAs required any party seeking modifications to amounts paid under the definition of "Actual Cost" to make a request on the other party "on or before the last business day of the calendar month." Further, Section 2.02 permitted the parties to "agree to modify the terms and conditions" of the amounts paid and the parties were required to negotiate any

---

[111] Pl. Ex. 6 § 2.01; Pl. Ex. 8 § 2.01.
[112] Pl. Ex. 6 Article I; Pl. Ex. 8 Article I.

modification requested in good faith. Finally, Section 6.02 required that any amendment to the PRAs to be in writing by all parties.

These are the PRA provisions that are germane to the disputes in this Adversary Proceeding. When reading these provisions within the entirety of the PRAs, the court concludes that the PRAs are unambiguous as a matter of law. Section 2.01 and an accompanying Article I definition of "Actual Cost" set forth a flat monthly amount; the parties agreed that this flat monthly amount would be deemed to be the "Actual Cost" of the front-office services that Highland was providing to the Advisors, through the Highland employees. The accompanying Sections 2.02, 4.02, and 6.02 allowed for a modification of these amounts, but only if a party notified the other party on or before the last business day of a calendar month that it requested such a modification. If the parties agreed to a modification, there had to be a written agreement memorializing the amendment.

The Advisors seem to argue that Sections 2.02 and 4.02 imposed an affirmative obligation on Highland to update the list of Dual Employees and their respective Allocation Percentages, or to unilaterally adjust the "Actual Costs." The literal wording of these provisions does not support such an obligation. Under the Advisors' interpretation of the PRA, Highland would have been obligated to invoke Section 4.02 (which is itself dependent on Section 2.02) on the Advisors' behalf and to adjust the Advisors' monthly payments as Dual Employees were terminated, or as changes were made in their compensation or Allocation Percentages. But again, that is simply not what the PRAs provide. The PRAs use the words the "Parties may agree to modify the terms" when assigning the obligation under Section 2.02, which the preamble defines as both Highland and the Advisors. Further, Section 4.02 requires "the Party requesting modification" to notify "the other Party." Notably, Section 4.02 does not put this obligation solely on Highland as it uses

43

"Party" to refer to either party to the contract, whereas it uses "HCMLP" specifically when assigning obligations to Highland elsewhere in the PRAs. The court concludes that the unambiguous language put no unilateral obligation on Highland to amend the PRAs to reflect changes in Dual Employees, but rather on both the parties to negotiate such amendments.

### ii. *Even if the PRAs Were Ambiguous, Extrinsic Evidence Supports a Fixed Payment Interpretation*

As stated above, the court concludes that the PRAs are not ambiguous, and that the only reasonable interpretation of the PRAs is they contemplate a fixed monthly payment. In fact, the only aspects of the PRAs that give the court any pause regarding ambiguity are as follow:  (a) the title of the PRAs (i.e., Payroll ***Reimbursement*** Agreement—suggesting an intention to reimburse payroll costs); and (b) the fact that there was a list of employees attached as Exhibit A.  Why use the term "reimbursement" or attach a list of employees if these words/concepts were not really dispositive of anything?  If these two aspects of the PRAs make them ambiguous, then the court is required to consider the wording of the contract ***in the light of the surrounding circumstances***, in order to ascertain the meaning the agreements, as might be given by a reasonably intelligent person acquainted with all operative usages, and knowing all of the circumstances prior to and contemporaneous with the making of the agreements.  *See Watkins v. Petro-Search,* 689 F.2d at 538.

The Findings of Fact set out a plethora of evidence that established that the parties always contemplated fixed amounts being used to pay Highland for providing front-office services to the Advisors.  This evidence included, among other things: (1) Mr. Klos credibly testifying that the PRAs, and Exhibit A's, were created to reflect payments, in conjunction with the other Agreements, that equaled the annual amounts that Mr. Dondero wanted transferred to Highland

after the 2017/2018 Annual Review ***to deal with Highland's cash liquidity problems*** (recall that prior to 2018, Highland provided sub-advisory services to the Advisors for free and Highland was facing an imminent loss of its Acis sub-advisory fees); (2) Mr. Waterhouse testifying that he was aware that four of the Dual Employees had been terminated at the signing of the PRAs, yet did not seek to update the Dual Employee allocations on the Exhibit A's at any point to reflect this; (3) employees and officers of the Advisors received Monthly Headcount Reports from Highland, detailing the hiring and termination of employees, including the Dual Employees during the relevant period; (3) the Exhibit A's were never updated, even though Dual Employees were terminated over time, and no one was ever asked to update them; (4) Mr. Waterhouse, as the Advisors' Treasurer, had knowledge of Dual Employees being terminated or otherwise leaving Highland, and continued to approve payments under the PRAs on 35 separate occasions; (5) Mr. Klos communicated with Mr. Waterhouse in January 2020, during which Mr. Klos confirmed to Mr. Waterhouse that the Agreements were "flat" amount payments and the same amounts had been paid since the PRAs were signed; and (6) no request for an amendment to the PRAs was made through November 2020 (except for the 2018 PRA Amendments—pursuant to which $2.5 million extra was paid to Highland on account of the PRAs, even though five more employees on the Exhibit A lists had left Highland since execution of the PRAs).

In summary, this extrinsic evidence further supports a conclusion that the PRAs were fixed rate contracts, if the PRAs should be determined to be ambiguous. This extrinsic evidence reveals that the Advisors were aware Dual Employees were being terminated, made no request for an amendment to the PRAs, and continued to make payments under the PRAs until Mr. Waterhouse, under the direction of Mr. Dondero, stopped making payments in November 2020.

Given that the court has concluded that the PRAs were fixed rate arrangements, the Advisors have failed to meet their burden of proving overpayments under the PRAs.

### iii. Highland Did Not Fail to Negotiate in Good Faith

The court noted above that Section 2.02 of the PRAs included language that required the parties to negotiate in good faith when a party notifies the other party that it is requesting a modification, pursuant to Section 4.02, before the last business day of the calendar month. The Advisors allege that Highland never negotiated in good faith when the Advisors supposedly made Highland aware (through Highland's consultant, Mr. Fred Caruso) that overpayments under the PRAs may have been made, and Mr. Caruso told the Advisors that an amendment could violate the automatic stay in bankruptcy.

The court has already found and concluded that: (a) the PRAs unambiguously created a fixed amount contract; (b) Highland was under no duty to unilaterally modify the PRAs if it knew that Dual Employees were terminated; and (c) the Advisors failed to provide sufficient evidence that they made a formal request of Highland to modify the fixed monthly amount, pursuant to the terms of the PRAs.[113] Thus, the Advisors never triggered Highland's obligation under Section 2.02. Specifically, without a formal notification/request of the type set forth in Section 4.02 of the PRAs, Highland's obligation to negotiate in good faith could not exist. Discussing potential overpayments with a third-party consultant (Mr. Caruso)—assuming such overpayments could even be possible—is not enough. Additionally, if the automatic stay was a valid concern of the Advisors (potentially impairing their ability to exercise contractual rights under the PRA), there were options available to them, including filing a motion for relief from stay to exercise

---

[113] The Advisors, in their pleadings, claimed Mr. Waterhouse made such a request in late 2019 in his conversations with Mr. Caruso. However, Mr. Waterhouse testified that they talked about overpayments possibly being made, but that he never recalled requesting amendment of the PRAs.

termination rights (termination was permissible under the PRAs, with or without cause, on 60-day notice)[114] or filing a motion to compel rejection of the PRAs pursuant to Bankruptcy Code section 365.

As such, the court concludes that Highland did not fail to negotiate in good faith under Section 2.02.

### iv.  Highland's Waiver Defense to Overpayments under the PRAs

Alternatively, if the PRAs should be construed to have contemplated variable amounts—that should have changed automatically as Dual Employees departed, as opposed to fixed rate amounts—Highland argues that the preset monthly amounts listed in the PRAs were controlling until the Advisors made a request under Section 2.02 to change those monthly amounts, and that the Advisors **waived** any right to overpayments by not making such a request or objecting to payments under the PRAs for all the many months during which Dual Employees were being terminated.

"Under Texas case law, waiver is the intentional relinquishment of a known right or the intentional conduct inconsistent with claiming that right."  *Sedona Contracting, Inc. v. Ford, Powell & Carson, Inc.*, 995 S.W.2d 192, 195 (Tex. App. 1999).  The elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right (which can be inferred from the conduct). *See id.*; *see also Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 778 (Tex. 2008); *Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 643 (Tex. 1996) ("The affirmative defense of waiver can be

---

[114] Pl. Ex. 6 § 5.02; Pl. Ex. 8 § 5.02.

asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right.").

Waiver "results as a legal consequence from some act or conduct of the party against whom it operates" and is "essentially unilateral in character," meaning "no act of the party in whose favor it is made is necessary to complete it." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017) (quotation marks omitted). "Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver." *Tenneco*, 925 S.W.2d at 643.

While waiver is ordinarily a question of fact, when the surrounding facts and circumstances are undisputed, the question becomes one of law. *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.,* 1 S.W.3d 108, 111 (Tex. 1999); *Tenneco*, 925 S.W.2d at 643.

The first element is met here. Pursuant to Sections 2.02 and 4.02 of the PRAs, the Advisors had the right to seek a change to the fixed monthly rate if they believed a change was appropriate.

There is no dispute over the second element. The PRAs were signed by Mr. Waterhouse as an officer of both Highland and the Advisors. Further, the Advisors have never disputed having knowledge of Sections 2.02 and 4.02 under the PRAs during the relevant period.

The third and final element is the most pertinent under the analysis for waiver—the question being whether the actions or inactions of the Advisors were sufficient to show an intention to relinquish their right to modify the PRAs. Relevant here: (a) the Advisors (through their officers Mr. Waterhouse, Mr. Norris, and Ms. Thedford) were kept up to date from before the PRAs were signed until after November 30, 2020, by Monthly Headcount Reports created by Highland and distributed to these officers; (b) the Advisors signed the PRAs on May 1, 2018, at which time, the Advisors knew four of the twenty-five Dual Employees under the attached Exhibit A's had been

terminated; (c) the Advisors entered into the PRA Amendments in December 2018, when they had knowledge that nine of the twenty-five Dual Employees had been terminated—instead of attempting to amend under Sections 2.02 and 4.02, to reduce the monthly payments, to reflect the reduced number of Dual Employees, the Advisors paid Highland an additional sum of $2.5 million and never requested an amendment thereafter; and (d) on the Petition Date in October 2019, the Advisors were aware that fourteen of the twenty-five Dual Employees had been terminated; yet, from the Petition Date to November 30, 2020, the Advisors never made a request to modify the PRAs under Sections 2.02 and 4.02 and continued to pay the fixed amounts, despite knowledge that over half the Dual Employees had been terminated.

In summary, the Advisors did not exercise their alleged right to correct the monthly flat amount, to account for alleged overpayments, for almost three years (from the time the contract was signed until November 30, 2020). Mr. Waterhouse authorized payments under the PRAs for almost three years—i.e., thirty-five times.

The court notes again that Mr. Waterhouse, when asked directly, did not recall ever requesting that the PRAs be amended in his conversations with Mr. Caruso and also failed to ever make a request to amend to Highland's new Independent Board. The Advisors do not claim to have made a request for amendment to the PRAs, despite claiming that Highland failed to negotiate in good faith when Mr. Caruso allegedly suggested the automatic stay might prevent amendments to the PRAs.

The waiver here cannot be remedied by the general non-waiver provisions in the PRAs.[115] A nonwaiver provision in a contract that purports to absolutely bar waiver in the most general of terms might be wholly ineffective and itself can be waived. *Shields Ltd. P'ship v. Bradberry*, 526

---

[115] See Section 6.02 of Pl. Exh. 6 and Pl. Exh. 8.

S.W.3d 471, 484 (Tex. 2017) (while contrarily noting that *specific* non-waiver provisions noting specific actions or inaction that will not result in waiver are wholly enforceable). Nothing in the general non-waiver provisions in the PRAs provided any specificity as to the above actions or nonactions of the Advisors regarding amendment to the PRAs that would prevent waiver.

The Advisors never exercised their rights under Sections 2.02 and 4.02 of the PRAs and, indeed, acted counter to those rights by continuing to make payments without requesting amendment to the fixed monthly amounts from the time that the PRAs were signed until November 30, 2020, while simultaneously having knowledge that many of the Dual Employees were gone. Accordingly, the court concludes that Highland has met its burden of proof that the Advisors waived any amounts of alleged overpayments that might have been properly remedied by amendment of the monthly rates under Sections 2.02 and 4.02.

     v.     *Highland's Defense to Overpayments under the Voluntary Payment Rule*

Highland also raised the voluntary payment rule as a defense to the Advisors claims of overpayments. Under the voluntary payment rule, "money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability." *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009). "The rule is a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a defendant may respond with the voluntary-payment rule as a defense." *XTO Energy Inc. v. Goodwin*, 584 S.W.3d 481, 497 (Tex. App. 2017). Highland contends that the Advisors overpayment claims under the PRAs are essentially ones for unjust enrichment and, thus, the voluntary payment rule is a proper defense to such claims.

In response, the Advisors contend that the voluntary payment rule cannot be asserted in regard to a breach of contract claim, which is what the Advisors contend they are claiming (i.e., not unjust enrichment). Texas case law cited by the Advisors states, "although the voluntary-payment rule may have been widely used by parties and some Texas courts at one time, its scope has diminished as the rule's equitable policy concerns have been addressed through statutory or other legal remedies." *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 771 (Tex. 2005). "Like other equitable claims and defenses, an adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable." *Id.* at 770. While not completely abrogated, the rule today has only "limited application in Texas jurisprudence." *Id.* at 771.

The court need not decide the scope and applicability of the voluntary payment rule to the disputes under the PRAs at this time. The court has already found and concluded that the PRAs are unambiguous and created a fixed amount payment arrangement. The court has also found and concluded that, even if the PRAs were ambiguous, the extrinsic evidence supports the interpretation that the PRAs created a fixed amount payment arrangement. Further, the court has found and concluded that, even if the PRAs were not intended to be fixed amount payment arrangements, the Advisors waived their right to modify by continuing to make payments with knowledge of terminated Dual Employees for three years.

### D. The Advisors' Claims under the SSAs

#### i. The Advisors' Claim for Breach of Contract under the SSAs

Turning to the SSAs—which were less of a focus at Trial than the PRAs—the Advisors claim that Highland breached the SSAs by failing to perform certain services owing to the Advisors, including legal and compliance services, thereunder. The Advisors contend that on or

around July 2020, Highland instructed its employees to cease providing certain services to the Advisors which Highland believed were adverse to the interests of Highland. The Advisors maintain that this forced the Advisors to retain two new employees to "cover" for such lost services, resulting in $425,000 in damages. The Advisors also contend that they were forced to pay Highland $1 million for legal services that Highland was no longer providing, resulting in $1.3 million in payments post-petition for services that Highland failed to provide. The Advisors seek damages for overpayments and breaches of the SSAs totaling $1,725,000.

As stated above, the elements of breach of contract under Texas law are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach. *Williams*, 884 F.3d at 244.

Highland argues that the Advisors have not met their burden of proving the elements of breach or damages. Highland argues that the evidence, to the contrary, shows that Highland continued to perform under the SSAs—not the least of which was the evidence of the Advisors' continuous representations to the Retail Board that the quality of services under the agreements with Highland had not deteriorated.

As discussed extensively in the court's Findings of Fact above, the Advisors made numerous repeated representations to the Retail Board that performance under the SSAs continued as normal following July 2020—despite the Advisors now alleging that legal and compliance services were withheld.

To recap, in August 2020, the Advisors represented to the Retail Board that "there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter" and that the Advisors believed "the current shared services being provided are generally consistent with the

level of services that historically have been received."[116]  In September and October 2020, the

Advisors continued their representations that shared services continued to be properly provided.

During a two-day meeting of the Retail Board, on September 16-17, 2020, the Advisors told the

Retail Board that they do "not expect that the level and quality of services would change in the

immediate term, and Mr. Norris stated he was "comfortable with the level and quality of services

being provided and has not seen any issue with the conflicts process."[117] On October 9, 2020, the

Advisors told the Retail Board there were "contingency plans" being formulated but "[i]n the

interim the plan is to continue with the existing services."[118] On October 13, 2020, Mr. Norris

represented to the Retail Board that "all operations continued in the normal course [sic] there had

been no material impact on the day-to-day operations of the Funds".[119] On October 28, 2020, the

Advisors continued to reassure the Retail Board by saying Highland and the Advisors were

working on a "seamless transition" and the "quality and level" of services had not been negatively

impacted by Highland's bankruptcy.[120] A week after that, the Retail Board was told there "has not

been any disruption to the services provided to the Funds by HCMLP pursuant to the Shared

Services Agreement".[121] The Advisors continued to communicate with the Retail Board in

December 2020 and January 2021 but never made any representation Highland had provided any

less quality or level of services than it had previously under the SSAs.

  Based on their own representations to the Retail Board, the court finds and concludes that

the Advisors have failed to meet their burden for proving the element of breach by Highland for a

lack of services provided under the SSAs.

---

[116] Pl. Ex. 59; Pl. Ex. 18.
[117] Pl. Ex. 60.
[118] Pl. Ex. 81.
[119] Pl. Ex. 61.
[120] Pl. Ex. 62.
[121] Pl. Ex. 63.

Further, based on those same representations and no other evidence showing otherwise, the Advisors did not meet their burden of showing damages as a result of the alleged breaches. The Advisors failed to show that the "loss" from employing two new employees to provide certain legal services were caused by Highland's failure to perform under the SSAs.

### ii.     The Advisors' Claim for Overpayment under the SSAs

Finally, the Advisors also have brought a claim for overpayments under the SSAs, asserting that they overpaid Highland by $1 million for legal services that Highland stopped providing. This claim, like the Advisors' breach of contract claim, relies on the court concluding that the Advisors have satisfied their burden of showing Highland did not perform under the SSAs. Relying on the analysis above, the court concludes that the Advisors have not satisfied their burden of showing Highland failed to provide any services contracted for under the SSAs and, thus, cannot succeed on their claim for overpayment.

### iii.     Highland's Waiver Defense to the Advisors' Claims under the SSAs

If the court were to find that Highland had breached the SSAs, Highland alternatively pleaded the defense of waiver, similar as it did with regard to the Advisors' claims under the PRAs.

The elements of waiver, again, include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right (which can be inferred from the conduct). *Sedona Contracting, Inc.*, 995 S.W.2d at 195.

The Advisors don't dispute that they signed the SSAs and were aware of the terms of the SSAs.

Again, similar to waiver under the PRAs, the third element requires the most analysis here. The Advisors have admitted that Mr. Waterhouse oversaw and authorized all payments made

under the SSAs. The Advisors never made objections to making such payments under the SSAs as they were making them. Further, the Advisors never raised any objection to the payments with Highland to put them on notice. In fact, quite the opposite, the Advisors made representations to the Retail Board, detailed above, that everything was running smoothly with regard to the services provided under the SSAs. The Advisors knowingly and intentionally made payments every month under the SSAs until November 30, 2020 but decided not to raise the issue at any point with Highland until they stopped paying under the SSAs.

The Advisors' conduct is inconsistent with asserting rights under the SSA. The Advisors hired two new employees to perform certain services under the SSAs, allegedly indicating that they thought the SSAs were being breached. Yet, the Advisors continued authorizing the same payments to Highland. The Advisors did not tell Highland that it believed required services were not being provided and did not assert an administrative expense claim at the time.

If silence were not enough, as detailed above, the Advisors made numerous representations to the Retail Board after the supposed breach that everything was operating as normal under the SSAs, and Highland's service were of the same "quality and level" as always.

The Advisors conducted themselves intentionally in a manner inconsistent with asserting their claims of breach of the SSAs. Accordingly, the court concludes the Advisors have waived their claims resulting from the payments under the SSAs.

     D.    <u>Highlands' Breach of Contract Claims Relating to All Four Agreements</u>

Finally, Highland has claimed breaches of contract by the Advisors under all four of the Agreements due to nonpayment under each Agreement for certain months, starting in November

2020. The months in which Highland claims nonpayment are as follows:

| Agreement | Months of Nonpayment | Amounts Unpaid |
|---|---|---|
| *HCMFA SSA* | November 2020, December 2020, and January 2021 | $924,000[122] |
| *HCMFA PRA* | December 2020 and January 2021 | $832,000 ($416,000/month) |
| *NexPoint SSA* | December 2020 and January 2021 | $336,000 ($168,000/month) |
| *NexPoint PRA* | December 2020 and January 2021 | $504,000 ($252,000/month) |

Highland also sought damages relating to the nonpayment of fees under its Shared Service Agreement with NREA. NREA is a wholly owned subsidiary of NexPoint. The SSA with NREA apparently had a monthly fee of $80,000 every month, the payment on which also ceased in November 2020. While there was evidence to support this arrangement existed (for example, Mr. Waterhouse confirmed there was an SSA between Highland and NREA),[123] the NREA SSA itself was not submitted into evidence and NREA is not listed as a defendant to this Adversary Proceeding. The court concludes that, even though NREA is apparently a subsidiary of NexPoint, no sufficient theory of liability has been argued as to why NexPoint should be held liable for an agreement Highland made with NREA. As such, the court will not grant relief related to the alleged NREA SSA in connection with this Trial.

The burden of proving the elements of breach of contract for its claims asserted now switches to Highland. As stated above, the elements are: (1) the existence of a valid contract; (2)

---

[122] The HCMFA SSA was the one and only agreement with a variable fee arrangement. Highland made this calculation by taking the most recent payment due in November of $308,000 and multiplying that number by three for the three months of nonpayment.
[123] Tr. Transcript 4/12/22, Part 2 of 2, at 70:6-17 [DE # 113}.

performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach. *Williams*, 884 F.3d at 244 (internal citations omitted).

Element one is quickly satisfied as neither party disputes the existence of valid contracts here.

The court relies on its Findings of Facts and previous Conclusions of Law to satisfy element two. As stated by the court above, the PRAs unambiguously established a fixed payment arrangement that was not variable based on the termination of certain Dual Employees. The remaining Dual Employees continued to provide front-office services and, thus, Highland performed under the PRAs. Further, Highland clearly performed under the SSAs at all times according to the Advisors' own representations to the third-party Retail Board that Highland was sufficiently performing at all times. The representations were constant and continued from July 2020 through early 2021, the entire period in which the Advisors now claim legal and compliance services were not being provided.

The third element is uncontested. The Advisors do not contest that they stopped making payments under all of the Agreements in November 2020 at the direction of Mr. Dondero.

The last element, damages, is also present and easily calculable. The nonpayment by the Advisors establishes Highland's alleged compensatory damages. Highland's damages are: (a) the amounts that were not paid in December 2020 and January 2021 under all four Agreement, plus for November 2020 in the case of the HCMFA SSA.

The court concludes that Highland has met its burden on breach of contract by the Advisors on each of the Agreements due to their nonpayment of amounts required.

E.    Do Equities Matter at All Here?

This court often states that "facts matter".  Occasionally, facts suggest a certain equitable result contrary to what the law requires. This can sometimes make a court wrestle with a result. Are the Advisors being treated inequitably or unfairly here—by having to pay a fixed amount under the PRAs when the number of employees at Highland dropped precipitously during the term of the PRAs?

Putting aside for a moment the fact that the Advisors had a right to seek modification of the PRAs—a fact about which they profess confusion, because of the Bankruptcy Code's automatic stay—here are a few facts that detract from any equitable arguments that the Advisors might have.

First, prior to 2018—for six years—Highland provided "front-office" sub-advisory services to the Advisors for free.  *For free*. Perhaps this is the real reason why folks were not too worried about potential overpayments under the new PRAs that were executed in May 2018—at least not until the Advisors and Highland began their corporate divorce. Sounds like the Advisors had been getting a windfall.

Additionally, Mr. Seery credibly testified (and no one ever disagreed) that the SSAs (in contrast to the PRAs) were *money-losers* for Highland.  The SSAs were unprofitable for Highland. If the PRAs were profitable, well, that arguably balanced things out a bit.

The fact is that the Agreements were not arms-length agreements, and this cannot be overlooked here. They were intercompany agreements—i.e., entered into between parties that were friendly and affiliated, back at their time of execution. The arrangements were all about the perceived needs of the Highland complex at a time when there was no bankruptcy. The evidence

suggests that everyone was just fine with the agreements for years. But the parties are now hostile and disagree on just about everything.

The fact is that the Agreements, by their terms, could have been renegotiated or terminated by either party during the bankruptcy case. But the Advisors would have had to file a motion to lift stay and ask court permission. This would not necessarily have been a good strategy for them, because the Advisors and Mr. Dondero thought/hoped he might gain back control of Highland eventually (and, therefore, would have the whole complex back under his control). Thus, it might not make sense to change the status quo on the Agreements. In any event, in such a scenario. the court might have denied relief from the stay (depending on the merits of arguments made). Or, the court might have granted relief to the Advisors, in which case Highland might have decided it had to abruptly liquidate—due to a loss of a steady cash stream—which might have caused an abrupt departure of employees or, at best, an abrupt transition of employees away from Highland to the Advisors or an entity with whom the Advisors would contract (such as Skyview). This abrupt transition might not have been pretty.

Equities? Ultimately, the court has interpreted the contracts here (and other evidence—in case the Agreements should be construed as ambiguous) as it thinks is required. But again, these were not arms-length contracts. They were contracts among insiders, made at a time when everyone was friendly. Made at a time when Highland needed cash, and at a time when Highland had been providing *free* front-office services to the Advisors for years. Free services when—meanwhile--the Advisors were parties to investment contracts with Retail Funds, whereby the Advisors were no doubt earning many millions of dollars of fees therefrom for themselves (considering that they were managing many billions of dollars of assets). If equities matter at all here, the result reached here seems entirely fair.

## IV.     DAMAGES COMPUTATION FOR JUDGMENT

The court will grant damages in favor of Highland of: (i) $924,000 for unpaid fees under the HCMFA SSA for November 2020, December 2020, and January 2021; (ii) $832,000 for unpaid amounts under the HCMFA PRA for December 2020 and January 2021; (iii) $336,000 for unpaid fees under the NexPoint SSA for December 2020 and January 2021; and (iv) $504,000 for unpaid amounts under the NexPoint PRA for December 2020 and January 2021.

All relief requested by the Advisors for administrative expense claims for (i) alleged overpayments and (2) alleged breaches of contract by Highland under the Agreements are ***denied***.

Additionally, Highland has asserted that it is entitled to costs and expenses, including attorneys' fees, in connection with prosecuting its claims and defenses against the Advisors. No evidence was presented on the shifting of expenses, including attorney's fees. The parties agreed in their Joint Pretrial Order that "[t]he quantification of any attorney's fees awarded in this Adversary Proceeding, subject to defenses, will be handled through post-trial motion practice under Rule 54(d)(2), and no Party need present evidence on any attorney fee claim at the trial of this Adversary Proceeding."[124] Accordingly, Highland may file its post-trial motion forthwith. Unless the parties otherwise agree, Highland's post-trial motion for fees, costs, and expenses is due within 21 days of entry of these Findings of Fact and Conclusions of Law; with a Responses of the Advisors due 21 days thereafter, and any reply do 10 days thereafter. The parties may seek a hearing thereafter.

### # # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # #

---

[124] DE # 96 in the AP at p. 16.